UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------x
JONATHAN JUNG,

              Plaintiff,

                               :    05-CV-4286 (MBM)

- against -

                               :    ECF Case

SKADDEN, ARPS, SLATE, MEAGHER &
FLOM, LLP and SUSAN DORNFELD,       :

              Defendants.   :
---------------------------------x


**COMPENDIUM OF UNREPORTED CASES
CITED IN DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION TO DISMISS THE FIRST, THIRD, FOURTH
AND SIXTH CAUSES OF ACTION IN PLAINTIFF'S COMPLAINT**


SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ATTORNEYS FOR DEFENDANTS
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP
AND SUSAN DORNFELD

FOUR TIMES SQUARE

BOROUGH OF MANHATTAN

CITY OF NEW YORK

NEW YORK 10036-6522

(212) 735-3000

# COMPENDIUM TABLE OF CONTENTS

**TAB**

<u>Alexander v. Burke Rehab. Ctr.</u>, No. 92 Civ. 6574, 1995 WL 293963 (S.D.N.Y. May 15, 1995)......................................................................................................A

<u>Casper v. Lew Lieberbaum & Co., Inc.</u>, No. 97 Civ. 3016, 1998 WL 150993 (S.D.N.Y. Mar. 31, 1998) ..................................................................................B

<u>Duffy v. Drake Beam Morin, Harcourt General, Inc.</u>, No. 96 Civ. 5606, 1998 WL 252063 (S.D.N.Y. May 19, 1998).............................................................C

<u>Harrison v. New York City Admin. for Children's Service</u>, No. 02 Civ. 0947, 2003 WL 21640381 (S.D.N.Y. July 7, 2003) ..................................................D

<u>Lightfoot v. Union Carbide Corp.</u>, No. 92 Civ. 6311, 1994 WL 184670 (S.D.N.Y. May 12, 1994)...................................................................................E

<u>Lucas v. Pathfinder's Personnel, Inc.</u>, No. 01 Civ. 2252, 2002 WL 986641 (S.D.N.Y. May 13, 2002)....................................................................................F

<u>Ruiz v. New York City Fire Department</u>, No. 00 CIV. 4371, 2001 WL 767009 (S.D.N.Y. July 9, 2001) ........................................................................G

<u>Toolan v. Board of Education of the City of New York</u>, No. 02 Civ. 6989, 03 Civ. 576, 2003 WL 22015437 (S.D.N.Y. Aug. 25, 2003).........................................H

# TAB A

Not Reported in F.Supp. Page 1

1995 WL 293963 (S.D.N.Y.)

(Cite as: 1995 WL 293963 (S.D.N.Y.))

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Christina L. ALEXANDER, Plaintiff,
v.
BURKE REHABILITATION CENTER, Defendant.
No. 92 Civ. 6574 (PKL).

May 15, 1995.
Christina L. Alexander, Bronx, NY.

Barbara Hoey, Kelley Drye & Warren, New York City.

*MEMORANDUM ORDER*

LEISURE, District Judge:

*1 This action alleges employment discrimination on the basis of race, color, national origin, gender, and age. Plaintiff is Christina L. Alexander ("Alexander"). She is proceeding *pro se.* [FN1] Defendant is the Winifred Masterson Burke Rehabilitation Hospital ("Burke"). Alexander is a black female of Caribbean ancestry. She began working for Burke in April 1984, when she was 41 years old, as Assistant Director of Burke's Pharmacy Department (the "Pharmacy"). In July 1988, Peter Mantegazza ("Mantegazza"), who was then Burke's Associate Executive Director, appointed Alexander Acting Director of the Pharmacy. In March 1989, Mantegazza promoted Alexander to Supervising Pharmacist and Director of the Pharmacy. In September 1990, however, Mantegazza fired Alexander, asserting that her performance as Supervising Pharmacist and Director of the Pharmacy was unsatisfactory.

Alexander alleges that Mantegazza fired her because of her race, color, national origin, and gender, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-5 ("Title VII"), and because of her age, in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* (the "ADEA").

Burke has moved for summary judgement on Alexander's Title VII and ADEA claims. For the reasons stated below, Burke's motion is granted in its entirety.

BACKGROUND
Alexander worked as Assistant Director of the Pharmacy for approximately four years, from April 1984 to July 1988. During this period, she reported to Pompeo DiPonte ("DiPonte"), who was then Burke's Supervising Pharmacist and Director of the Pharmacy. Alexander received salary increases during each year of her tenure as Assistant Director. *See* Plaintiff Affidavit ("Alex. Aff.") at ¶ 7. In this capacity, Alexander did not have substantial management or administrative responsibilities. *See* Deposition of Christina L. Alexander ("Alex. Dep.") at 84-98.

