# TAB B

Westlaw.

Not Reported in F.Supp.

Page 1

1998 WL 150993 (S.D.N.Y.)

**(Cite as: 1998 WL 150993 (S.D.N.Y.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Kimberly A. CASPER, Deanna Caliendo and
Linette Cinelli, Plaintiffs,
v.
LEW LIEBERBAUM & CO., INC., Mark I. Lew,
Leonard A. Neuhaus, Brian T.
Clendenin, Joseph A. Alagna, Jr., Barry S. Rabkin,
Bernard L. Golembe, Marc H.
Rabkin, Fred Dorushkin and Ronald Dorushkin,
Defendants.
**No. 97 Civ. 3016(JGK).**

March 31, 1998.

Lai Lee Chan, New York City, Richard S. Missan,
New York City, Thomas P. Puccio, New York City,
for plaintiffs.

Michael P. Zweig, Loeb & Loeb LLP, New York
City, for defendant Lew Lieberbaum & Co, Inc.

Steven G. Eckhaus, Eckhaus & Olson, New York
City, for defendant Mark I. Lew.

David L. Katsky, Thomas M. Lopez, Esanu Katsky
Korins & Siger, New York City, for defendant
Leonard A. Neuhaus.

Frances Mary Maloney, Epstein Becker & Green,
New York City, for defendant Brian T. Clendenin.

Bettina B. Plevan, Proskauer Rose LLP, New York
City, for defendant Joseph A. Alagna, Jr.

Lois Carter Schlissel, Meyer, Suozzi, English &
English, P.C., Mineola, NY, for defendants Barry S.
Rabkin, Marc H. Rabkin, and Fred Dorushkin.

Marc A. Agnifilo, New York City, for defendant
Bernard L. Golembe.

Martin I. Saperstein, Goodman, Saperstein &
Cuneo, Garden City, NY, for defendant Ronald
Dorushkin.

OPINION AND ORDER

KOELTL, J.

*1 The plaintiffs, Kimberly Casper ("Casper"),
Deanna Caliendo ("Caliendo") and Linette Cinelli
("Cinelli") filed this action against Lew Lieberbaum
& Co., Inc. ("LLCI") and various LLCI employees
alleging claims for sexual discrimination,
retaliation, and constructive discharge under Title
VII of the Civil Rights Act of 1964 ("Title VII"), 42
U.S.C. § 2000e, et. seq., the New York Human
Rights Law, N.Y. Executive Law § 296, et. seq.
("NYHRL"), and the New York City Human Rights
Law, New York City Administrative Code § 8-101,
et. seq. (N.Y.CHRL), as well as claims for assault,
battery, slander per se, and intentional infliction of
emotional distress. All defendants have filed
motions to dismiss certain claims in the Amended
Complaint pursuant to Federal Rule of Civil
Procedure 12(b)(6), and defendant Brian T.
Clendenin ("Clendenin") has also moved in the
alternative for summary judgment under Federal
Rule of Civil Procedure 56 dismissing those aspects
of the plaintiffs' fourth through sixth causes of
action directed at him. Clendenin also moves to
dismiss all claims against him pursuant to Federal
Rule of Civil Procedure 12(b)(1) because he alleges
that the plaintiffs failed to name him in their Equal
Employment Opportunity Commission charges. In
addition, the defendants ask the Court to decline to
exercise supplemental jurisdiction over the
remaining pendent state law claims under 28 U.S.C.
§ 1367(c).

**I.**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

1998 WL 150993 (S.D.N.Y.)

**(Cite as: 1998 WL 150993 (S.D.N.Y.))**

On a motion to dismiss, the allegations in the complaint are accepted as true. *See Cohen v. Koenig,* 25 F.3d 1168, 1172-73 (2d Cir.1994); *see also Baxter v. A.R. Baron & Co., Inc.,* No. 94 Civ. 3913, 1996 WL 586338, at *2 (S.D.N.Y. Oct.11, 1996); *Lora v. Greifinger,* No. 96 Civ. 0628, 1997 WL 102473, at *3 (S.D.N.Y. Feb. 27, 1997). In addition, all reasonable inferences must be made in the plaintiff's favor. *See Gant v. Wallingford Bd. Of Educ.,* 69 F.3d 669, 673 (2d Cir.1995); *Cosmas v. Hasset,* 886 F.2d 8, 11 (2d Cir.1989); *See also Lora,* 1997 WL 102473, at *3. The court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the complaint itself is legally sufficient." *Goldman v. Belden,* 754 F.2d 1059, 1067 (2d Cir.1985); *see also Lora,* 1997 WL 102473, at *3. Therefore, the defendants' motion should only be granted if it appears that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief. *See Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Valmonte v. Bane,* 18 F.3d 992, 998 (2d Cir.1994); *see also Goldman,* 754 F.2d at 1065; *Lora,* 1997 WL 102473, at *3.

Therefore, for the purposes of this motion, the Court accepts as true the following facts as alleged in the Amended Complaint. The three plaintiffs are all former employees of LLCI, a nationwide investment banking and brokerage firm with offices in Garden City, Hauppage, and Manhattan in the state of New York, and in the states of Connecticut, Massachusetts, Pennsylvania, Texas, Arizona, and Florida. (Amended Complaint ("Compl.") ¶¶ 3, 19.) The plaintiffs worked at LLCI's executive office in Garden City, New York on Long Island. (Compl.¶¶ 3, 15-17.) Casper worked at LLCI from August 1989 to August 1990 and then from May 1992 to February 1995, when she was fired. (Compl.¶ 15.) Caliendo worked at LLCI from November 1995 to November 1996, at which time she alleges she was constructively discharged. (Compl.¶ 16.) Cinelli worked at LLCI from November 1995 to December 1996, at which time she claims that she was also constructively discharged. (Compl.¶ 17.) All three are currently residents of the state of New York. (Compl.¶¶ 15-17.)

*2 The individual defendants were all officers and employees of defendant LLCI who worked at LLCI's Garden City, New York, office while the plaintiffs were also employed there. Defendant Lew was the principal shareholder and Chairman of the Board of Directors and Chief Executive Office of LLCI. (Compl.¶ 20.) Defendant Neuhaus was the Chief Financial Officer and Chief Operating Officer of LLCI. (Compl.¶ 21.) Defendant Clendenin was President and Head Trader of LLCI. (Compl.¶ 22.) Defendant Alagna was the Executive Vice President and National Sales Manager of LLCI. (Compl.¶ 23.) Defendant Barry S. Rabkin was the First Vice President and Sales Coordinator for LLCI. (Compl.¶ 24.) Defendant Bernard L. Golembe was the Operations Manager of defendant LLCI. (Compl.¶ 25.) Defendants Marc H. Rabkin, Fred Dorushkin, and Ronald Dorushkin were all Junior Partner Brokers at LLCI. (Compl.¶¶ 26-28.)

The Amended Complaint alleges a pervasive campaign of sexual harassment and discrimination by the individual defendants and by LLCI against the plaintiffs. (Compl.¶ 3.) The plaintiffs claim that they were the victims of numerous acts of both physical and verbal harassment, including allegedly serving as the targets for sexually explicit comments and inappropriate contact over the entire period of their employment at LLCI. Moreover, when they complained about their supervisors' behavior and ultimately filed a complaint with the EEOC, the plaintiffs allege that they were retaliated against, and in the case of Casper, terminated, for making their complaints.

Casper filed a charge of discrimination against the defendants with the EEOC on June 9, 1995. (Compl.¶ 9.) Caliendo filed a charge of discrimination with the EEOC on November 19, 1996. (Compl.¶ 10.) Cinelli first filed a charge of discrimination on December 23, 1996, and on January 16, 1997 filed a second charge alleging retaliation. (Compl.¶ 11.) The EEOC issued separate right to sue letters for all plaintiffs on April 10, 1997, and the plaintiffs then filed this action on

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

1998 WL 150993 (S.D.N.Y.)

**(Cite as: 1998 WL 150993 (S.D.N.Y.))**

April 28, 1997. (Ex. 1 to Compl.; Compl. ¶ 12.)

**II.**

Defendant Clendenin moves to dismiss all of the plaintiffs' claims against him pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject matter jurisdiction because he contends that the plaintiffs did not name him as a respondent in the administrative charge of discrimination that they filed with the EEOC. This argument has no merit.

As the defendants themselves correctly argue with respect to the issue of whether a pending EEOC charge tolls the statute of limitations with respect to state law claims, claims arising under state common law are claims independent of a plaintiff's Title VII claims and may be brought in a parallel proceeding. *Cf. Johnson v. Railway Express Agency, Inc.,* 421 U.S. 454, 459, 95 S.Ct. 1716, 44 L.Ed.2d 295 (1975) ("the legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently [her] rights under both Title VII and other applicable state and federal statutes.") (internal quotation marks omitted). Thus, there is no requirement that a plaintiff file an EEOC administrative charge against a prospective defendant who will be sued on state common law tort claims. In any event, jurisdiction over the plaintiffs' claims against Clendenin is based on this Court's supplemental jurisdiction pursuant to 28 U.S.C. § 1367, and Clendenin is not, and in fact cannot be, sued under Title VII as an individual. [FN7] *See Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313 (2d Cir.1995) (holding that Title VII does not provide remedies against individual employees allegedly responsible for prohibited conduct).

> FN7. All of the cases cited by Clendenin in support of his argument were decided prior to the Court of Appeals for the Second Circuit's decision in *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1313 (2d Cir.1995), which foreclosed individual liability under Title VII.

**\*3** Accordingly, Clendenin's motion to dismiss for lack of subject matter jurisdiction is denied.

**III.**

The plaintiffs' fourth, fifth, and sixth claims allege violations of the New York State Human Rights Law, N.Y.Exec.Law § 296, et. seq. The fourth claim alleges that all defendants discriminated against the plaintiffs on the basis of gender, including quid pro quo harassment and sexual harassment creating an abusive and hostile work environment. (Compl.¶¶ 210-222.) Plaintiff Cinelli alone asserts the fifth cause of action, for retaliation, against defendants LLCI, Lew, Clendenin, and Rabkin. (Compl.¶¶ 223-227.) In the sixth cause of action, plaintiffs Caliendo and Cinelli assert a claim of constructive discharge against all defendants. (Compl.¶¶ 228-231.) Defendants Clendenin, Dorushkin, Golembe and Alagna now move to dismiss these claims.

Clendenin moves to dismiss the plaintiffs' fourth, fifth, and sixth causes of action as asserted against him on two bases. First, he argues that he is not an "employer" or "supervisor" as defined in the NYHRL, and therefore, he cannot be held individually liable under the statute. Second, he contends that, with respect to his conduct, the plaintiffs have failed to state a claim for sexual harassment, Cinelli has failed to state a claim for retaliation, and Cinelli and Caliendo have failed to state a claim for constructive discharge. Defendant Golembe also argues that the plaintiffs' fourth and sixth claims should be dismissed because he is not an "employer" or "supervisor" and thus cannot be held individually liable. Defendant Alagna contends that Cinelli's claims against him should be dismissed for failure to plead sufficient allegations in the Amended Complaint that his conduct violated the NYHRL. Defendant Ronald Dorushkin also argues that both Caliendo's and Cinelli's claims against him should be dismissed for insufficiently pleading that he violated their rights under the NYHRL.

In *Patrowich v. Chemical Bank,* 63 N.Y.2d 541, 542, 483 N.Y.S.2d 659, 660, 473 N.E.2d 11 (1984), the New York Court of Appeals held that an employee may not be sued individually under the NYHRL "if he is not shown to have any ownership interest or any power to do more than carry out personnel decisions made by others." *Id.; see also*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

1998 WL 150993 (S.D.N.Y.)

**(Cite as: 1998 WL 150993 (S.D.N.Y.))**

*Tomka,* 66 F.3d at 1317. Section 296(6) of the NYHRL, however, states that it is an unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or attempt to do so."

In interpreting this section of the statute, the Court of Appeals for the Second Circuit in *Tomka* distinguished *Patrowich* and found that "a defendant who actually participates in the conduct giving rise to a discrimination claim may be held personally liable under the [NYHRL]." *Tomka,* 66 F.3d at 1317. This interpretation of § 296(6) has been accepted by the New York State Supreme Court Appellate Division, First Department. *See Steadman v.. Sinclair,* 636 N.Y.S.2d 325, 326, 223 A.D.2d 392, 393 (1st Dep't 1996); *Peck v. Sony Music Corp.,* 632 N.Y.S.2d 963, 963, 221 A.D.2d 157, 158 (1st Dep't 1995); *but see Foley v. Mobil Chemical Co.,* 647 N.Y.S.2d 374, 170 Misc.2d 1 (N.Y.Sup.Ct. Monroe Co.1996). Thus, the actions of individual defendants in creating a hostile working environment may subject them to liability under the NYHRL. *See Tomka,* 66 F.3d at 1317; *Wise v. New York City Police Dep't,* 928 F.Supp. 355, 374 (S.D.N.Y.1996).

*4 Having carefully reviewed the Amended Complaint, the Court finds that the allegations with respect to defendants Clendenin, Golembe, Alagna, and Ronald Dorushkin are sufficient to state claims under the NYHRL and to survive a motion to dismiss. The detailed allegations of the complaint sufficiently allege that these defendants actively participated in creating the hostile work environment and in the acts leading to the alleged constructive discharge of plaintiffs Cinelli and Caliendo and alleged retaliation against Caliendo. Thus, since the allegations of the complaint are sufficient, there are plainly issues of fact with respect to these issues that cannot be decided on a Rule 12(b)(6) motion to dismiss. [FN8]

> FN8. Clendenin's motion for summary judgment is denied for the same reason. As evidenced in the papers, there are issues of fact with respect to Clendenin's position in the company, his involvement in fostering the hostile work environment,

whether he retaliated against Cinelli, and whether he participated in the acts leading to the constructive discharge of Cinelli and Caliendo.

