# EXHIBIT 1

# CHAO & EDELSON, L.L.C.

ATTORNEYS AT LAW
230 PARK AVENUE
NEW YORK, N.Y. 10169

TELEPHONE: (212) 867-4751
FACSIMILE: (212) 867-4755

DIRECT DIAL: Brendan Chao          E-Mail: bchao@chaoedelson.com
(212) 867-4753

July 6, 2004

Mr. Vaughn Burke
Skadden, Arps, Slate, Meagher & Flom
4 Times Square
New York, N.Y. 10036

Re:    Jonathan Jung

Dear Mr. Burke:

This office represents Mr. Jonathan Jung, a former Skadden employee. This letter is to notify you of our representation of Mr. Jung, and of Mr. Jung's rejection of Skadden's severance package.

We will file Mr. Jung's Charge of Discrimination with the Equal Employment Opportunity Commission shortly. Please contact me if you would like to receive a courtesy copy before filing.

Sincerely yours,

Brendan Chao

cc:    Mr. Jonathan Jung
33 West Hardwood Terrace
Palisades Park, N.J. 07650

EXHIBIT 2

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE

NEW YORK 10036-6522

———

TEL: (212) 735-3000

FAX: (212) 735-2000

www.skadden.com

DIRECT DIAL

212-735-2910

DIRECT FAX

917-777-2910

EMAIL ADDRESS

HBAER@SKADDEN.COM

FIRM/AFFILIATE OFFICES
———
BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEWARK
PALO ALTO
RESTON
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA

July 14, 2004

Brendan Chao, Esq.
Chao & Edelson, L.L.C.
Attorneys at Law
230 Park Avenue
New York, New York  10169

Re:  <u>Jonathan Jung</u>

Dear Mr. Chao:

This will confirm a message I left on your voicemail last week.  I will be representing Skadden, Arps, Slate, Meagher & Flom LLP with respect to Mr. Jung's claim of discrimination.  Accordingly, all correspondence should be sent to me at the above address.

Very truly yours,

Henry P. Baer

cc:  Vaughn Burke

# EXHIBIT 3

230 Park Avenue
New York, N.Y. 10169
Tel: (212) 867-4751
Fax: (212) 867-4755

**CHAO
&
EDELSON, L.L.C.**

# Fax

| **To:** | Henry P. Baer, Esq. | **From:** | Brendan Chao, Esq. |
|---|---|---|---|
| **Fax:** | (212) 777-2910 | **Pages:** | 4 (including cover page) |
| **Phone:** | (212) 735-2910 | **Date:** | 10/7/2004 |
| **Re:** | Charge of Discrimination | **CC:** | N/A |
| | Jonathan W. Jung | | |

☐ **Urgent**    **X For Review**    ☐ **Please Comment**    ☐ **Please Reply**    ☐ **Please Recycle**

● **Comments:** This office represents Mr. Jonathan W. Jung. As previously requested, attached is Mr. Jung's Charge of Discrimination, which will be filed with the EEOC. Please contact me should you have any questions concerning this matter.

Regards,

Brendan Chao

CHAO & EDELSON, L.L.C. - CONFIDENTIALITY NOTICE: This communication is intended to be viewed only by the individual or entity to whom it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately at (212) 867-4751. Thank you for your cooperation.

# CHARGE OF DISCRIMINATION

### *Jonathan W. Jung v. Skadden, Arps, Slate, Meagher & Flom*

1.    I am an Asian-American male.

2.    On or about September 8, 1998, Skadden Arps Slate Meagher & Flom ("Skadden Arps") hired me as a Tax Coordinator, and on October 1, 2001, Skadden Arps promoted me to International Tax Supervisor.

3.    My responsibilities included: managing and overseeing quarterly tax payments for the international partners, advising attorneys on the guidelines, policies, costs, and compliance on various tax issues, and managing Skadden Arp's expatriate tax issues.

4.    Skadden Arps is a large law firm employing several thousand employees in several countries, including the United States.

5.    Throughout my employment with Skadden Arps I have been qualified for my position, and performed my duties in a professional and competent manner.

6.    Beginning in February 2003, I began to experience discrimination based on my race and national origin. This culminated with the termination of my employment in retaliation for a number of complaints I made concerning discrimination in the workplace.

7.    By way of non-exhaustive examples, my supervisor, Susan Dornfeld (Ms. Dornfeld"), a Caucasian, provided technology allowances to other Caucasian employees in my department, but not to me. The technology allowance included new computers, software, and hardware peripherals.

8.    Ms. Dornfeld routinely recommended higher bonuses and raises for Caucasian employees in my department while giving lower bonuses and raises to me and other minority employees, including Asian Americans.

9.    Ms. Dornfeld has denied promotions to both me and other minority employees in my department.

10.    Ms. Dornfeld, who is responsible for preparing annual evaluations for employees, has routinely given minority employees poor evaluations in an effort to "paper" their files and force their resignations.

11.    Ms. Dornfeld has made racially derogatory comments, for instance, following an office move to White Plains, Ms. Dornfeld, while assigning seating arrangements, stated, "I don't want to have Orientals and blacks sitting together because they will spend all day talking."

CHAO & EDELSON                                          2

12.     In January 2000, Ms. Dornfeld resigned her position and left Skadden Arps. In November 2002, Skadden Arps rehired Ms. Dornfeld, and she set upon a course of "whitening" her staff.

13.     Ms. Dornfeld forced the resignation of a number of minority employees, e.g. Rosie Francis, Eugene Lam, and Violet Chan, and replaced them with Caucasian employees. During her current tenure as Treasurer, Ms. Dornfeld has hired only Caucasian employees.

14.     On one occasion, an Asian American employee from another department sought to apply for a vacant position in my department. The Asian American employee was told that taking the position would involve a reduction in salary, and he was discouraged from applying. The Asian American employee did not fill the position, instead, a Caucasian, Linda Dromgoole, was hired and was paid an annual salary of $88,000, which would, in fact, have constituted a raise for the Asian American employee had he been accepted for the position.

15.     Ms. Dornfeld used abusive language toward Asian Americans, Mr. Jung in particular, but did not use such language with Caucasian employees. For instance, Ms. Dornfeld summoned Mr. Jung to her office in the spring of 2003 and began yelling at Mr. Jung, "What the fuck are you talking about? I don't understand what the fuck you just said."

16.     In March 2004, Mr. Jung reported Ms. Dornfeld's misconduct to Earle Yaffa ("Mr. Yaffa"), a managing director at Skadden Arps. Mr. Yaffa failed to take any action, and the following month, Mr. Jung received a written warning concerning his performance.

17.     Repeated criticism of Mr. Jung's performance, despite his previous satisfactory performance as reflected in his performance evaluations, culminated in his dismissal on June 7, 2004.

18.     Based on the above facts, I believe that my race and national origin played an impermissible role in Skadden Arps's discriminatory treatment of me, and in its retaliatory termination of my employment.

19.     I also believe that Skadden Arps has participated in a pattern and practice of discriminating against minorities, specifically Asian Americans.

20.     For the foregoing reasons, I seek an award of lost benefits, compensatory damages, liquidated damages, attorneys' fees and costs, and an order directing Skadden Arps to cease and desist from its discriminatory practices, together with any further and additional relief that this administrative agency deems just and proper. This does not constitute a filing under New York State law, or with the New York State Division of Human Rights.

21.     I provide the foregoing information to assert my rights under Title VII to invoke the jurisdiction of the EEOC to investigate this Charge and proceed in accordance with its statutory mandate and procedural regulations, and to satisfy all procedural prerequisites to the

CHAO & EDELSON                    3

commencement of a civil action in the event that this Charge is not resolved by conciliation, conference, and persuasion. Nothing in this Charge is intended to constitute a waiver of any right to seek judicial relief under state or local law with respect to the conduct complained of hereinafter.

22.    I will advise the EEOC of any change in my address and telephone number, and I will cooperate in the proper processing of, and investigation into, this charge. Please direct all communications and inquiries regarding this matter to Brendan Chao, Esq. of Chao & Edelson L.L.C., 230 Park Avenue, New York, New York 10169, (212) 867-4753.

# Confirmation Report — Memory Send

|  |  |  |
|---|---|---|
| Time | : | Oct-07-2004  11:24am |
| Tel line | : |  |
| Name | : |  |

| | | |
|---|---|---|
| Job number | : | 293 |
| Date | : | Oct-07 11:12am |
| To | : | 912127772910 |
| Document pages | : | 004 |
| Start time | : | Oct-07 11:12am |
| End time | : | Oct-07 11:24am |
| Pages sent | : | 000 |
| Status | : | NG  B0 |

Job number    : 293                    **\*\*\* SEND FAILED \*\*\***

230 Park Avenue
New York, N.Y. 10169
Tel: (212) 867-4751
Fax: (212) 867-4755





| To: | Henry P. Baer, Esq. | From: | Brendan Chao, Esq. |
|---|---|---|---|
| Fax: | (212) 777-2910 | Pages: | 4 (including cover page) |
| Phone: | (212) 735-2910 | Date: | 10/7/2004 |
| Re: | Charge of Discrimination | CC: | N/A |
| | Jonathan W. Jung | | |

☐ Urgent      X For Review      ☐ Please Comment      ☐ Please Reply      ☐ Please Recycle

● **Comments:** This office represents Mr. Jonathan W. Jung. As previously requested, attached is Mr. Jung's Charge of Discrimination, which will be filed with the EEOC. Please contact me should you have any questions concerning this matter.

Regards,

Brendan Chao

CHAO & EDELSON, L.L.C. - CONFIDENTIALITY NOTICE: This communication is intended to be viewed only by the individual or entity to whom it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. Any dissemination, distribution or copying of this communication is strictly prohibited without our prior permission. If the reader of this message is not the intended recipient, or the employee or agent responsible for delivering the message to the intended recipient, or if you have received this communication in error, please notify us immediately at (212) 867-4751. Thank you for your cooperation.

EXHIBIT 4

# SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE

NEW YORK 10036-6522

———

TEL: (212) 735-3000

FAX: (212) 735-2000

www.skadden.com

DIRECT DIAL
212-735-2910
DIRECT FAX
917-777-2910
EMAIL ADDRESS
HBAER@SKADDEN.COM

FIRM/AFFILIATE OFFICES

BOSTON
CHICAGO
HOUSTON
LOS ANGELES
NEWARK
PALO ALTO
SAN FRANCISCO
WASHINGTON, D.C.
WILMINGTON
———
BEIJING
BRUSSELS
FRANKFURT
HONG KONG
LONDON
MOSCOW
PARIS
SINGAPORE
SYDNEY
TOKYO
TORONTO
VIENNA



December 15, 2004

BY HAND DELIVERY

Mr. Peter Holland, Investigator
U.S. Equal Employment Opportunity Commission
New York District Office
33 Whitehall Street, 5th Floor
New York, NY 10004-2122

      Re:  Jonathan Jung v. Skadden, Arps, Slate Meagher & Flom LLP
            EEOC Charge No. 160-2005-00082

Dear Mr. Holland:

      This position statement is submitted on behalf of respondent, Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden, Arps" or the "Firm"), in response to the allegations contained in the charge filed by Jonathan Jung, an Asian-American, on or about October 12, 2004 (the "Charge"). Mr. Jung alleges that he was discriminated against by the Firm on the basis of his race and national origin and that he suffered retaliation for registering a complaint about the alleged discrimination. Skadden, Arps unequivocally denies that it unlawfully discriminated or retaliated against Mr. Jung in any way. As is more fully set forth below, all decisions regarding Mr. Jung's employment were made for legitimate business reasons, wholly unrelated to Mr. Jung's race or national origin or the single complaint he lodged months after being warned about performance issues. Accordingly, Skadden, Arps submits that Mr. Jung's Charge is completely lacking in merit and respectfully requests that it be dismissed in its entirety.

Mr. Peter Holland
December 15, 2004
Page 2


I.       Factual Background

         A.       Skadden, Arps is Fully Committed to Workplace
                  Diversity and Does Not Tolerate Discrimination

                  Skadden, Arps is an international law firm, with attorneys practicing
in twenty-one offices throughout the world.  It has a strong commitment to promote
diversity at all levels within the Firm.  (See Exhibit A.)

                  In addition, the Firm's Diversity Committee, established in 1988,
provides valuable programs for Skadden, Arps employees designed to make them
more sensitive to diversity issues.  Skadden, Arps also has a full-time Diversity
Manager, devoted exclusively to the management of the Firm's diversity efforts.

                  Notably, Skadden, Arps recently received an award from the National
South Asian Bar Association in recognition of the Firm's support as a sponsor of its
inaugural national conference.

         B.       The Firm Hired Mr. Jung as Tax Coordinator
                  and Thereafter Promoted Him to Tax Supervisor

                  The Firm hired Mr. Jung on September 8, 1998 as a Tax Coordinator
in its Tax and Investments Department.  This department has approximately fifteen
professionals responsible for all partnership tax matters and managing the Firm's
investments.  Mr. Jung was interviewed and offered the position by Susan Dornfeld,
who was at that time Controller of Firm Taxes and Partner Accounting.

                  As a Tax Coordinator, Mr. Jung was responsible for the Firm's
international tax matters, including advising on tax matters for the Firm's expatriates
(i.e., U.S. citizens on long-term assignment in one of the Firm's international
offices), reviewing U.S. and foreign tax returns and tax filings for the Firm's
expatriate partners and associates, performing tax equalization for the expatriates,[1]
and coordinating and reviewing expatriate payroll information.

---

[1]     "Tax equalization" is a policy that is followed by many employers of expatriate
        employees.  The underlying theory of tax equalization is to ensure that while
        expatriate employees are on foreign assignment, the employees will pay
        approximately the same amount of income and social security taxes they would
        have paid had they remained in the U.S. or their home country.  As set forth
        below, Mr. Jung's failure to perform his duties in this area had a significant
        economic impact on Skadden, Arps.

Mr. Peter Holland
December 15, 2004
Page 3

Effective October 1, 2001, Mr. Jung was promoted from Tax Coordinator to Tax Supervisor. As Tax Supervisor, it was expected that Mr. Jung would train and delegate some of his more routine responsibilities to staff members, enabling him to expand his role and responsibilities within the Firm's Tax and Investments Department.[2]

C.    Problems With Mr. Jung's Performance

Mr. Jung appeared to possess the technical background in tax issues required for his position. However, over the course of the more than four years that he worked at the Firm, his initially modest level of initiative decreased while his carelessness increased. In fact, Mr. Jung made repeated omissions in his work – errors which cost the Firm over $100,000. It ultimately became clear, and was well documented long before Mr. Jung made any complaint to the Firm regarding alleged discrimination, that he lacked the skills and commitment required for his job.

1.    Initially, Mr. Jung Generally Met the Firm's Expectations

Skadden, Arps provides its employees with evaluations of their performance after their first three months of employment in order to identify potential problems, if any, before they become serious enough to jeopardize the employee's job. Mr. Jung received his Three Month Progress Report, dated December 12, 1998, from Ms. Dornfeld. He was rated "M," the middle of three possible categories (Exceeds Requirements, Meets Requirements and Does Not Meet Requirements).

The Firm also provides its employees with annual performance evaluations. Mr. Jung's 1999 performance evaluation was completed in or about March 1999, also by Ms. Dornfeld. He received an overall rating of "Very Good", the second of five categories (Exceptional, Very Good, Acceptable, Needs Improvement and Unacceptable). Ms. Dornfeld commended Mr. Jung for being "able to grasp complex issues and derive solutions independently" and for "identif[ying] improvements in both the process as well as expatriate policies." Still, she noted that Mr. Jung "needs to be more communicative with the individuals he is working with" and "at times doesn't seem to fully listen to the questions, comments or concerns being raised. He needs to listen better and give the other person the

---

[2]    The Tax and Investments Department was originally based in the Firm's New York City office, but was moved on March 15, 2003 to the Firm's newly opened office in White Plains, New York.

Mr. Peter Holland
December 15, 2004
Page 4

chance to understand and discuss the issue, even if his position doesn't change." Ms. Dornfeld also suggested that Mr. Jung would benefit from "[taking] a course on improving written communications skills."

> 2.     After His First Year at the Firm,
> Mr. Jung's Performance Began to Slide

Ms. Dornfeld, who had been promoted to Treasurer, left the Firm in January 2000. In her absence, Mr. Jung was supervised by Karl Duchek, the Director of Finance, and worked very closely with Andrea Zavell, the International Office Administrator, who administers the policies and programs of the Firm's international offices, including the expatriate policies. Mr. Duchek and Ms. Zavell each found that Mr. Jung failed to attend to his responsibilities in a timely manner or keep the appropriate managers apprised of the status of his work. They noted that, among other things, Mr. Jung's carelessness had resulted in financial losses to the Firm.

Prior to giving Mr. Jung his 2000 performance evaluation, Ms. Zavell reviewed with him a one and a half page list of items that she was forced to handle while he was on vacation, each of which were Mr. Jung's responsibilities. Mr. Jung's neglect of such responsibilities had serious implications for the Firm, in the form of tax penalties and interest. As Ms. Zavell pointed out, Mr. Jung's lack of consideration for those who had to complete his work required them to handle time-critical issues without the benefit of an advance briefing.

Ms. Zavell and Mr. Duchek jointly completed a performance evaluation for Mr. Jung in or about March 2000, and gave Mr. Jung an overall rating of "Acceptable," one level lower than his previous rating by Ms. Dornfeld. With respect to the categories of "Judgment & Decision Making" and "Administrative Responsibility," however, he received an even lower rating of "Needs Improvement". In particular, they noted Mr. Jung's failure to meet many deadlines as especially problematic.[3]

---

[3]     As Ms. Zavell recalls it, Mr. Jung disagreed with certain aspects of his 2000 performance evaluation and said he was going to put a rebuttal in his file. No rebuttal was ever received by the Firm.

Mr. Peter Holland
December 15, 2004
Page 5

3.    Mr. Jung is Promoted to Tax Supervisor
      to Motivate Him to a Higher Level of Performance

On June 12, 2000, the Firm hired Chris Chin as Controller of Firm Taxes and Investments and as a replacement for Ms. Dornfeld. In that role, Mr. Chin became Mr. Jung's supervisor. Mr. Chin viewed Mr. Jung as an average – or slightly above average – performer. In Mr. Jung's 2001 employment evaluation, completed in or about March 2001, he was rated between "Very Good" and "Acceptable".

Mr. Chin was instrumental in Mr. Jung's promotion from Tax Coordinator to Tax Supervisor, effective October 1, 2001, despite the fact that he was aware that Mr. Jung had problems with thoroughness, often failed to catch his own mistakes, and consistently failed to return calls or messages from the Firm's partners. Mr. Chin supported Mr. Jung's promotion in the hope that it would motivate Mr. Jung to a higher level of performance. With the promotion, it was expected that Mr. Jung would train and delegate more routine tax responsibilities to the Firm's tax staff, including another Asian employee who had been hired on September 5, 2000 as a Senior Tax Accountant reporting to Mr. Jung.

Mr. Chin completed another performance evaluation for Mr. Jung in or about March 2002. He rated Mr. Jung "Very Good", the second of four possible categories for management staff (Exceptional, Very Good, Acceptable and Unacceptable). Nonetheless, Mr. Chin indicated that Mr. Jung needed to improve in the following three areas: (1) "[g]ain a better understanding of Firm's foreign business and financial operations;" (2) "[t]rain[ing] Payroll staff on International withholding taxes;" and (3) "[d]elegat[ing] more preparation work to staff."