In July 1988, DiPonte went on medical leave of absence, and Mantegazza appointed Alexander Acting Director of the Pharmacy. In conjunction with this appointment, Alexander received a 10 percent salary increase. Alexander asserts that the 10 percent salary increase was in consideration of additional workload associated with her appointment, rather than increased responsibility, *see* Alex. Aff. at ¶ 10; she argues that she continued to report to DiPonte, who continued to supervise and direct the Pharmacy from his home (allegedly in violation of New York law), *see, e.g.,* Alex. Aff. at ¶¶ 9-11; Alex. Dep. at 102 (Alexander: DiPonte "was home ill and giving orders, and retained his title as director of pharmacy until he closed his eyes."). [FN2]

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DiPonte died in late February 1989; and in March 1989, Mantegazza promoted Alexander to Supervising Pharmacist and Director of the Pharmacy. In conjunction with this promotion, Alexander received a 12 percent salary increase. [FN3] There is no dispute that, as Director of the Pharmacy, Alexander had substantial management and administrative responsibilities. *See, e.g.,* Alex. Aff., Exhibit 22 (Job Description for Director of Pharmacy: "12. Prepares Budget. 13. Establishes and maintains system of records and bookkeeping in accordance with hospital policy for recording patients' charges."); Alex. Dep. at 170.

*2 In July 1989, approximately four months after Alexander became Supervising Pharmacist and Director of the Pharmacy, an internal audit determined that there existed at the Pharmacy a large backlog of unprocessed medication administration records ("MARs" or "charge tickets," *see* Alex. Dep. at 293). [FN4] An MAR memorializes a Burke patient's receipt of medication, and a Burke patient is not billed for an administration of medication until the corresponding MAR is processed. The internal auditor's report indicated, in relevant part:

> The gross margin for the Pharmacy Department has dropped.... Reasons for the drop ... include unprocessed charges from early 1988 still not recorded.... During 1989 an intern has been working about 2 hours a night helping to process some of the many Pharmacy documents which were never priced and submitted to the Data Processing Department during 1988. Current year charges are being processed on a timely basis. During the Test of Charges audit I noted that there were $16,332 of Pharmacy Charges for April processed in May. I tested March during the Pharmacy audit, and scanned records from January through May for late charges. I noted late charges for January processed in February which totalled $5,264. I did not note any other significant instances of late charges in 1989.

Alex. Aff., Exhibit 25, at 2. Mantegazza spoke to Alexander about the MAR backlog after the auditor's report was issued. Alex. Dep. at 272. He was displeased about the backlog and wanted it cleared up as soon as possible. *Id.* at 273. He permitted Alexander to hire additional clerical help during the summer of 1989. *Id.* During the months that followed, until May 1990, Alexander told Mantegazza that she was "getting it under control, bit by bit," *id.,* so that he "would have been led to believe" that she was "dealing with the backlog," *id.* at 273-74.

In May 1990, however, Mantegazza became aware that the backlog situation was not as he had been led to believe, Affidavit of Peter Mantegazza ("Mant. Aff.") at ¶ 18, and he met with Alexander to discuss the situation, *see* Alex. Dep. at 292. Mantegazza then wrote a memorandum to Alexander, dated May 10, 1990, *see* Affidavit of Maureen Carr ("Carr Aff."), Exhibit 6 (the "May 10, 1990 Memo"); Alex. Dep. at 292-93, which Alexander received, *id.* at 292. The May 10, 1990 Memo provides:

> I am writing to formally follow-up on our meeting this morning. Evidently, the Pharmacy has not been processing charge tickets on a timely basis. This recurrent problem has been discussed with you on several occasions by myself as well as representatives from the Finance Department. You gave me the impression during our conversations that you were fairly up to date in this area. However, the charge tickets which have been submitted to Data Processing recently represent charges for patients who were discharged months ago.
> You informed me this morning that there is still a considerable backlog of Pharmacy charges which have not been processed. As a member of management it is important for you to keep me informed of any difficulties you are experiencing in handling these administrative matters. You should be more proactive in bringing problems to my attention for possible solutions, as opposed to allowing me to discover deficiencies in the operation of the Pharmacy Department.
> *3 You indicated that the backlog could be cleared up within the next three weeks. As the census for the past few months has been low and is not likely to peak in the coming weeks, this would be a good time for you to concentrate your efforts on these administrative matters. I will approve reasonable overtime requests as well as

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

> some per diem help which will allow you to bring the charges up to date.
> As we agreed this morning, the entire backlog must be cleared by a June 15th deadline. You believed that this time frame was reasonable and I expect that from that point on you will stay on top of things.
> I remain available to discuss any problems you are experiencing in meeting this goal.