**IV.**

The plaintiffs' seventh, eighth, and ninth causes of action assert violations of the New York City Human Rights Law, Administrative Code of the City of New York, §§ 8-101 et. seq. The plaintiffs' seventh, eighth, and ninth claims under the NYCHRL parallel the plaintiffs' fourth, fifth, and sixth claims under the NYHRL. In the seventh claim, all three plaintiffs allege that the defendants discriminated against the plaintiffs on the basis of gender, including quid pro quo harassment and sexual harassment creating an abusive and hostile work environment. (Compl.¶¶ 232-246.) Plaintiff Cinelli alone asserts the eighth cause of action, for retaliation, against defendants LLCI, Lew, Clendenin, and Rabkin. (Compl.¶¶ 247-252.) In the ninth cause of action, plaintiffs Caliendo and Cinelli assert a claim of constructive discharge against all defendants. All defendants move to dismiss these causes of action because all of the discriminatory conduct alleged in the Amended Complaint occurred in Garden City, New York. Therefore, the defendants argue that the plaintiffs have not satisfied the jurisdictional prerequisite to the application of the Administrative Code, since the Administrative Code applies only to conduct that takes place within the five boroughs of New York City.

Title 8 of the New York City Administrative Code, the New York City Human Rights Law, "vests in the New York City Commission on Human Rights the authority and jurisdiction to eliminate discrimination only within the City of New York." *Launer v. Buena Vista Winery, Inc.,* 916 F.Supp. 204, 214 (E.D.N.Y.1996.) Both New York State law and the Administrative Code limit the applicability of the Administrative Code to acts that occur within the boundaries of New York City. *See* N.Y.Gen.Mun.Law § 239-s; N.Y.C.Admin.Code § 2-201. Thus, the plaintiffs must allege that the defendants intentionally discriminated against them within New York City for their claims to fall within

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 150993 (S.D.N.Y.)

**(Cite as: 1998 WL 150993 (S.D.N.Y.))**

the jurisdiction of the Administrative Code. *See Lightfoot v. Union Carbide Corp.,* No. 92 Civ. 6411, 1994 WL 184670, at *5 (S.D.N.Y. May 12, 1994); *see also Pierre v. Chemical Bank,* 960 F.Supp. 21, 23 (E.D.N.Y.1997) (noting that the City Commission on Human Rights had no subject matter jurisdiction over an alleged discrimination "since its territorial jurisdiction does not extend to employment outside of New York City."); *Funderburke v. Uniondale Union Free School Dist.,* 660 N.Y.S.2d 659, 661, 172 Misc.2d 963, 966 (N.Y.Sup.Ct. Nassau Co.1997). Moreover, the plaintiff must show more than the happenstance that a defendant has an office in New York City. *See Lightfoot,* 1994 WL 184670, at *5 (granting summary judgment dismissing plaintiff's claims under the New York City Human Rights Law because the discriminatory conduct impacted the plaintiff at the defendant's Connecticut office where he was employed, even though the decision to adopt the Early Separation Program that led to plaintiff's dismissal was made at the New York City office).

*5 The plaintiffs argue that since some of the allegedly discriminatory conduct took place in New York City, application of the New York City Human Rights Law is appropriate. In support of this argument, they point to comments of a sexually explicit nature that were allegedly broadcast through LLCI's interoffice microphone system from the Garden City office to the New York City office. (Compl.¶¶ 4, 18, 19, 152-155.) In addition, the plaintiffs aver that certain defendants would answer the plaintiffs' telephones with vulgar innuendo or sexual obscenities. [FN9] (Compl.¶¶ 59, 148-150.) However, these allegations are insufficient to demonstrate that any discriminatory conduct against these plaintiffs occurred in New York City. All of the plaintiffs and the defendants worked at LLCI's Garden City office, and all of the alleged acts of harassment were performed there. To the extent that telephone calls or sexually explicit comments were made to New York, those comments impacted on the plaintiffs solely at the Garden City office. The alleged violations of the Administrative Code were the quid pro quo and hostile environment sexual harassment claims, and the constructive discharge and retaliatory discharge

claims, all of which impacted the plaintiffs in Garden City. *See Lightfoot,* 1994 WL 184670, at *5 (noting that the "impact" of any discriminatory acts occurred while the plaintiff was employed in Connecticut). This is not a case like *Launer,* 916 F.Supp. at 214, in which discriminatory comments were made via telephone and facsimile to the plaintiff in New York City from California and the plaintiff was fired in New York City, since there is no allegation in the Amended Complaint that any statements were made to the plaintiffs in New York City at all. [FN10] The discriminatory conduct in this case, the alleged hostile work environment or the quid pro quo sexual harassment, occurred in Garden City and not in New York City.

> FN9. At argument, counsel for plaintiff informed the Court that these telephone calls were often from individuals living in New York City. However, that fact is not alleged in the Amended Complaint. In any event, the Court has assumed for the purposes of this motion that the telephone calls were from New York City.

> FN10. The plaintiffs also argue that under *Batchelor v. Nynex Telesector Resources Group,* 623 N.Y.S.2d 235, 236, 213 A.D.2d 189, 190 (1st Dep't 1995), they must only allege that the offices of the defendant relevant to the complaint are located in New York City to show that some of the conduct took place in New York City, and they contend that they have met this standard. However, the seventh claim, the only one that references New York City, merely states that LLCI has an office in Manhattan. (Compl.¶ 235.) This statement alone does not demonstrate that any relevant conduct affecting the plaintiffs took place in the New York City office, and the complaint as a whole fails to make any such allegations.

Accordingly, the defendants' motions to dismiss the plaintiffs' seventh, eighth, and ninth claims is granted.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 150993 (S.D.N.Y.)

**(Cite as: 1998 WL 150993 (S.D.N.Y.))**

### V.

All defendants move to dismiss plaintiff Casper's tenth through thirteenth causes of action, which allege claims for assault, battery, slander, and intentional infliction of emotional distress, as barred by New York's one-year statute of limitations for intentional torts. Under New York law, the statute of limitations for intentional torts, including all four of these claims, is one year. N.Y.C.P.L.R. § 215. All of the defendants' alleged actions giving rise to these claims occurred prior to February 1995, the effective date of her termination, more than one year before plaintiff Casper filed her complaint on April 28, 1997.

The plaintiff argues that the statute of limitations on these claims was tolled pending the filing and investigation of her EEOC charges. However, the weight of well-reasoned authority in this Circuit has rejected the very same argument. *See, e.g., Walker v. Weight Watchers Int'l,* 961 F.Supp. 32, 36- 37 (E.D.N.Y.1997); *Gray v. Shearson Lehman Bros.,* 947 F.Supp. 132, 137 (S.D.N.Y.1996); *Hall v. USAir, Inc.,* No. CV95-3944, 1996 WL 228458, *3 (E.D.N.Y. Apr.29, 1996); *Lamb v. Citibank, N.A.,* No. 93 Civ. 2358, 1994 U.S. Dist. LEXIS 12903, *23-3 (S.D.N.Y. Sept. 12, 1994), *aff'd without op.,* 1995 U.S.App. LEXIS 28868 (2d Cir.Sept.11, 1995), *cert. denied,* 116 S.Ct. 1675 (1996); *accord Juarez v. Ameritech Mobile Communications, Inc.,* 957 F.2d 317, 322-23 (7th Cir.1992) (statute of limitations on Illinois state law claims not tolled); *Arnold v. United States,* 816 F.2d 1306, 1313 (9th Cir.1987) (statute of limitations on California state law claims not tolled). In *Johnson v. Railway Express Agency, Inc.,* the Supreme Court found that the timely filing of an employment discrimination charge with the EEOC did not toll the running of the statute of limitations under 42 U.S.C. § 1981. *Id.,* 421 U.S. at 459. There is similarly no provision in New York state law that allows the tolling of the state statute of limitations for intentional torts during the pendency of EEOC charges. Therefore, the statute of limitations on Casper's state law intentional tort claims was not tolled by the pendency of her EEOC proceeding.

**\*6** Accordingly, the defendants' motions to dismiss

plaintiff Casper's tenth through thirteenth causes of action, for assault, battery, slander, and intentional infliction of emotional distress, are granted.

### VI.

Defendants Alagna and Golembe move to dismiss the plaintiffs' tenth cause of action, which alleges a claim of assault against each defendant. With respect to defendant Alagna, the Amended Complaint alleges that:

> In or about May 1996 ... while speaking to Plaintiff DEANNA CALIENDO in his office, when her back was turned to him, Defendant JOSEPH A. ALAGNA, JR.... closed the door to his office. With her back still turned to him, he went to his couch and sat down. When she turned around to face him, he stared at her, and started to unbutton and unzip his pants. As he did so, he asked her to perform oral sex on him. Horrified, she quickly ran out of his office.

(Compl.¶¶ 263d, 86.) With respect to defendant Golembe, the Amended Complaint alleges that:

> In or about August 1996, Defendant BERNARD L. GOLEMBE ... looked down the blouse of Plaintiff LINETTE CINELLI and said to her, "Hey, Cinelli!, Lean over a little more so I can get a better look."

(Compl.¶¶ 263g, 147.)

"An 'assault' is an intentional placing of another person in fear of imminent harmful or offensive contact." *United Nat. Ins. Co. v. Waterfront New York Realty Corp.,* 994 F.2d 105, 108 (2d Cir .1993) . *See Hayes v. Schultz,* 541 N.Y.S.2d 115, 116, 150 A.D.2d 522, 522 (2d Dep't 1989) (affirming trial court's dismissal of an assault claim following a nonjury trial, because "the plaintiff did not establish that any of the actions of the defendant ... although arguably discourteous, put her in 'imminent apprehension' of 'harmful or offensive contact.' ") Alagna and Golembe argue that these alleged acts are insufficient to state a claim for assault because Caliendo and Cinelli have not alleged that the defendants' respective acts placed the plaintiffs in fear of imminent harmful or offensive contact. However, paragraph 264 of the Amended Complaint specifically alleged that "[e]ach of said

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 150993 (S.D.N.Y.)

**(Cite as: 1998 WL 150993 (S.D.N.Y.))**

acts ... placed each of the Plaintiffs in fear of imminent harmful or offensive contact." (Compl.¶ 264.) Paragraph 267 similarly alleges that "[i]n each of saidacts, [the plaintiffs] each believed that she was about to receive bodily injury, or was placed in fear of imminent or offensive contact." (Compl.¶ 267.) Thus, the plaintiffs have appropriately alleged that Alagna's and Golembe's acts placed them in imminent fear of harmful of offensive contact. Moreover, to the extent that Alagna and Golembe argue that their acts are insufficient as a matter of law to constitute assault, there are plainly issues of fact that cannot be resolved on a motion to dismiss. *See Cohen v. Davis,* 926 F.Supp. 399, 402 (S.D.N.Y.1996).

**VII.**

Defendants LLCI, Lew, Neuhaus, Alagna, Barry Rabkin, Golembe, Fred Dorushkin, and Ronald Dorushkin also move to dismiss Caliendo's and Cinelli's claims for slander per se. [FN11] Caliendo and Casper assert that twenty-six statements (some published more than once) by various defendants constitute slander per se. Generally, there are "four elements necessary to establish a prima facie case of slander: (1) an oral defamatory statement of fact, (2) regarding the plaintiff, (3) published to a third party by the defendant, and (4) injury to the plaintiff." *Weldy v. Piedmont Airlines, Inc.,* 985 F.2d 57, 61 (2d Cir.1993). The plaintiff pleading a slander claim must allege publication of the defamatory statements to a third party. *See Geddes v. Princess Properties Int'l, Ltd.,* 451 N.Y.S.2d 150, 151, 88 A.D.2d 835, 835 (1st Dep't 1982); *see also Williams v. Variq Brazilian Airlines,* 564 N.Y.S.2d 328, 330, 169 A.D.2d 434, 437 (1st Dep't), *appeal denied,* 78 N.Y.2d 854, 573 N.Y.S.2d 467, 577 N.E.2d 1059 (1991); *Memory Gardens, Inc. v. D'Amico,* 458 N.Y.S.2d 956, 957, 91 A.D.2d 1159, 1159 (3rd Dep't 1983). In addition, the plaintiff must allege that the statements took place within one year prior to the filing of the Complaint so that a defendant may properly interpose a statute of limitations defense. *See Tasso v. Platinum Guild Int'l,* No. 94 Civ. 8288, 1997 WL 16066, at *4 (S.D.N.Y. Jan.16, 1997); *Reeves v. Continental Equities Corp. of America,* 767 F.Supp. 469, 473 (S.D.N.Y.1991) (dismissing defamation claim for,

among other reasons, failure to allege the dates of the defamatory statements); *Geddes,* 451 N.Y.S.2d at 151, 88 A.D.2d at 835.

> FN11. Because the Court finds the Casper's slander per se claim is barred by the one year statute of limitations applicable to intentional torts, the Court need not address the defendants' arguments with respect to her claim.

*7 The plaintiffs in this case have not pleaded special damages, but instead argue that this case falls within two of the four categories of slander per se. Although "slander as a rule is not actionable unless the plaintiff suffers special damage," *Liberman v. Gelstein,* 80 N.Y.2d 429, 434, 590 N.Y.S.2d 857, 860, 605 N.E.2d 344 (1992), damages are "presumed when the defamatory statement takes the form of slander per se." *Weldy,* 985 F.2d at 61-62. For a claim to fall within the slander per se exception, it must "consist of statements (i) charging plaintiff with a serious crime; (ii) that tend to injure another in his or her trade, business or profession; (iii) that plaintiff has a loathsome disease; or (iv) imputing unchastity to a woman." *Liberman,* 80 N.Y.2d at 435, 590 N.Y.S.2d at 860, 605 N.E.2d at 347. The plaintiffs only argue that the alleged slanderous statements either charge the plaintiffs with a serious crime or tend to injure the plaintiffs in their trade.