Perhaps more telling than the 2002 review is the fact that Mr. Chin denied a subsequent informal request from Mr. Jung to be promoted to manager or to assume additional responsibility for the Firm's investment partnerships. Mr. Chin denied this request because Mr. Jung failed to demonstrate the higher level of performance that Mr. Chin expected of him as a supervisor.

4.    Mr. Jung's Inability to Meet Deadlines and
      Lack of Care Continued to Cause Problems

Ms. Dornfeld rejoined the Firm in October 2002. She then resumed her responsibilities as Treasurer and as Mr. Jung's supervisor. Like Mr. Duchek and Ms. Zavell, she expressed serious concern about Mr. Jung's inability to meet deadlines, failure to identify and resolve problems and seek advice when appropriate and overall neglect of his responsibilities. Her first review of Mr. Jung after her

Mr. Peter Holland
December 15, 2004
Page 6

return was given in or about April 2003.  She rated Mr. Jung between "Acceptable" and "Unacceptable", and specifically commented:

> Jonathan's performance since I have rejoined Skadden has been disappointing.  He keeps work 'close to the vest' and provides information (finished projects and/or status reports) only when asked.  He doesn't take charge of a[] project and see it to completion on a timely basis.  His responsibilities include working with other departments and rarely does a project get completed without some disagreement or complication and an ultimate finger pointing by all involved.  At this stage in his career, he needs to be able to be part of the solution and suggest ways to accomplish the required task at hand.  He needs to be more assertive in dealing with other members of the tax and international departments.  He needs to ask questions and seek guidance and input in making decisions rather than proceeding entirely on his own.  There are often careless grammatical [errors] and typos in his written work.  While Jonathan has commented that []he wants to take on more responsibilities, he seems to concentrate on those areas that he finds enticing at the risk of not completing what he needs to get done.

Ms. Dornfeld did, however, add that Mr. Jung seemed to have a "good relationship" with the Senior Tax Accountant who he supervised.  Rather than accepting this performance evaluation as a means of understanding where he failed to meet the Firm's expectations, Mr. Jung refused to sign the review.

5.      Mr. Jung's Failure to Properly Administer Skadden, Arps' Tax Policy Resulted in a Loss of Over $100,000

On May 1, 2003, Skadden, Arps hired James Waters as the Firm's Tax Manager and he took over as Mr. Jung's supervisor.  Mr. Waters found that Mr. Jung failed to collect from a number of the Firm's tax-equalized expatriate attorneys amounts which they owed to the Firm at the conclusion of each tax year.  In addition, Mr. Jung failed to collect tax refunds received by a number of the Firm's expatriates for amounts of taxes overpaid by the Firm on their behalf, thereby providing a windfall to those expatriates and losses to Skadden, Arps.  These and other errors by Mr. Jung resulted in losses to the Firm of more than $100,000.

Mr. Peter Holland
December 15, 2004
Page 7

       D.    <u>Mr. Jung is Disciplined For Poor Work Performance</u>

           1.    <u>Mr. Jung Received a Written Warning</u>
                    <u>For Poor Work Performance in December 2003</u>

By December 2003, Mr. Jung's work had deteriorated to the point that he was issued a Written Warning in accordance with the Firm's Disciplinary Action Procedures. (<u>See</u> Exhibit B.) Thus, on December 10, 2003 – well before Mr. Jung first complained to the Firm about alleged discrimination -- Mr. Waters and Jamie Hirsch, a member of the Firm's Human Resources Department, met with Mr. Jung and advised him that, because he was not meeting the expectations of his position, the Firm was issuing him a Written Warning for Poor Work Performance.

During the meeting, Mr. Waters and Ms. Hirsch showed Mr. Jung a performance evaluation prepared by Mr. Waters which rated him "Unacceptable" and documented the specific deficiencies in his performance and problems he had caused Skadden, Arps by not meeting the Firm's expectations of him.[4]  Specifically, Mr. Waters stated:

> 1) he [Mr. Jung] has little or no interaction with his staff and relies on me [Mr. Waters] to keep his staff busy rather than delegating the work himself, 2) his grasp of the issues are generally flawed and not comprehensive, 3) he consistently fails to fulfill my requests for weekly project updates which undermine my ability to coordinate and manage the work flow in the department, 4) items that he is responsible for such as tax settlements have been left unresolved and are still outstanding for an unacceptable period of time, 5) he makes financial decisions that cost the firm money and his lack of administrating our tax policy results in write-offs of >$100,000 owed to the firm, 6) he gives technically incorrect advice to members within the Firm (i.e., cost projections) and prepares inaccurate analyses that business decisions are based upon, 7) his organizational skills are poor and his files are in disarray;

---

[4]    The Firm generally completes annual performance evaluations of its support staff each March or April in advance of salary increases which are determined, on the basis of the evaluations, each April. Mr. Jung's December 2003 performance evaluation was an extra review, which Mr. Waters completed specifically to address the problems with Mr. Jung's performance and identify for Mr. Jung specific goals and areas for improvement.

Mr. Peter Holland
December 15, 2004
Page 8

hours can be wasted trying to find documentation located in his files, and 8) he rarely follows up on projects in a timely manner. While Jonathan has been with the firm for nearly five years and accumulated a lot of Skadden knowledge, his technical skills (which is the basis for his position) are well below expectations. He is a pleasant and likeable person but he is not functioning at the level expected nor has he demonstrated any improvement in the areas addressed in his April review.

Regarding Mr. Jung's supervisory responsibilities, Mr. Waters commented that "Jonathan fails to provide adequate training for his subordinate[s] and fails to contribute to their development as a tax professional."

The evaluation which Mr. Waters and Ms. Hirsch reviewed with Mr. Jung also identified the following three specific Job Related Goals, with deadlines for completion:

Goal 1.  Organizing all files, by individual, by tax year – by 1/25/04

Goal 2.  Clean-up all outstanding employee receivables related to expatriates – by 1/25/04

Goal 3.  Identify other areas of tax work where he can be of assistance[5] – by 3/31/04

In addition, the evaluation listed numerous areas in which Mr. Jung needed to show immediate improvement, including proofreading all communications, keeping himself and his staff focused on key objectives, providing clear expectations for his staff, and providing appropriate training for staff.

Finally, during the December 10, 2003 meeting, Mr. Jung was warned that "he needs to demonstrate immediate and consistent improvement or it may lead to further disciplinary action, up to and including, the termination of his employment." (See Exhibit C.)

Mr. Jung's first complaint to the Firm regarding alleged discrimination was in a letter dated March 8, 2004 to Earle Yaffa, the Managing

---

[5]  By 2003, the number of the Firm's expatriates who were tax-equalized was declining.

Mr. Peter Holland
December 15, 2004
Page 9

Director of the Firm (the "March 2004 Letter").  Mr. Jung's allegation that "Mr. Yaffa failed to take any action, and the following month, [he] received a written warning concerning his performance," (Charge, at ¶ 16), is inaccurate in two highly important respects.  First, Mr. Jung received a Written Warning for Poor Work Performance on December 10, 2003, approximately three months before the March 2004 Letter.  Second, the Firm did not fail to take any action upon receipt of the March 2004 Letter.  To the contrary, as fully set forth in a letter dated April 6, 2004 to Mr. Jung's attorney, the Firm conducted an investigation of the allegations made in the March 2004 Letter.  Having learned of the same problems as are described in this position statement, the Firm determined that Mr. Jung's claims had absolutely no merit and so notified him through his counsel.

> 2.    Mr. Jung Failed to Meet the Goals That Were Set For Him in December or Demonstrate Improvement in His Performance

Mr. Jung made minimal effort to achieve the objectives established for him as part of his Written Warning in December 2003.  He failed to complete Goal 1 (organize all files, by individual and by tax year) and Goal 2 (clean up all outstanding employee receivables related to expatriates) at all, let alone by the established deadline of January 25, 2004, and he never made any attempt to achieve Goal 3 (identify other areas of tax work where he can be of assistance).  On February 18, 2004 – also before the March 2004 Letter – Mr. Waters prepared a memorandum documenting Mr. Jung's continued poor work performance and failure to meet the goals and expectations established for him.  (See Exhibit D.)  The memorandum was not sent to Mr. Jung because of the pendency of the 2004 review period.  Instead, Mr. Waters recorded his concerns in Mr. Jung's 2004 annual performance evaluation.

Mr. Waters completed Mr. Jung's annual performance evaluation in or about March 2004.  As in December 2003, he gave Mr. Jung a rating of "Unacceptable," noting that Mr. Jung had not successfully attained either of the two goals established for him in his Written Warning.  With respect to Goal 1 Mr. Waters stated:

> Jonathan's first goal was to organize all the outstanding files by individual and by tax year for a January 25, 2004 due date. Although Jonathan made some effort to organize a few of the files by individual, approximately a dozen files have not been completed (most do not appear to be started).  Furthermore, these files have not been organized by tax year (except as overflow files are created).

Mr. Peter Holland
December 15, 2004
Page 10

With respect to Goal 2, Mr. Waters reported:

> Jonathan's second goal was to confirm all associates and partners (including four partners from 1997) who have outstanding tax settlements and to facilitate the collection of payment by January 25, 2004. To date, Jonathan has not confirmed the outstanding tax settlements or made any collections.

The report did not directly address Goal 3. However, as noted above, Mr. Jung never identified other areas of tax work where he could be of assistance to the Firm.

Furthermore, Mr. Jung did not show progress in the areas in which he was advised in his Written Warning that he must show immediate improvement. Specifically, Mr. Waters stated:

> Jonathan continues to communicate poorly . . . . Jonathan does not stay focused on key objectives . . . . Jonathan does not provide clear expectations to his staff or provide the appropriate training.

(See Exhibit E.)

> 3.    Mr. Jung Received a Final Warning
>       For Poor Work Performance in April 2004

On April 19, 2004, Mr. Waters and Ms. Hirsch again met with Mr. Jung and advised him that, as a result of his failure to demonstrate improvement since his Written Warning in December 2003, the Firm was issuing a Final Warning for Poor Work Performance.[6] During that April 2004 meeting, Mr. Waters and Ms. Hirsch reviewed with Mr. Jung the performance evaluation that Mr. Waters had prepared the previous month. In particular, Mr. Jung was reminded of the goals that had been set for him in December 2003, which he had failed to meet. Mr. Jung attempted to justify his failure to achieve Goal 2 (clean up all outstanding employee receivables related to expatriates) by saying that it would be virtually impossible to

---

[6]    In accordance with the Disciplinary Action Procedures, the Firm could have terminated Mr. Jung's employment at that time for his continued poor work performance. (See Exhibit B.) However, a decision was made to give him one more opportunity to demonstrate improvement.

Mr. Peter Holland
December 15, 2004
Page 11

confirm all outstanding tax settlements between expatriates and the Firm. Mr. Waters explained to him that, to the contrary, since every cash payment or receipt is recorded in the Firm's accounting system, the outstanding tax settlements are not impossible to confirm at all. Mr. Jung proffered absolutely no explanation for his failure to achieve Goal 1 or Goal 3. Once again, Mr. Jung was warned that unless he demonstrated immediate and consistent improvement, he would be subject to further disciplinary action, up to and including the termination of his employment. (See id.)

       4.     Mr. Jung's Continued Poor Work Performance
               Resulted in the Termination of his Employment

By June 2004 Mr. Jung had still not met the goals which were set for him in December 2003 and which were reviewed with him in April 2004 when he was given a Final Warning. More than half of the files for which Mr. Jung was responsible remained unorganized and he had made absolutely no effort to clean up outstanding employee receivables related to expatriates. Mr. Waters himself confirmed two outstanding tax settlement amounts owed to partners through his own investigation and information gathering, demonstrating that, as he had told Mr. Jung earlier, it was possible to achieve the goal.

Mr. Jung also failed to demonstrate improvement – or even an effort to improve – in the other areas addressed with him in December 2003 and April 2004. Compounding the problem, Mr. Jung took time off on April 9, 2004 and June 4, 2004 – both of which were dates for the Firm's quarterly estimated payments – without getting any approval for time off on those time sensitive days. Further, Mr. Jung had exceeded his allowable unscheduled paid time off for 2004, which not only violated Firm policy, but required his colleagues to absorb his additional workload.

All of this evidence of Mr. Jung's continued poor work performance was documented in a memo to file by Mr. Waters, dated June 4, 2004. (See Exhibit F.) In sum, in the months following Mr. Jung's Written Warning and Final Warning, he made virtually no effort to save his job.

Accordingly, on June 7, 2004, due to his continued poor work performance, the Firm terminated Mr. Jung's employment. Even though it was under no obligation to do so, Skadden, Arps provided Mr. Jung with two weeks' severance pay as well as an amount equal to four months pay in consideration of his relocation from the Firm's New York office to the White Plains office.[7] (See Exhibits G, H.)

---

[7]    Payment of the bonus was to be made only to employees who remained with the Firm for fourteen months after the move to White Plains and who were "in good

Mr. Peter Holland
December 15, 2004
Page 12

    E.      Mr. Jung's Allegations Regarding
              Discriminatory Treatment by Ms. Dornfeld
              <u>are False and Unsupported by the Evidence</u>

        Mr. Jung's Charge is replete with references to alleged discriminatory treatment by Ms. Dornfeld, ironically, the very person who hired Mr. Jung. Among his allegations, Mr. Jung asserted that Ms. Dornfeld "has routinely given minority employees poor evaluations in an effort to 'paper' their files and force their resignations." (Charge, at ¶ 10.) Notably, however, as detailed above, negative evaluations of Mr. Jung's performance came not just from Ms. Dornfeld, but also from most of the people for whom he worked while employed by Skadden, Arps. In fact, during the time Ms. Dornfeld was away from the Firm, Mr. Jung was supervised by and received evaluations from Ms. Zavell, the Firm's International Office Administrator; Mr. Duchek, the Firm's Director of Finance; and Mr. Chin, the Firm's Tax Controller, each of whom identified significant problems with Mr. Jung's performance. Further, shortly after Ms. Dornfeld's return to Skadden, Arps, the Firm hired Mr. Waters as Tax Manager and he became Mr. Jung's direct supervisor. It was Mr. Waters – not Ms. Dornfeld -- who made the determination to issue Mr. Jung formal warnings and ultimately terminate his employment as a result of his poor work performance.

        Mr. Jung also enumerates various incidents in support of his allegation that he and other minority employees were treated unfairly by Ms. Dornfeld. However, as set forth below, there is no basis in fact for Mr. Jung's claims.

        1.      Ms. Dornfeld Did Not Discriminate Against
              <u>Mr. Jung With Respect to a Technology Allowance</u>

        In the Charge, Mr. Jung alleges that Ms. Dornfeld "provided technology allowances to . . . Caucasian employees in [his] department, but not to [him]." (Charge, at ¶ 7). This allegation misstates the facts.

        The Firm provides a technology allowance to attorneys but, except in very rare cases, not to support staff members, such as the employees in the Tax and Investments Department. In one of the rare instances in which a support staff

---

standing." Although Mr. Jung was clearly not "in good standing" at that time, he was given the bonus (a net amount of $14,082.63) to ease his transition while looking for a new job.

Mr. Peter Holland
December 15, 2004
Page 13

member did receive a technology allowance, an allowance of $2,000 was given to one employee in the Tax and Investments Department on May 2, 2003. At that time, the Firm had recently relocated the Tax and Investments Department from New York City to its newly opened office in White Plains. Ms. Dornfeld granted the technology allowance because the employee in question lived in Brooklyn and had a long commute to the Firm's White Plains office, did not own a computer and, most significantly, had responsibilities which required him to be in regular contact with people in various time zones which he could do most efficiently by e-mail. On the other hand, Mr. Jung lived approximately five minutes from the Firm's White Plains office and he had no need to communicate with others when he was not at work. In addition, the other employee had specifically asked for the technology allowance for the reasons set forth above, while Mr. Jung never requested one. Although the individual who received the allowance is Caucasian, his race was not a factor in Ms. Dornfeld's decision to provide him with a technology allowance.

> 2.   Ms. Dornfeld Never Made
>       <u>Any Discriminatory Comments</u>

Mr. Jung also complains of certain "comments" allegedly made by Ms. Dornfeld. For example, he asserts:

> Ms. Dornfeld has made racially derogatory comments, for instance, following an office move to White Plains, Ms. Dornfeld, while assigning seating arrangements, stated, 'I don't want to have Orientals and blacks sitting together because they will spend all day talking.'

(Charge, at ¶ 11.) Ms. Dornfeld flatly denies making any such statement following the office move to White Plains or otherwise. In fact, when the Tax and Investments Department moved to the White Plains office, two of the three offices assigned by Ms. Dornfeld to Tax Coordinators and Investment Analysts were assigned to teams consisting of one Black employee and one Asian employee. In short, Ms. Dornfeld's office assignments were based on legitimate business reasons and had nothing to with the race or national origin of the individuals.

In addition, Mr. Jung alleges:

> Ms. Dornfeld used abusive language toward Asian Americans, Mr. Jung in particular, but did not use such language with Caucasian employees. For instance, Ms. Dornfeld summoned Mr. Jung to her office in the spring of 2003 and began yelling at

Mr. Peter Holland
December 15, 2004
Page 14

> Mr. Jung, saying 'What the f*** are you talking about?  I don't
> understand what the f*** you just said.'

(Charge, at ¶ 15.)  Ms. Dornfeld admits (with some embarrassment) that she
may have resorted to such language one on or two occasions when she became
extremely frustrated by Mr. Jung's work.  However, such statements do not
belie any racial animus.  Indeed, Ms. Dornfeld also admits (and again with some
embarrassment) that she has used coarse language when expressing her
displeasure with the work product of other employees, including those who are
not Asian.  Mr. Jung's allegation that Ms. Dornfeld directed such language only
towards Asian Americans is utterly false and unsupported by any evidence.

Ms. Dornfeld _never_ made any demeaning or derogatory comments
concerning Mr. Jung's or any other employee's race or national origin.

3.    Ms. Dornfeld Did Not Make Employment Decisions
on the Basis of Any Individual's Race or National Origin

a.    Ms. Dornfeld Did Not "Force the
Resignations" of Minority Employees

Ms. Dornfeld did not, as Mr. Jung alleges, "[force] the resignations of
a number of minority employees e.g., Rosie Francis, Eugene Lam, and Violet Chan,
and [replace] them with Caucasian employees . . . ."  (Charge, at ¶ 13.)

Rosalind Francis, who is Black, was an Investment Supervisor and
was a very dedicated employee who was valued by Skadden, Arps for her excellent
work during her fifteen-year tenure with the Firm.  Indeed, Ms. Dornfeld "thinks the
world" of this individual and had in fact promoted her from Investment Coordinator
to Investment Supervisor on April 1, 1995.  Ms. Francis voluntarily resigned from
her employment with the Firm on February 28, 2003 because she was moving to
Florida with her husband, whose job had been relocated there.  She wrote a letter of
resignation to the Firm's Human Resources Department, stating "Kindly accept this
is as my formal resignation from Skadden due to the relocation. . . . I enjoyed my
tenure and gained invaluable experiences working here."

Eugene Lam, an Asian-American, was a Tax Coordinator for
Skadden, Arps.  He resigned on his own accord on December 24, 2003, after he had
accepted a position with another law firm, because he lived in Queens, New York,
and found that the commute to the Firm's White Plains office was too difficult.
Similarly, Violet Chan, another Asian-American was also a Tax Coordinator who
voluntarily left the Firm on March 19, 2003 because she did not want to make the

Mr. Peter Holland
December 15, 2004
Page 15

commute to White Plains.  As she articulated in an e-mail to the Firm's Human
Resources Department, dated March 4, 2004, "One of the main [reasons] I am
resigning from the position is the difficulty I face in commuting to and from work.  It
takes me almost 5 hours."  That same day Ms. Chan sent a resignation e-mail to Ms.
Dornfeld and another supervisor, stating "I would like to thank both of you and my
colleagues who have been so helpful to my work during my employment at
Skadden."