May 10, 1990 Memo; *see also* Alex. Dep. at 292-95. Alexander did not clear up the backlog by June 15, 1990. Alex. Dep. at 296. [FN5]

Mantegazza evaluated Alexander's performance in June 1990, memorializing the evaluation in a memorandum dated June 28, 1990, *see* Carr Aff., Exhibit 7 (the "June 1990 Performance Appraisal"), which Alexander received, *see, e.g.,* Alex. Dep. at 137. There, Mantegazza wrote, *inter alia:*

> You are a hard worker and an enthusiastic employee. These traits are recognized and certainly appreciated. Unfortunately your efforts have not yielded entirely positive results.
> You have not managed your fiscal responsibilities well. Specifically, there have been repeated problems encountered regarding your department's timely processing of charge tickets. This has been brought to your attention on many occasions. You have not attempted to address this problem proactively in that you have never brought it to my attention or sought assistance and advice....

June 1990 Performance Appraisal at 1. The June 1990 Performance Appraisal further recounted Alexander's failure substantially to comply with a request that Mantegazza made of her at their May 10, 1990 meeting, that she provide him with "written weekly updates regarding the progress of cleaning up the backlog." *Id.* at 2; *see also* Alex. Dep. at 297-98 (acknowledging that she submitted two such updates, on approximately May 21 and June 13, as described in the June 1990 Performance Appraisal, at 2). [FN6] Alexander received a 7.5 percent salary increase, effective June 24, 1990. *See* Alex. Aff. at ¶ 7, Exhibit 14.

The June 1990 Performance Appraisal also related that Alexander had "recently alluded to an increased work load which has resulted from regulatory and accreditation agencies' demands." June 1990 Performance Appraisal at 2. In early July 1990, Alexander agreed to present to Mantegazza a report supporting her assertion that the Pharmacy's workload had increased (the "Workload Survey"). *See* Carr Aff., Exhibit 8, at 1; Alex. Dep. at 410-12; *compare* Burke's 3(g) Statement at ¶ 23 *with* Plaintiff's 3(g) Statement at ¶ 23. They scheduled a meeting, for August 14, 1990, to discuss the Workload Survey; Mantegazza later rescheduled this meeting to August 23, 1990. *See* Alex. Aff. at ¶ 20; Mant. Aff. at ¶ 27. On the morning of August 23, however, to Mantegazza's chagrin, Alexander cancelled the meeting, stating that the Pharmacy was shortstaffed that day; she did not present him with the Workload Survey. *See* Alex. Dep. at 412; Carr Aff., Exhibit 8, at 1; Mant. Aff. at ¶ 31; *compare* Burke's 3(g) Statement at ¶ 25 *with* Plaintiff's 3(g) Statement at ¶ 25 ("Date due of this survey/report to Mr. Mantegazza was postponed to the end of August based on its completion.").

*4 Between August 14 and August 23, 1990, Alexander submitted to Mantegazza a draft budget proposal for the Pharmacy. As explained in an August 23, 1990 memorandum from Mantegazza to Alexander, which Alexander received, *see* Alex. Dep. at 423-24, Mantegazza found Alexander's draft budget proposal deficient in several respects. *See* Carr Aff., Exhibit 8 (the "August 1990 Memo"), at 2; Mant. Aff. at ¶¶ 28-30. [FN7] Mantegazza returned the draft to Alexander for revision, accompanied by portions of another department's budget to serve as an example. *See* Alex. Dep. 448-49.

On August 28, 1990, Mantegazza and Alexander met to discuss Alexander's budget proposal and overall work performance. *Id.* at 421. At this meeting, Alexander submitted to Mantegazza the Workload Survey she had previously agreed to provide. *Id.* at 421-22. However, as Alexander acknowledged at a later meeting with Mantegazza and Maureen Carr ("Carr"), Burke's Assistant Administrator for Human Resources, the Workload Survey contained significant errors. *See, e.g., id.* at 465-68.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Shortly thereafter, Alexander went on vacation for approximately two weeks, returning September 17, 1990. *See* Alex. Dep. at 468-69. Mantegazza had informed Alexander, in the June 1990 Performance Appraisal, that he would be reevaluating her performance in three months -- in September 1990. *See* June 1990 Performance Appraisal, at 3; Alex. Dep. at 468-69. On September 18, 1990, Alexander received a memorandum from Mantegazza, memorializing this reevaluation. *See* Carr Aff., Exhibit 9, at 1-2 (the "September 1990 Performance Appraisal"); Alex. Dep. at 492. The September 1990 Performance Appraisal stated, *inter alia:*

> I have always found you to be a pleasant and enthusiastic employee.... [[[However,] [s]ince May, when we began meeting more regularly, at my request, you have not demonstrated your ability to function effectively as a department head.... I cannot allow a key department to function under an ineffective manager for the reasons stated in this correspondence and the three previous memos.