**A.**

**1.**

With respect to whether a statement charges a plaintiff with a serious crime, "the law distinguishes between serious and relatively minor offenses, and only statements regarding the former are actionable without proof of damage." *Liberman,* 80 N.Y.2d at 435, 590 N.Y.S.2d at 861, 605 N.E.2d 344. In considering whether a statement charges an allegedly defamed plaintiff with a crime, the New York Court of Appeals has adopted the Restatement (Second) of Torts ("Restatement") approach. The Restatement considers an imputation of criminal conduct slander per se if the crime charged "would be (a) punishable by imprisonment in a state or federal institution, or (b) regarded by public opinion

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 150993 (S.D.N.Y.)

**(Cite as: 1998 WL 150993 (S.D.N.Y.))**

as involving moral turpitude." Restatement § 571. *See, e.g., Weldy,* 985 F.2d at 62; *Liberman,* 80 N.Y.2d at 435-36, 590 N.Y.S.2d at 861, 605 N.E.2d 344 (finding that although an accusation charging a plaintiff with bribery was a "serious" crime meeting the requirements for a claim of slander per se, harassment, which is not even a misdemeanor, was not a serious crime).

In this case, the plaintiffs argue that certain statements by the defendants imputed to the plaintiffs the serious crimes of prostitution or sodomy. *See, e.g.,* Compl. ¶¶ 93; 96; 129; 131; 132; 133; 134; 135; 136; 139; 141; 142; 143; 144; 146; 148; and 149. The defendants respond that these crimes are not sufficiently "serious" to state a claim to satisfy the requirements for slander per se. Under New York law, prostitution is a class B misdemeanor, with a penalty of up to three months in prison, N.Y.Penal Law § 230.00, as is consensual sodomy. N.Y. Penal Law §§ 130.38; 130.00. These are sufficiently serious crimes for the purposes of slander per se. *See Weldy,* 985 F.2d at 62.

### 2.

The defendants also argue that their alleged statements are merely vulgar outbursts or statements of opinion that are not actionable. "Under either Federal or State law, the dispositive question is whether a reasonable listener ... could have concluded that [the defendant] was conveying facts about the plaintiff." *600 West 115th St. Corp. v. Von Gutfeld,* 80 N.Y.2d 130, 139, 589 N.Y.S.2d 825, 829, 603 N.E.2d 930 (1992) (citing *Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20-21, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990)), *cert. denied,* 508 U.S. 910 (1993). Statements which are mere "rhetorical hyperbole, [or] vigorous epithet[s]" are not actionable. *Greenbelt Cooperative Publishing Ass'n, Inc. v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970) ("blackmail" was rhetorical hyperbole and not actionable); *see also National Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 285-86, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) ("scab" was "merely rhetorical hyperbole, a lusty and imaginative expression ..."). New York law provides a broad protection for statements of

opinion. *See Levin v. McPhee,* 119 F.3d 189, 197 (2d Cir.1997). Thus, under New York law

> **\*8** the inquiry, which must be made by the court ... entails an examination of the challenged statements with a view toward (1) whether the specific language in issue has a precise meaning which is readily understood; (2) whether the statements are capable of being proven true or false; and (3) whether either the full context of the communication in which the statement appears or the broader social context and surrounding circumstances are such as to signal ... readers or listeners that what is being read or heard is likely to be opinion, not fact.

*Gross v. New York Times Co.,* 82 N.Y.2d 146, 153-54, 603 N.Y.S.2d 813, 817- 18, 623 N.E.2d 1163 (1993) (citations and internal quotation marks omitted) (reversing dismissal of complaint asserting claim for libel where the articles cited "contain many assertions of objective fact that, if proven false, could form the predicate for a maintainable libel action."); *see also Levin,* 119 F.3d at 196-197 . "When the defendant's statements, read in context, are readily understood as conjecture, hypothesis, or speculation, this signals the reader that what is said is opinion, and not fact." *Levin,* 119 F.3d at 197.

It may well be that the alleged statements made by the defendants in this case were mere vulgar epithets or statements of opinion, and that when understood in context, they were not reasonably understood as statements of fact accusing the plaintiffs of committing a crime. Moreover, it may be that the statements were mere rhetorical hyperbole. But those issues cannot be decided on the papers before the Court, particularly given the fact that the statements were spoken and their full context is not set forth. The Court at this point cannot analyze their full context as required under New York law and cannot determine whether they were or were not conveying facts about the plaintiffs such that the motion could be granted in the defendants' favor. *See 600 West 115th Street Corp.,* 80 N.Y.2d at 139, 589 N.Y.S.2d at 829, 603 N.E.2d 930; *Levy v. Educational Records Bureau, Inc.,* 566 N.Y.S.2d 613, 613, 170 A.D.2d 391, 392 (1st Dep't 1991). Instead, the Amended Complaint sufficiently alleges that some remarks were uttered

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 150993 (S.D.N.Y.)

**(Cite as: 1998 WL 150993 (S.D.N.Y.))**

by the defendants in this case as statements of fact that the plaintiffs were in fact selling sex for money, an allegation of a serious crime, in the context of an environment that was allegedly rife with sexual harassment. Thus, at least for the purposes of this Rule 12(b)(6) motion to dismiss, the Court cannot find that these statements are protected hyperbole or opinion.

**3.**

Because at this stage of the proceedings the Court cannot find that these statements were protected opinion or hyperbole, and because the crimes alleged are sufficiently "serious" as to constitute slander per se, the Court must consider whether each purportedly slanderous statement on its face charged the allegedly defamed plaintiff with a serious crime. *See Feche v. Viacom Int'l, Inc.,* 649 N.Y.S.2d 782, 782, 233 A.D.2d 125, 125 (1st Dep't 1996) (statement must be "of and concerning" the plaintiffs). In assessing each claim, the Court must "construe the allegedly defamatory statement according to its plain meanings.... Innuendo is not available to enlarge the meaning of the statement beyond the significance of the words themselves." *Nunez v. A-T Fin. Info., Inc.,* 957 F.Supp. 438, 441 (S.D.N.Y.1997). In light of these principles, the Court finds that only those statements referred to in paragraphs 93 (with respect to Golembe's alleged charge in May, August, and October 1996), 129, 131, 132, 139, 141, 144, 146, and 148 state claims for slander per se under the "serious crime" exception. [FN12] Of these, paragraphs 132, 141, and 148 fail to allege to whom the statement was published, and paragraphs 132, 141 and 146 fail to allege the specific dates upon which the statements were made. The slander per se claims with respect to the statements alleged in these four paragraphs will be dismissed without prejudice to filing a second amended complaint within 30 days of the date of this Opinion and Order.

> FN12. The statement in paragraph 95 was alleged to have been made in January 1996 and is dismissed as barred by the one year statute of limitations.

**B.**

*9 The plaintiffs also assert that certain alleged defamatory statements tend to injure the plaintiffs in their trade or business. *See, e.g.,* Compl. ¶ ¶ 94; 102; and 137. The "trade, business or profession" exception is " 'limited to defamation of a kind incompatible with the proper conduct of the business, trade, profession or office itself. The statement must be made with reference to a matter of significance and importance for that purpose, rather than a more general reflection upon the plaintiff's character or qualities." *Liberman,* 80 N.Y.2d at 436, 590 N.Y.S.2d at 861, 605 N.E.2d 344 (quoting Prosser and Keeton, *Torts* § 112 at 791). The statements alleged in this case to have injured Caliendo and Cinelli in their "trade, business or profession" do not meet this standard. Instead, it is clear that these statements are merely comments, however reprehensible, on the general characteristics of their intended targets and do not "impugn the plaintiff's ability to perform his or her specific occupation." *Van-Go Transport Co. v. New York City Brd. of Educ.,* 971 F.Supp. 90, 98 (E.D.N.Y.1997) (citing *Liberman* ).

To summarize, the defendants, motions to dismiss the slander per se claims are denied with respect to those statements alleged in paragraphs 93 (with respect to Golembe's charges in May, August, and October 1996), 129, 131, 139, and 144. The slander per se claims with respect to those statements alleged in paragraphs 132, 141, 146 and 148 are dismissed without prejudice to filing a second amended complaint within 30 days of this Opinion and Order. The defendants' motions to dismiss the slander per se claims are granted in all other respects. [FN13]

> FN13. The slander per se claims can only be maintained by the specific plaintiffs against the specific individual defendants and LLCI named in the paragraphs cited. To the extent the complaint seeks to make these charges against other defendants not named in those paragraphs, those claims are dismissed. Accordingly, all slander pe se claims against defendants Lew, Neuhaus, Clendenin, Alagna, Mark Rabkin, and Ronald Dorushkin are

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 150993 (S.D.N.Y.)

**(Cite as: 1998 WL 150993 (S.D.N.Y.))**

dismissed. Caliendo's claims against Barry Rabkin and Fred Dorushkin are also dismissed. Finally, as explained above, Cinelli's claims in paragraphs 132 against Barry Rabkin, 141 against Fred Dorushkin, 146 against Bernard Golembe, and 148 against Barry Rabkin are also dismissed without prejudice.

## VIII.

All defendants except for LLCI move to dismiss the plaintiffs' claim for intentional infliction of emotional distress. [FN14] Under New York law, the elements of a claim for intentional infliction of emotion distress are: "(1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress." *Bender v. City of New York,* 78 F.3d 787, 790 (2d Cir .1996). In *Fischer v. Maloney,* 43 N.Y.2d 553, 402 N.Y.S.2d 991, 373 N.E.2d 1215 (1978), the New York Court of Appeals adopted the Restatement's explanation of this cause of action, which notes that "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id.,* 43 N.Y.2d at 557, 402 N.Y.S.2d at 992-93, 373 N.E.2d 1215 (quoting Restatement § 46(1) cmt. d); *Cohn-Frankel v. United Synagogue of Conservative Judaism,* 667 N.Y.S.2d 360, 361 (1st Dep't 1998). This standard is extremely high and exacting, *Stylianou v. St. Luke's/Roosevelt Hosp. Ctr.,* 902 F.Supp. 54, 58 (S.D.N.Y.1995), and the New York Court of Appeals has not yet sustained a claim under this cause of action. *See Silberstein v. Advance Magazine Publishers, Inc.,* No. 97 Civ. 7832, 1997 U.S. Dist. LEXIS 20425, *2-3 (S.D.N.Y. Dec. 23, 1997) (quoting *Howell v. New York Post Co., Inc.* 81 N.Y.2d 115, 596 N.Y.S.2d 350, 353, 612 N.E.2d 699 (1993)).

> FN14. The Court has dismissed plaintiff Casper's intentional infliction of emotional distress claim as barred by New York's one-year statute of limitations for

intentional torts. Thus, only the intentional infliction of emotional distress claims of Caliendo and Cinelli remain.

*\*10* The defendants argue that Caliendo and Cinelli have failed to allege conduct that rises to the level of extreme and outrageous conduct required to state a claim for intentional infliction of emotional distress. However, "there is no question in New York 'that sexual harassment can give rise to a claim for intentional infliction of emotional distress.' " *Bonner v. Guccione,* 916 F.Supp. 271, 276 (S.D.N.Y.1996) (quoting *Collins v. Willcox, Inc.,* 600 N.Y.S.2d 884, 885, 158 Misc.2d 54 (N .Y.Sup.Ct.N.Y.Co.1992)); *see, e.g., Dana v. Oak Park Marina, Inc.,* 660 N.Y.S.2d 906, 910, 230 A.D.2d 204 (4th Dep't 1997) (sustaining a claim for infliction of emotional distress based on reckless conduct where the defendants installed a videotape camera in a ladies' restroom); *O'Reilly v. Executone of Albany, Inc.,* 503 N.Y.S.2d 185, 186, 121 A.D.2d 772, 774 (3rd Dep't 1986) (affirming lower court's denial of motion to dismiss where plaintiff was subjected to physical sexual contact, sexual jokes, pornography and erotica); *McIntyre v. Manhattan Ford, Lincoln-Mercury, Inc.,* No. 128889/94, 1997 WL 838144, at *8 (N.Y.Sup.Ct.N.Y.Co. Aug. 25, 1997) (upholding jury verdict for intentional infliction of emotional distress damages based on a pattern of sexual harassment); *Koster v. Chase Manhattan Bank, N.A.,* 609 F.Supp. 1191, 1198 (S.D.N.Y.1985). Such a claim may result from a pattern or course of conduct. *Bonner,* 916 F.Supp. at 276 (quoting *Carter v. Andriani,* 443 N.Y.S.2d 157, 158, 84 A.D.2d 513 (1st Dep't 1981)). For example, in *Bonner,* the Court found that the plaintiff had stated a claim for intentional infliction of emotional distress in the sexual harassment context where "the plaintiff has plead a course of harassing, intimidating, and demeaning conduct (in the form of verbal abuse)...." *Id.* at 278. The conduct alleged to have taken place in this case, including a pervasive pattern of lewd and salacious behavior and unwanted physical contact, fits comfortably within the range of those cases that have sustained a claim for intentional infliction of emotional distress in this context.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 150993 (S.D.N.Y.)