        If Ms. Dornfeld had the choice, she would have retained all three of
these individuals.

                        b.    Ms. Dornfeld Hired and
                              Promoted Minority Candidates

        Mr. Jung's assertions that "Ms. Dornfeld has hired only Caucasian
employees" and "denied promotions to [him] and other minority employees" are also
completely false and unsupported by the evidence.  (Charge, at ¶ ¶ 9, 13.)

        As a matter of fact, as stated above, it was Ms. Dornfeld who hired
Mr. Jung.  In addition, on February 18, 2003 Ms. Dornfeld hired a Black male as a
Tax Coordinator and later offered the position of Tax Manager to another Asian
applicant.  Unfortunately, that individual declined the offer.  Ms. Dornfeld and Mr.
Waters also interviewed and hired a Black female for the position of Administrative
Secretary for the Tax and Investments Department on November 15, 2004.

        Regarding promotions, as stated above, Ms. Dornfeld promoted
Rosalind Francis, a Black female, from Investment Coordinator to Investment
Supervisor in 1995.  She also offered an Asian female the opportunity to be
promoted from Investment Analyst to Investment Supervisor in or about February
2003 when Ms. Francis resigned.  That individual turned down the promotion
because she did not want the added responsibilities of a supervisor.

        Clearly, Mr. Jung's allegations regarding Ms. Dornfeld's failure to hire
or promote Asian and other minority candidates are erroneous.  With respect to Mr.
Jung's allegation that Ms. Dornfeld failed to promote him, Mr. Jung never applied for
a promotion while Ms. Dornfeld was at the Firm.  As stated above, Mr. Jung did
make one informal request to Mr. Chin, who had promoted him to Tax Supervisor, to
be promoted to manager or to assume additional responsibility for the Firm's
investment partnerships.  However, Mr. Chin rejected that request because Mr. Jung
had not met the Firm's expectations of him in his then-current role.

Mr. Peter Holland
December 15, 2004
Page 16

Mr. Jung also contends that an Asian-American employee from another department applied for an Investment Supervisor position, ultimately filled by a Caucasian, and that "[t]he Asian American employee was told that taking the position would involve a reduction in salary, and he was discouraged from applying." (Charge, at ¶ 14.) He continues that the woman who was promoted "was paid an annual salary of $88,000, which would, in fact have constituted a raise for the Asian American employee had he been accepted for the position." (Id.) The Firm's Tax Manager, not Ms. Dornfeld, interviewed candidates for Investment Supervisor and ultimately made the decision as to who would fill the position. He recalls that an Asian male who had worked at Skadden, Arps for several months in an entry level position in the Firm's Expense Department, met with him to inquire about the Investment Supervisor position. Although he did not hire the individual for the position because he did not have the level of experience necessary to become a supervisor, he did not tell him, as alleged by Mr. Jung, that taking a supervisory position would involve a reduction in salary. The woman who was hired for the position had many years of experience in the investments area, strong recommendations from her prior employers, as well as an M.B.A.

   c.  Ms. Dornfeld's Determination of Salary Increases
     and Bonuses is Based Strictly on Work Performance

Finally, Mr. Jung's allegation that "Ms. Dornfeld routinely recommended higher bonuses and raises for Caucasian employees in [his] department while giving lower bonuses and raises to me and other minority employees, including Asian Americans" is similarly lacking in merit. (Charge, at ¶ 7.) The Firm provides salary increases and bonuses based strictly on the ratings an employee receives in his or her evaluation.

For example, in April 2003, Mr. Jung received a rating of 3.5 (between "Acceptable" and "Unacceptable") on his annual performance evaluation. Accordingly, he received a salary increase of 3.61% (or $3,000) in 2003. On the other hand, two Asian employees in Mr. Jung's department received ratings of 2 ("Very Good") on their 2003 performance evaluations and each received a salary increase of 4.5%.

Mr. Jung did not always receive the salary increases or bonuses of a fully performing employee. However, those decisions were based solely on the evaluations of his performance. Mr. Jung has not demonstrated – and cannot demonstrate – that his or any other employee's race or national origin has played any role whatsoever in Ms. Dornfeld's or the Firm's determination of salary increases or bonuses.

Mr. Peter Holland
December 15, 2004
Page 17

II.    Legal Analysis

         In federal employment discrimination cases, an individual alleging
disparate treatment bears the initial burden of establishing a presumptive, or prima
facie, case of discrimination. McDonnell Douglas Corp. v. Green, 411 U.S. 792
(1973). Once a prima facie case has been established, the respondent need only
articulate a legitimate, nondiscriminatory reason for its actions. Tex. Dep't of Cmty.
Affairs v. Burdine, 450 U.S. 248, 252-56 (1981). The burden then shifts back to the
complainant, who must prove that the respondent's stated reason is pretextual, and
ultimately must prove that discrimination was the true motivation for the
respondent's action. Burdine, 450 U.S. at 252-56; St. Mary's Honor Ctr. v. Hicks,
509 U.S. 502, 515 (1993).

         A.    Mr. Jung Fails to Establish a Claim
               of Race or National Origin Discrimination

         To establish a prima facie case of employment discrimination, Mr.
Jung must show that: (1) he is a member of a protected class; (2) he is qualified for
his position; (3) he suffered an adverse employment action; and (4) the
circumstances give rise to an inference of discrimination. See McDonnell Douglas,
411 U.S. at 802; Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).

         Mr. Jung fails to meet his prima facie burden because he has not
shown -- and cannot show - that he was qualified for the position of Tax Supervisor.
He makes only a conclusory assertion that "[t]hroughout his employment with
Skadden Arps [he was] qualified for [his] position, and performed [his] duties in a
professional and competent manner." (Charge, at ¶ 5.) However, the record shows
that Mr. Jung received numerous unsatisfactory evaluations of his work performance
from at least four different Skadden, Arps supervisors and cost the Firm over
$100,000 by not performing his job at an acceptable level. Because Mr. Jung has
failed to allege any facts to support even an inference that he was performing his
duties as Tax Supervisor adequately, he has failed to establish that he was "qualified"
for his position. See Ralkin v. N.Y. City Transit Auth., 62 F. Supp. 2d 989, 998
(E.D.N.Y. 1999) (holding former transit authority employee was not qualified for her
position, as required for her prima facie case of discrimination, where employee
received unsatisfactory performance evaluations from at least four transit authority
employees and supervisors).

         In addition, Mr. Jung fails to establish his prima facie case because he
has not – and cannot – show facts that give rise to an inference of discrimination.
Mr. Jung attempts to allege that the negative evaluations he received from Ms.
Dornfeld manifested discriminatory animus. Specifically, he claims that "Ms.

Mr. Peter Holland
December 15, 2004
Page 18

Dornfeld . . . has routinely given minority employees poor evaluations in an effort to 'paper' their files and force their resignations." (Charge, at ¶ 17.) Notably, however Ms. Dornfeld only completed the Three Month Progress Report and two performance evaluations for Mr. Jung and was absent for almost three years of his employment at the Firm. Mr. Jung has not alleged that any of his other supervisors who documented his poor work performance in his evaluations exhibited any discriminatory animus. In fact, Mr. Waters, who issued both the Written Warning and the Final Warning to Mr. Jung and ultimately made the decision to terminate him, is not even mentioned in Mr. Jung's Charge.

Moreover, Ms. Dornfeld's evaluations of Mr. Jung do not in fact evidence any bias. Instead, they reveal a balanced appraisal of Mr. Jung's abilities. For example, in Mr. Jung's 1999 performance evaluation, Ms. Dornfeld commended Mr. Jung for being "able to grasp complex issues and derive solutions independently" and for "identif[ying] improvements in both the process as well as expatriate policies." Even in Ms. Dornfeld's April 2003 evaluation of Mr. Jung, in which she gave Mr. Jung an overall rating between "Acceptable," and "Unacceptable," she still complimented Mr. Jung for having a "good relationship" with the Senior Tax Accountant who he supervised. These performance evaluations provide little inference of discriminatory bias. See Lawrence v. State Univ. of N.Y., No. 01 Civ 7395, 2002 WL 31812700, at * 4 (S.D.N.Y. Dec. 12, 2002) (holding employee failed to show circumstances giving rise to inference of discrimination, despite claims that his employer created negative evaluations as a "paper trail" to precipitate his discharge, where the evaluations balanced criticism with compliments). Furthermore, since Ms. Dornfeld was the person who hired Mr. Jung, "it is difficult to impute to her an invidious motivation that would be inconsistent with [her] decision to hire [him]." Grady v. Affiliated Cent., Inc., 130 F.3d 553, 560 (2d Cir. 1997); see also Pimentel v. City of N.Y., 2001 WL 1579553, at *6 (S.D.N.Y. 2001) (holding that where employee's supervisor selected employee for the position and later wrote memoranda critical of her performance, the "same actor inference" applied and countered an inference of discriminatory intent), rev'd in part on reconsideration by, Pimentel v. City of N.Y., No. 00 Civ. 326, 2002 WL 977535 (S.D.N.Y. May 14, 2002).

Mr. Jung also attempts to raise an inference of discrimination by pointing to three other minority employees in his department who he claims Ms. Dornfeld "forced" to resign. However, as described above, each of these three individuals voluntarily resigned for personal reasons. Furthermore, also as set forth above, Ms. Dornfeld both hired and promoted Asians and other minority employees. Certainly, the diversity in the staff of the Firm's Tax and Investments Department undercuts any inference that Mr. Jung's termination was discriminatory. See Chambers v. TRM Copy Ctrs. Corp., 43 F.3d 29, 38 (2d Cir. 1994) (noting that

Mr. Peter Holland
December 15, 2004
Page 19

ethnically varied make-up of work force would support inference of no discriminatory animus); Lawrence, 2002 WL 31812700, at *6 (holding that diversity in the staff of university's Registrar's Office center undercut any inference that termination of Black clerk in that office was discriminatory).

Even assuming arguendo that Mr. Jung could establish a prima facie case of discrimination – and he cannot – the Firm has offered a legitimate, nondiscriminatory reason for terminating Mr. Jung's employment – namely, his unacceptable work performance which continued despite numerous sub par evaluations and two formal warnings. As detailed above, Mr. Jung was not meeting the expectations of his position, for reasons including, without limitation, his inability to grasp certain fundamental tax issues, failure to complete work in a timely manner, disorganization, poor writing skills, incompetence as a supervisor and overall neglect of his responsibilities costing the Firm over $100,000. By issuing a Written Warning and then a Final Warning, the Firm offered Mr. Jung two opportunities to improve his performance and meet the achievable goals that were set for him. The Firm ultimately terminated Mr. Jung because of his poor work performance which continued after both formal warnings.

Accordingly, the burden shifts to Mr. Jung to demonstrate by a preponderance of the evidence that the Firm's presumptively valid explanation for issuing him formal warnings and ultimately terminating his employment was merely a pretext for discrimination, and that discrimination was the true motivation for Skadden, Arps' actions. In an attempt to do so, Mr. Jung points to two alleged discriminatory comments by Ms. Dornfeld. However, as set forth above, Ms. Dornfeld was not the person who decided to terminate Mr. Jung's employment with the Firm. The first of these comments attributed to Ms. Dornfeld not only was denied by her, but also is contrary to the facts (see page 13, infra). Moreover, the second of the two alleged comments, involving "abusive language" by Ms. Dornfeld, is insufficient to show that discrimination motivated the Firm's actions. See, e.g., Ogbo v. N.Y. State Dep't of Fin., No. 99 Civ. 9387, 2001 WL 986546, at *7 (S.D.N.Y. Aug. 28, 2001) (holding despite fact that plaintiff's supervisor "cursed at him and insulted him with names like 'horse's ass' and 'dummy,'" he had not met his burden of showing such "alleged comments were motivated by discrimination, a necessary ingredient since an abusive workplace, without more, is not actionable under Title VII").

Thus, Mr. Jung has not and cannot satisfy his ultimate burden. The showing he makes in support of his claim that discrimination was behind his warnings or his termination is simply too insubstantial to overcome the overwhelming evidence that the Firm's discipline and ultimate termination of Mr.

Mr. Peter Holland
December 15, 2004
Page 20

Jung were motivated not by discrimination but by its dissatisfaction with his work
performance.

B.     Mr. Jung Fails to Establish a Claim of Retaliation

In order to establish a prima facie case of retaliation under federal
law, a plaintiff must show that:  (1) he participated in some statutorily protected
activity that was know by the alleged retaliator; (2) that he suffered an adverse
employment action; and (3) there is a causal connection between the protected
activity and the adverse employment action.  Van Zant v. KLM Royal Dutch
Airlines, 80 F.3d 708, 714 (2d Cir. 1996).

In the instant case, Mr. Jung has not and cannot allege facts sufficient
to establish a causal link between any protected activity and adverse employment
action.  The March 2004 Letter, in which Mr. Jung, through his attorney, complained
to Mr. Yaffa regarding alleged discrimination by Skadden, Arps, is a "protected
activity."  However, this protected activity did not occur until March 8, 2004, which
is approximately three months after Mr. Jung received his Written Warning for Poor
Work Performance, at which time he was notified that he must "demonstrate
immediate and consistent improvement or it may lead to further disciplinary action,
up to and including, the termination of his employment."  Furthermore, the March
2004 Letter was also sent to the Firm weeks after Mr. Waters documented Mr. Jung's
continued poor work performance in his memorandum dated February 18, 2004.
Thus, prior to the March 2004 Letter, Mr. Jung had received a series of negative
performance evaluations from numerous supervisors, the Firm had issued Mr. Jung a
Written Warning and Mr. Waters had documented Mr. Jung's continued poor work
performance.  These facts cast grave doubt on Mr. Jung's ability to establish a causal
connection between the March 2004 Letter and his termination of employment with
the Firm.  See, e.g., Carr v. Westlb Admin., Inc., 171 F. Supp. 2d 302, 309-10
(S.D.N.Y. 2001) (holding employee failed to establish causal connection between his
filing of complaint with EEOC and his termination, where employee received a
series of negative performance appraisals prior to filing); Taylor v. Polygram
Records, No. 94 Civ. 7689, 1999 WL 124456, at *21 (S.D.N.Y. Mar. 8, 1999)
(holding that because employee's "position was already demonstrably at risk before
she hired [an attorney] or filed the [EEOC] charge, [she could not] show on the basis
of temporal proximity alone that her termination resulted from that conduct")
(emphasis in original); Lawson v. Getty Terminals Corp., 866 F. Supp. 793, 804
(S.D.N.Y. 1994) (holding there was no causal nexus between employee's complaint
to defendant's human resources department and his termination where, prior to
employee's complaint, his annual review indicated his work was between
"competent" and "marginal" and he was counseled regarding his work performance).

Mr. Peter Holland
December 15, 2004
Page 21

          Even assuming Mr. Jung could establish a <u>prima facie</u> case of retaliation – and he cannot – Skadden, Arps has articulated a legitimate, nondiscriminatory reason for terminating Mr. Jung. That is his continued poor work performance and failure to meet the goals that the Firm set for him in his Written Warning and reiterated in his Final Warning. Given Mr. Jung's history of negative performance evaluations, he cannot demonstrate this reason is a pretext for retaliation. <u>See, e.g.</u>, <u>Thompson v. City of N.Y.</u>, No. 98 Civ. 4725, 2002 WL 31760219 (S.D.N.Y. Dec. 9, 2002) (holding teacher failed to prove that non-discriminatory explanations for a disciplinary letter and transfer were a pretext for retaliation against her for filing a grievance regarding alleged discrimination, where extensive history of negative performance evaluations and disciplinary letters had accumulated in teacher's file long before she filed her grievance).

III.    <u>Conclusion</u>

          For the foregoing reasons,[8] the Commission should properly find that no reasonable grounds exist to believe that the Firm discriminated against Mr. Jung on the basis of his race or national origin. His charge should therefore be dismissed in its entirety.

          Please do not hesitate to contact the undersigned if you should require anything further.

          Respectfully submitted,

          *Henry P. Baer*

          Henry P. Baer

---

[8] The Firm expressly reserves and does not waive any of its defenses to the Charge, whether or not articulated herein, including but not limited to defenses based on the timeliness of Mr. Jung's allegations. <u>See, e.g.</u>, <u>Diaz v. Weill Med. Ctr. of Cornell Univ.</u>, No. 02 Civ. 7380, 2004 WL 285947, at *18 (S.D.N.Y. Feb. 13, 2004) (holding allegations regarding discriminatory remarks based on employee's religion and national origin, none of which occurred during the 300-day look back period, were time barred).

# EXHIBIT 5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

JONATHAN JUNG,                                    05-CV-4286 (MBM)

                              Plaintiff,      :   STIPULATION

                                              :

          - against -

                                              :

SKADDEN, ARPS, SLATE, MEAGHER &               :
FLOM, LLP and SUSAN DORNFELD,

                              Defendants.     :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

        IT IS HEREBY STIPULATED AND AGREED by and between the

parties, through their undersigned counsel, that the time for defendants Skadden, Arps,

Slate, Meagher & Flom LLP and Susan Dornfeld to answer, move or otherwise respond

with respect to the Complaint shall be extended to and including June 10, 2005.

Dated: New York, New York
       May 16, 2005

BRENDAN CHAO, ESQ.                  SKADDEN, ARPS, SLATE, MEAGHER
                                      & FLOM LLP

By                                  By
   Brendan Chao                        Henry P. Baer
                                       David E. Schwartz
Attorneys for Plaintiff                Attorneys for Defendants
230 Park Avenue                        Four Times Square
New York, New York 10169               New York, New York 10036-6522
(212) 867-4753                         (212) 735-3000

SO ORDERED:

_____
U.S.D.J.

# EXHIBIT 6







Search Site: [          ] GO
○ Any Word  ⦿ All Words  ○ Search Exact Phrase
☒ Printer Friendly

**Commercial Arbitration Rules and Mediation Procedures
(Including Procedures for Large, Complex Commercial Disputes)**
Amended and Effective September 15, 2005 (Fee Update).
Click here to view a summary of the previous Rules changes.