September 1990 Performance Appraisal, at 2. Later on September 18, 1990, Mantegazza met with Alexander in person. *See* Alex. Dep. at 492. He asked for her resignation, but she declined to give it. Mantegazza then fired Alexander, and later that day, he sent her a brief memorandum, stating that her employment at Burke was terminated, effective immediately. *See id.* at 492-95; Carr Aff., Exhibit 9, at 3. Alexander avers that, sometime on May 18, 1990, Mantegazza offered her one month's pay in exchange for a letter signed by Alexander, promising not to sue Burke. *See* Alex. Aff. at ¶ 21. Alexander was 47 years old at the time of her discharge. *See* Alex. Dep. at 72 (Alexander was born December 25, 1942.).

On October 16, 1990, Thomas Grandville ("Grandville"), a younger white male of Italian ancestry, was promoted to Supervising Pharmacist and Director of the Pharmacy. Grandville had served as Staff Pharmacist and Assistant Director of the Pharmacy under Alexander, and after Alexander was terminated, as Acting Director. Alexander acknowledged at her deposition that, in her July 1988 performance exaluation for Grandville, she noted no deficiencies or problems with his performance as Staff Pharmacist, and found his work "competent" and "professional." *See* Alex. Dep. at 235-38. Alexander similarly acknowledged that in her April 1990 performance evaluation for Grandville, she noted no deficiencies or problems with his performance as Assistant Director; Alexander "was very pleased with him." *Id.* at 239. Alexander avers, however, that, "on or about 1990 or 1991," two of Burke's formal requirements for the position of Supervising Pharmacist and Director of the Pharmacy were reduced so that Grandville would qualify for the position: years in practice were reduced from 5 years to 3, and years in supervisory capacity were reduced from 3 years to 1. Alexander further avers that Grandville and DiPonte each earned higher salaries than she did, as Director of the Pharmacy. *See* Alex. Aff. at ¶ 22. [FN8]

*5 On or about January 9, 1991, Alexander filed charges against Burke with both the New York State Division of Human Rights ("NYSDHR") and the EEOC. *See* Plaintiff's Complaint, Hoey Affidavit ("Hoey Aff."), Exhibit C, at ¶¶ 6-7. On January 10, 1992, the NYSDHR issued a determination that there was "no probable cause to believe that the said respondent has engaged in ... the unlawful discriminatory practice complained of." *See* Determination and Order After Investigation, Hoey Affidavit, Exhibit B. On June 2, 1992, EEOC determined that the relevant statutes had not been violated. On June 3, 1992, Alexander received a Notice of Right to Sue Letter from the EEOC. *See* Plaintiff's Complaint, Hoey Aff., Exhibit C, at ¶ 8.

Alexander filed this action on September 3, 1992, some 92 days after she received the Notice of Right to Sue Letter. This Court referred the action to the Honorable Theodore H. Katz, United States Magistrate Judge for the Southern District of New York to supervise discovery and to prepare a report and recommendation on Burke's dispositive motion. Judge Katz recommended that Alexander's Title VII claims be dismissed as time-barred and that summary judgment be granted in favor of Burke on Alexander's ADEA claim. This Court now considers Burke's motion *de novo.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

DISCUSSION

"Summary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir. 1993). In deciding the motion, "the court is required to draw all factual inferences in favor of the party against whom summary judgment is sought." *Balderman v. U.S. Veterans Administration,* 870 F.2d 57, 60 (2d Cir. 1989).

The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion" and identifying the materials in the record that "it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Once a motion for summary judgment is properly made and supported, however, the burden shifts to the nonmoving party to "'set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).

In an employment discrimination case alleging disparate-treatment, "summary judgment is proper only if the evidence of discriminatory intent is so slight that no rational jury could find in plaintiff's favor." *Viola v. Philips Medical Sys. of North America,* 42 F.3d 712, 716 (2d Cir. 1994) (citing *Gallo v. Prudential Residential Services L.P.,* 22 F.3d 1219, 1224 (2d Cir. 1994)). However, "[t]he ... impression that summary judgment is unavailable to defendants in discrimination cases is unsupportable." *McLee v. Chrysler Corp.,* 38 F.3d 67, 68 (2d Cir. 1994).