**(Cite as: 1998 WL 150993 (S.D.N.Y.))**

The defendants also argue that Cinelli and Caliendo have failed to plead that the defendants intended to cause them extreme emotional distress. However, the Amended Complaint alleges that "[s]uch conduct was intentional or reckless and so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency." (Compl.¶ 295.) This statement, coupled with the detailed allegations in the Amended Complaint, are sufficient to defeat a motion to dismiss.

Accordingly, the defendants' motion to dismiss the plaintiffs' claim for intentional infliction of emotional distress is denied. [FN15]

> FN15. Alagna and Ronald Dorushkin argue that because Cinelli has not made any factual allegations against them, her claim for intentional infliction of emotional distress against them should be dismissed. Having reviewed the complaint, it is clear that Cinelli makes no factual allegations against either defendant to support her claims of intentional infliction of emotional distress by them against her. Cinelli's claims against Alagna and Ronald Dorushkin for intentional infliction of emotional distress are therefore dismissed.

### IX.

The individual defendants argue that the court should not exercise its supplemental jurisdiction over the state law claims asserted against them pursuant to 28 U.S.C. § 1367(c). "Depending on a host of factors, ... including the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims--district courts may decline to exercise jurisdiction over supplemental state law claims." *City of Chicago v. International College of Surgeons,* 522 U.S. 156, ----, 118 S.Ct. 523, 534, 139 L.Ed.2d 525 (1997); *see also* 28 U.S.C. § 1367(c). Moreover, a district court should "consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity." *City of*

*Chicago,* 522 U.S. at ----, 118 S.Ct. at 534 (quoting *Carnegie-Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)). In this case, although no federal claims are asserted against the individual defendants, the Title VII claim against LLCI and the state law claims asserted against the individual defendants and LLCI arise from the same facts and are part of the same case or controversy. *See* 28 U.S.C. § 1367(a); *United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Requiring the plaintiffs to litigate their state law claims in New York state court would result in duplicitous and wasteful litigation and would not serve the interests of judicial economy and fairness for all litigants.

Moreover, to the extent the defendants' argument rests on the purported uncertainty as to whether the NYHRL permits individual liability, *Tomka v. Seiler Corp.,* 66 F.3d 1295 (2d Cir.1995), is the law of this Circuit, and this Court is bound by its interpretation of New York law. Therefore, the Court finds that the exercise of supplemental jurisdiction in this case is proper. *See, e.g., Rodrigue v. Hartford Fire Ins. Co.,* No. 3:97CV01226, 1997 WL 736525, at *4 (D.Conn. Nov.24, 1997); *Kudatzky v. Galbreath Co.,* No. 96 Civ. 2693, 1997 WL 598586, at *8 (S.D.N.Y. Sept.23, 1997); *Velasquez v. Mirv Coffee, Inc.,* No. 96 Civ. 5464, 1996 WL 706910, at * 2 (S.D.N.Y. Dec.6, 1996); *Moore v. Natwest Mkts.,* No. 96 Civ. 1166, 1996 WL 507333, at *3 (S.D.N.Y. Sept.6, 1996); *Sigmon v. Parker Chapin Flattau & Klimpl,* 901 F.Supp. 667, 680 (S.D.N.Y.1995).

### CONCLUSION

*11 The defendants' motions to dismiss the plaintiffs' claims under the New York City Human Rights Law are **granted.** The defendants' motions to dismiss plaintiff Kimberly Casper's intentional tort claims as barred by the statute of limitations (tenth through thirteenth claims) are **granted.** The defendants' motions to dismiss the slander per se claims are denied with respect to those statements alleged in paragraphs 93 (to the limited extent noted above), 129, 131, 139, and 144. The slander per se claims with respect to those statements alleged in paragraphs 132, 141, 146, and 148 are dismissed without prejudice to filing a second amended

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 12

1998 WL 150993 (S.D.N.Y.)

**(Cite as: 1998 WL 150993 (S.D.N.Y.))**

complaint within 30 days of this Opinion and Order. The defendants' motions to dismiss the slander per se claims are **granted** in all other respects. Plaintiff Cinelli's claims against Alagna and Ronald Dorushkin for intentional infliction of emotional distress are dismissed. The defendants' remaining motions to dismiss are all **denied.** Defendant Clendenin's motion for summary judgment is also **denied.**

**SO ORDERED.**

1998 WL 150993 (S.D.N.Y.)

   **Motions, Pleadings and Filings (Back to top)**

• 1:97CV03016  (Docket)
                      (Apr. 28, 1997)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB C

Not Reported in F.Supp.                                                                  Page 1

1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C

**(Cite as: 1998 WL 252063 (S.D.N.Y.))**

C

**Motions, Pleadings and Filings**

United States District Court, S.D. New York.
Joseph DUFFY, Sylvan Von Burg and Raphael
Graham, Plaintiffs,
v.
DRAKE BEAM MORIN, HARCOURT
GENERAL, INC. and Harcourt Brace And
Company,
Defendants.
**No. 96 Civ. 5606(MBM).**

May 19, 1998.
Joseph J. Ranni, Ranni & Smith New York, NY,
for Plaintiffs.

Thomas R. Kelly, Epstein Becker & Green, New
York, NY, for Defendants.

OPINION AND ORDER

MUKASEY, J.

*1 Joseph Duffy, Sylvan Von Burg, and Ralphael
Graham [FN1] sue their former employer Drake
Beam Morin ("DBM"), and its parent company,
Harcourt General, Inc. ("Harcourt General"), for
violating the Age Discrimination in Employment
Act of 1967 ("ADEA"), 29 U.S.C. §§ 621, *et seq.*
(1994), the Employee Retirement Income Security
Act of 1974 ("ERISA"), 29 U.S.C. §§ 1140 *et seq.*
(1994), and state and local anti-discrimination laws.
Harcourt General moves pursuant to Fed.R.Civ.P.
56(c) for a summary judgment of dismissal on all
claims. DBM moves for partial summary judgment
on certain claims. For the reasons stated below,
Harcourt General's motion is granted, and DBM's
motion is granted in part and denied in part.

FN1. Graham sues in both plaintiffs'

original and First Amended Complaint
under the name "Raphael Graham."

I.

The following facts, viewed in the light most
favorable to plaintiffs, [FN2] are relevant to
defendants' motions for summary judgment: DBM
provides career counseling and management
services to companies and their employees. (Def.
Rule 56.1 Statement ¶ 21) DBM has its main
office in Manhattan, and branch offices in Melville,
New York, and Parsippany, New Jersey, among
other places. (*Id.* ¶ 30; Compl. ¶¶ 4, 44, 69)
[FN3] Duffy, Von Burg, and Graham were formerly
employed by DBM as consultants. (Compl.¶¶ 10,
42, 67)

> FN2. Plaintiffs failed to file a statement of
> facts as to which there exists a genuine
> issue of material fact as required by Local
> Civil Rule 56.1. As a result, any facts in
> Defendant's Rule 56.1 Statement that are
> not controverted by plaintiffs' papers and
> supporting documents are deemed
> admitted pursuant to the terms of that Rule.
> *See Glazer v. Formica Corp.,* 964 F.2d
> 149, 154 (2d Cir.1992) (citing *Dusanenko
> v. Maloney,* 726 F.2d 82, 84 (2d Cir.1984)
> ).

> FN3. "Compl." refers to plaintiffs' First
> Amended Complaint filed in May 1997.

DBM is a wholly-owned subsidiary of Harcourt
General. (Def. Rule 56.1 Statement ¶ 1) Although
Harcourt General reviews DBM's financial reports
regularly and requires DBM to obtain its approval
before making significant changes in operations
(Walz Depos. at 22-23), Harcourt General exercises
no day-to-day control over DBM. (Def. Rule 56.1
Statement ¶ 2) Moreover, Harcourt General and
DBM have separate human resources departments (
*id.* ¶ 10), and DBM develops its own policies and

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C

**(Cite as: 1998 WL 252063 (S.D.N.Y.))**

makes its own decisions as to the hiring, discipline, and termination of its employees. (*Id.* ¶ 3) However, DBM employees are eligible to participate in pension and benefit plans administered by Harcourt General. (Walz Depos. at 40-41)

Beginning in 1994, DBM implemented new performance standards for its consultants called "core competencies." (Def. Rule 56.1 Statement ¶ 23) Each consultant at DBM reviewed the core competencies with his or her manager before they took effect. (*Id.* ¶ 25) At that time, DBM gave its consultants the option of either remaining at DBM and performing in accordance with the core competencies, or resigning and taking advantage of an enhanced severance package. (*Id.* ¶ 26) Consultants who chose the former course, but who failed to meet the new performance standards, were fired and received only a standard severance package. (*Id.* ¶ 27; Kelly Aff. Exs. M, N) DBM rehired some of these former employees to perform consulting work for DBM clients as independent contractors, although these consultants--who are no longer DBM employees--are ineligible to participate in DBM's pension or benefit plans. (Ranni Aff. Ex. 1 at 9)

A. *Joseph Duffy*

**\*2** Duffy was hired by DBM on December 2, 1985. (Def. Rule 56.1 Statement ¶ 29) At all times relevant to this case, Duffy worked out of DBM's office in Melville, New York. (*Id.* ¶ 30) When DBM introduced the core competencies in early 1995, Duffy elected to remain at DBM and attempt to meet the new standards. (*Id.* ¶ 28) On October 6, 1995, DBM fired Duffy on the ground that he had failed to meet these standards. (*Id.* ¶ 31) At that time, Duffy's pension rights were fully vested for both normal and early retirement benefits in the DBM pension plan. (*Id.* ¶ 34) On October 13, 1995, Duffy filed a charge of employment discrimination against DBM with the Equal Employment Opportunity Commission ("EEOC"). (Ranni Aff. Ex. 13)

In November 1995, DBM hired Duffy as an

independent contractor to conduct a two-day workshop for one of DBM's clients. (Def. Rule 56.1 Statement ¶ 37) After Duffy conducted the workshop, but before he was paid for that work, DBM asked Duffy to sign an independent contractor agreement. (*Id.* ¶ 38) The agreement contained, *inter alia,* a non-competition provision barring Duffy from performing consulting services for any of DBM's clients for at least one year. (Ranni Aff. Ex. 20 ¶ 7) The parties dispute whether the agreement DBM asked Duffy to sign was its "standard" independent contractor agreement (Def. Reply Mem. at 20; Kelly Aff. Exs. AG, AH), or a more restrictive version of the one DBM typically offers to other independent contractors. (Pl. Mem. at 17; Ranni Aff. Ex. 21) When Duffy refused to sign the independent contractor agreement, DBM refused to pay him for the workshop. (Def. Rule 56.1 Statement ¶ 42) DBM subsequently dropped its demand that Duffy sign the agreement and paid him in full. (*Id.*)

B. *Sylvan Von Burg*

Von Burg was hired by DBM on May 23, 1988 (*id.* ¶ 44), and he worked at all relevant times at DBM's main office in New York City. (Compl.¶ 44) When the core competencies were introduced, Von Burg, like Duffy, declined DBM's offer of an enhanced severance package and elected instead to continue working at DBM. (Def. Rule 56.1 Statement ¶ 28) On June 30, 1995, DBM fired Von Burg on the ground that he, too, had failed to satisfy the new performance standards. (*Id.* ¶¶ 12, 46) On October 13, 1995, Von Burg filed a charge of discrimination against DBM with the EEOC. (Compl. ¶ 50; Kelly Aff. Ex. Q) At the time he was fired, Von Burg's pension rights were fully vested for normal retirement benefits under DBM's pension plan (Def. Rule 56.1 Statement ¶ 46), but he was more than three years away from having his rights vest for early retirement benefits. (*Id.* ¶ 47)

C. *Ralphael Graham*

Graham was hired by DBM on May 1, 1985. (*Id.* ¶ 49) At all relevant times, Graham worked at DBM's office in Parsippany, New Jersey. (Compl.¶

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C

**(Cite as: 1998 WL 252063 (S.D.N.Y.))**

69) Graham also continued to work at DBM after the core competencies were introduced in 1995. (Def. Rule 56.1 Statement ¶ 50) On October 27, 1995, Mark Landsberg, Graham's supervisor at DBM, met with Graham to discuss his performance. (*Id* .) At that meeting, Landsberg offered Graham an enhanced severance package if he would accept early retirement and sign a severance agreement. (*Id.* ¶ 51) Graham neither signed the agreement nor returned to work after October 27, 1995. (*Id.* ¶ 52) However, DBM continued to pay him salary through December 20, 1995. (*Id.*) When Graham left DBM, his pension rights were fully vested for both normal and early retirement benefits. (*Id.* ¶ 55) On December 1, 1995, Graham filed a discrimination complaint with the EEOC. (Ranni Aff. Ex. 14)

**\*3** The parties dispute whether Graham was still employed by DBM between October 27, 1995, and December 20, 1995, and how much severance pay, if any, Graham was entitled to receive from DBM when he left. However, viewed in the light most favorable to Graham, the facts reveal that Graham was fired by DBM on October 27, 1995, when he refused to accept early retirement and sign the severance agreement. (Graham Depos. at 129; Ranni Aff. Ex. 13) The payments Graham received from DBM after October 27, 1995, were amounts to which he was entitled under DBM's standard severance package (Ranni Aff. Ex. 12), and based on his ten years of service with DBM, Graham was entitled to continue receiving those payments until January 26, 1996. (*Id.*)

*D. Procedural History*

After they received right-to-sue letters from the EEOC, plaintiffs filed this action against DBM and Harcourt General alleging unlawful age discrimination and retaliation in violation of the ADEA and state and local anti-discrimination laws. Plaintiffs claim also that defendants fired them in an effort to deny them their pension rights in violation of ERISA. Harcourt General moves pursuant to Rule 56(c) for a summary judgment dismissing all claims. DBM moves for partial summary judgment on the following claims: 1) Duffy's and Graham's

retaliation claims; [FN4] 2) Duffy's, Von Burg's, and Graham's ERISA claims; 3) Duffy's and Graham's claims under the New York City Human Rights Law ("City Human Rights Law"), N.Y. City Admin. Code § 8-107 *et seq.* (1986); and 4) Graham's claims under the New York State Human Rights Law ("State Human Rights Law"), N.Y. Exec. Law § 296 (McKinney 1990).