TABLE OF CONTENTS

IMPORTANT NOTICE
INTRODUCTION
STANDARD ARBITRATION CLAUSE
ADMINISTRATIVE FEES
MEDIATION
LARGE, COMPLEX CASES

COMMERCIAL MEDIATION PROCEDURES
M-1. Agreement of Parties
M-2. Initiation of Mediation
M-3. Requests for Mediation
M-4. Appointment of the Mediator
M-5. Qualifications of the Mediator
M-6. Vacancies
M-7. Representation
M-8. Date, Time, and Place of Mediation
M-9. Identification of Matters in Dispute
M-10. Authority of the Mediator
M-11. Privacy
M-12. Confidentiality
M-13. No Stenographic Record
M-14. Termination of Mediation
M-15. Exclusion of Liability
M-16. Interpretation and Application of Procedures
M-17. Expenses
ADMINISTRATIVE FEES

COMMERCIAL ARBITRATION RULES
R-1. Agreement of Parties
R-2. AAA and Delegation of Duties
R-3. National Roster of Arbitrators
R-4. Initiation under an Arbitration Provision in a Contract
R-5. Initiation under a Submission
R-6. Changes of Claim
R-7. Jurisdiction
R-8. Mediation
R-9. Administrative Conference
R-10. Fixing of Locale
R-11. Appointment from National Roster
R-12. Direct Appointment by a Party
R-13. Appointment of Chairperson by Party-Appointed Arbitrators or Parties
R-14. Nationality of Arbitrator
R-15. Number of Arbitrators
R-16. Disclosure
R-17. Disqualification of Arbitrator
R-18. Communication with Arbitrator
R-19. Vacancies
R-20. Preliminary Hearing
R-21. Exchange of Information
R-22. Date, Time, and Place of Hearing
R-23. Attendance at Hearings
R-24. Representation
R-25. Oaths
R-26. Stenographic Record
R-27. Interpreters
R-28. Postponements
R-29. Arbitration in the Absence of a Party or Representative
R-30. Conduct of Proceedings
R-31. Evidence
R-32. Evidence by Affidavit and Post-hearing Filing of Documents or Other Evidence
R-33. Inspection or Investigation
R-34. Interim Measures

R-35. Closing of Hearing
R-36. Reopening of Hearing
R-37. Waiver of Rules
R-38. Extensions of Time
R-39. Serving of Notice
R-40. Majority Decision
R-41. Time of Award
R-42. Form of Award
R-43. Scope of Award
R-44. Award upon Settlement
R-45. Delivery of Award to Parties
R-46. Modification of Award
R-47. Release of Documents for Judicial Proceedings
R-48. Applications to Court and Exclusion of Liability
R-49. Administrative Fees
R-50. Expenses
R-51. Neutral Arbitratorâ€™s Compensation
R-52. Deposits
R-53. Interpretation and Application of Rules
R-54. Suspension for Nonpayment

EXPEDITED PROCEDURES
E-1. Limitation on Extensions
E-2. Changes of Claim or Counterclaim
E-3. Serving of Notices
E-4. Appointment and Qualifications of Arbitrator
E-5. Exchange of Exhibits
E-6. Proceedings on Documents
E-7. Date, Time, and Place of Hearing
E-8. The Hearing
E-9. Time of Award
E-10. Arbitratorâ€™s Compensation

PROCEDURES FOR LARGE, COMPLEX COMMERCIAL DISPUTES
L-1. Administrative Conference
L-2. Arbitrators
L-3. Preliminary Hearing
L-4. Management of Proceedings

OPTIONAL RULES FOR EMERGENCY MEASURES OF PROTECTION
O-1. Applicability
O-2. Appointment of Emergency Arbitrator
O-3. Schedule
O-4. Interim Award
O-5. Constitution of the Panel
O-6. Security
O-7. Special Master
O-8. Costs

ADMINISTRATIVE FEES
Fees
Refund Schedule
Hearing Room Rental

## IMPORTANT NOTICE

These rules and any amendment of them shall apply in the form in effect at the time the administrative filing requirements are met for a demand for arbitration or submission agreement received by the AAA. To ensure that you have the most current information, see our Web Site at www.adr.org.

## INTRODUCTION

Each year, many millions of business transactions take place. Occasionally, disagreements develop over these business transactions. Many of these disputes are resolved by arbitration, the voluntary submission of a dispute to an impartial person or persons for final and binding determination. Arbitration has proven to be an effective way to resolve these disputes privately, promptly, and economically.

The American Arbitration Association (AAA), a not-for-profit, public service organization, offers a broad range of dispute resolution services to business executives, attorneys, individuals, trade associations, unions, management, consumers, families, communities, and all levels of government. Services are available through AAA headquarters in New York and through offices located in major cities throughout the United States. Hearings may be held at locations convenient for the parties and are not limited to cities with AAA offices. In addition, the AAA serves as a center for education and training, issues specialized publications, and conducts research on all forms of out-of-court dispute settlement.

### Standard Arbitration Clause

The parties can provide for arbitration of future disputes by inserting the following clause into their contracts:

*Any controversy or claim arising out of or relating to this contract, or the breach thereof, shall be settled by arbitration administered by the American Arbitration Association under its Commercial Arbitration Rules, and judgment on the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof.*

Arbitration of existing disputes may be accomplished by use of the following:

Confidential information disclosed to a mediator by the parties or by witnesses in the course of the mediation shall not be divulged by the mediator. All records, reports, or other documents received by a mediator while serving in that capacity shall be confidential.

The mediator shall not be compelled to divulge such records or to testify in regard to the mediation in any adversary proceeding or judicial forum.

The parties shall maintain the confidentiality of the mediation and shall not rely on, or introduce as evidence in any arbitral, judicial, or other proceeding:

(a) views expressed or suggestions made by another party with respect to a possible settlement of the dispute;

(b) admissions made by another party in the course of the mediation proceedings;

(c) proposals made or views expressed by the mediator; or

(d) the fact that another party had or had not indicated willingness to accept a proposal for settlement made by the mediator.

### M-13. No Stenographic Record

There shall be no stenographic record of the mediation process.

### M-14. Termination of Mediation

The mediation shall be terminated:

(a) by the execution of a settlement agreement by the parties;

(b) by a written declaration of the mediator to the effect that further efforts at mediation are no longer worthwhile; or

(c) by a written declaration of a party or parties to the effect that the mediation proceedings are terminated.

### M-15. Exclusion of Liability

Neither the AAA nor any mediator is a necessary party in judicial proceedings relating to the mediation. Neither the AAA nor any mediator shall be liable to any party for any act or omission in connection with any mediation conducted under these procedures.

### M-16. Interpretation and Application of Procedures

The mediator shall interpret and apply these procedures insofar as they relate to the mediator's duties and responsibilities. All other procedures shall be interpreted and applied by the AAA.

### M-17. Expenses

The expenses of witnesses for either side shall be paid by the party producing such witnesses. All other expenses of the mediation, including required traveling and other expenses of the mediator and representatives of the AAA, and the expenses of any witness and the cost of any proofs or expert advice produced at the direct request of the mediator, shall be borne equally by the parties unless they agree otherwise.

### ADMINISTRATIVE FEES

The nonrefundable case set-up fee is $325 per party. In addition, the parties are responsible for compensating the mediator at his or her published rate, for conference and study time (hourly or per diem).

All expenses are generally borne equally by the parties. The parties may adjust this arrangement by agreement.

Before the commencement of the mediation, the AAA shall estimate anticipated total expenses. Each party shall pay its portion of that amount as per the agreed upon arrangement. When the mediation has terminated, the AAA shall render an accounting and return any unexpended balance to the parties.

### COMMERCIAL ARBITRATION RULES

### R-1. Agreement of Parties*+

(a) The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter AAA) under its Commercial Arbitration Rules or for arbitration by the AAA of a domestic commercial dispute without specifying particular rules. These rules and any amendment of them shall apply in the form in effect at the time the administrative requirements are met for a demand for arbitration or submission agreement received by the AAA. The parties, by written agreement, may vary the procedures set forth in these rules. After appointment of the arbitrator, such modifications may be made only with the consent of the arbitrator.

(b) Unless the parties or the AAA determines otherwise, the Expedited Procedures shall apply in any case in which no disclosed claim or counterclaim exceeds $75,000, exclusive of interest and arbitration fees and costs. Parties may also

agree to use these procedures in larger cases. Unless the parties agree otherwise, these procedures will not apply in cases involving more than two parties. The Expedited Procedures shall be applied as described in Sections E-1 through E-10 of these rules, in addition to any other portion of these rules that is not in conflict with the Expedited Procedures.

(c) Unless the parties agree otherwise, the Procedures for Large, Complex Commercial Disputes shall apply to all cases in which the disclosed claim or counterclaim of any party is at least $500,000, exclusive of claimed interest, arbitration fees and costs. Parties may also agree to use the Procedures in cases involving claims or counterclaims under $500,000, or in nonmonetary cases. The Procedures for Large, Complex Commercial Disputes shall be applied as described in Sections L-1 through L-4 of these rules, in addition to any other portion of these rules that is not in conflict with the Procedures for Large, Complex Commercial Disputes.

(d) All other cases shall be administered in accordance with Sections R-1 through R-54 of these rules.

* The AAA applies the *Supplementary Procedures for Consumer-Related Disputes* to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are nonnegotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use. The AAA will have the discretion to apply or not to apply the Supplementary Procedures and the parties will be able to bring any disputes concerning the application or non-application to the attention of the arbitrator. Consumers are not prohibited from seeking relief in a small claims court for disputes or claims within the scope of its jurisdiction, even in consumer arbitration cases filed by the business.

+ A dispute arising out of an employer promulgated plan will be administered under the AAA's National Rules for the Resolution of Employment Disputes.

### R-2. AAA and Delegation of Duties

When parties agree to arbitrate under these rules, or when they provide for arbitration by the AAA and an arbitration is initiated under these rules, they thereby authorize the AAA to administer the arbitration. The authority and duties of the AAA are prescribed in the agreement of the parties and in these rules, and may be carried out through such of the AAA's representatives as it may direct. The AAA may, in its discretion, assign the administration of an arbitration to any of its offices.

### R-3. National Roster of Arbitrators

The AAA shall establish and maintain a National Roster of Commercial Arbitrators ("National Roster") and shall appoint arbitrators as provided in these rules. The term "arbitrator" in these rules refers to the arbitration panel, constituted for a particular case, whether composed of one or more arbitrators, or to an individual arbitrator, as the context requires.

### R-4. Initiation under an Arbitration Provision in a Contract

(a) Arbitration under an arbitration provision in a contract shall be initiated in the following manner:

(i) The initiating party (the "claimant") shall, within the time period, if any, specified in the contract(s), give to the other party (the "respondent") written notice of its intention to arbitrate (the "demand"), which demand shall contain a statement setting forth the nature of the dispute, the names and addresses of all other parties, the amount involved, if any, the remedy sought, and the hearing locale requested.

(ii) The claimant shall file at any office of the AAA two copies of the demand and two copies of the arbitration provisions of the contract, together with the appropriate filing fee as provided in the schedule included with these rules.

(iii) The AAA shall confirm notice of such filing to the parties.

(b) A respondent may file an answering statement in duplicate with the AAA within 15 days after confirmation of notice of filing of the demand is sent by the AAA. The respondent shall, at the time of any such filing, send a copy of the answering statement to the claimant. If a counterclaim is asserted, it shall contain a statement setting forth the nature of the counterclaim, the amount involved, if any, and the remedy sought. If a counterclaim is made, the party making the counterclaim shall forward to the AAA with the answering statement the appropriate fee provided in the schedule included with these rules.

(c) If no answering statement is filed within the stated time, respondent will be deemed to deny the claim. Failure to file an answering statement shall not operate to delay the arbitration.

(d) When filing any statement pursuant to this section, the parties are encouraged to provide descriptions of their claims in sufficient detail to make the circumstances of the dispute clear to the arbitrator.

### R-5. Initiation under a Submission

Parties to any existing dispute may commence an arbitration under these rules by filing at any office of the AAA two copies of a written submission to arbitrate under these rules, signed by the parties. It shall contain a statement of the nature of the dispute, the names and addresses of all parties, any claims and counterclaims, the amount involved, if any, the remedy sought, and the hearing locale requested, together with the appropriate filing fee as provided in the schedule included with these rules. Unless the parties state otherwise in the submission, all claims and counterclaims will be deemed to be denied by the other party.

## R-6. Changes of Claim

After filing of a claim, if either party desires to make any new or different claim or counterclaim, it shall be made in writing and filed with the AAA. The party asserting such a claim or counterclaim shall provide a copy to the other party, who shall have 15 days from the date of such transmission within which to file an answering statement with the AAA. After the arbitrator is appointed, however, no new or different claim may be submitted except with the arbitrator's consent.

## R-7. Jurisdiction

(a) The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope or validity of the arbitration agreement.

(b) The arbitrator shall have the power to determine the existence or validity of a contract of which an arbitration clause forms a part. Such an arbitration clause shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitrator that the contract is null and void shall not for that reason alone render invalid the arbitration clause.

(c) A party must object to the jurisdiction of the arbitrator or to the arbitrability of a claim or counterclaim no later than the filing of the answering statement to the claim or counterclaim that gives rise to the objection. The arbitrator may rule on such objections as a preliminary matter or as part of the final award.

## R-8. Mediation

At any stage of the proceedings, the parties may agree to conduct a mediation conference under the Commercial Mediation Procedures in order to facilitate settlement. The mediator shall not be an arbitrator appointed to the case. Where the parties to a pending arbitration agree to mediate under the AAA's rules, no additional administrative fee is required to initiate the mediation.

## R-9. Administrative Conference

At the request of any party or upon the AAA's own initiative, the AAA may conduct an administrative conference, in person or by telephone, with the parties and/or their representatives. The conference may address such issues as arbitrator selection, potential mediation of the dispute, potential exchange of information, a timetable for hearings and any other administrative matters.

## R-10. Fixing of Locale

The parties may mutually agree on the locale where the arbitration is to be held. If any party requests that the hearing be held in a specific locale and the other party files no objection thereto within 15 days after notice of the request has been sent to it by the AAA, the locale shall be the one requested. If a party objects to the locale requested by the other party, the AAA shall have the power to determine the locale, and its decision shall be final and binding.

## R-11. Appointment from National Roster

If the parties have not appointed an arbitrator and have not provided any other method of appointment, the arbitrator shall be appointed in the following manner:

(a) Immediately after the filing of the submission or the answering statement or the expiration of the time within which the answering statement is to be filed, the AAA shall send simultaneously to each party to the dispute an identical list of 10 (unless the AAA decides that a different number is appropriate) names of persons chosen from the National Roster. The parties are encouraged to agree to an arbitrator from the submitted list and to advise the AAA of their agreement.

(b) If the parties are unable to agree upon an arbitrator, each party to the dispute shall have 15 days from the transmittal date in which to strike names objected to, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all persons named therein shall be deemed acceptable. From among the persons who have been approved on both lists, and in accordance with the designated order of mutual preference, the AAA shall invite the acceptance of an arbitrator to serve. If the parties fail to agree on any of the persons named, or if acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the submitted lists, the AAA shall have the power to make the appointment from among other members of the National Roster without the submission of additional lists.

(c) Unless the parties agree otherwise when there are two or more claimants or two or more respondents, the AAA may appoint all the arbitrators.

## R-12. Direct Appointment by a Party

(a) If the agreement of the parties names an arbitrator or specifies a method of appointing an arbitrator, that designation or method shall be followed. The notice of appointment, with the name and address of the arbitrator, shall be filed with the AAA by the appointing party. Upon the request of any appointing party, the AAA shall submit a list of members of the National Roster from which the party may, if it so desires, make the appointment.

(b) Where the parties have agreed that each party is to name one arbitrator, the arbitrators so named must meet the standards of Section R-17 with respect to impartiality and independence unless the parties have specifically agreed pursuant to Section R-17(a) that the party-appointed arbitrators are to be non-neutral and need not meet those

standards.

(c) If the agreement specifies a period of time within which an arbitrator shall be appointed and any party fails to make the appointment within that period, the AAA shall make the appointment.

(d) If no period of time is specified in the agreement, the AAA shall notify the party to make the appointment. If within 15 days after such notice has been sent, an arbitrator has not been appointed by a party, the AAA shall make the appointment.

### R-13. Appointment of Chairperson by Party-Appointed Arbitrators or Parties

(a) If, pursuant to Section R-12, either the parties have directly appointed arbitrators, or the arbitrators have been appointed by the AAA, and the parties have authorized them to appoint a chairperson within a specified time and no appointment is made within that time or any agreed extension, the AAA may appoint the chairperson.

(b) If no period of time is specified for appointment of the chairperson and the party-appointed arbitrators or the parties do not make the appointment within 15 days from the date of the appointment of the last party-appointed arbitrator, the AAA may appoint the chairperson.

(c) If the parties have agreed that their party-appointed arbitrators shall appoint the chairperson from the National Roster, the AAA shall furnish to the party-appointed arbitrators, in the manner provided in Section R-11, a list selected from the National Roster, and the appointment of the chairperson shall be made as provided in that Section.

### R-14. Nationality of Arbitrator

Where the parties are nationals of different countries, the AAA, at the request of any party or on its own initiative, may appoint as arbitrator a national of a country other than that of any of the parties. The request must be made before the time set for the appointment of the arbitrator as agreed by the parties or set by these rules.

### R-15. Number of Arbitrators

If the arbitration agreement does not specify the number of arbitrators, the dispute shall be heard and determined by one arbitrator, unless the AAA, in its discretion, directs that three arbitrators be appointed. A party may request three arbitrators in the demand or answer, which request the AAA will consider in exercising its discretion regarding the number of arbitrators appointed to the dispute.

### R-16. Disclosure

(a) Any person appointed or to be appointed as an arbitrator shall disclose to the AAA any circumstance likely to give rise to justifiable doubt as to the arbitrator's impartiality or independence, including any bias or any financial or personal interest in the result of the arbitration or any past or present relationship with the parties or their representatives. Such obligation shall remain in effect throughout the arbitration.

(b) Upon receipt of such information from the arbitrator or another source, the AAA shall communicate the information to the parties and, if it deems it appropriate to do so, to the arbitrator and others.

(c) In order to encourage disclosure by arbitrators, disclosure of information pursuant to this Section R-16 is not to be construed as an indication that the arbitrator considers that the disclosed circumstance is likely to affect impartiality or independence.

### R-17. Disqualification of Arbitrator

(a) Any arbitrator shall be impartial and independent and shall perform his or her duties with diligence and in good faith, and shall be subject to disqualification for

(i) partiality or lack of independence,

(ii) inability or refusal to perform his or her duties with diligence and in good faith, and

(iii) any grounds for disqualification provided by applicable law. The parties may agree in writing, however, that arbitrators directly appointed by a party pursuant to Section R-12 shall be nonneutral, in which case such arbitrators need not be impartial or independent and shall not be subject to disqualification for partiality or lack of independence.

(b) Upon objection of a party to the continued service of an arbitrator, or on its own initiative, the AAA shall determine whether the arbitrator should be disqualified under the grounds set out above, and shall inform the parties of its decision, which decision shall be conclusive.

### R-18. Communication with Arbitrator

(a) No party and no one acting on behalf of any party shall communicate ex parte with an arbitrator or a candidate for arbitrator concerning the arbitration, except that a party, or someone acting on behalf of a party, may communicate ex parte with a candidate for direct appointment pursuant to Section R-12 in order to advise the candidate of the general nature of the controversy and of the anticipated proceedings and to discuss the candidate's qualifications, availability, or independence in relation to the parties or to discuss the suitability of candidates for selection as a third arbitrator where the parties or party-designated arbitrators are to participate in that selection.

(b) Section R-18(a) does not apply to arbitrators directly appointed by the parties who, pursuant to Section R-17(a), the parties have agreed in writing are non-neutral. Where the parties have so agreed under Section R-17(a), the AAA shall as an administrative practice suggest to the parties that they agree further that Section R-18(a) should nonetheless apply prospectively.

### R-19. Vacancies

(a) If for any reason an arbitrator is unable to perform the duties of the office, the AAA may, on proof satisfactory to it, declare the office vacant. Vacancies shall be filled in accordance with the applicable provisions of these rules.

(b) In the event of a vacancy in a panel of neutral arbitrators after the hearings have commenced, the remaining arbitrator or arbitrators may continue with the hearing and determination of the controversy, unless the parties agree otherwise.

(c) In the event of the appointment of a substitute arbitrator, the panel of arbitrators shall determine in its sole discretion whether it is necessary to repeat all or part of any prior hearings.

### R-20. Preliminary Hearing

(a) At the request of any party or at the discretion of the arbitrator or the AAA, the arbitrator may schedule as soon as practicable a preliminary hearing with the parties and/or their representatives. The preliminary hearing may be conducted by telephone at the arbitrator's discretion.

(b) During the preliminary hearing, the parties and the arbitrator should discuss the future conduct of the case, including clarification of the issues and claims, a schedule for the hearings and any other preliminary matters.