A. Alexander's Title VII Claims.

*6 "As a general matter, Title VII provides that if the EEOC dismisses a charge, or if it fails to file a civil action or enter into a conciliation agreement within the applicable time limitations, it 'shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge.'" *South v. Saab Cars USA,* 28 F.3d 9, 11 (2d Cir. 1994) (quoting 42 U.S.C. § 2000e-5(f)(1)). There is no dispute that Alexander filed her complaint more than 90 days after she received her Notice of Right to Sue. Alexander explains that she believed that Saturdays, Sundays, and holidays were excluded for purposes of calculating the limitations period and that she filed her complaint within the limitations period as she erroneously calculated it. She argues that the statute of limitations should be equitably tolled because she is proceeding *pro se,* she made an honest mistake, and Burke has not demonstrated prejudice.

"While the 90-day rule is not a jurisdictional predicate, 'in the absence of a recognized equitable consideration, the court cannot extend the limitations period by even one day.'" *Johnson v. Al Tech Specialties Steel Corp.,* 731 F.2d 143, 146 (2d Cir. 1984) (quoting *Rice v. New England College,* 676 F.2d 9, 11 (1st Cir. 1982)). This is not a case "where the claimant has actively pursued [her] judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass." *Irwin v. Department of Veterans Affairs,* 498 U.S. 89, 96 (1990). Nor is it a case:

where the court has led the plaintiff to believe that she had done all that was required of her ... where affirmative misconduct on the part of the defendant may have lulled plaintiff into inaction ... where the claimant has received inadequate notice ... [or] where a motion for the appointment of counsel is pending.

*Saab,* 28 F.3d at 11-12 (citations omitted). Rather, the circumstances of Alexander's untimely filing amount to "at best a garden variety case of excusable neglect," insufficient to justify equitable tolling. *See Irwin,* 498 U.S. at 96; *Saab,* 28 F.3d at 12. Moreover:

Although absence of prejudice is a factor to be considered in determining whether the doctrine of equitable tolling should apply once a factor that might justify such tolling is identified, it is not an independent basis for invoking the doctrine and sanctioning deviations from established procedures.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Procedural requirements established by Congress for gaining access to the federal courts are not to be disregarded by courts out of a vague sympathy for particular litigants.... In the long run, experience teaches that strict adherence to the procedural requirements specified by the legislature is the best guarantee of evenhanded administration of the law.

*7 *Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 152 (1984) (citation and internal quotation marks omitted).

The Court therefore grants summary judgment in favor of Burke on Alexander's Title VII claims. [FN9]

B. Alexander's ADEA Claim.

Alexander's age discrimination claim is founded solely on circumstantial evidence. *Compare* Burke's 3(g) Statement, at ¶ 30 *with* Plaintiff's 3(g) Statement, at ¶ 30. As a result, the Court "employ[s] the familiar three-step burden shifting analysis developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-04 (1973) and *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 252-53 (1981)." *Gallo,* 22 F.3d at 1224 (citations omitted). "Although the burden shifting [analysis] set forth in *McDonnell Douglas* arose and was refined in the context of employment discrimination under Title VII ... the same methodology [is utilized] in the ADEA context." *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1112 (2d Cir. 1988) (citations omitted).

"In order to establish a prima facie case of age discrimination under the standard enunciated in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), a plaintiff must show (1) that he was within the protected age group, (2) that he was qualified for the position, (3) that he was discharged, and (4) that the discharge occurred under circumstances giving rise to an inference of age discrimination." *Woroski v. Nashua Corp.,* 31 F.3d 105, 108 (2d Cir. 1994) (citations and internal quotation marks omitted); *see Meiri v. Dacon,* 759 F.2d 989, 995 (2d Cir. 1985) (stating second element of *prima facie* case of discriminatory discharge case as whether plaintiff's "performance was satisfactory" -- whether plaintiff's performance "meets his employer's legitimate expectations") (citations and internal quotation marks omitted). "The nature of the plaintiff's burden of proof at the prima facie stage is *de minimus.*" *Dister v. Continental Group,* 859 F.2d 1108, 1114 (2d Cir. 1988) (emphasis in original); *Woroski,* 31 F.3d at 109 (The "burden on the plaintiff to make out a prima facie case is a modest one.").