> FN4. Von Burg does not assert a claim for retaliation.

II.

On a motion for summary judgment, the moving party bears the burden of proving that there are no material facts in dispute and that it is entitled to judgment as a matter of law. *See* Fed.R.Civ.P. 56(c) . Although the burden of persuasion is always on the moving party, the non-movant may not resist a motion for summary judgment merely by offering conclusory assertions suggesting that "there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, the non-movant must set forth specific facts that demonstrate a genuine issue for trial. *See* Fed.R.Civ.P. 56(e); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In employment discrimination cases, where liability often turns on the issue of intent, courts should approach a motion for summary judgment with special caution. *See Gallo v. Prudential Residential Servs. Ltd. Partnership,* 22 F.3d 1219, 1224 (2d Cir.1994). Because employers rarely leave direct evidence of discriminatory intent, the court must scrutinize all of the available evidence in search of circumstantial proof to rebut the employer's explanation for its actions. *See Hollander v. American Cyanamid Co.,* 895 F.2d 80, 85 (2d Cir.1990).

**\*4** However, that discrimination cases are subject to a heightened duty of care does not mean that summary judgment is unavailable in such cases. *See McLee v. Chrysler Corp.,* 38 F.3d 67, 68 (2d Cir.1994). When an employer provides convincing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.                                    Page 4
1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C

(Cite as: 1998 WL 252063 (S.D.N.Y.))

evidence explaining its conduct, and the plaintiff's case rests on conclusory allegations of discrimination, the court may properly conclude that there is no genuine issue of material fact and grant summary judgment to the employer. *See Meloff v. New York Life Ins. Co.,* 51 F.3d 372, 375 (2d Cir.1995).

### III.

Harcourt General moves for a summary judgment of dismissal on each of plaintiffs' claims. It argues that it is not liable to plaintiffs because they worked for DBM, and not Harcourt General, and because Harcourt General was not involved in any of the employment decisions that are at issue in this case. [FN5] (Def. Mem. at 21) I agree.

> FN5. Harcourt General argues also that plaintiffs' discrimination claims should be dismissed because plaintiffs failed to exhaust their administrative remedies before filing suit against Harcourt General. (Def. Mem. at 12-13) Because I agree with Harcourt General's first argument, I do not reach this alternative ground for dismissal.

As the Second Circuit recently observed, "the law only treats the employees of a corporate entity as the employees of a related entity under extraordinary circumstances." *Murray v. Miner,* 74 F.3d 402, 404 (2d Cir.1996). Whether a case presents such circumstances turns on the outcome of a "flexible four-part test aimed at determining the degree of interrelationship between the two entities." *Cook v. Arrowsmith Shelburne, Inc.,* 69 F.3d 1235, 1240 (2d Cir.1995). The "single employer" doctrine, as this test has come to be known, provides as follows:

A parent and subsidiary cannot be found to represent a single, integrated enterprise in the absence of evidence of (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control.

*Id.* at 1240 (quotation omitted). [FN6] Although each of these factors is important, the second one--centralized control of labor relations--should be the focus of the inquiry. *See Id.* at 1241; *see, e.g.,*

*Sharkey v. Lasmo (Aul Ltd.),* 992 F.Supp. 321 (S.D.N.Y.1998). That criterion has been distilled further into the following question: "What entity made the final decisions regarding employment matters related to the person claiming discrimination?" *Arrowsmith,* 69 F.3d at 1240 (quotation omitted).

> FN6. It is unclear whether this standard is also the proper one for assessing whether Harcourt General may be held liable for the ERISA violations allegedly committed by DBM. *See, e.g., Carner v.. MGS--576 5th Ave., Inc.,* No. 93 Civ. 8259, 1998 WL 33978, at *10 (S.D.N.Y. Jan. 21, 1998) (holding that single employer doctrine does not apply to ERISA claims). I need not resolve this issue here because plaintiffs' ERISA claims must be dismissed on the ground that plaintiffs fail to present a prima facie case of intentional interference with their pension rights as required by that statute, *see* discussion *infra* at pp. 20-24.

Applying the single employer doctrine to the facts of this case demonstrates that Harcourt General may not be held liable for the allegedly discriminatory conduct of DBM. It is uncontroverted that DBM and Harcourt General have separate human resources departments (Def. Rule 56.1 Statement ¶ 9), and that DBM establishes its own policies and makes its own decisions as to the hiring, discipline, and termination of its employees. (*Id.* ¶ 3) It is likewise undisputed that plaintiffs worked for DBM and that each was supervised by another DBM employee. (Duffy Depos. at 60-61; Von Burg Depos. at 114-115; Graham Depos. at 45-48) It follows from these undisputed facts that DBM, and not Harcourt General, made the "final decisions" regarding plaintiffs' employment that are at issue here. *See Arrowsmith,* 69 F.3d at 1240.

**\*5** The other *Arrowsmith* factors support this conclusion. Nothing in the record suggests that Harcourt General and DBM have interrelated operations such as shared employees or office space, *cf. Regan v. In the Heat of the Nite, Inc.,* No.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C

**(Cite as: 1998 WL 252063 (S.D.N.Y.))**

93 Civ. 862, 1995 WL 413249, at *4 (S.D.N.Y. July 12, 1995) (restaurants jointly liable based on shared employees and office space), or that they have any of the same officers or managers. *Cf. Dortz v. City of New York,* 904 F.Supp. 127, 145-47 (S.D.N.Y.1995) (medical school jointly liable where it controlled hospital's operations and supervised its employees, including plaintiff). The only factor that favors requiring Harcourt General to answer for the acts of its subsidiary--common ownership and financial control-- is insufficient, without more, to create such liability. *See Balut v. Loral Elec. Sys.,* 988 F.Supp. 339, 347 (S.D.N.Y.1997) ("the mere fact of a parent-subsidiary relationship does not trigger liability").

Plaintiffs resist this conclusion, arguing that Harcourt General was involved in the employment decisions at issue in this case. They surmise that DBM must have obtained Harcourt General's approval before implementing the core competencies because the new standards represented a significant change in DBM's operations. (Pl. Mem. at 9) In support of this claim, plaintiffs assert that DBM's implementation of the core competencies resulted in the firing of at least ten employees over the age of 40. (*Id.*) Plaintiffs also suggest that Harcourt General had a strong interest in the core competencies because, as the administrator of DBM's pension and benefit plans, Harcourt General benefitted directly from any reduction in the number of DBM employees who were eligible to participate in these plans. (*Id.*) These allegations are not supported by the record.

Although Harcourt General generally requires DBM to obtain its approval before making significant changes in operations (Walz Depos. at 22-23), there is no evidence that such approval was either sought or obtained with respect to any of DBM's actions at issue here. Rather, plaintiffs offer only speculation that implementation of the new performance standards was a significant change in DBM's operations that would have required Harcourt General's approval. Plaintiffs' failure to support these allegations with evidence is particularly striking given the extensive pre-trial discovery in this matter.

Furthermore, that Harcourt General administers the pension and benefit plans for its subsidiaries, including DBM, is hardly uncommon, *see, e.g., Pagan v. NYNEX Pension Plan,* 52 F.3d 438, 439 (2d Cir.1995); *Reichelt v. Emhart Corp.,* 921 F.2d 425, 427-28 (2d Cir.1990), nor is it proof that Harcourt General made the employment decisions at issue here. *See Richard v. Bell Atlantic Corp.,* 946 F.Supp. 54, 62-63 (D.D.C.1996) (that parent administers pension and benefit plans for its subsidiary is of "low or no probative value" in determining single employer status) (citing *Frank v. U.S. West, Inc.,* 3 F.3d 1357, 1363 (10th Cir.1993)). Accordingly, plaintiffs' discrimination claims against Harcourt General must be dismissed.

IV.

*6 DBM also moves for partial summary judgment on the following claims: 1) Duffy's and Graham's retaliation claims; 2) Duffy's, Von Burg's, and Graham's ERISA claims; 3) Duffy's and Graham's City Human Rights Law claims; and 4) Graham's State Human Rights Law claims. These claims are subject to the familiar three-step framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined in *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), among other cases. *See Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 465 (2d Cir.1997) (retaliation); *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1112 (2d Cir.1988) (ERISA). A court applying this standard proceeds as follows:

First, the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.

1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C

**(Cite as: 1998 WL 252063 (S.D.N.Y.))**

*Burdine,* 450 U.S. at 252 (quoting *McDonnell Douglas,* 411 U .S. at 802)).

A. *Duffy's and Graham's Retaliation Claims*

Although DBM concedes that disputed issues of fact preclude summary judgment on plaintiffs' age discrimination claims (Def. Reply Mem. at 5), it has moved for summary judgment on Duffy's and Graham's retaliation claims. *See Davis v. State Univ. of New York,* 802 F.2d 638, 642 (2d Cir.1986) ("A finding of unlawful retaliation is not dependent on the merits of the underlying discrimination complaint."). A prima facie case of retaliation stemming from a charge of age discrimination requires proof of the following four elements: "1) the plaintiff was engaged in an activity protected under the ADEA; 2) the employer was aware of the plaintiff's participation in the protected activity; 3) the plaintiff was subject to an adverse employment action; and 4) there is a nexus between the protected activity and the adverse action taken." *Wanamaker,* 108 F.3d at 465; *accord Hollander,* 895 F.2d at 85. [FN7]

> FN7. Duffy and Graham assert identical claims of retaliation under the ADEA and the City and State Human Rights Laws. These state and local law claims are governed by the same standards as those brought under the ADEA. *See Spence v. Maryland Cas., Co.,* 995 F.2d 1147, 1158 (2d Cir.1993).

"Adverse employment action" includes dismissal, demotion, diminution of an employee's wages or benefits, and other actions by an employer which cause an employee to suffer a "materially adverse change in the terms and conditions of employment." *Torres v. Pisano,* 116 F.3d 625, 640 (2d Cir.), *cert. denied,* 522 U.S. 997, 118 S.Ct. 563, 139 L.Ed.2d 404 (1997). The Court of Appeals also has found adverse employment action even after an employee has been terminated where the employer takes some additional step which adversely affects the employee's ability either to secure future employment, *see Silver v. Mohasco Corp.,* 602 F.2d 1083, 1090 (2d Cir.1979) ("blacklisting" former

employee), *rev'd on other grounds,* 447 U.S. 807, 100 S.Ct. 2486, 65 L.Ed.2d 532 (1980), or to "expeditiously ascertain and enforce [his] rights [against the employer]." *Johnson v. Palma,* 931 F.2d 203, 207 (2d Cir.1991) (refusing to participate in grievance procedure). The requisite causal connection may be proved "indirectly by showing that the protected activity was followed closely by discriminatory treatment...." *Id.* (citing *DeCintio v. Westchester County Medical Ctr.,* 821 F.2d 111, 115 (2d Cir.1987)).

1. *Duffy*

*7 Duffy claims that DBM retaliated against him for filing a complaint with the EEOC by refusing to pay him for the workshop he conducted in November 1995 unless he signed an independent contractor agreement with DBM. (Pl. Mem. at 17) As noted, that agreement contained a non-competition provision which would have restricted Duffy's right to work as a consultant for any of DBM's clients for at least one year. (Ranni Aff. Ex. 20 ¶ 7) DBM concedes that these allegations satisfy the first two elements of a prima facie case of retaliation. (Def. Mem. at 31) However, it argues that Duffy fails to establish the third and fourth elements. (*Id.* at 31-32) I disagree.

As noted, Duffy filed a complaint with the EEOC on October 13, 1995. (Ranni Aff. Ex. 13) Approximately one month later, in mid-November 1995, DBM hired Duffy to conduct a two-day workshop for one of DBM's clients as an independent contractor. (Def. Rule 56.1 Statement ¶ 37) DBM subsequently refused to pay Duffy unless he signed the agreement described above. (Ranni Aff. Ex. 12 ¶ 7)

Of course, that DBM rehired Duffy as an independent contractor was not adverse employment action. *Cf. Boyle v. McCann-Erickson, Inc.,* 949 F.Supp. 1095, 1104-05 (S.D.N.Y.1997) ("Here, plaintiff had already been terminated; accordingly this alleged decision [not to rehire him to do freelance work] did not effect his employment nor hinder him in any way from enforcing his rights."). However, that DBM refused to pay him

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C

**(Cite as: 1998 WL 252063 (S.D.N.Y.))**

for work he had already performed unless he signed an agreement restricting his right to work in the future arguably qualifies as adverse employment action. *Cf. Silver,* 602 F.2d at 1090 (employer's "blacklisting" of former employee prevented him from securing future employment). Further, that DBM forced the agreement on Duffy approximately one month after he filed his EEOC complaint is sufficient to establish a prima facie case of retaliation. *See Johnson,* 931 F.2d at 207.

The burden now shifts to DBM to provide a legitimate, non-discriminatory reason for its conduct. *See Hollander,* 895 F.2d at 83. DBM claims that the agreement it required Duffy to sign was its "standard" independent contractor agreement, and that in doing so, DBM was treating Duffy the same as its other independent contractors. In support of this claim, DBM has submitted a blank independent contractor agreement (Kelly Aff. Ex. AG), as well as testimony from one of its employees to the effect that the agreement proffered to Duffy was prepared using that form as a template. (Collins Depos. at 514-15) Together, this evidence is sufficient to meet DBM's burden of production on this issue. *See Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993).