### R-21. Exchange of Information

(a) At the request of any party or at the discretion of the arbitrator, consistent with the expedited nature of arbitration, the arbitrator may direct

i) the production of documents and other information, and

ii) the identification of any witnesses to be called.

(b) At least five business days prior to the hearing, the parties shall exchange copies of all exhibits they intend to submit at the hearing.

(c) The arbitrator is authorized to resolve any disputes concerning the exchange of information.

### R-22. Date, Time, and Place of Hearing

The arbitrator shall set the date, time, and place for each hearing. The parties shall respond to requests for hearing dates in a timely manner, be cooperative in scheduling the earliest practicable date, and adhere to the established hearing schedule. The AAA shall send a notice of hearing to the parties at least 10 days in advance of the hearing date, unless otherwise agreed by the parties.

### R-23. Attendance at Hearings

The arbitrator and the AAA shall maintain the privacy of the hearings unless the law provides to the contrary. Any person having a direct interest in the arbitration is entitled to attend hearings. The arbitrator shall otherwise have the power to require the exclusion of any witness, other than a party or other essential person, during the testimony of any other witness. It shall be discretionary with the arbitrator to determine the propriety of the attendance of any other person other than a party and its representatives.

### R-24. Representation

Any party may be represented by counsel or other authorized representative. A party intending to be so represented shall notify the other party and the AAA of the name and address of the representative at least three days prior to the date set for the hearing at which that person is first to appear. When such a representative initiates an arbitration or responds for a party, notice is deemed to have been given.

### R-25. Oaths

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if it is required by law or requested by any party, shall do so.

### R-26. Stenographic Record

Any party desiring a stenographic record shall make arrangements directly with a stenographer and shall notify the other parties of these arrangements at least three days in advance of the hearing. The requesting party or parties shall pay the cost of the record. If the transcript is agreed by the parties, or determined by the arbitrator to be the official record of the proceeding, it must be provided to the arbitrator and made available to the other parties for inspection, at a date, time, and place determined by the arbitrator.

### R-27. Interpreters

Any party wishing an interpreter shall make all arrangements directly with the interpreter and shall assume the costs of the service.

### R-28. Postponements

The arbitrator may postpone any hearing upon agreement of the parties, upon request of a party for good cause shown, or upon the arbitrator's own initiative.

### R-29. Arbitration in the Absence of a Party or Representative

Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be made solely on the default of a party. The arbitrator shall require the party who is present to submit such evidence as the arbitrator may require for the making of an award.

### R-30. Conduct of Proceedings

(a) The claimant shall present evidence to support its claim. The respondent shall then present evidence to support its defense. Witnesses for each party shall also submit to questions from the arbitrator and the adverse party. The arbitrator has the discretion to vary this procedure, provided that the parties are treated with equality and that each party has the right to be heard and is given a fair opportunity to present its case.

(b) The arbitrator, exercising his or her discretion, shall conduct the proceedings with a view to expediting the resolution of the dispute and may direct the order of proof, bifurcate proceedings and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case.

(c) The parties may agree to waive oral hearings in any case.

### R-31. Evidence

(a) The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator may deem necessary to an understanding and determination of the dispute. Conformity to legal rules of evidence shall not be necessary. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any of the parties is absent, in default or has waived the right to be present.

(b) The arbitrator shall determine the admissibility, relevance, and materiality of the evidence offered and may exclude evidence deemed by the arbitrator to be cumulative or irrelevant.

(c) The arbitrator shall take into account applicable principles of legal privilege, such as those involving the confidentiality of communications between a lawyer and client.

(d) An arbitrator or other person authorized by law to subpoena witnesses or documents may do so upon the request of any party or independently.

### R-32. Evidence by Affidavit and Post-hearing Filing of Documents or Other Evidence

(a) The arbitrator may receive and consider the evidence of witnesses by declaration or affidavit, but shall give it only such weight as the arbitrator deems it entitled to after consideration of any objection made to its admission.

(b) If the parties agree or the arbitrator directs that documents or other evidence be submitted to the arbitrator after the hearing, the documents or other evidence shall be filed with the AAA for transmission to the arbitrator. All parties shall be afforded an opportunity to examine and respond to such documents or other evidence.

### R-33. Inspection or Investigation

An arbitrator finding it necessary to make an inspection or investigation in connection with the arbitration shall direct the AAA to so advise the parties. The arbitrator shall set the date and time and the AAA shall notify the parties. Any party who so desires may be present at such an inspection or investigation. In the event that one or all parties are not present at the inspection or investigation, the arbitrator shall make an oral or written report to the parties and afford them an opportunity to comment.

### R-34. Interim Measures**

(a) The arbitrator may take whatever interim measures he or she deems necessary, including injunctive relief and measures for the protection or conservation of property and disposition of perishable goods.

(b) Such interim measures may take the form of an interim award, and the arbitrator may require security for the costs of such measures.

(c) A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate.

** The Optional Rules may be found below.

### R-35. Closing of Hearing

The arbitrator shall specifically inquire of all parties whether they have any further proofs to offer or witnesses to be heard. Upon receiving negative replies or if satisfied that the record is complete, the arbitrator shall declare the hearing closed. If briefs are to be filed, the hearing shall b e declared closed as of the final date set by the arbitrator for the receipt of briefs. If documents are to be filed as provided in Section R-32 and the date set for their receipt is later than that set for the receipt of briefs, the later date shall be the closing date of the hearing. The time limit within which the arbitrator is required to make the award shall commence, in the absence of other agreements by the parties, upon the closing of the hearing.

### R-36. Reopening of Hearing

The hearing may be reopened on the arbitrator's initiative, or upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed on by the parties in the contract(s) out of which the controversy has arisen, the matter may not be reopened unless the parties agree on an extension of time. When no specific date is fixed in the contract, the arbitrator may reopen the hearing and shall have 30 days from the closing of the reopened hearing within which to make an award.

### R-37. Waiver of Rules

Any party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with and who fails to state an objection in writing shall be deemed to have waived the right to object.

### R-38. Extensions of Time

The parties may modify any period of time by mutual agreement. The AAA or the arbitrator may for good cause extend any period of time established by these rules, except the time for making the award. The AAA shall notify the parties of any extension.

### R-39. Serving of Notice

(a) Any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration under these rules, for any court action in connection therewith, or for the entry of judgment on any award made under these rules may be served on a party by mail addressed to the party, or its representative at the last known address or by personal service, in or outside the state where the arbitration is to be held, provided that reasonable opportunity to be heard with regard to the dispute is or has been granted to the party.

(b) The AAA, the arbitrator and the parties may also use overnight delivery or electronic facsimile transmission (fax), to give the notices required by these rules. Where all parties and the arbitrator agree, notices may be transmitted by electronic mail (E-mail), or other methods of communication.

(c) Unless otherwise instructed by the AAA or by the arbitrator, any documents submitted by any party to the AAA or to the arbitrator shall simultaneously be provided to the other party or parties to the arbitration.

### R-40. Majority Decision

When the panel consists of more than one arbitrator, unless required by law or by the arbitration agreement, a majority of the arbitrators must make all decisions.

### R-41. Time of Award

The award shall be made promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than 30 days from the date of closing the hearing, or, if oral hearings have been waived, from the date of the AAA's transmittal of the final statements and proofs to the arbitrator.

### R-42. Form of Award

(a) Any award shall be in writing and signed by a majority of the arbitrators. It shall be executed in the manner required by law.

(b) The arbitrator need not render a reasoned award unless the parties request such an award in writing prior to appointment of the arbitrator or unless the arbitrator determines that a reasoned award is appropriate.

### R-43. Scope of Award

(a) The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties, including, but not limited to, specific performance of a contract.

(b) In addition to a final award, the arbitrator may make other decisions, including interim, interlocutory, or partial rulings, orders, and awards. In any interim, interlocutory, or partial award, the arbitrator may assess and apportion the fees, expenses, and compensation related to such award as the arbitrator determines is appropriate.

(c) In the final award, the arbitrator shall assess the fees, expenses, and compensation provided in Sections R-49, R-50, and R-51. The arbitrator may apportion such fees, expenses, and compensation among the parties in such amounts as the arbitrator determines is appropriate.

(d) The award of the arbitrator(s) may include:

(i) interest at such rate and from such date as the arbitrator(s) may deem appropriate; and

(ii) an award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement.

### R-44. Award upon Settlement

If the parties settle their dispute during the course of the arbitration and if the parties so request, the arbitrator may set forth the terms of the settlement in a "consent award." A consent award must include an allocation of arbitration costs, including administrative fees and expenses as well as arbitrator fees and expenses.

### R-45. Delivery of Award to Parties

Parties shall accept as notice and delivery of the award the placing of the award or a true copy thereof in the mail addressed to the parties or their representatives at the last known addresses, personal or electronic service of the award, or the filing of the award in any other manner that is permitted by law.

### R-46. Modification of Award

Within 20 days after the transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other parties shall be given 10 days to respond to the request. The arbitrator shall dispose of the request within 20 days after transmittal by the AAA to the arbitrator of the request and any response thereto.

### R-47. Release of Documents for Judicial Proceedings

The AAA shall, upon the written request of a party, furnish to the party, at the party's expense, certified copies of any papers in the AAA's possession that may be required in judicial proceedings relating to the arbitration.

### R-48. Applications to Court and Exclusion of Liability

(a) No judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

(b) Neither the AAA nor any arbitrator in a proceeding under these rules is a necessary or proper party in judicial proceedings relating to the arbitration.

(c) Parties to an arbitration under these rules shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction thereof.

(d) Parties to an arbitration under these rules shall be deemed to have consented that neither the AAA nor any arbitrator shall be liable to any party in any action for damages or injunctive relief for any act or omission in connection with any arbitration under these rules.

### R-49. Administrative Fees

As a not-for-profit organization, the AAA shall prescribe an initial filing fee and a case service fee to compensate it for the cost of providing administrative services. The fees in effect when the fee or charge is incurred shall be applicable. The filing fee shall be advanced by the party or parties making a claim or counterclaim, subject to final apportionment by the arbitrator in the award. The AAA may, in the event of extreme hardship on the part of any party, defer or reduce the administrative fees.

### R-50. Expenses

The expenses of witnesses for either side shall be paid by the party producing such witnesses. All other expenses of the arbitration, including required travel and other expenses of the arbitrator, AAA representatives, and any witness and the cost of any proof produced at the direct request of the arbitrator, shall be borne equally by the parties, unless they agree otherwise or unless the arbitrator in the award assesses such expenses or any part thereof against any specified party or parties.

### R-51. Neutral Arbitrator's Compensation

(a) Arbitrators shall be compensated at a rate consistent with the arbitrator's stated rate of compensation.

(b) If there is disagreement concerning the terms of compensation, an appropriate rate shall be established with the arbitrator by the AAA and confirmed to the parties.

(c) Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator.

### R-52. Deposits

The AAA may require the parties to deposit in advance of any hearings such sums of money as it deems necessary to

cover the expense of the arbitration, including the arbitrator's fee, if any, and shall render an accounting to the parties and return any unexpended balance at the conclusion of the case.

### R-53. Interpretation and Application of Rules

The arbitrator shall interpret and apply these rules insofar as they relate to the arbitrator's powers and duties. When there is more than one arbitrator and a difference arises among them concerning the meaning or application of these rules, it shall be decided by a majority vote. If that is not possible, either an arbitrator or a party may refer the question to the AAA for final decision. All other rules shall be interpreted and applied by the AAA.

### R-54. Suspension for Nonpayment

If arbitrator compensation or administrative charges have not been paid in full, the AAA may so inform the parties in order that one of them may advance the required payment. If such payments are not made, the arbitrator may order the suspension or termination of the proceedings. If no arbitrator has yet been appointed, the AAA may suspend the proceedings.

### EXPEDITED PROCEDURES

### E-1. Limitation on Extensions

Except in extraordinary circumstances, the AAA or the arbitrator may grant a party no more than one seven-day extension of time to respond to the demand for arbitration or counterclaim as provided in Section R-4.

### E-2. Changes of Claim or Counterclaim

A claim or counterclaim may be increased in amount, or a new or different claim or counterclaim added, upon the agreement of the other party, or the consent of the arbitrator. After the arbitrator is appointed, however, no new or different claim or counterclaim may be submitted except with the arbitrator's consent. If an increased claim or counterclaim exceeds $75,000, the case will be administered under the regular procedures unless all parties and the arbitrator agree that the case may continue to be processed under the Expedited Procedures.

### E-3. Serving of Notices

In addition to notice provided by Section R-39(b), the parties shall also accept notice by telephone. Telephonic notices by the AAA shall subsequently be confirmed in writing to the parties. Should there be a failure to confirm in writing any such oral notice, the proceeding shall nevertheless be valid if notice has, in fact, been given by telephone.

### E-4. Appointment and Qualifications of Arbitrator

(a) The AAA shall simultaneously submit to each party an identical list of five proposed arbitrators drawn from its National Roster from which one arbitrator shall be appointed.

(b) The parties are encouraged to agree to an arbitrator from this list and to advise the AAA of their agreement. If the parties are unable to agree upon an arbitrator, each party may strike two names from the list and return it to the AAA within seven days from the date of the AAA's mailing to the parties. If for any reason the appointment of an arbitrator cannot be made from the list, the AAA may make the appointment from other members of the panel without the submission of additional lists.

(c) The parties will be given notice by the AAA of the appointment of the arbitrator, who shall be subject to disqualification for the reasons specified in Section R-17. The parties shall notify the AAA within seven days of any objection to the arbitrator appointed. Any such objection shall be for cause and shall be confirmed in writing to the AAA with a copy to the other party or parties.

### E-5. Exchange of Exhibits

At least two business days prior to the hearing, the parties shall exchange copies of all exhibits they intend to submit at the hearing. The arbitrator shall resolve disputes concerning the exchange of exhibits.

### E-6. Proceedings on Documents

Where no party's claim exceeds $10,000, exclusive of interest and arbitration costs, and other cases in which the parties agree, the dispute shall be resolved by submission of documents, unless any party requests an oral hearing, or the arbitrator determines that an oral hearing is necessary. The arbitrator shall establish a fair and equitable procedure for the submission of documents.

### E-7. Date, Time, and Place of Hearing

In cases in which a hearing is to be held, the arbitrator shall set the date, time, and place of the hearing, to be scheduled to take place within 30 days of confirmation of the arbitrator's appointment. The AAA will notify the parties in advance of the hearing date.

### E-8. The Hearing

(a) Generally, the hearing shall not exceed one day. Each party shall have equal opportunity to submit its proofs and complete its case. The arbitrator shall determine the order of the hearing, and may require further submission of

documents within two days after the hearing. For good cause shown, the arbitrator may schedule additional hearings within seven business days after the initial day of hearings.

(b) Generally, there will be no stenographic record. Any party desiring a stenographic record may arrange for one pursuant to the provisions of Section R-26.

### E-9. Time of Award

Unless otherwise agreed by the parties, the award shall be rendered not later than 14 days from the date of the closing of the hearing or, if oral hearings have been waived, from the date of the AAA's transmittal of the final statements and proofs to the arbitrator.

### E-10. Arbitrator's Compensation

Arbitrators will receive compensation at a rate to be suggested by the AAA regional office.

### PROCEDURES FOR LARGE, COMPLEX COMMERCIAL DISPUTES

### L-1. Administrative Conference

Prior to the dissemination of a list of potential arbitrators, the AAA shall, unless the parties agree otherwise, conduct an administrative conference with the parties and/or their attorneys or other representatives by conference call. The conference will take place within 14 days after the commencement of the arbitration. In the event the parties are unable to agree on a mutually acceptable time for the conference, the AAA may contact the parties individually to discuss the issues contemplated herein. Such administrative conference shall be conducted for the following purposes and for such additional purposes as the parties or the AAA may deem appropriate:

(a) to obtain additional information about the nature and magnitude of the dispute and the anticipated length of hearing and scheduling;

(b) to discuss the views of the parties about the technical and other qualifications of the arbitrators;

(c) to obtain conflicts statements from the parties; and

(d) to consider, with the parties, whether mediation or other non-adjudicative methods of dispute resolution might be appropriate.

### L-2. Arbitrators

(a) Large, Complex Commercial Cases shall be heard and determined by either one or three arbitrators, as may be agreed upon by the parties. If the parties are unable to agree upon the number of arbitrators and a claim or counterclaim involves at least $1,000,000, then three arbitrator(s) shall hear and determine the case. If the parties are unable to agree on the number of arbitrators and each claim and counterclaim is less than $1,000,000, then one arbitrator shall hear and determine the case.

(b) The AAA shall appoint arbitrator(s) as agreed by the parties. If they are unable to agree on a method of appointment, the AAA shall appoint arbitrators from the Large, Complex Commercial Case Panel, in the manner provided in the Regular Commercial Arbitration Rules. Absent agreement of the parties, the arbitrator(s) shall not have served as the mediator in the mediation phase of the instant proceeding.

### L-3. Preliminary Hearing

As promptly as practicable after the selection of the arbitrator(s), a preliminary hearing shall be held among the parties and/or their attorneys or other representatives and the arbitrator(s). Unless the parties agree otherwise, the preliminary hearing will be conducted by telephone conference call rather than in person. At the preliminary hearing the matters to be considered shall include, without limitation:

(a) service of a detailed statement of claims, damages and defenses, a statement of the issues asserted by each party and positions with respect thereto, and any legal authorities the parties may wish to bring to the attention of the arbitrator(s);

(b) stipulations to uncontested facts;

(c) the extent to which discovery shall be conducted;

(d) exchange and premarking of those documents which each party believes may be offered at the hearing;

(e) the identification and availability of witnesses, including experts, and such matters with respect to witnesses including their biographies and expected testimony as may be appropriate;

(f) whether, and the extent to which, any sworn statements and/or depositions may be introduced;

(g) the extent to which hearings will proceed on consecutive days;

(h) whether a stenographic or other official record of the proceedings shall be maintained; and

(i) the possibility of utilizing mediation or other non-adjudicative methods of dispute resolution; and

(j) the procedure for the issuance of subpoenas.

By agreement of the parties and/or order of the arbitrator(s), the pre-hearing activities and the hearing procedures that will govern the arbitration will be memorialized in a Scheduling and Procedure Order.

## L-4. Management of Proceedings

(a) Arbitrator(s) shall take such steps as they may deem necessary or desirable to avoid delay and to achieve a just, speedy and cost-effective resolution of Large, Complex Commercial Cases.

(b) Parties shall cooperate in the exchange of documents, exhibits and information within such party's control if the arbitrator(s) consider such production to be consistent with the goal of achieving a just, speedy and cost-effective resolution of a Large, Complex Commercial Case.

(c) The parties may conduct such discovery as may be agreed to by all the parties provided, however, that the arbitrator(s) may place such limitations on the conduct of such discovery as the arbitrator(s) shall deem appropriate. If the parties cannot agree on production of documents and other information, the arbitrator(s), consistent with the expedited nature of arbitration, may establish the extent of the discovery.

(d) At the discretion of the arbitrator(s), upon good cause shown and consistent with the expedited nature of arbitration, the arbitrator(s) may order depositions of, or the propounding of interrogatories to, such persons who may possess information determined by the arbitrator(s) to be necessary to determination of the matter.

(e) The parties shall exchange copies of all exhibits they intend to submit at the hearing 10 business days prior to the hearing unless the arbitrator(s) determine otherwise.

(f) The exchange of information pursuant to this rule, as agreed by the parties and/or directed by the arbitrator(s), shall be included within the Scheduling and Procedure Order.

(g) The arbitrator is authorized to resolve any disputes concerning the exchange of information.

(h) Generally hearings will be scheduled on consecutive days or in blocks of consecutive days in order to maximize efficiency and minimize costs.