"Once the plaintiff has made out a prima facie case, the employer is required to offer a legitimate, non-discriminatory business rationale for its actions. If the employer articulates such a reason, the plaintiff has the burden of proving that [her] age was the real reason for the discharge." *Woroski,* 31 F.3d at 108 (citing *Spence v. Maryland Cas. Co.,* 995 F.2d 1147, 1155; *Maresco v. Evans Chemetics,* 964 F.2d 106, 110 (2d Cir. 1992)). As the Supreme Court has emphasized, "a reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason." *St. Mary's Honor Ctr. v. Hicks,* 113 S. Ct. 2742, 2752 (1993) (emphasis in original); *see also Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 142 (2d Cir. 1993) ("[A] Title VII plaintiff does not necessarily meet its burden of persuasion by convincing the factfinder that the employer's non-discriminatory explanation is not credible; rather, the trier of fact must find that the plaintiff has proven its explanation of discriminatory intent by a fair preponderance of the evidence."), *cert. denied,* 114 S. Ct. 1189 (1994). "What this means in the summary judgment context is that the plaintiff must establish a genuine issue of material fact either through direct, statistical or circumstantial evidence as to whether the employer's reason for discharging her is false and as to whether it is more likely that a discriminatory reason motivated the employer to make the adverse employment decision." *Gallo,* 22 F.3d at 1225 (citations omitted).

*8 Applying these principles to the record, viewed in the light most favorable to Alexander, she cannot survive Burke's summary judgment motion. She has failed to adduce evidence from which the trier of

fact could reasonably conclude that she has established the elements of a *prima facie* case; and, in any event, she has failed to adduce evidence from which the trier of fact could reasonably conclude that Burke's legitimate nondiscriminatory reasons for firing her were a pretext for age discrimination.

1. Prima Facie Case.

There is no dispute that Alexander was discharged. Nor is there any dispute that, at the time of her discharge, Alexander was 47 years old and thus a member of the protected age group. Moreover, Burke's strenuous argument to the contrary notwithstanding, the Court assumes *arguendo* that the trier of fact could reasonably infer that age animus played a role in Alexander's discharge. Alexander has therefore established the first, third and fourth elements of a *prima facie* case of age discrimination under the *McDonnell Douglas* standard. Nevertheless, as Burke argues, Alexander has failed to establish the second element of a *prima case* of discriminatory discharge, because the trier of fact could not reasonably conclude that Alexander performed satisfactorily as Director of the Pharmacy.

Alexander became Supervising Pharmacist and Director of the Pharmacy in March 1989, and as Director, her responsibilities included preparing a budget and establishing and maintaining a system of records and bookkeeping in accordance with hospital policy for resording patients' charges. Alexander failed to meet Mantegazza's legitimate expectations in these regards. With respect to the system of records and bookkeeping, an internal audit, conducted in July 1989, four months after Alexander became Supervising Pharmacist and Director, determined that there existed at the Pharmacy a large backlog of MARs. Mantegazza apprised Alexander that he was displeased about this backlog and that he wanted it cleared up as soon as possible. To this end, he authorized Alexander to hire additional clerical help. Nevertheless, some ten months later, in May 1990, Alexander had failed substantially to rectify the MAR backlog, although, in the interim, she had led Mantegazza to believe that she had been dealing with the problem. Alexander also failed to meet the June 15, 1990 deadline for clearing up the backlog, which she and Mantegazza established at their May 10, 1990 meeting, and she failed substantially to comply with Mantegazza's request that she provide him with written weekly updates concerning the backlog. Mantegazza documented these performance deficiencies and apprised Alexander of them, in no uncertain terms, in the May 10, 1990 Memo and the June 1990 Performance Appraisal.

With respect to budget preparation, Alexander's draft budget proposal, which she submitted between August 14, and August 23, 1990, contained calculation errors and included significant monetary requests that were not adequately substantiated by supporting documentation. For example, Alexander's submission included a request for an additional staff pharmacist; as presented by Alexander, this request was to be supported by the Workload Survey, which Alexander did not submit contemporaneously with the draft budget proposal, and which, when later submitted, contained significant errors. Alexander's draft budget proposal also included a request for $132,750 more drug expenses in 1991, amounting to a 54 percent increase, yet this request was not supported by any explanation. Mantegazza documented most of these deficiencies in the August 1990 Memo and apprised Alexander of all of them through the August 1990 Memo and a subsequent meeting among Mantegazza, Alexander, and Carr.

*9 The only evidence Alexander has identified in support of a conclusion that she was performing satisfactorily is that she received a salary increase of 7.5 percent, in July 1990. However, Alexander has not invited the Court's attention to any evidence that her salary increase was merit based, and the Court's independent review of the record has discovered none. Moreover, Alexander received this salary increase before the inadequacy of her budget preparation skills became manifest, in August 1990. Viewing the record in the light most favorable to Alexander, the Court finds that the trier of fact could not reasonably conclude that Alexander performed satisfactorily as Director of the Pharmacy.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2. Legitimate Non-Discriminatory Reasons and Absence of Pretext.