Because DBM has carried this burden, Duffy must show that DBM's proffered reason was not the true reason for its actions but was instead a pretext for discrimination. *See Burdine,* 450 U.S. at 255-56. However, Duffy need not present additional evidence to satisfy this burden and may rely instead on the evidence that established his prima facie case. *See St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 510, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Here, it is clear that DBM's refusal to pay Duffy after he completed the work was wrongful. DBM did not ask Duffy to sign the independent contractor agreement before he performed the work, nor is there any competent evidence that Duffy knew at the time he agreed to conduct the workshop that he would have to limit his future employment significantly if he accepted work from DBM. As noted, DBM forced the agreement on Duffy approximately one month after Duffy filed his complaint with the EEOC.

\*8 Moreover, there is evidence in the record--although admittedly not-much--which casts doubt on DBM's claim that all its independent contractors worked according to the same terms that were offered to Duffy. (Ranni Aff. Ex. 21) Duffy's evidence, taken together and viewed in the light most favorable to him, suggests that DBM may have treated Duffy differently from its other independent contractors. As a result, Duffy has shown that there is a genuine issue of material fact as to whether DBM's proffered reason for its actions was a pretext for discrimination. Accordingly, DBM's motion for summary judgment on Duffy's retaliation claims is denied.

*2. Graham*

Graham alleges that DBM retaliated against him for filing his EEOC complaint by refusing to pay him the severance to which he claims to have been entitled. (Pl. Mem. at 16) Graham argues that DBM stopped paying him severance on December 20, 1995, and that based on his ten years of service at DBM, he was entitled to continue receiving payments until January 26, 1996. (*Id.*) Again, DBM concedes that Graham has established the first two elements of a prima facie case (Def. Mem. at 31), but argues that he fails to establish the third and fourth elements. (Def. Reply Mem. at 18-19) Once again, I disagree.

Viewing the facts in the light most favorable to Graham, DBM fired Graham on October 27, 1995, when he refused to accept early retirement and sign a severance agreement. (Pl. Mem. at 16) As noted, Graham filed a discrimination complaint with the EEOC on December 1, 1995. (Ranni Aff. Ex. 14) Approximately three weeks later, on December 20, 1995, DBM stopped making severance payments to Graham (*id.* Ex. 17), even though he was entitled to receive such payments until January 26, 1996. (*Id.* Ex. 12) Because failing to pay an employee severance to which he is entitled is an adverse employment action, *see Wanamaker,* 108 F.3d at 466, and because DBM stopped making these payments less than three weeks after Graham filed a complaint with the EEOC, *see Johnson,* 931 F.2d at 207, Graham has stated a prima facie case of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C

**(Cite as: 1998 WL 252063 (S.D.N.Y.))**

retaliation.

DBM claims that it had a legitimate, non-discriminatory reason for discontinuing these payments to Graham. It argues that contrary to Graham's assertions, Graham was still an employee of DBM from October 27, 1995, through December 20, 1995, although DBM had told him to stop reporting to work while he considered whether to accept the enhanced severance package and sign the severance agreement. (Def. Rule 56.1 Statement ¶ 51) Thus, DBM alleges, Graham was receiving salary--and not severance payments--during this period. (*Id.* ¶ 52)

Furthermore, DBM claims that it contacted Graham on December 20, 1995, and requested that he accept the package or return to work. (*Id.* ¶ 53) When Graham refused to do either, DBM deemed him to have retired and ceased paying him salary. ( *Id.* ¶ 54) DBM claims also that Graham was not entitled to severance because he had retired, even though Graham never signed the severance agreement or received the enhanced severance package. (Def. Reply Mem. at 19) Based on the above allegations and supporting evidence, DBM has met its burden of setting forth a legitimate, non-discriminatory explanation for its conduct. *See Jackson v. Lyons Falls Pulp & Paper, Inc.,* 865 F.Supp. 87, 95 (N.D.N.Y.1994) (conditioning payment of severance on employee's willingness to sign severance agreement not unlawful where employee was not otherwise entitled to severance); *Cronin v. ITT Corp.,* 737 F.Supp. 224, 230 (S.D.N.Y.) (same), *aff'd,* 916 F.2d 709 (1990) (table).

**\*9** Graham must now show that this explanation was not the true reason for DBM's actions but was instead a pretext for discrimination. *See Burdine,* 450 U.S. at 255-56. Again, a plaintiff does not have to present additional evidence to carry this burden and may rely instead on the evidence that established his prima facie case. *See Hicks,* 509 U.S. at 510. On this record, I cannot determine whether DBM's proffered reason for discontinuing the payments to Graham was pretextual because there is a genuine issue of fact as to whether

Graham was entitled to receive severance pay from DBM and, if so, how much. DBM's severance policy, as reflected in its employee handbook, arguably supports both Graham's and DBM's positions. (Ranni Aff. Ex. 12) The handbook states that employees "released" by DBM are entitled to receive severance payments, but those electing "retirement, whether 'early,' 'normal,' or 'deferred,' " are not. (*Id.*) Whether DBM "released" Graham, or whether he "retir[ed]" is an issue of fact for trial.

Apart from whether Graham was entitled to severance under DBM's severance policy, other evidence in the record suggests that DBM's reason for discontinuing salary payments to Graham may have been pretextual. DBM paid severance to both Duffy and Von Burg, even though each of them--like Graham-- declined the enhanced severance package and refused to sign the severance agreement. (Kelly Aff. Exs. M, N) Further, the agreement that DBM asked Graham to sign appears to acknowledge that Graham was entitled to receive DBM's standard severage package even if he declined the enhanced one. (Ranni Aff. Ex. 5 ¶ 6) Under these circumstances, Graham's evidence, viewed in the light most favorable to him, is sufficent to raise an inference of discrimination and therefore also to defeat DBM's motion for summary judgment. *See Fisher v. Vassar College,* 114 F.3d 1332, 1338 (2d Cir.1997) (en banc) ("The sufficiency of the finding of pretext to support a finding of discrimination depends on the circumstances of the case."), *cert. denied,* 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). Accordingly, DBM's motion for summary judgment on Graham's retaliation claims is denied.

*B. Duffy's, Von Burg's, and Graham's ERISA claims*

Section 510 of ERISA makes it unlawful for "any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140 (1994). Although this section is concerned primarily with "protect[ing] plan participants from termination

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C

**(Cite as: 1998 WL 252063 (S.D.N.Y.))**

motivated by an employer's desire to prevent a pension from vesting," *Inter-Modal Rail Employees Ass'n v. Atchison, Topeka and Santa Fe Ry. Co.,* 520 U.S. 510, 117 S.Ct. 1513, 1515, 137 L.Ed.2d 763 (1997) (quotations and citations omitted), ERISA also protects employees whose pension rights are fully vested against actions by their employers that are specifically intended to prevent them from accruing additional vested benefits. *See Gitlitz v. Compagnie Nationale Air France,* 129 F.3d 554, 558 (11th Cir.1997); *Conkwright v. Westinghouse Elec. Corp.,* 933 F.2d 231, 238 (4th Cir.1991); *Clark v. Resistoflex Co., Div. of Unidynamics Corp.,* 854 F.2d 762, 770 (5th Cir.1988).

*10 However, "[n]o ERISA cause of action lies where the loss of pension benefits was a mere consequence of, but not a motivating factor behind, a termination of employment." *Titsch v. Reliance Group, Inc.,* 548 F.Supp. 983, 985 (S.D.N.Y.1982), *aff'd,* 742 F.2d 1441 (2d Cir.1983) (table). Thus, a plaintiff must do more than show "that if he had not been terminated, he would have been able to accrue additional benefits." *Dister,* 859 F.2d at 1111 (quotation omitted). Rather, "the ultimate inquiry in a § 510 case is whether the employer had the specific intent to interfere with the employee's ERISA rights...." *Clark v. Coats & Clark, Inc.,* 990 F.2d 1217, 1222 (11th Cir.1993).

To state a prima facie case under § 510, a plaintiff must prove: 1) that he is an employee who may be entitled to receive benefits under a plan covered by ERISA; 2) that he was otherwise qualified for the job he held; and 3) that the timing of his discharge and the resulting cost saving to the employer raises an inference of discrimination. *See Dister,* 859 F.2d at 1114-15; *Burger v. Litton Indus., Inc.,* No. 91 Civ. 0918, 1996 WL 421449, at *17 (S.D.N.Y. Apr. 25, 1996) (Peck, M.J.). In this case, DBM concedes that the first element has been established (Def. Mem. at 37), and disputed issues of fact preclude summary judgment as to whether plaintiffs were otherwise qualified for the jobs they held at DBM. However, Duffy's, Von Burg's, and Graham's ERISA claims must be dismissed because they have failed to establish the third element of a prima facie

case--that the timing of their discharge and the resulting cost saving to DBM raises an inference of discrimination. *See Lightfoot v. Union Carbide Corp.,* 110 F.3d 898, 906 (2d Cir.1997).

As noted, Duffy's and Graham's pension rights were fully vested for both early and normal retirement benefits when DBM fired them. (Def. Rule 56.1 Statement ¶ ¶ 34, 55) At the time he was fired, Von Burg was fully vested for normal retirement benefits, but was more than three years away from vesting for early retirement. (*Id.* ¶ 47) As a consequence, that DBM fired plaintiffs when it did fails to raise an inference of discrimination. *See Burger,* 1996 WL 421449, at *17 (no inference where employee fired four months before enhanced pension rights would have vested); *see also Turner v. Schering-Plough Corp.,* 901 F.2d 335, 348 (3d Cir.1990) (no inference where employee fired more than two years before vesting).

Nor is there evidence that DBM--or Harcourt General, for that matter--stood to reap substantial cost savings by firing plaintiffs. *See Sweet v. Electronic Data Systems, Inc.,* No. 95 Civ. 3987, 1996 WL 204471, at *11 (S.D.N.Y. Apr. 26, 1996) ("Plaintiff has offered nothing about ... the amount of benefits he might have received, [or] the amount EDS may have saved by letting him go ... to suggest that the decision to fire him was motivated by a desire to avoid pension or health care responsibilities."). On this record, the mere fact that plaintiffs were terminated fails to raise an inference that DBM fired them with the specific intent to deny plaintiffs their pension rights. *Cf. Dister,* 859 F.2d at 1155 (inference proper where employee fired four months before vesting and plaintiff presented evidence of substantial cost saving to employer); *Corcoran v. GAB Business Servs., Inc.,* 723 F.Supp. 966, 969 (S.D.N.Y.1989) (inference proper where employee fired seven months before vesting coupled with evidence of cost saving).

*11 Nor is this case similar to *Seaman v. Arvida Realty Sales,* 985 F.2d 543 (11th Cir.1993), upon which plaintiffs rely. In *Seaman,* the Court permitted Seaman to proceed with her ERISA claims against her former employer, Arvida, even

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C

**(Cite as: 1998 WL 252063 (S.D.N.Y.))**

though her pension rights were fully vested at the time of her discharge. *Id.* at 546. Seaman alleged that Arvida's decision to terminate her prevented her from receiving additional vested benefits under Arvida's pension plan. *Id.* at 546. In holding that this allegation was sufficient to state a claim under ERISA, the Eleventh Circuit relied heavily on Arvida's admission that it had fired Seaman because she refused to accept a change in status from employee to independent contractor and the concomitant loss of pension and health benefits. *Id.* at 544. On these facts, the Court reversed the district court's dismissal of Seaman's ERISA claims. *Id.* at 547.

*Seaman* is readily distinguishable. Unlike the employer in *Seaman*, DBM did not force plaintiffs because they refused to give up their right to participate in DBM's pension and benefit plans. Rather, it fired them because they failed to perform under the new performance standards. Whether those standards discriminated against plaintiffs on the basis of age, or whether DBM applied them in a discriminatory manner, are issues to be decided at trial. However, plaintiffs have come forth with no evidence that DBM's decision to fire them was motivated by a desire to reduce its contributions to the pension and benefits plans. Accordingly, plaintiffs' ERISA claims must be dismissed.

C. *Duffy's and Graham's City Human Rights Law claims*

Duffy's and Graham's City Human Rights Law claims must be dismissed because neither Duffy nor Graham was subjected to discriminatory conduct within New York City. [FN8] The City Human Rights Law prohibits employers from discriminating against its employees, *inter alia,* on the basis of age. *See* N.Y.C. Admin. Code § 8-107. However, both New York State law and the New York City Administrative Code limit the applicability of the City Human Rights Law to acts occurring within the boundaries of New York City. *See* N.Y. Gen. Mun. Law § 239-s (McKinney 1990) ; N.Y.C. Admin. Code § 2-201 (1986); *see also Levy v. City Comm'n on Human Rights,* 85 N.Y.2d 740, 743, 628 N.Y.S.2d 245, 246-47, 651 N.E.2d

1264 (1995) ("The Administrative Code ... vests in the New York City Commission on Human Rights the authority and jurisdiction to eliminate and prevent discrimination within the City of New York.") (citation and footnote omitted). Thus, in order to state a claim under the City Human Rights Law, a plaintiff must allege that he was discriminated against by the defendant within New York City. *See Casper v. Lew Lieberbaum & Co.,* No. 97 Civ. 3016, 1998 WL 150993, at *4 (S.D.N.Y. Mar. 31, 1998); *Wishner v. Continental Airlines,* No. 94 Civ. 8239, 1997 WL 420286, at *8 (S.D.N.Y. July 25, 1997).