## OPTIONAL RULES FOR EMERGENCY MEASURES OF PROTECTION

### O-1. Applicability

Where parties by special agreement or in their arbitration clause have adopted these rules for emergency measures of protection, a party in need of emergency relief prior to the constitution of the panel shall notify the AAA and all other parties in writing of the nature of the relief sought and the reasons why such relief is required on an emergency basis. The application shall also set forth the reasons why the party is entitled to such relief. Such notice may be given by facsimile transmission, or other reliable means, but must include a statement certifying that all other parties have been notified or an explanation of the steps taken in good faith to notify other parties.

### O-2. Appointment of Emergency Arbitrator

Within one business day of receipt of notice as provided in Section O-1, the AAA shall appoint a single emergency arbitrator from a special AAA panel of emergency arbitrators designated to rule on emergency applications. The emergency arbitrator shall immediately disclose any circumstance likely, on the basis of the facts disclosed in the application, to affect such arbitrator's impartiality or independence. Any challenge to the appointment of the emergency arbitrator must be made within one business day of the communication by the AAA to the parties of the appointment of the emergency arbitrator and the circumstances disclosed.

### O-3. Schedule

The emergency arbitrator shall as soon as possible, but in any event within two business days of appointment, establish a schedule for consideration of the application for emergency relief. Such schedule shall provide a reasonable opportunity to all parties to be heard, but may provide for proceeding by telephone conference or on written submissions as alternatives to a formal hearing.

### O-4. Interim Award

If after consideration the emergency arbitrator is satisfied that the party seeking the emergency relief has shown that immediate and irreparable loss or damage will result in the absence of emergency relief, and that such party is entitled to such relief, the emergency arbitrator may enter an interim award granting the relief and stating the reasons therefore.

### O-5. Constitution of the Panel

Any application to modify an interim award of emergency relief must be based on changed circumstances and may be made to the emergency arbitrator until the panel is constituted; thereafter such a request shall be addressed to the panel. The emergency arbitrator shall have no further power to act after the panel is constituted unless the parties agree that the emergency arbitrator is named as a member of the panel.

### O-6. Security

Any interim award of emergency relief may be conditioned on provision by the party seeking such relief of appropriate security.

**O-7. Special Master**

A request for interim measures addressed by a party to a judicial authority shall not be deemed incompatible with the agreement to arbitrate or a waiver of the right to arbitrate. If the AAA is directed by a judicial authority to nominate a special master to consider and report on an application for emergency relief, the AAA shall proceed as provided in Section O-1 of this article and the references to the emergency arbitrator shall be read to mean the special master, except that the special master shall issue a report rather than an interim award.

**O-8. Costs**

The costs associated with applications for emergency relief shall initially be apportioned by the emergency arbitrator or special master, subject to the power of the panel to determine finally the apportionment of such costs.

**ADMINISTRATIVE FEES**

The administrative fees of the AAA are based on the amount of the claim or counterclaim. Arbitrator compensation is not included in this schedule. Unless the parties agree otherwise, arbitrator compensation and administrative fees are subject to allocation by the arbitrator in the award.

In an effort to make arbitration costs reasonable for consumers, the AAA has a separate fee schedule for consumer-related disputes. Please refer to Section C-8 of the *Supplementary Procedures for Consumer-Related Disputes* when filing a consumer-related claim.

The AAA applies the *Supplementary Procedures for Consumer-Related Disputes* to arbitration clauses in agreements between individual consumers and businesses where the business has a standardized, systematic application of arbitration clauses with customers and where the terms and conditions of the purchase of standardized, consumable goods or services are non-negotiable or primarily non-negotiable in most or all of its terms, conditions, features, or choices. The product or service must be for personal or household use. The AAA will have the discretion to apply or not to apply the Supplementary Procedures and the parties will be able to bring any disputes concerning the application or non-application to the attention of the arbitrator. Consumers are not prohibited from seeking relief in a small claims court for disputes or claims within the scope of its jurisdiction, even in consumer arbitration cases filed by the business.

**Fees**

An initial filing fee is payable in full by a filing party when a claim, counterclaim or additional claim is filed. A case service fee will be incurred for all cases that proceed to their first hearing. This fee will be payable in advance at the time that the first hearing is scheduled. This fee will be refunded at the conclusion of the case if no hearings have occurred. However, if the Association is not notified at least 24 hours before the time of the scheduled hearing, the case service fee will remain due and will not be refunded.

These fees will be billed in accordance with the following schedule:

| Amount of Claim | Initial Filing Fee | Case Service Fee |
|---|---|---|
| Above $0 to $10,000 | $750 | $200 |
| Above $10,000 to $75,000 | $950 | $300 |
| Above $75,000 to $150,000 | $1,800 | $750 |
| Above $150,000 to $300,000 | $2,750 | $1,250 |
| Above $300,000 to $500,000 | $4,250 | $1,750 |
| Above $500,000 to $1,000,000 | $6,000 | $2,500 |
| Above $1,000,000 to $5,000,000 | $8,000 | $3,250 |
| Above $5,000,000 to $10,000,000 | $10,000 | $4,000 |
| Above $10,000,000 | * | * |
| Nonmonetary Claims** | $3,250 | $1,250 |

**Fee Schedule for Claims in Excess of $10 Million .**

The following is the fee schedule for use in disputes involving claims in excess of $10 million. If you have any questions, please consult your local AAA office or case management center.

| Claim Size | Fee | Case Service Fee |
|---|---|---|
| $10 million and above | Base fee of $ 12,500 plus .01% of the amount of claim above $ 10 million. | $6,000 |
|  | Filing fees capped at $65,000 |  |

** This fee is applicable only when a claim or counterclaim is not for a monetary amount. Where a monetary claim

amount is not known, parties will be required to state a range of claims or be subject to the highest possible filing fee.

Fees are subject to increase if the amount of a claim or counterclaim is modified after the initial filing date. Fees are subject to decrease if the amount of a claim or counterclaim is modified before the first hearing.

The minimum fees for any case having three or more arbitrators are $2,750 for the filing fee, plus a $1,250 case service fee. Expedited Procedures are applied in any case where no disclosed claim or counterclaim exceeds $75,000, exclusive of interest and arbitration costs.

Parties on cases held in abeyance for one year by agreement, will be assessed an annual abeyance fee of $300. If a party refuses to pay the assessed fee, the other party or parties may pay the entire fee on behalf of all parties, otherwise the matter will be closed.

### Refund Schedule

The AAA offers a refund schedule on filing fees. For cases with claims up to $75,000, a minimum filing fee of $300 will not be refunded. For all other cases, a minimum fee of $500 will not be refunded. Subject to the minimum fee requirements, refunds will be calculated as follows:

- 100% of the filing fee, above the minimum fee, will be refunded if the case is settled or withdrawn within five calendar days of filing.
- 50% of the filing fee will be refunded if the case is settled or withdrawn between six and 30 calendar days of filing.
- 25% of the filing fee will be refunded if the case is settled or withdrawn between 31 and 60 calendar days of filing.

No refund will be made once an arbitrator has been appointed (this includes one arbitrator on a three-arbitrator panel). No refunds will be granted on awarded cases.

Note: the date of receipt of the demand for arbitration with the AAA will be used to calculate refunds of filing fees for both claims and counterclaims.

### Hearing Room Rental

The fees described above do not cover the rental of hearing rooms, which are available on a rental basis. Check with the AAA for availability and rates.

AAA235

©2005 American Arbitration Association. All Rights Reserved   Privacy Policy   Terms of Use

EXHIBIT 7



Contact ● Privacy Policy

Home

Focus Areas

Search Site: [            ] GO
○ Any Word  ◉ All Words  ○ Search Exact Phrase
☒ Printer Friendly

**National Rules for the Resolution of Employment Disputes**

**(Including Mediation and Arbitration Rules)**

Amended and Effective September 15, 2005

INTRODUCTION
Role of the American Arbitration Association
Legal Basis of Employment ADR
The Fairness Issue: The Due Process Protocol
AAA's Employment ADR Rules
AAA's Policy on Employment ADR
Notification
Designing an ADR Program
Alternative Dispute Resolution Options
Types of Disputes Covered

NATIONAL RULES FOR THE RESOLUTION OF EMPLOYMENT DISPUTES

1. Applicable Rules of Arbitration
2. Notification
3. AAA as Administrator of the Arbitration
4. Initiation of Arbitration
5. Changes of Claim
6. Administrative and Mediation Conferences
7. Discovery
8. Arbitration Management Conference
9. Location of the Arbitration
10. Date and Time of Hearing
11. Qualifications to Serve as Arbitrator and Rights of Parties to Disqualify Arbitrator
12. Number and Appointment of Neutral Arbitrators
13. Vacancies
14. Representation
15. Stenographic Record
16. Interpreters
17. Attendance at Hearings
18. Confidentiality
19. Postponements
20. Oaths
21. Majority Decision
22. Order of Proceedings and Communication with Arbitrators
23. Arbitration in the Absence of a Party or Representative
24. Evidence
25. Evidence by Affidavit or Declaration and Post-Hearing Filing of Documents or Other Evidence
26. Inspection or Investigation
27. Interim Measures
28. Closing of Hearing
29. Reopening of Hearing
30. Waiver of Oral Hearing
31. Waiver of Objection/Lack of Compliance with These Rules
32. Extensions of Time
33. Serving of Notice
34. The Award
35. Modification of Award
36. Release of Documents for Judicial Proceedings
37. Judicial Proceedings and Exclusion of Liability
38. Administrative Fees
39. Expenses
40. Neutral Arbitrator's Compensation

41. Deposits
42. Interpretation and Application of Rules

**ADMINISTRATIVE FEE SCHEDULE**

For Disputes Arising Out of Employer-Promulgated Plans
Administrative Fee
Filing Fees
Hearing Fees
Postponement/Cancellation Fees
Hearing Room Rental
**Suspension for Nonpayment**

For Disputes Arising out of Individually-Negotiated Employment Agreements and Contracts
Administrative Fee
Fees
**Hearing Room Rental**

For Disputes Proceeding Under the Supplementary Rules for Class Action Arbitration ("Supplementary Rules")

EMPLOYMENT MEDIATION RULES

1. Agreement of Parties
2. Initiation of Mediation
3. Request for Mediation
4. Appointment of Mediator
5. Qualifications of Mediator
6. Vacancies
7. Representation
8. Date, Time, and Place of Mediation
9. Identification of Matters in Dispute
10. Authority of Mediator
11. Privacy
12. Confidentiality
13. No Stenographic Record
14. Termination of Mediation
15. Exclusion of Liability
16. Interpretation and Application of Rules
17. Expenses

MEDIATION FEE SCHEDULE

**Introduction**

Federal and state laws reflecting societal intolerance for certain workplace conduct, as well as court decisions interpreting and applying those statutes, have redefined responsible corporate practice and employee relations. Increasingly, employers and employees face workplace disputes involving alleged wrongful termination, sexual harassment, or discrimination based on race, color, religion, sex, national origin, age and disability.

As courts and administrative agencies become less accessible to civil litigants, employers and their employees now see alternative dispute resolution ("ADR") as a way to promptly and effectively resolve workplace disputes. ADR procedures are becoming more common in contracts of employment, personnel manuals and employee handbooks. Increasingly, corporations and their employees look to the American Arbitration Association as a resource in developing prompt and effective employment procedures for employment-related disputes.

These rules have been developed for employers and employees who wish to use a private alternative to resolve their disputes, enabling them to have complaints heard by an impartial person with expertise in the employment field. These procedures benefit both the employer and the individual employee by making it possible to resolve disputes without extensive litigation.

**Role of the American Arbitration Association**

The American Arbitration Association, founded in 1926, is a not-for-profit, public service organization dedicated to the resolution of disputes through mediation, arbitration, elections, and other voluntary dispute resolution procedures. Over 4,000,000 workers are now covered by employment ADR plans administered by the AAA.

In addition, the AAA provides education and training, specialized publications, and research on all forms of dispute settlement. With 36 offices worldwide and cooperative agreements with arbitral institutions in 41 other nations, the American Arbitration Association is the nation's largest private provider of ADR services.

For over 75 years, the American Arbitration Association has set the standards for the development of fair and equitable dispute resolution procedures. The development of the *National Rules for the Resolution of Employment Disputes* , and the reconstitution of a select and diverse roster of expert neutrals to hear and resolve disputes, are the most recent initiatives of the Association to provide private, efficient and cost-effective procedures for out-of-court settlement of workplace disputes.

**Legal Basis of Employment ADR**

Since the beginning of this decade, Congress has twice reaffirmed the important role of ADR in the area of employment discrimination -- in the Americans with Disabilities Act in 1990, and a year later in Section 118 of the Civil Rights Act in 1991. While technically not dealing with a contract of employment, the seminal court case dealing with the arbitration of disputes relating to the non-union workplace is *Gilmer v. Interstate/Johnson Lane, 500 U.S. 20, 111 S.Ct. 1647 (1991)*. The Supreme Court refused to invalidate Gilmer's agreement with the New York Stock Exchange that he would arbitrate disputes with his employer (Interstate/Johnson Lane) simply because he was obliged to sign it in order to work as a securities dealer whose trades were executed on the Exchange. Although the Gilmer Court found that the Age Discrimination in Employment Act did not preclude arbitration of age discrimination claims, it specifically declined to decide whether employment arbitration agreements were the type of "contracts of employment" which are not made enforceable by the Federal Arbitration Act.

Since *Gilmer*, lower federal courts have generally enforced employer-imposed ADR programs, as long as the programs are fair. Some courts have held that the employee must have received adequate notice of the program. However, the issue of binding arbitration programs that are a condition of employment is still giving rise to litigation.

**The Fairness Issue: The Due Process Protocol**

*The Due Process Protocol for Mediation and Arbitration of Statutory Disputes Arising Out of the Employment Relationship* was developed in 1995 by a special task force composed of individuals representing management, labor, employment, civil rights organizations, private administrative agencies, government, and the American Arbitration Association. The *Due Process Protocol*, which was endorsed by the Association in 1995, seeks to ensure fairness and equity in resolving workplace disputes. The *Due Process Protocol* encourages mediation and arbitration of statutory disputes, provided there are due process safeguards. It conveys the hope that ADR will reduce delays caused by the huge backlog of cases pending before administrative agencies and the courts. The *Due Process Protocol* "recognizes the dilemma inherent in the timing of an agreement to mediate and/or arbitrate statutory disputes" but does not take a position on whether an employer can require a pre-dispute, binding arbitration program as a condition of employment.

The *Due Process Protocol* has been endorsed by organizations representing a broad range of constituencies. They include the American Arbitration Association, the American Bar Association Labor and Employment Section, the American Civil Liberties Union, the Federal Mediation and Conciliation Service, the National Academy of Arbitrators, and the National Society of Professionals in Dispute Resolution. The National Employment Lawyers Association has endorsed the substantive provisions of the *Due Process Protocol*. It has been incorporated into the ADR procedures of the Massachusetts Commission Against Discrimination (MCAD) and into the *Report of the United States Secretary of Labor's Task Force in Excellence in State and Local Government*.

**AAA's Employment ADR Rules**

On June 1, 1996, the Association issued *National Rules for the Resolution of Employment Disputes*. The rules reflected the guidelines outlined in the *Due Process Protocol* and were based upon the AAA's *California Employment Dispute Resolution Rules*, which were developed by a committee of employment management and plaintiff attorneys, retired judges and arbitrators, in addition to Association executives. The revised rules were developed for employers and employees who wish to use a private alternative to resolve their disputes. The rules enabled parties to have complaints heard by an impartial person of their joint selection, with expertise in the employment field. Both employers and individual employees benefit by having experts resolve their disputes without the costs and delay of litigation. The rules included procedures which ensure due process in both the mediation and arbitration of employment disputes. After a year of use, the rules have been amended to address technical issues.

**AAA's Policy on Employment ADR**

The AAA's policy on employment ADR is guided by the state of existing law, as well as its obligation to act in an impartial manner. In following the law, and in the interest of providing an appropriate forum for the resolution of employment disputes, the Association administers dispute resolution programs which meet the due process standards as outlined in its *National Rules for the Resolution of Employment Disputes and the Due Process Protocol*. If the Association determines that a dispute resolution program on its face substantially and materially deviates from the minimum due process standards of the *National Rules for the Resolution of Employment Disputes and the Due Process Protocol*, the Association may decline to administer cases under that program. Other issues will be presented to the arbitrator for determination.

**Notification**

If an employer intends to utilize the dispute resolution services of the Association in an employment ADR plan, it shall, at least 30 days prior to the planned effective date of the program: (1) notify the Association of its intention to do so; and (2) provide the Association with a copy of the employment dispute resolution plan. If an employer does not comply with this requirement, the Association reserves the right to decline its administrative services. Copies of all plans should be sent to the American Arbitration Association's Office of Program Development, 335 Madison Avenue, New York, NY 10017; FAX: 212-716-5913.

**Designing an ADR Program**

The guiding principle in designing a successful employment ADR system is that it must be fair in fact and perception. The American Arbitration Association has considerable experience in administering and assisting in the design of employment ADR plans, which gives it an informed perspective on how to effectively design ADR systems, as well as the problems to avoid. Its guidance to those designing employment ADR systems is summarized as follows:

- The American Arbitration Association encourages employers to consider the wide range of legally-available options to resolve workplace disputes outside the courtroom.

- A special emphasis is placed by the Association on encouraging the development of in-house dispute resolution procedures, such as open door policies, ombuds, peer review, and internal mediation.
- The Association recommends an external mediation component to resolve disputes not settled by the internal dispute resolution process.
- Programs which use arbitration as a final step may employ:
- pre-dispute, voluntary final and binding arbitration;
- pre-dispute, mandatory nonbinding arbitration;
- pre-dispute, mandatory final and binding arbitration; or
- post-dispute, voluntary final and binding arbitration.
- Although the AAA administers binding arbitration systems that have been required as a condition of initial or continued employment, such programs must be consistent with the Association's *National Rules for the Resolution of Employment Disputes* and the *Due Process Protocol.*

Specific guidance on the responsible development and design of employment ADR systems is contained in the Association's publication, *Resolving Employment Disputes: A Practical Guide* , which is available from any AAA office.

### Alternative Dispute Resolution Options

*Open Door Policy:* Employees are encouraged to meet with their immediate manager or supervisor to discuss problems arising out of the workplace environment. In some systems, the employee is free to approach anyone in the chain of command.

*Ombuds:* A neutral third party (either from within or outside the company) is designated to confidentially investigate and propose settlement of employment complaints brought by employees.

*Peer Review:* A panel of employees (or employees and managers) works together to resolve employment complaints. Peer review panel members are trained in the handling of sensitive issues.

*Internal Mediation:* A process for resolving disputes in which a neutral third person from within the company, trained in mediation techniques, helps the disputing parties negotiate a mutually acceptable settlement. Mediation is a nonbinding process in which the parties discuss their disputes with an impartial person who assists them in reaching a settlement. The mediator may suggest ways of resolving the dispute but may not impose a settlement on the parties.

*Fact-Finding:* The investigation of a complaint by an impartial third person (or team) who examines the complaint and the facts and issues a non-binding report. Fact-finding is particularly helpful for allegations of sexual harassment, where a fact-finding team, composed of one male and one female neutral, investigates the allegations and presents its findings to the employer and the employee.

*Arbitration:* Arbitration is generally defined as the submission of disputes to one or more impartial persons for final and binding determination. It can be the final step in a workplace program that includes other dispute resolution methods. There are many possibilities for designing this final step. They include:

> *Pre-Dispute, Voluntary Final and Binding Arbitration:* The parties agree in advance, on a voluntary basis, to use arbitration to resolve disputes and they are bound by the outcome.