If Alexander had established a *prima facie* case of age discrimination, Burke would still be entitled to summary judgment on Alexander's ADEA claim, because Alexander's performance deficiencies as Director of the Pharmacy are legitimate non-discriminatory reasons for her discharge as to which there is no genuine issue; and, in any event, "the evidence of discriminatory intent is so slight that no rational jury could find in plaintiff's favor." *Viola,* 42 F.3d at 716 (citing *Gallo,* 22 F.3d at 1224); *see generally St. Mary's Honor Ctr.,* 113 S. Ct. at 2752 ("[A] reason cannot be proved to be 'a pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.") (emphasis in original).

Alexander was a member of the protected age group when she started working at Burke in 1984, and she was thus necessarily a member of the protected age group when Mantegazza appointed her Acting Director in July 1988 and when he promoted her to Supervising Pharmacist and Director in March 1989. Alexander has failed to explain why Mantegazza would develop an aversion to older people less than two and a half years after he appointed her Acting Director and one and a half years after he promoted her to Supervising Pharmacist and Director. *See LeBlanc v. Great American Ins. Co.,* 6 F.3d 836, 847 (1st Cir. 1993), *cert. denied,* 114 S.Ct. 1398 (1994); *Lowe v. J.B. Hunt Transp., Inc.,* 963 F.2d 173, 175 (8th Cir. 1992); *Proud v. Stone,* 945 F.2d 796, 797 (4th Cir. 1991) ("[I]n cases where the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer.").

Alexander argues, nevertheless, that she was replaced by Grandville, who is younger than she is, and she avers that "on or about 1990 or 1991," two of Burke's formal requirements for the position of Supervising Pharmacist and Director of the Pharmacy were reduced so that Grandville would qualify for the position: years in practice were reduced from 5 years to 3, and years in supervisory capacity were reduced from 3 years to 1. However, Alexander herself found no deficiencies in Grandville's performance when she evaluated him in his capacities as Staff Pharmacist and Assistant Director; in her words, she "was very pleased with him," *id.* at 239. Moreover, Burke's reduction of the years-in-practice and years-in-supervisory-capacity requirements to accommodate Grandville is not a sound basis upon which to infer that Alexander's discharge was discriminatory, because neither of these was a job requirement that Burke discharged Alexander for failing to satisfy. [FN10]

*10 Alexander further argues that Grandville served as Acting Director for only one month before becoming Director, while she served as Acting Director for eight months before becoming Director. But in so arguing, Alexander forgets her factual contention that DiPonte "was home ill and giving orders, *and retained his title as director of pharmacy until he closed his eyes,*" Alex. Dep. at 102 (emphasis added), *in February 1989, one month* before she became Director of the Pharmacy.

Alexander next contends that Mantegazza offered her one month's pay [FN11] to sign a letter promising not to sue Burke for discriminatory discharge. However, in light of the substantial costs of conducting employment discrimination litigation, the Court finds this evidence of questionable relevance, at best, on the issue of whether Alexander's discharge was discriminatorily motivated. *See* Fed. R. Evid. 408, adv. comm. note to 1972 amendment (One of two grounds supporting rule that excludes evidence of offers to compromise disputed claims, when sought to be admitted to establish liability, is that "[t]he evidence is irrelevant, since the offer may be motivated by a desire for peace rather than from any concession of weakness of position. The validity of this position will vary as the amount of the offer varies in relation to the size of the claim and may also be influenced by other circumstances."). [FN12]

Finally, Alexander argues that Grandville and DiPonte each earned higher salaries as Director

than she did. But this point does not give rise to an inference of age discrimination, because although Grandville is younger than Alexander, DiPonte was older than she was.

Viewing the record in the light most favorable to Alexander, the trier of fact could not reasonably conclude that Mantegazza discharged Alexander because of her age. The Court therefore grants summary judgment in favor of Burke on Alexander's ADEA claim.

CONCLUSION

Burke's motion for summary judgment is HEREBY GRANTED in its entirety.

SO ORDERED.

FN1. A *pro se* party's papers must be "liberally construed" and are held to less stringent standards than those drafted by lawyers. *See, e.g., Hughes v. Rowe,* 449 U.S. 5, 9 (1980) (*per curiam*) (citation omitted).

FN2. Burke asserts that the 10 percent salary increase was in consideration of the substantial managerial and administrative responsibilities that Alexander assumed when she became Acting Director; Burke further asserts that, when Alexander became Acting Director, she began reporting directly to Mantegazza.

FN3. Alexander also received salary increases in May and June 1989. Burke apparently gave the May 1989 increase to all Pharmacy employees, in an effort to make their salaries more competitive with those paid by other pharmacy employers in Burke's area. *See* Alex. Dep. at 70-73. The reason for the June 1989 increase is not clear from the record.