> FN8. DBM argues also that plaintiffs' City Human Rights Law claims-- including Von Burg's--must be dismissed because they failed to serve a copy of their complaint on the New York City Commission on Human Rights and the Corporation Counsel as required by N.Y.C. Admin.Code § 8-502 (1986). (Def. Mem. at 23-24) Whatever doubt may have existed before, *see, e.g., Paladines v. Poulos,* No. 93 Civ. 9031, 1994 WL 389022, at *3 (S.D.N.Y. July 22, 1994) (service of complaint on administrative agencies is a prerequisite to suit under City Human Rights Law); *see also Gray v. Shearson Lehman Bros., Inc.,* 947 F.Supp. 132, 137 (S.D.N.Y.1996) (dismissing City Human Rights Law claim where plaintiff failed to serve complaint on administrative agencies and did not oppose dismissal on that ground), it is now settled that filing a complaint with the above agencies is not a prerequisite to bringing suit under the City Human Rights Law. *See Quirk v. Sherry,* 238 A.D.2d 274, 656 N.Y.S.2d 874 (1st Dep't 1997); *Westphal v. Catch Ball Products Corp.,* 953 F.Supp. 475, 481 (S.D.N.Y.1997); *Kim v. Dial Serv. Int'l, Inc.,* No. 96 Civ. 3327, 1997 WL 5902, at *7-8 (S.D.N.Y. Jan. 8, 1997).

**\*12** Here; it is undisputed that, at all relevant times, Duffy and Graham worked at DBM's offices in Melville, New York, and Parsippany, New Jersey, respectively. (Def. Rule 56.1 Statement ¶ 30;

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C

**(Cite as: 1998 WL 252063 (S.D.N.Y.))**

Compl. ¶ 69) Duffy's and Graham's immediate supervisors, Joelyn Cecere and Mark Landsberg, respectively, also worked in these field offices. (Duffy Depos. at 132-33; Kelly Aff. Ex. AA; Trum Depos. at 487; Ranni Aff. Ex. 13) By contrast, nothing in the record suggests that either Duffy or Graham was subjected to discriminatory conduct by DBM in New York City.

Moreover, even if, as Duffy and Graham claim, the decision to fire them was made by DBM at its headquarters in New York City, that fact, standing alone, is insufficient to establish a violation of the City Human Rights Law when the employees affected by that decision did not work in New York City. *See Lightfoot v. Union Carbide Corp.,* No. 92 Civ. 6411, 1994 WL 184670, at *5 (S.D.N.Y. May 12, 1994) (dismissing City Human Rights Law claim where plaintiff worked in Connecticut even though decision to adopt early retirement program that led to plaintiff's dismissal was made at defendant's New York City office), *aff'd,* 110 F.3d 898 (2d Cir.1997). To hold otherwise would be to expand the City Human Rights Law to cover any employee who is fired pursuant to a decision handed down by an employer from its New York City headquarters, no matter where the employee in question actually works. Accordingly, because neither Duffy nor Graham was subject to any discriminatory conduct in New York City, Duffy's and Graham's City Human Rights Law claims are dismissed.

D. *Graham's State Human Rights Law claims*

For essentially the same reasons, Graham's State Human Rights Law claims also must be dismissed. The State Human Rights Law--like its local law counterpart-- prohibits employers from discriminating against their employees, *inter alia,* on the basis of age. *See* N.Y. Exec. Law § 296(a). Although the State Human Rights Law, unlike the City Human Rights Law, applies to certain discriminatory acts committed outside New York State, *see* N.Y. Exec. Law § 298-a (McKinney 1990) ("The provisions of this article shall apply as hereinafter provided to an act committed outside this state against a resident of this state ... if such act

would constitute an unlawful discriminatory practice if committed within this state"), the State Human Rights Law affords no remedy to a non-New York resident who suffers discrimination outside New York State. *See Iwankow v. Mobil Corp.,* 150 A.D.2d 272, 273, 541 N.Y.S.2d 428 (1st Dep't 1989) ("absent an allegation that a discriminatory act was committed in New York or that a New York State resident was discriminated against, New York's courts have no subject matter jurisdiction over the alleged wrong [under the State Human Rights Law]."); *Beckett v. Prudential Ins., Co.,* 893 F.Supp. 234, 238 (S.D.N.Y.1995) ("The [State Human Rights Law] does not provide a non-resident with a private cause of action for discriminatory conduct committed outside New York by a New York corporation").

*13 Graham is a resident of Morristown, New Jersey. (Compl.¶ 3) As noted, Graham worked, at all times relevant to this case, at DBM's branch office in Parsippany, New Jersey. (*Id.* ¶ 69) Graham's immediate supervisor also worked in that office. (Trum Depos. at 487; Ranni Aff. Ex. 13) Nothing in the record suggests that Graham was subjected to discriminatory conduct by DBM in New York State.

Similarly, even if the decision to fire Graham was made by DBM at its headquarters in New York City, that fact is insufficient to establish a violation of the State Human Rights Law. *See Miller v. Citicorp,* No. 95 Civ. 9728, 1997 WL 96569, at *8-9 (S.D.N.Y. Mar. 4, 1997); *Sherwood v. Olin Corp.,* 772 F.Supp. 1418, 1426 (S.D.N.Y.1991). As Judge Preska noted recently in *Miller,* this same argument was considered and rejected by the Appellate Division in *Iwankow:*

Plaintiff attempts to salvage his [State Human Rights Law] claim by asserting that CSI could not have acted as it did in Florida without the approval of Citicorp and Citibank, N.A. in New York. A similar contention was raised and rejected in *Iwankow.* There, the court noted that 'the only jurisdictional nexus asserted in the complaint, apart from the fact that defendants are domestic corporations, is that plaintiff's termination was part of a worldwide reduction in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C

**(Cite as: 1998 WL 252063 (S.D.N.Y.))**

force which was decided upon at corporate headquarters in New York. The court rejected the application of the [State Human Right Law] [on those facts]....

1997 WL 96569, at *9 (citations omitted). This result does not leave Graham without a remedy under state law; he has asserted claims--which DBM does not challenge--under the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1 *et seq.* (West 1993). Accordingly, Graham's State Human Rights Law claims must be dismissed. [FN9]

> FN9. Alternatively, I would reach the same result were I to apply New York's choice-of-law rules to determine whether New York or New Jersey law governs Graham's claims. *See Littman v. Firestone Tire & Rubber Co.,* 709 F.Supp. 461, 469 (S.D.N.Y.1989) (New Jersey law applies to wrongful discharge claim where plaintiff worked and was fired in New Jersey).

\* \* \*

For the above reasons, Harcourt General's motion for a summary judgment of dismissal is granted. DBM's motion for partial summary judgment is denied with respect to Duffy's and Graham's retaliation claims, and is granted in all other respects.

1998 WL 252063 (S.D.N.Y.), Pens. Plan Guide (CCH) P 23945C

**Motions, Pleadings and Filings (Back to top)**

• 1:96CV05606  (Docket)
                (Jul. 25, 1996)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# TAB D

Not Reported in F.Supp.2d                                                    Page 1

2003 WL 21640381 (S.D.N.Y.)

**(Cite as: 2003 WL 21640381 (S.D.N.Y.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Pamela M. HARRISON, Plaintiff,
v.
NEW YORK CITY ADMINISTRATION FOR
CHILDREN'S SERVICES, et al., Defendants.
**No. 02Civ.0947RCCRLE.**

July 7, 2003.
Pamela M. Harrison, Ridgewood, New York,
Plaintiff, pro se.

Michael A. Cardozo, Corporation Counsel of the
City of New York, New York, New York, for
Defendants.

REPORT AND RECOMMENDATION

ELLIS, Magistrate J.

I. INTRODUCTION

*1 *Pro se* plaintiff Pamela M. Harrison
("Harrison") brings this employment discrimination
action against defendants New York City
Administration for Children's Services ("ACS"),
Frank Olton ("Olton"), John Pape ("Pape"), and
Anthony Defazio ("Defazio") (collectively
"defendants"), pursuant to Title VII of the Civil
Rights Act of 1964, as amended, 42 U.S.C. §§
2000e *et seq.* ("Title VII"). Harrison alleges that
defendants failed to approve a transfer request to
ACS's Bronx office starting in April 1999, and
approximately every six months thereafter, on the
basis of her race, color, and gender. She also alleges
continuous harassment and retaliation from April
1999. Defendants filed a motion to dismiss the
complaint, pursuant to Federal Rule of Civil
Procedure 12(b)(6), on the grounds that it is
time-barred, and otherwise fails to state a claim
upon which relief can be granted. Specifically, ACS
asserts that Harrison has not pled facts sufficient to
demonstrate an "adverse employment action" as
established under the framework set forth by the
Supreme Court in *McDonnell Douglas Corp. v.
Green,* 411 U.S. 792 (1973). ACS also argues that
under *Swierkiewicz v. Sorema,* 534 U.S. 506, 508
(2002), Harrison's harassment claim should be
dismissed as insufficiently stated. Additionally,
ACS argues that Harrison cannot maintain a cause
of action under Title VII against defendants in their
individual capacities. For the reasons set forth
below, I recommend that defendants' motion to
dismiss the complaint be GRANTED IN PART, as
to Harrison's retaliation claim, any claims which she
alleges took place before September 24, 1999, and
her claims against both the ACS and the individual
defendants, DENIED IN PART, as to defendant's
timeliness argument, and Harrison's refusal to
transfer and harassment claims.

II. BACKGROUND
Harrison is an African American woman with three
children. *See* Complaint ("Compl.") at 4. Harrison
claims that she was continually denied a transfer
from ACS's central office in Manhattan to its Bronx
office. *Id.* In her complaint, Harrison alleges that "I
believe that other Caucasian and non African
American women were granted the opportunity to
transfer to locations closer to their homes." *Id.* at 4.
In addition, Harrison alleges that beginning in April
1999, she was continually harassed because of her
race, gender and color. *See* Amended Complaint
("Am.Compl.") at 3-4.

Harrison filed a charge with the Equal Employment
Opportunity Commission ("EEOC") on July 19,
2000. *Id.* The EEOC issued a Right-to-Sue letter on
May 3, 2001. *See* Declaration of Assistant
Corporation Counsel Abigail Goldenberg in

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d

2003 WL 21640381 (S.D.N.Y.)

**(Cite as: 2003 WL 21640381 (S.D.N.Y.))**

Support of Defendant's Motion to Dismiss ("Goldenberg Decl.") at Exh. D. On November 11, 2001, the EEOC issued a second Right-to-Sue letter to Harrison. *Id* . at Exh. D. Harrison claims she received the second letter on November 15, 2001. *See* Am. Compl. at 5. She further notes that defendants have not provided proof that the original letter was sent to her at the proper address. *See Id.;* Plaintiff's Response ("Pl.Opp.") at 1. On March 12, 2002, the EEOC sent Harrison a letter advising her that the November 11 letter was sent in error, and therefore was rescinded. *See* Goldenberg Decl. at Exh. F. The EEOC noted that the May 3 letter was still operative. *Id.* Harrison was subsequently fired by defendants on February 11, 2002. *See* Am. Compl. at 4.

**\*2** Harrison filed this instant action on February 6, 2002. The matter was referred to the undersigned by the Honorable Richard Conway Casey on May 3, 2002. Pursuant to an Order by this Court, Harrison filed an amended complaint on September 9, 2002. On November 1, 2002, ACS moved to dismiss the complaint.

### III. DISCUSSION
A. Standard for Motion to Dismiss--Title VII

In deciding a motion to dismiss, the Court "must accept as true all the factual allegations in the complaint," *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U .S. 163, 164 (1993) (citation omitted), and draw all reasonable inferences in favor of the plaintiff. *See Albright v. Oliver,* 510 U.S. 266, 268 (1994); *Weinstein v. Albright,* 261 F .3d 127, 131 (2d Cir.2001). At this stage, the Court's responsibility is not to test the weight of the evidence, but rather to look at the " 'legal feasibility of the complaint[.]" ' *Cooper v. Parksy,* 140 F.3d 433, 440 (2d Cir.1998) ( *quoting Ryder Energy Distribution Corp. v. Merrill Lynch Commodities Inc.,* 748 F .2d 774, 779 (2d Cir.1984)).

Prior to *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506 (2002), a plaintiff in this Circuit alleging employment discrimination under Title VII was required to plead evidence of a *prima facie* case

under *McDonnell Douglas,* 411 U.S. at 802; *Tarshis v. Reise Org .,* 211 F.3d 30, 35-36 (2d Cir.2000), *abrogated by Swierkiewicz.* Although the burden was minimal, a motion to dismiss was granted if the plaintiff made only "bald assertions[,]" *id.,* and "bare allegations" without factual support. *Gregory v. Daly,* 243 F.3d 687, 692 (2d Cir.2001). In *Swierkiewicz,* the Supreme Court held that the requirement to plead a *prima facie* case was inappropriate, and that a plaintiff need only provide information which " 'give[s] the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." ' 534 U.S. at 508 (*quoting Conley v. Gibson,* 335 U.S. 41, 47 (1957)); *see also Aguilar v. New York Convention Ctr. Operating Corp.,* 2002 WL 844397 \*2 (S.D.N.Y.2002). The complaint should contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a).

Furthermore, where a plaintiff is *pro se* and is alleging civil rights violations, the Court should proceed with caution and review claims liberally. *Weinstein,* 261 F.2d at 132; *see also Shah v. New York State Dep't of Civil Serv.,* 168 F.3d 610, 614 (2d Cir.1999). The Court should apply "less stringent standards than formal pleadings drafted by lawyers," *Haines v. Kerner,* 404 U.S. 519, 520 (1972), and look beyond the "four corners of the complaint" to all the pleadings before the Court, including the plaintiff's opposition papers. *Pagan v. New York State Div. of Parole,* 2002 WL 398682 \* 3 (S.D.N.Y.2002); *Amaker v. Haponik,* 2000 WL 343772 \*1 (S.D.N.Y.2000); *see also Burgess v. Goord,* 1999 WL 33458 \*1 n. 1 (S.D.N.Y.1999).