> *Pre-Dispute, Mandatory Nonbinding Arbitration:* The parties must use the arbitration process to resolve disputes, but they are not bound by the outcome.

> *Pre-Dispute, Mandatory Final and Binding Arbitration:* The parties must arbitrate unresolved disputes and they are bound by the outcome.

> *Post-Dispute, Voluntary Final and Binding Arbitration:* The parties have the option of deciding whether to use final and binding arbitration after a dispute arises.

### Types of Disputes Covered

The dispute resolution procedures contained in this booklet can be inserted into an employee personnel manual, an employment application of an individual employment agreement, or can be used for a specific dispute. They do not apply to disputes arising out of collective bargaining agreements.

### NATIONAL RULES FOR THE RESOLUTION OF EMPLOYMENT DISPUTES

### 1. Applicable Rules of Arbitration

The parties shall be deemed to have made these rules a part of their arbitration agreement whenever they have provided for arbitration by the American Arbitration Association (hereinafter "AAA") or under its *National Rules for the Resolution of Employment Disputes* . If a party establishes that an adverse material inconsistency exists between the arbitration agreement and these rules, the arbitrator shall apply these rules.

If, within 30 days after the Association's commencement of administration, a party seeks judicial intervention with respect to a pending arbitration, the Association will suspend administration for 60 days to permit the party to obtain a stay of arbitration from the court.

These rules, and any amendment of them, shall apply in the form obtaining at the time the demand for arbitration or submission is received by the AAA.

### 2. Notification

An employer intending to incorporate these rules or to refer to the dispute resolution services of the AAA in an employment ADR plan, shall, at least 30 days prior to the planned effective date of the program:

(i) notify the Association of its intention to do so and,

(II) provide the Association with a copy of the employment dispute resolution plan.

Compliance with this requirement shall not preclude an arbitrator from entertaining challenges as provided in Section 1. If an employer does not comply with this requirement, the Association reserves the right to decline its administrative services.

### 3. AAA as Administrator of the Arbitration

When parties agree to arbitrate under these rules, or when they provide for arbitration by the AAA and an arbitration is initiated under these rules, they thereby authorize the AAA to administer the arbitration. The authority and duties of the AAA are prescribed in these rules, and may be carried out through such of the AAA's representatives as it may direct.

### 4. Initiation of Arbitration

Arbitration shall be initiated in the following manner.

a. The parties may submit a joint request for arbitration.

b. In the absence of a joint request for arbitration:

(i) The initiating party (hereinafter "Claimant[s]") shall:

(1) File a written notice (hereinafter "Demand") of its intention to arbitrate at any regional office of the AAA, within the time limit established by the applicable statute of limitations if the dispute involves statutory rights. If no statutory rights are involved, the time limit established by the applicable arbitration agreement shall be followed. Any dispute over such issues shall be referred to the arbitrator. The filing shall be made in duplicate, and each copy shall include the applicable arbitration agreement. The Demand shall set forth the names, addresses, and telephone numbers of the parties; a brief statement of the nature of the dispute; the amount in controversy, if any; the remedy sought; and requested hearing location.

(2) Simultaneously mail a copy of the Demand to the party (hereinafter "Respondent[s]").

(3) Include with its Demand the applicable filing fee, unless the parties agree to some other method of fee advancement.

(ii) The Respondent(s) shall file an Answer with the AAA within 10 days after the date of the letter from the AAA acknowledging receipt of the Demand. The Answer shall provide the Respondent's brief response to the claim and the issues presented. The Respondent(s) shall make its filing in duplicate with the AAA, and simultaneously shall mail a copy of the Answer to the Claimant.

(iii) The Respondent(s):

(1) May file a counterclaim with the AAA within 10 days after the letter from the AAA acknowledging receipt of the Demand. The filing shall be made in duplicate. The counterclaim shall set forth the nature of the claim, the amount in controversy, if any, and the remedy sought.

(2) Simultaneously shall mail a copy of any counterclaim to the Claimant.

(3) Shall include with its filing the applicable filing fee provided for by these rules.

(iv) The Claimant may file an Answer to the counterclaim with the AAA within 10 days after the date of the letter from the AAA acknowledging receipt of the counterclaim. The Answer shall provide Claimant's brief response to the counterclaim and the issues presented. The Claimant shall make its filing in duplicate with the AAA, and simultaneously shall mail a copy of the Answer to the Respondent(s).

c. The form of any filing in these rules shall not be subject to technical pleading requirements.

### 5. Changes of Claim

Before the appointment of the arbitrator, if either party desires to offer a new or different claim or counterclaim, such party must do so in writing by filing a written statement with the AAA and simultaneously mailing a copy to the other party(s), who shall have 10 days from the date of such mailing within which to file an answer with the AAA. After the appointment of the arbitrator, a party may offer a new or different claim or counterclaim only at the discretion of the arbitrator.

### 6. Administrative and Mediation Conferences

Before the appointment of the arbitrator, any party may request, or the AAA, in its discretion, may schedule an administrative conference with a representative of the AAA and the parties and/or their representatives. The purpose of the administrative conference is to organize and expedite the arbitration, explore its administrative aspects, establish the most efficient means of selecting an arbitrator, and to consider mediation as a dispute resolution option. There is no administrative fee for this service.

At any time after the filing of the Demand, with the consent of the parties, the AAA will arrange a mediation conference under its Mediation Rules to facilitate settlement. The mediator shall not be any arbitrator appointed to the case, except by mutual agreement of the parties. There is no administrative fee for initiating a mediation under AAA Mediation Rules for parties to a pending arbitration.

**7. Discovery**

The arbitrator shall have the authority to order such discovery, by way of deposition, interrogatory, document production, or otherwise, as the arbitrator considers necessary to a full and fair exploration of the issues in dispute, consistent with the expedited nature of arbitration.

**8. Arbitration Management Conference**

As soon as possible after the appointment of the arbitrator but not later than 60 days thereafter, the arbitrator shall conduct an Arbitration Management Conference with the parties and/or their representatives, in person or by telephone, to explore and resolve matters that will expedite the arbitration proceedings. The specific matters to be addressed include:

(i) the issues to be arbitrated;

(ii) the date, time, place and estimated duration of the hearing;

(iii) the resolution of outstanding discovery issues and establishment of discovery parameters;

(iv) the law, standards, rules of evidence and burdens of proof that are to apply to the proceeding;

(v) the exchange of stipulations and declarations regarding facts, exhibits, witnesses and other issues;

(vi) the names of witnesses (including expert witnesses), the scope of witness testimony, and witness exclusion;

(vii) the value of bifurcating the arbitration into a liability phase and damages phase;

(viii) the need for a stenographic record;

(ix) whether the parties will summarize their arguments orally or in writing;

(x) the form of the award;

(xi) any other issues relating to the subject or conduct of the arbitration;

(xii) the allocation of attorney's fees and costs.

The arbitrator shall issue oral or written orders reflecting his or her decisions on the above matters and may conduct additional conferences when the need arises.

There is no AAA administrative fee for an Arbitration Management Conference.

**9. Location of the Arbitration**

The parties may designate the location of the arbitration by mutual agreement. In the absence of such agreement before the appointment of the arbitrator, any party may request a specific hearing location by notifying the AAA in writing and simultaneously mailing a copy of the request to the other party(s). If the AAA receives no objection within 10 days of the date of the request, the hearing shall be held at the requested location. If a timely objection is filed with the AAA, the AAA shall have the power to determine the location and its decision shall be final and binding. After the appointment of the arbitrator, the arbitrator shall resolve all disputes regarding the location of the hearing.

**10. Date and Time of Hearing**

The arbitrator shall have the authority to set the date and time of the hearing in consultation with the parties.

**11. Qualifications to Serve as Arbitrator and Rights of Parties to Disqualify Arbitrator**

a Standards of Experience and Neutrality

(i) Arbitrators serving under these rules shall be experienced in the field of employment law.

(ii) Arbitrators serving under these rules shall have no personal or financial interest in the results of the proceedings in which they are appointed and shall have no relation to the underlying dispute or to the parties or their counsel that may create an appearance of bias.

(iii) The roster of available arbitrators will be established on a non-discriminatory basis, diverse by gender, ethnicity, background and qualifications.

(iv) The Association may, upon request of a party or upon its own initiative, supplement the list of proposed arbitrators in disputes arising out of individually negotiated employment contracts with persons from the regular Commercial Roster, to allow the Association to respond to the particular needs of the dispute. In multi-arbitrator disputes, at least one of the arbitrators shall be experienced in the field of employment law.

b Standards of Disclosure by Arbitrator

Prior to accepting appointment, the prospective arbitrator shall disclose all information that might be relevant to the standards of neutrality set forth in this Section, including but not limited to service as a neutral in any past or pending case involving any of the parties and/or their representatives or that may prevent a prompt hearing.

c Disqualification for Failure to Meet Standards of Experience and Neutrality

An arbitrator may be disqualified in two ways:

(i) No later than 10 days after the appointment of the arbitrator, all parties jointly may challenge the qualifications of an arbitrator by communicating their objection to the AAA in writing. Upon receipt of a joint objection, the arbitrator shall be replaced.

(ii) Any party may challenge the qualifications of an arbitrator by communicating its objection to the AAA in writing. Upon receipt of the objection, the AAA either shall replace the arbitrator or communicate the objection to the other parties. If any party believes that the objection does not merit disqualification of the arbitrator, the party shall so communicate to the AAA and to the other parties within 10 days of the receipt of the objection from the AAA. Upon objection of a party to the service of an arbitrator, the AAA shall determine whether the arbitrator should be disqualified and shall inform the parties of its decision, which shall be conclusive.

### 12. Number and Appointment of Neutral Arbitrators

a  If the parties do not specify the number of arbitrators, the dispute shall be heard and determined by one arbitrator. If the parties cannot agree upon the number of arbitrators, the AAA shall have the authority to determine the number of arbitrators.

b  If the parties have not appointed an arbitrator and have not provided any method of appointment, the arbitrator shall be appointed in the following manner:

(i) Immediately after it receives the Demand, the AAA shall mail simultaneously to each party a letter containing an identical list of the names of all arbitrators who are members of the regional Employment Dispute Resolution Roster.

(ii) Each party shall have 10 days from the date of the letter in which to select the name of a mutually acceptable arbitrator to hear and determine their dispute. If the parties cannot agree upon a mutually acceptable arbitrator, they shall so notify the AAA. Within 10 days of the receipt of that notice, the AAA shall send the parties a shorter list of arbitrators who are members of the regional Employment Dispute Resolution Roster. Each party shall have 10 days from the date of the letter containing the revised list to strike any names objected to, number the remaining names in order of preference, and return the list to the AAA. If a party does not return the list within the time specified, all of the listed persons shall be deemed acceptable to that party.

(iii) The AAA shall invite the acceptance of the arbitrator whom both parties have selected as mutually acceptable or, in the case of resort to the ranking procedure, the arbitrator who has received the highest rating in the order of preference that the parties have specified.

(iv) If the parties fail to agree on any of the persons whom the AAA submits for consideration, or if mutually acceptable arbitrators are unable to act, or if for any other reason the appointment cannot be made from the list of persons whom the AAA submits for consideration, the AAA shall have the power to make the appointment from among other members of the Roster without the submission of additional lists.

### 13. Vacancies

If for any reason an arbitrator is unable to perform the duties of the office, the AAA may, on proof satisfactory to it, declare the office vacant. The vacancy shall be filled in accordance with applicable provisions of these Rules.

In the event of a vacancy in a panel of neutral arbitrators after the hearings have commenced, the remaining arbitrator or arbitrators may continue with the hearing and determination of the controversy, unless the parties agree otherwise.

### 14. Representation

Any party may be represented by counsel or other authorized representative. For parties without representation the AAA will, upon request, provide reference to institutions which might offer assistance. A party who intends to be represented shall notify the other party and the AAA of the name and address of the representative at least 10 days prior to the date set for the hearing or conference at which that person is first to appear. If a representative files a Demand or an Answer, the obligation to give notice of representative status is deemed satisfied.

### 15. Stenographic Record

Any party desiring a stenographic record shall make arrangements directly with a stenographer and shall notify the other parties of these arrangements at least three days in advance of the hearing. The requesting party or parties shall pay the cost of the record. If the transcript is agreed by the parties, or determined by the arbitrator to be the official record of the proceeding, it must be provided to the arbitrator and made available to the other parties for inspection, at a date, time, and place determined by the arbitrator.

### 16. Interpreters

Any party wishing an interpreter shall make all arrangements directly with the interpreter and shall assume the costs of the service.

### 17. Attendance at Hearings

The arbitrator shall have the authority to exclude witnesses, other than a party, from the hearing during the testimony of any other witness. The arbitrator also shall have the authority to decide whether any person who is not a witness may attend the hearing.

### 18. Confidentiality

The arbitrator shall maintain the confidentiality of the arbitration and shall have the authority to make appropriate rulings to safeguard that confidentiality, unless the parties agree otherwise or the law provides to the contrary.

**19. Postponements**

The arbitrator: (1) may postpone any hearing upon the request of a party for good cause shown; (2) must postpone any hearing upon the mutual agreement of the parties; and (3) may postpone any hearing on his or her own initiative.

**20. Oaths**

Before proceeding with the first hearing, each arbitrator may take an oath of office and, if required by law, shall do so. The arbitrator may require witnesses to testify under oath administered by any duly qualified person and, if it is required by law or requested by any party, shall do so.

**21. Majority Decision**

All decisions and awards of the arbitrators must be by a majority, unless the unanimous decision of all arbitrators is expressly required by the arbitration agreement or by law.

**22. Order of Proceedings and Communication with Arbitrators**

A hearing shall be opened by: (1) filing the oath of the arbitrator, where required; (2) recording the date, time, and place of the hearing; (3) recording the presence of the arbitrator, the parties, and their representatives, if any; and (4) receiving into the record the Demand and the Answer, if any. The arbitrator may, at the beginning of the hearing, ask for statements clarifying the issues involved.

The parties shall bear the same burdens of proof and burdens of producing evidence as would apply if their claims and counterclaims had been brought in court.

Witnesses for each party shall submit to direct and cross examination as approved by the arbitrator.

With the exception of the rules regarding the allocation of the burdens of proof and going forward with the evidence, the arbitrator has the authority to set the rules for the conduct of the proceedings and shall exercise that authority to afford a full and equal opportunity to all parties to present any evidence that the arbitrator deems material and relevant to the resolution of the dispute.

Documentary and other forms of physical evidence, when offered by either party, may be received in evidence by the arbitrator.

The names and addresses of all witnesses and a description of the exhibits in the order received shall be made a part of the record.

There shall be no ex parte communication with the arbitrator, unless the parties and the arbitrator agree to the contrary in advance of the communication.

**23. Arbitration in the Absence of a Party or Representative**

Unless the law provides to the contrary, the arbitration may proceed in the absence of any party or representative who, after due notice, fails to be present or fails to obtain a postponement. An award shall not be based solely on the default of a party. The arbitrator shall require the party who is in attendance to present such evidence as the arbitrator may require for the making of the award.

**24. Evidence**

The parties may offer such evidence as is relevant and material to the dispute and shall produce such evidence as the arbitrator deems necessary to an understanding and determination of the dispute. An arbitrator or other person authorized by law to subpoena witnesses or documents may do so upon the request of any party or independently.

The arbitrator shall be the judge of the relevance and materiality of the evidence offered, and conformity to legal rules of evidence shall not be necessary. The arbitrator may in his or her discretion direct the order of proof, bifurcate proceedings, exclude cumulative or irrelevant testimony or other evidence, and direct the parties to focus their presentations on issues the decision of which could dispose of all or part of the case. All evidence shall be taken in the presence of all of the arbitrators and all of the parties, except where any party is absent, in default, or has waived the right to be present.

**25. Evidence by Affidavit or Declaration and Post-Hearing Filing of Documents or Other Evidence**

The arbitrator may receive and consider the evidence of witnesses by affidavit, but shall give it only such weight as the arbitrator deems it entitled to after consideration of any objection made to its admission.

If the parties agree or the arbitrator directs that documents or other evidence may be submitted to the arbitrator after the hearing, the documents or other evidence shall be filed with the AAA for transmission to the arbitrator, unless the parties agree to a different method of distribution. All parties shall be afforded an opportunity to examine such documents or other evidence and to lodge appropriate objections, if any.

**26. Inspection or Investigation**

An arbitrator finding it necessary to make an inspection or investigation in connection with the arbitration shall direct the AAA to so advise the parties. The arbitrator shall set the date and time, and the AAA shall notify the parties. Any party who so desires may be present during the inspection or investigation. In the event that one or all parties are not present during the inspection or investigation, the arbitrator shall make an oral or written report to the parties and

afford them an opportunity to comment.

### 27. Interim Measures

At the request of any party, the arbitrator may take whatever interim measures he or she deems necessary with respect to the dispute, including measures for the conservation of property.

Such interim measures may be taken in the form of an interim award and the arbitrator may require security for the costs of such measures.

### 28. Closing of Hearing

The arbitrator shall specifically inquire of all parties whether they have any further proofs to offer or witnesses to be heard. Upon receiving negative replies or if satisfied that the record is complete, the arbitrator shall declare the hearing closed.

If briefs are to be filed, the hearing shall be declared closed as of the final date set by the arbitrator for the receipt of briefs. If documents are to be filed as provided in Section 25 and the date set for their receipt is later than that set for the receipt of briefs, the later date shall be the date of closing the hearing. The time limit within which the arbitrator is required to make the award shall commence to run, in the absence of other agreements by the parties, upon closing of the hearing.

### 29. Reopening of Hearing

The hearing may be reopened by the arbitrator upon the arbitrator's initiative, or upon application of a party for cause shown, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed on by the parties in the contract(s) out of which the controversy has arisen, the matter may not be reopened unless the parties agree on an extension of time. When no specific date is fixed in the contract, the arbitrator may reopen the hearing and shall have 30 days from the closing of the reopened hearing within which to make an award.

### 30. Waiver of Oral Hearing

The parties may provide, by written agreement, for the waiver of oral hearings in any case. If the parties are unable to agree as to the procedure, the AAA shall specify a fair and equitable procedure.

### 31. Waiver of Objection/Lack of Compliance with These Rules

Any party who proceeds with the arbitration after knowledge that any provision or requirement of these rules has not been complied with, and who fails to state objections thereto in writing, shall be deemed to have waived the right to object.

### 32. Extensions of Time

The parties may modify any period of time by mutual agreement. The AAA or the arbitrator may for good cause extend any period of time established by these Rules, except the time for making the award. The AAA shall notify the parties of any extension.

### 33. Serving of Notice

Each party shall be deemed to have consented that any papers, notices, or process necessary or proper for the initiation or continuation of an arbitration under these Rules; for any court actions in connection therewith; or for the entry of judgment on an award made under these procedures may be served on a party by mail addressed to the party or its representative at the last known address or by personal service, in or outside the state where the arbitration is to be held.

The AAA and the parties may also use facsimile transmission, telex, telegram, or other written forms of electronic communication to give the notices required by these Rules.