FN4. Alexander argues at length that the initial accumulation of MARs was not her fault. But the Court finds this point immaterial, because, as discussed below, Alexander was fired, *inter alia,* for failing to rectify the existing MAR backlog and prevent further accumulation of MARs, during the many months that followed the audit, not for causing the initial accumulation of MARs.

FN5. Alexander asserts, in her 3(g) Statement: "After an attempted conversation with Mr. Mantegazza regarding the Memorandum of May 10, 1989, he indicated not to worry about it and that I should not be concerned about it, it was an error on his part." Plaintiff's 3(g) Statement at ¶ 20. The record contains no "Memorandum of May 10, 1989." Viewing the record in the light most favorable to Alexander, the Court assumes she is actually asserting that Mantegazza told her "not to worry" about the May 10, 1990 Memo. Even so read, Alexander's assertion is unavailing. First, the assertion is absent from her sworn affidavit, and she did not testify to it at her deposition; the assertion is therefore not part of the evidentiary record on this motion. Second, the assertion, if true, would not excuse Alexander's failure to rectify the backlog between July 1989 and May 1990, nor would it excuse her failure to apprise Mantegazza of the true state of the backlog during that period. Finally, as further described below, the record is clear from Alexander's own testimony and contemporaneous conduct that she was aware, after, as well as before, the May 10, 1990 Memo, that Mantegazza expected her, as Director of the Pharmacy, to rectify the MAR backlog. *See, e.g.,* Alex. Dep. at 295-98.

FN6. Alexander testified at her deposition that she did not remember whether or not Mantegazza made this request. *See* Alex. Dep. at 295-97. However, Alexander acknowledges updating Mantegazza twice after May 10, 1990, as described in the June 1990 Performance Appraisal, *see*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Alex. Dep. at 295-98, and although Alexander received the June 1990 Performance Appraisal, *see* Alex. Dep. at 137, she did not contemporaneously object to its criticism of her for failing substantially to comply with this request. Alexander's lack of memory, without more, is simply not sufficient to create a genuine issue of fact as to whether Mantegazza actually made this request (or whether Alexander failed substantially to comply with it).

FN7. In Mantegazza's words: "It was poorly prepared, contained calculations which were incorrect, and contained several significant monetary requests which were not backed up by any substantiating data." Mant. Aff. at ¶ 29. Alexander has not disputed Mantegazza's assertion that her request for an additional staff pharmacist was substantiated only by the Workload Survey, *compare* August 1990 Memo, at 2 *with* Alex. Dep. at 433-34, 454, which was not submitted contemporaneously with the draft budget proposal, *see* Alex. Dep. at 412, and which, when later submitted, contained substantial errors, *see id.* at 465-68. Nor has Alexander disputed Mantegazza's criticisms of her "non-salary requests." *Compare* August 1990 Memo, at 2 *with* Alex. Dep. at 443-445, 454. Nor does Alexander contend that Mantegazza was "saying anything that is untrue or incorrect," Alex. Dep. at 448, in opining that it was "reasonable to expect more than a two sentence explanation to justify a $90,000 expense for a computer system," *see* August 1990 Memo, at 2; this opinion merely "cause[d] confusion on [Alexander's] part," because she assertedly had written "basically" what Mantegazza had previously told her to write in support of the request, *see* Alex. Dep. at 448.

FN8. Alexander's Affidavit refers at this point to an Exhibit 33. *See* Alex. Aff. at ¶ 22. However, no such Exhibit is appended to the Affidavit.

FN9. In the alternative, the Court would have granted summary judgment in favor of Burke on Alexander's Title VII claims because, as discussed below, Alexander failed to adduce evidence from which the trier of fact could reasonably conclude that she performed satisfactorily in her capacity as Director of the Pharmacy.

FN10. The changes that Alexander alleges presumably would operate to include some younger people among the pool of applicants who may compete for the position based on their other qualifications, but the changes would not operate to exclude older people from the applicant pool.

FN11. Alexander testified that she was earning approximately $50,000 per year, in June 1990, so that one month's pay would have been approximately $4,000 to $5,000 dollars.

FN12. The Court does not mean to suggest that this evidence would be inadmissible at trial. Burke has not so argued, and it is not clear that there existed, at the time of the offer, "a claim which was disputed as to either validity or amount," within the meaning of Fed. R. Evid. 408 (emphasis added). The Court nevertheless finds the logic underlying the rule persuasive to the extent stated in the text.

1995 WL 293963 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:92CV06574  (Docket)
(Sep. 03, 1992)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.