B. Timeliness

**\*3** "In order to be timely, a claim under Title VII ... must be filed within 90 days of the claimant's receipt of a right-to-sue letter." *Sherlock v. Montefiore Med. Ctr.,* 84 F.3d 522, 525 (2d Cir.1996) (*citing* 42 U.S.C. § 2000e-5(f)(1); *see also Baldwin County Welcome Ctr. v. Brown,* 466 U.S. 147, 149-50 (1984) (*per curiam* ); *Cornwell v. Robinson,* 23 F.3d 694, 706 (2d Cir.1994)). "This ninety-day period begins to run on the date the claimant actually receives the right-to-sue notice."

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 21640381 (S.D.N.Y.)

**(Cite as: 2003 WL 21640381 (S.D.N.Y.))**

*Lin v. New York City Admin. for Children's Servs.,* 2001 WL 964016 *3 (S.D .N.Y.2001) (*citing Abidekun v. New York City Transit Auth.,* 1998 WL 296372 *3 (E.D.N.Y.1998)). In this circuit, "there is a rebuttable presumption that a mailed document is received three days after its mailing." *Ruiz v. New York City Fire Dep't,* 2001 WL 767009 * 2 (S.D.N.Y.2001) (citation omitted). Furthermore, in the absence of a direct challenge, there is a presumption "that a notice provided by a government agency has been mailed on the date shown on the notice." *Sherlock v. Montefiore Medical Center,* 84 F.3d 522, 526 (2d Cir.1996) ( *citing Baldwin County Welcome Center v. Brown,* 466 U.S. 147, 148 & n. 1 (1984)).

In the case before the Court, the initial letter from the EEOC was dated May 3, 2002. *See* Goldenberg Decl. at Exh. D. Based on representations made by Harrison in both the Complaint and her opposition papers, it appears that she never received the May 3 letter. Defendants argue that *Sherlock* and its progeny compel the Court to dismiss Harrison's complaint based on timeliness. *See* Memorandum of Law in Support of Defendants' Motion to Dismiss ("Def.Mem.") at 7. However, as the court observed in *Ruiz,* "the complaint [in *Sherlock* ] apparently did not allege the date on which plaintiff received the right-to-sue letter." 2001 WL 767009 at *2. When, as here, the complaint alleges a late date of receipt, or non-receipt, for purposes of a 12(b)(6) motion, a court must accept the allegation as true, and deny defendant's motion to dismiss for timeliness. *See Id.; Chi Ho Lin v. New York City Administration for Children's Services,* 2001 WL 964016 *4 (S.D.N.Y.2001); *Everson v. New York City Transit Authority, et al.,* 216 F.Supp.2d 71, 78 (E.D.N.Y.2002). Accordingly, to the extent that defendants' motion to dismiss is based on timeliness, the motion should be DENIED.

C. Harrison's Title VI Claims

1. Refusal to Transfer

Harrison's original Title VII claim centered on the fact that defendants denied her repeated requests for transfer to a new location. *See* Compl. at 4-5. She alleges that "other caucasian and non African-American women were granted the opportunity to transfer to locations closer to their homes." *Id.* Her Title VII claim, therefore, centered on the refusal to transfer on the alleged basis of racial and gender discrimination.

To make out a prima facie Title VII discrimination claim, a plaintiff must pass the burden-shifting test laid out by the Supreme Court in *McDonnell Douglas.* "The *McDonnell Douglas* formulation requires the plaintiff to demonstrate that she (1) was a member of a protected class, (2) was qualified for the job in question, (3) suffered an adverse employment action, and that (4) others similarly situated were more favorably treated." *Dawson v. Bumble & Bumble,* 246 F.Supp.2d 301, 312 (S.D.N.Y.2003) (*citing McDonnell Douglas,* 411 U.S. at 803). Defendants argue that Harrison's claim does not arise to an adverse employment action, and thus fails the *McDonnell Douglas* test.

*4 As the Second Circuit has noted, "[a] plaintiff sustains an adverse employment action if he or she endures a 'materially adverse change' in the terms and conditions of employment." *Galabya v. New York City Board of Education,* 202 F.3d 636, 640 (2d Cir.2000) (citations omitted). Further, "[t]o be 'materially adverse' a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.* (citation omitted). Although not an exclusive list, the Second Circuit has stated, "[a] materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." *Id.* (citations omitted). However, "[a]n adverse employment action need not translate into financial consequences." *Dawson,* 246 F.Supp.2d at 322.

Defendants argue that courts within this circuit have noted that a transfer will be considered an adverse employment action only if it equates to a setback in the plaintiff's career. *See, e.g., Weeks v. New York State Division of Parole,* 273 F.3d 76, 86

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 21640381 (S.D.N.Y.)

**(Cite as: 2003 WL 21640381 (S.D.N.Y.))**

(2d Cir.2001), *abrogated on other grounds by National R.R. Passenger Corporation v. Morgan,* 536 U.S. 101 (2002); *Galabya,* 202 F.3d at 641; *Rodriguez v. Board of Education,* 620 F.2d 363, 366 (2d Cir.1980). However, these cases are distinguishable from the case before this Court because none of the cases cited by defendants deal with a situation where the transfer has a negative impact on the plaintiff's ability to perform the job. In this case, however, Harrison's ability to perform her job satisfactorily goes directly toward her transfer request.

Moreover, Harrison alleges that other "caucasian and non African-American" employees were transferred upon request. This factual allegation has not been explored. "It is important to recognize the difference between disposing of a case on a 12(b)(6) motion and resolving the case later in the proceedings ... by summary judgment." *Chance v. Armstrong,* 143 F.3d 698, 701 (2d Cir.1998). During the course of discovery, Harrison will have the opportunity to gather proof that the defendants had a transfer policy which was applied in a discriminatory manner. *See Boyd v. Nationwide Mutual Insurance Company,* 208 F.3d 406, 410-11 (S.D .N.Y.2000) (citation omitted) ("[I]t cannot be said in advance of discovery that plaintiff will not be able to raise an issue of fact."). If transfer were regularly granted to Caucasian employees, but denied to African American employees, such a practice would constitute discrimination. Therefore, defendants motion to dismiss Harrison's refusal to transfer claim should be DENIED.

2. Harassment and Retaliation

Harrison alleges harassment, dating back to April 1999, and retaliation, both for a denial of a promotion and her subsequent termination. Defendants allege that Harrison's harassment claim is deficient in facts, and fails to state a cause of action. *See* Def. Mem. at 10. However, pursuant to Federal Rule of Civil Procedure 8(a), the courts only requires notice pleading. Further, as the Supreme Court held in *Swierkiewicz,* the complaint need only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it

rests." 534 U.S. at 508. As defendants properly point out, the complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." *Johnson v. Baruch College,* 2002 U.S. Dist. LEXIS 16605 *11 (S.D.N.Y. September 3, 2002) (citation omitted). Harrison's complaint alleges both the charge and the time the harassment began. "The simplified notice pleading standard relies on liberal discovery rules and summary judgment motions to define disputed facts and issues and to dispose of unmeritorious claims." *Swierkiewicz,* 534 U.S. at 512. Therefore, defendants motion to dismiss Harrison's harassment claim should be DENIED.

**\*5** Harrison's retaliation claim, however, should be dismissed. A *prima facie* case for retaliation must demonstrate that plaintiff engaged in a protected activity, that the employer was aware that plaintiff did so, that the employer took an adverse action against the plaintiff, and that a causal connection existed between the protected activity and the adverse action taken by the employer. *See Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993). Harrison alleges that her firing was retaliatory, but she does not allege which protected activity (the filing of the EEOC and New York City Commission on Human Rights ("NYCCHR") charges or the filing of the present complaint) caused the retaliation. To the extent Harrison is alleging that the firing was retaliation for filing charges with the EEOC and NYCCHR, this fails to meet the causality requirement necessary for a retaliation cause of action. In *Clark County School District v. Breeden,* the Supreme Court noted that the temporal proximity between the protected activity and the adverse action taken by the employer must be "very close." 532, U.S. 268, 273 (2001). Harrison was fired nineteen months after filing charges with the appropriate administrative agencies, and this simply cannot meet the causality standard. *Id.* (noting, "[a]ction taken (as here) 20 months later suggests, by itself, no causality at all."). Further, Harrison cannot allege that the firing was taken as a result of filing the current complaint because the affidavit of service notes that defendants were not served until February 14, three days after Harrison was fired. Therefore, defendants

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                Page 5
2003 WL 21640381 (S.D.N.Y.)

**(Cite as: 2003 WL 21640381 (S.D.N.Y.))**

motion to dismiss Harrison's retaliation cause of action should be GRANTED.

3. Claims Arising from Conduct Before September 24, 1999

Harrison filed a charge with the EEOC and NYCCHR on July 19, 2000. *See* Goldenberg Decl. at Exh. C. Title VII mandates that claims must be filed with the EEOC within 300 days of the alleged discriminatory acts if the state in which the discriminatory act occurred has an entity with the authority to grant or seek relief. *See* 42 U.S.C. § 2000e-5(e)(1). Therefore, "[a] claim is time barred if it is not filed within [this] time limit[ ]." *National Railroad Corporation v. Morgan,* 536 U.S. 101, 109 (2002). Defendants argue that any claim Harrison raises dating back before September 24, 1999, is time-barred. The Supreme Court has held that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." *Id.* at 113. These discrete acts include retaliatory acts and failure to promote. *Id.* at 114. Therefore, Harrison's claims relating to retaliation and failure to promote, to the extent they occurred before September 24, 1999, are time-barred, and therefore should be dismissed. Defendants motion with respect to these claims should be GRANTED.

Harrison's claim of harassment, however, is not time barred. She states that she was harassed because of her race and gender, dating back to April 1999. *See* Amend. Compl. at 3. Her claim, viewed as a hostile work environment claim, may incorporate acts which occurred outside of the 300 day filing period, so long as they are related as one single act. The Supreme Court has noted, "[a] hostile work environment claim is comprised of a series of separate acts that collectively constitute one 'unlawful employment practice." ' *Morgan,* 536 U.S. at 117 (*citing* 42 U.S.C. § 2000e-5(e)(1)). The Court went on to hold:

*6 The timely filing provision only requires that a Title VII plaintiff file a charge within a certain number of days after the unlawful practice happened. It does not matter, for purposes of the statute, that some of the component acts of the

hostile work environment fall outside the statutory time period. Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.

*Id.* Therefore, any harassing conduct which supports a hostile work environment claim should be considered even if it occurred before September 24, 1999. Therefore, defendants motion to dismiss Harrison's harassment claim should be DENIED.

D. Claims against ACS and Individual Defendants

Defendants argue that Harrison's complaint should be dismissed against ACS because it is not a suable entity by law. *See* Def. Mem. at 14. The New York City Charter provides that "[a]ll actions and proceedings for the recovery of penalties for the violation of any law shall be brought in the name of the City of New York and not in that of any agency, except where otherwise provided by law." N.Y. City Charter Ch. 16 § 396. Accordingly, ACS is not a properly named defendant, and Harrison's claims against ACS should be dismissed. *Simpri v. New York City Agency for Children's Services,* 2001 WL 1661910 at * 5 (S.D.N.Y. December 28, 2001). However, Harrison should be granted leave to amend her complaint to sue the proper party, namely the City of New York. *Id.*

Harrison's claims against Olton, Pape and Defazio in their individual capacities must also be dismissed. The Second Circuit has previously ruled that "individuals are not subject to liability under Title VII." *Wrighten v. Glowski,* 232 F.3d 119, 120 (2d Cir.2000) (*citing Tomka v. Seiler Corporation,* 66 F.3d 1295, 1313 (2d Cir.1995)); *see also Mandell v. County of Suffolk,* 316 F.3d 368, 377 (2d Cir.2003). Although individual liability can be asserted under New York's Human Rights Law, N.Y. Exec. Law § 296, Harrison has not added this supplemental claim to her amended complaint. *See Mandell,* 316 F.3d at 377 (citations omitted). Therefore, Harrison's claims against the individual defendants should be DISMISSED WITHOUT PREJUDICE.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

2003 WL 21640381 (S.D.N.Y.)

**(Cite as: 2003 WL 21640381 (S.D.N.Y.))**

### IV. CONCLUSION

For the reasons stated herein, I respectfully recommend that defendants' motion to dismiss the complaint be GRANTED IN PART, as to Harrison's retaliation claim, any claims which she alleges took place before September 24, 1999, and her claims against both the ACS and the individual defendants, DENIED IN PART, as to defendant's timeliness argument, and Harrison's refusal to transfer and harassment claims.

Pursuant to Rule 72, Federal Rules of Civil Procedure, the parties shall have ten (10) days after being served with a copy of the recommended disposition to file written objections to this Report and Recommendation. Such objections shall be filed with the Clerk of the Court and served on all adversaries, with extra copies delivered to the chambers of the Honorable Richard Conway Casey, 500 Pearl Street, Room 1950, and to the chambers of the undersigned, Room 1970. Failure to file timely objections shall constitute a waiver of those objections both in the District Court and on later appeal to the United States Court of Appeals. *See Thomas v. Arn,* 474 U.S. 140, 150 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15, 16 (2d Cir.1989) (*per curiam* ); 28 U.S.C. § 636(b)(1) (West Supp.1995); Fed.R.Civ.P. 72, 6(a), 6(e).

2003 WL 21640381 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:02CV00947  (Docket)

(Feb. 06, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.