### 34. The Award

    a The award shall be made promptly by the arbitrator and, unless otherwise agreed by the parties or specified by law, no later than 30 days from the date of closing of the hearing or, if oral hearings have been waived, from the date of the AAA's transmittal of the final statements and proofs to the arbitrator.

    b An award issued under these rules shall be publicly available, on a cost basis. The names of the parties and witnesses will not be publicly available, unless a party expressly agrees to have its name made public in the award.

    c The award shall be in writing and shall be signed by a majority of the arbitrators and shall provide the written reasons for the award unless the parties agree otherwise. It shall be executed in the manner required by law.

    d The arbitrator may grant any remedy or relief that the arbitrator deems just and equitable, including any remedy or relief that would have been available to the parties had the matter been heard in court. The arbitrator shall, in the award, assess arbitration fees, expenses, and compensation as provided in Sections 38, 39, and 40 in favor of any party and, in the event any administrative fees or expenses are due the AAA, in favor of the AAA.

    e The arbitrator shall have the authority to provide for the reimbursement of representative's fees, in whole or in part, as part of the remedy, in accordance with applicable law.

f If the parties settle their dispute during the course of the arbitration, the arbitrator may set forth the terms of the settlement in a consent award.

g The parties shall accept as legal delivery of the award the placing of the award or a true copy thereof in the mail, addressed to a party or its representative at the last known address, personal service of the award, or the filing of the award in any manner that may be required by law.

h The arbitrator's award shall be final and binding. Judicial review shall be limited, as provided by law.

### 35. Modification of Award

Within 20 days after the transmittal of an award, any party, upon notice to the other parties, may request the arbitrator to correct any clerical, typographical, technical or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided.

The other parties shall be given 10 days to respond to the request. The arbitrator shall dispose of the request within 20 days after transmittal by the AAA to the arbitrator of the request and any response thereto.

If applicable law requires a different procedural time frame, that procedure shall be followed.

### 36. Release of Documents for Judicial Proceedings

The AAA shall, upon the written request of a party, furnish to the party, at that party's expense, certified copies of any papers in the AAA's case file that may be required in judicial proceedings relating to the arbitration.

### 37. Judicial Proceedings and Exclusion of Liability

a No judicial proceeding by a party relating to the subject matter of the arbitration shall be deemed a waiver of the party's right to arbitrate.

b Neither the AAA nor any arbitrator in a proceeding under these rules is or shall be considered a necessary or proper party in judicial proceedings relating to the arbitration.

c Parties to these procedures shall be deemed to have consented that judgment upon the arbitration award may be entered in any federal or state court having jurisdiction.

d Neither the AAA nor any arbitrator shall be liable to any party for any act or omission in connection with any arbitration conducted under these procedures.

### 38. Administrative Fees*

As a not-for-profit organization, the AAA shall prescribe filing and other administrative fees to compensate it for the cost of providing administrative services. The AAA administrative fee schedule in effect at the time the demand for arbitration or submission agreement is received shall be applicable.

AAA fees shall be paid in accordance with the Administrative Fee Schedule (see below).

The AAA may, in the event of extreme hardship on any party, defer or reduce the administrative fees. (To ensure that you have the most current information, see our Website at www.adr.org).

*Pursuant to Section 1284.3 of the California Code of Civil Procedure, consumers with a gross monthly income of less than 300% of the federal poverty guidelines are entitled to a waiver of arbitration fees and costs, exclusive of arbitrator fees. This law applies to all consumer agreements subject to the California Arbitration Act, and to all consumer arbitrations conducted in California. Only those disputes arising out of employer promulgated plans are included in the consumer definition. If you believe that you meet these requirements, you must submit to the AAA a declaration under oath regarding your monthly income and the number of persons in your household. Please contact the AAA's Western Case Management Center at 1-877-528-0879 if you have any questions regarding the waiver of administrative fees. (Effective January 1, 2003)

### 39. Expenses

Unless otherwise agreed by the parties, the expenses of witnesses for either side shall be borne by the party producing such witnesses. All expenses of the arbitration, including required travel and other expenses of the arbitrator, AAA representatives, and any witness and the costs relating to any proof produced at the direction of the arbitrator, shall be borne by the employer, unless the parties agree otherwise or unless the arbitrator directs otherwise in the award as provided for in the Administrative Fee Schedule.

### 40. Neutral Arbitrator's Compensation

Arbitrators shall charge a rate consistent with the arbitrator's stated rate of compensation. If there is disagreement concerning the terms of compensation, an appropriate rate shall be established with the arbitrator by the AAA and confirmed to the parties.

Any arrangement for the compensation of a neutral arbitrator shall be made through the AAA and not directly between the parties and the arbitrator. Payment of the arbitrator's fees and expenses shall be made by the AAA from the fees and moneys collected by the AAA for this purpose.

### 41. Deposits

The AAA may require deposits in advance of any hearings such sums of money as it deems necessary to cover the expenses of the arbitration, including the arbitrator's fee, if any, and shall render an accounting and return any

unexpended balance at the conclusion of the case.

**42. Interpretation and Application of Rules**

The arbitrator shall interpret and apply these rules as they relate to the arbitrator's powers and duties. When there is more than one arbitrator and a difference arises among them concerning the meaning or application of these Rules, it shall be resolved by a majority vote. If that is not possible, either an arbitrator or a party may refer the question to the AAA for final decision. All other procedures shall be interpreted and applied by the AAA.

**ADMINISTRATIVE FEE SCHEDULE**

**For Disputes Arising Out of Employer-Promulgated Plans:**

**Administrative Fee**

The AAA's administrative fees are based on filing and service charges. Arbitrator compensation is not included in this schedule. Unless the employee chooses to pay a portion of the arbitrator's compensation, such compensation shall be paid in total by the employer. Arbitrator compensation and administrative fees are not subject to reallocation by the arbitrator(s) except upon the arbitrator's determination that a claim or counterclaim was filed for purposes of harassment or is patently frivolous.

**Filing Fees**

In cases before a single arbitrator, a nonrefundable filing fee capped in the amount of $125, is payable in full by the employee when a claim is filed, unless the plan provides that the employee pay less. A nonrefundable fee in the amount of $825 is payable in full by the employer, unless the plan provides that the employer pay more.

In cases before three or more arbitrators, a nonrefundable filing fee capped in the amount of $125, is payable in full by the employee when a claim is filed, unless the plan provides that the employee pay less. A nonrefundable fee in the amount of $1,775 is payable in full by the employer, unless the plan provides that the employer pay more.

**Hearing Fees**

For each day of hearing held before a single arbitrator, an administrative fee of $300 is payable by the employer.

For each day of hearing held before a multi-arbitrator panel, an administrative fee of $500 is payable by the employer.

There is no AAA hearing fee for the initial Arbitration Management Conference.

**Postponement/Cancellation Fees**

A fee of $150 is payable by a party causing a postponement of any hearing scheduled before a single arbitrator.

A fee of $250 is payable by a party causing a postponement of any hearing scheduled before a multi-arbitrator panel.

**Hearing Room Rental**

The hearing fees described above do not cover the rental of hearing rooms, which are available on a rental basis. Check with the administrator for availability and rates. Hearing room rental fees will be borne by the employer.

**Suspension for Nonpayment**

If arbitrator compensation or administrative charges have not been paid in full, the administrator may so inform the parties in order that one of them may advance the required payment. If such payments are not made, the arbitrator may order the suspension or termination of the proceedings. If no arbitrator has yet been appointed, the administrator may suspend the proceedings.

**For Disputes Arising Out of Individually-Negotiated Employment Agreements and Contracts:**

The AAA's Commercial Fee Schedule, listed below, will apply to disputes arising out of individually-negotiated employment agreements and contracts, even if such agreements and contracts reference or incorporate an employer-promulgated plan. Any questions or disagreements about whether a matter arises out of an employer-promulgated plan or an individually-negotiated agreement or contract shall be determined by the AAA and its determination shall be final.

**Administrative Fee**

The administrative fees of the AAA are based on the amount of the claim or counterclaim. Arbitrator compensation is not included in this schedule. Unless the parties agree otherwise, arbitrator compensation and administrative fees are subject to allocation by the arbitrator in the award.

**Fees**

An initial filing fee is payable in full by the filing party when a claim, counterclaim or additional claim is filed. A case service fee will be incurred for all cases that proceed to their first hearing. This fee will be payable in advance at the time that the first hearing is scheduled. This fee will be refunded at the conclusion of the case if no hearings have occurred. However, if the Association is not notified at least 24 hours before the time of the scheduled hearing, the case service fee will remain due and will not be refunded.

These fees will be billed in accordance with the following schedule:

| Amount of Claim | Initial Filing Fee | Case Service Fee |
| --- | --- | --- |

| | | |
|---|---|---|
| Above $0 to $10,000 | $750 | $200 |
| Above $10,000 to $75,000 | $950 | $300 |
| Above $75,000 to $150,000 | $1,800 | $750 |
| Above $150,000 to $300,000 | $2,750 | $1,250 |
| Above $300,000 to $500,000 | $4,250 | $1,750 |
| Above $500,000 to $1,000,000 | $6,000 | $2,500 |
| Above $1,000,000 to $5,000,000 | $8,000 | $3,250 |
| Above $5,000,000 to $10,000,000 | $10,000 | $4,000 |
| No Amount Stated** | $3,250 | $1,250 |

** This fee is applicable only when a claim or counterclaim is not for a monetary amount. Where a monetary claim amount is not known, parties will be required to state a range of claims or be subject to the highest possible filing fee.

**Fee Schedule for Claims in Excess of $10 Million**

The following is the fee schedule for use in disputes involving claims in excess of $10 million. If you have any questions, please consult your local AAA office or case management center.

| Claim Size | Fee | Case Service Fee |
|---|---|---|
| $10 million and above | Base fee of $12,500 plus .01% of the amount of claim above $10 million. | $6,000 |
| | Filing fees capped at $65,000 | |

Fees are subject to increase if the amount of a claim or counterclaim is modified after the initial filing date. Fees are subject to decrease if the amount of a claim or counterclaim is modified before the first hearing.

The minimum fees for any case having three or more arbitrators are $2,750 for the filing fee, plus a $1,250 case service fee. Expedited Procedures are applied in any case where no disclosed claim or counterclaim exceeds $75,000, exclusive of interest and arbitration cost

Parties on cases held in abeyance for one year by agreement, will be assessed an annual abeyance fee of $300. If a party refuses to pay the assessed fee, the other party or parties may pay the entire fee on behalf of all parties, otherwise the matter will be closed.

**Refund Schedule**

The AAA offers a refund schedule on filing fees. For cases with claims up to $75,000, a minimum filing fee of $300 will not be refunded. For all cases, a minimum fee of $500 will not be refunded. Subject to the minimum fee requirements, refunds will be calculated as follows:

' 100% of the filing fee, above the minimum fee, will be refunded if the case is settled or withdrawn within five calendar days of filing.

' 50% of the filing fee will be refunded if the case is settled or withdrawn between six and 30 calendar days of filing.

' 25% of the filing fee will be refunded if the case is settled or withdrawn between 31 and 60 calendar days of filing.

No refund will be made once an arbitrator has been appointed (this includes one arbitrator on a three-arbitrator panel). No refunds will be granted on awarded cases.

Note: The date of receipt of the demand for arbitration with the AAA will be used to calculate refunds of filing fees for both claims and counterclaims.

**Hearing Room Rental**

The fees described above do not cover the rental of hearing rooms, which are available on a rental basis. Check with the AAA for availability and rates.

**For Disputes Proceeding Under the Supplementary Rules for Class Action Arbitration ("Supplementary Rules"):**

The AAA's Administered Fee Schedule, as listed in Section 11 of the Supplementary Rules for Class Action Arbitration, shall apply to disputes proceeding under the Supplementary Rules.

**EMPLOYMENT MEDIATION RULES**

**1. Agreement of Parties**

Whenever, by provision in an employment dispute resolution program, or by separate submission, the parties have provided for mediation or conciliation of existing or future disputes under the auspices of the American Arbitration Association (hereinafter "AAA") or under these rules, they shall be deemed to have made these rules, as amended and in effect as of the date of the submission of the dispute, a part of their agreement.

**2. Initiation of Mediation**

Any party to an employment dispute may initiate mediation by filing with the AAA a submission to mediation or a written request for mediation pursuant to these rules, together with the applicable administrative fee.

**3. Request for Mediation**

A request for mediation shall contain a brief statement of the nature of the dispute and the names, addresses, and telephone numbers of all parties to the dispute and those who will represent them, if any, in the mediation. The initiating party shall simultaneously file two copies of the request with the AAA and one copy with every other party to the dispute.

**4. Appointment of Mediator**

Upon receipt of a request for mediation, the AAA will appoint a qualified mediator to serve. Normally, a single mediator will be appointed unless the parties agree otherwise or the AAA determines otherwise. If the agreement of the parties names a mediator or specifies a method of appointing a mediator, that designation or method shall be followed.

**5. Qualifications of Mediator**

No person shall serve as a mediator in any dispute in which that person has any financial or personal interest in the result of the mediation, except by the written consent of all parties. Prior to accepting an appointment, the prospective mediator shall disclose any circumstance likely to create a presumption of bias or prevent a prompt meeting with the parties. Upon receipt of such information, the AAA shall either replace the mediator or immediately communicate the information to the parties for their comments. In the event that the parties disagree as to whether the mediator shall serve, the AAA will appoint another mediator. The AAA is authorized to appoint another mediator if the appointed mediator is unable to serve promptly.

**6. Vacancies**

If any mediator shall become unwilling or unable to serve, the AAA will appoint another mediator, unless the parties agree otherwise.

**7. Representation**

Any party may be represented by a person of the party's choice. The names and addresses of such persons shall be communicated in writing to all parties and to the AAA.

**8. Date, Time, and Place of Mediation**

The mediator shall fix the date and the time of each mediation session. The mediation shall be held at the appropriate regional office of the AAA, or at any other convenient location agreeable to the mediator and the parties, as the mediator shall determine.

**9. Identification of Matters in Dispute**

At least 10 days prior to the first scheduled mediation session, each party shall provide the mediator with a brief memorandum setting forth its position with regard to the issues that need to be resolved. At the discretion of the mediator, such memoranda may be mutually exchanged by the parties.

At the first session, the parties will be expected to produce all information reasonably required for the mediator to understand the issues presented. The mediator may require any party to supplement such information.

**10. Authority of Mediator**

The mediator does not have the authority to impose a settlement on the parties but will attempt to help them reach a satisfactory resolution of their dispute. The mediator is authorized to conduct joint and separate meetings with the parties and to make oral and written recommendations for settlement. Whenever necessary, the mediator may also obtain expert advice concerning technical aspects of the dispute, provided that the parties agree and assume the expenses of obtaining such advice. Arrangements for obtaining such advice shall be made by the mediator or the parties, as the mediator shall determine.

The mediator is authorized to end the mediation whenever, in the judgment of the mediator, further efforts at mediation would not contribute to a resolution of the dispute between the parties.

**11. Privacy**

Mediation sessions are private. The parties and their representatives may attend mediation sessions. Other persons may attend only with the permission of the parties and with the consent of the mediator.

**12. Confidentiality**

Confidential information disclosed to a mediator by the parties or by witnesses in the course of the mediation shall not be divulged by the mediator. All records, reports, or other documents received by a mediator while serving in that capacity shall be confidential. The mediator shall not be compelled to divulge such records or to testify in regard to the mediation in any adversary proceeding or judicial forum.

The parties shall maintain the confidentiality of the mediation and shall not rely on, or introduce as evidence in any arbitral, judicial, or other proceeding:

- views expressed or suggestions made by another party with respect to a possible settlement of the dispute;
- admissions made by another party in the course of the mediation proceedings;

- proposals made or views expressed by the mediator; or
- the fact that another party had or had not indicated willingness to accept a proposal for settlement made by the mediator.

**13. No Stenographic Record**

There shall be no stenographic record of the mediation process.

**14. Termination of Mediation**

The mediation shall be terminated:

- by the execution of a settlement agreement by the parties;
- by a written declaration of the mediator to the effect that further efforts at mediation are no longer worthwhile; or
- by a written declaration of a party or parties to the effect that the mediation proceedings are terminated.

**15. Exclusion of Liability**

Neither the AAA nor any mediator is a necessary party in judicial proceedings relating to the mediation.

Neither the AAA nor any mediator shall be liable to any party for any act or omission in connection with any mediation conducted under these rules.

**16. Interpretation and Application of Rules**

The mediator shall interpret and apply these rules insofar as they relate to the mediator's duties and responsibilities. All other rules shall be interpreted and applied by the AAA.

**17. Expenses**

The expenses of witnesses for either side shall be paid by the party producing such witnesses. All other expenses of the mediation, including required traveling and other expenses of the mediator and representatives of the AAA, and the expenses of any witness and the cost of any proofs or expert advice produced at the direct request of the mediator, shall be borne equally by the parties unless they agree otherwise.

**MEDIATION FEE SCHEDULE**

The nonrefundable case set-up fee is $325 per party. In addition, the parties are responsible for compensating the mediator at his or her published rate, for conference and study time (hourly or per diem).

All expenses are generally borne equally by the parties. The parties may adjust this arrangement by agreement.

Before the commencement of the mediation, the AAA shall estimate anticipated total expenses. Each party shall pay its portion of that amount as per the agreed upon arrangement. When the mediation has terminated, the AAA shall render an accounting and return any unexpendable balance to the parties.

Rules, forms, procedures and guides, as well as information about applying for a fee reduction or deferral, are subject to periodic change and updating.

AAA121-1/04

©2005 American Arbitration Association  All Rights Reserved   Privacy Policy  Terms of Use

EXHIBIT 8

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1995 WL 422162 (S.D.N.Y.)
(Cite as: 1995 WL 422162 (S.D.N.Y.))

Page 1

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
D.H. BLAIR & CO., INC., Petitioner,
v.
HOWARD P. JOHNSON, et al., Respondents.
**No. 95 Civ. 3463 (MBM).**

July 18, 1995.

MEMORANDUM AND ORDER

MUKASEY, District Judge.

*1 Petitioner and respondents were parties to an arbitration held in Florida. Petitioner lost, and sued in the courts of New York to vacate the award. At the time that action was brought, and then removed to this court by respondents based on diversity of citizenship, there was already pending in Florida litigation to confirm the award. Other than a permissive venue and jurisdiction clause in the underlying customers agreement, this litigation has no connection with this jurisdiction. Respondents have moved, *inter alia,* to dismiss this action for improper venue, or to transfer it to the United States District Court for the Southern District of Florida. For the reasons summarized below, the motion to dismiss is granted.

Generally, the better rule is to lay venue for actions either to confirm or vacate the award in the jurisdiction where the arbitration was held. *Motion Picture Laboratory Technicians Local 780, I.A.T.S.E. v. McGregor & Werner, Inc.,* 804 F.2d 16, 18 (2d Cir.1986) (citing *Central Valley Typographical Union, No. 46 v. McClatchy Newspapers,* 762 F.2d 741, 744 (9th Cir.1985)). Further, it is also generally the rule that the first filed lawsuit should govern where the action will proceed, absent a showing that the balance of convenience favors the venue of the second or that special circumstances are present. *Id. at 19.* Here, not only was the first action brought in Florida (Resp.Ex. E), but also the balance of convenience plainly favors that jurisdiction inasmuch as that is where the parties were content to resolve

their differences in the first instance. Finally, the discouragement of **forum shopping**, a litigation tactic of which this case may be considered a museum-quality specimen, is itself a "special circumstance" to be considered by a court faced with litigation of this kind. *Id.* Thus, every relevant consideration weighs against permitting this action to continue in this court.

There remains the question of whether to dismiss or to transfer. Because petitioner's motion to vacate is a compulsory counterclaim in respondents' action to confirm, and indeed is already pending in Florida, there is no reason to put the clerks of various courts to the tedium of shuffling paper. Accordingly, the complaint is dismissed without prejudice and petitioner may pursue its remedies in Florida.

SO ORDERED:

Not Reported in F.Supp., 1995 WL 422162 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:95cv03463 (Docket) (May. 12, 1995)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.