UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
JONATHAN JUNG,

                           Plaintiff,     :

                                     :

          - against -                  05-CV-4286 (MBM)

                                     :

SKADDEN, ARPS, SLATE, MEAGHER &     ECF Case
FLOM, LLP,                          :

                      Defendant.    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## COMPENDIUM OF UNREPORTED CASES
### CITED IN DEFENDANT'S REPLY MEMORANDUM
### OF LAW IN FURTHER SUPPORT OF ITS MOTION
### <u>TO COMPEL ARBITRATION AND STAY THIS ACTION</u>

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

ATTORNEYS FOR DEFENDANT
SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

FOUR TIMES SQUARE

BOROUGH OF MANHATTAN

CITY OF NEW YORK

NEW YORK 10036-6522

(212) 735-3000

## TABLE OF CONTENTS

**CASES**                                                                  **TAB**

Becker v. DPC Acquisition Corp., No. 00 Civ. 1035, 2002 WL 1144066
    (S.D.N.Y. May 30, 2002)...........................................................................A

Brill v. Prudential-Bache Securities, Inc., No. 84 Civ. 0846, 1986 WL 6787
    (S.D.N.Y. June 13, 1986).........................................................................B

Chamois v. Countrywide Home Loans, Nos. 02 Civ 9550 and 02 Civ. 9553,
    2003 WL 23022033 (S.D.N.Y. Dec. 29, 2003) ......................................C

Dialog Group, Inc. v. Eaker, No. 04 Civ. 3498, 2004 WL 1660604 (S.D.N.Y.
    July 23, 2004)..........................................................................................D

In re HBLS, L.P., No. 01 CIV. 2025, 2001 WL 1490696 (S.D.N.Y. Nov. 21,
    2001) .......................................................................................................E

Scott v. Merrill Lynch, Pierce, Fenner & Smith, Inc., No. 89 Civ 3749,
    1992 WL 245506 (S.D.N.Y. Sept. 14, 1992)...........................................F

# Tab A

Westlaw.

Not Reported in F.Supp.2d                                                    Page 1
Not Reported in F.Supp.2d, 2002 WL 1144066 (S.D.N.Y.)
**(Cite as: 2002 WL 1144066 (S.D.N.Y.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Norbert BECKER, Plaintiff,
v.
DPC ACQUISITION CORP., the New Dana Perfumes
Corp., Marcafin, S.A. and Perfumes
Dana Do Brasil, Defendants.
**No. 00 Civ. 1035(WK).**

May 30, 2002.

Bruce H. Babitt, Wolman, Babitt & King, L.L.P., New
York, NY, for Plaintiff.

Francine S. Silverstein, Duane Morris LLP, New York, NY,
Daniel V. Folt, Duane Morris LLP, Wilmington, DE, for
Defendants.

*MEMORANDUM & ORDER*
KNAPP, Senior J.

**\*1** Norbert Becker (hereinafter "Plaintiff") brings this action
against Defendants DPC Acquisition Corp. ("DPC"), The
New Dana Perfumes Corp. ("New Dana"), Marcafin, S.A.
("Marcafin"), and Perfumes Dana Do Brasil ("Dana Brasil")
(hereinafter collectively "Defendants"), alleging the breach
of an employment contract. The Defendants now move to
bifurcate this case and, in effect, to secure a trial on the
"making" of the amended employment agreement
underlying Plaintiff's claims pursuant to the Federal
Arbitration Act, 9 U.S.C. § 4.

For the reasons that follow, we grant the Defendants' motion
in part and deny it in part.

*BACKGROUND*
On August 27, 1997, Plaintiff entered into an Employment
Agreement with Renaissance Cosmetics, Inc.
("Renaissance"). The Employment Agreement was executed
by John R. Jackson, an attorney and officer of Renaissance.
Pursuant to the Agreement, Plaintiff became President and
Chief Executive Officer of Renaissance and its subsidiaries.

Plaintiff's term of service was to last until June 30, 2000,
with options to renew. His compensation included a "base
salary" with bonus incentives and other employee benefits.

On May 21, 1998, Terry M. Theodore ("Theodore"), the
Chairman of Renaissance's Board of Directors, executed an
Amendment to the Employment Agreement. According to
Plaintiff, Theodore signed the Amendment on behalf of,
among others, such Renaissance subsidiaries as Marcafin (a
Swiss company) and Dana Brasil (a Brazilian company)
(collectively the "foreign Defendants"). The Amendment in
effect added parties, including the foreign Defendants, to the
original Employment Agreement. As a result, Marcafin and
Dana Brasil allegedly became Plaintiff's employers in
addition to Renaissance and its other subsidiaries.

On June 2, 1999, Renaissance and certain Renaissance
subsidiaries filed bankruptcy petitions. The foreign
Defendants were not among the host of Renaissance
subsidiaries which filed for bankruptcy. As part of the
bankruptcy proceedings, an Asset Purchase Agreement was
executed between buyer DPC (a company which had only
been incorporated a few days earlier) and sellers
Renaissance, Cosmar Corporation, Dana Perfumes Corp.,
MEM Company, Inc., Tinkerbell, Inc ., Great American
Cosmetics, Inc., and Houbigant. These debtors sold
substantially all their assets, retaining no employees or
business. Plaintiff alleges that, by virtue of this Asset
Purchase Agreement, New Dana (another newly minted
corporation) became the owner of Renaissance's foreign
subsidiaries, including the foreign Defendants.

On July 30, 1999, New Dana purportedly dismissed Plaintiff
without cause. As a result of that termination, Plaintiff now
seeks compensatory damages, representing accrued but
unpaid portions of his base salary, unreimbursed expenses,
accumulated benefits, and legal costs.

In responding to Plaintiff's lawsuit, the Defendants asserted,
*inter alia,* that this action was subject to binding arbitration
pursuant to Section 9 of the Employment Agreement.
Section 9 includes an arbitration clause which states, in
pertinent part:
**\*2** [T]he parties agree to submit any dispute hereunder to
binding arbitration. Arbitration shall be conducted in New

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1144066 (S.D.N.Y.)
(Cite as: 2002 WL 1144066 (S.D.N.Y.))

York, New York under the commercial rules of the American Arbitration Association by a panel of three arbitrators ... The decision of the arbitrators with respect to any issues subject to arbitration shall be binding on the parties and may be entered into any court of competent jurisdiction by either party, or application may be made to such court for judicial confirmation of the award and order of the enforcement, as the case may be. The demand for arbitration shall be made within a reasonable time after the claim, dispute or other matter in question has arisen.

Although the Defendants contend that the foregoing clause in the Employment Agreement imposes binding arbitration on all parties, they simultaneously raise a number of defenses which challenge whether they are bound to that agreement. Through these defenses, they assert that: (1) New Dana does not own the capital stock of the foreign Defendants and therefore cannot be held liable under the amended Employment Agreement containing the arbitration clause; (2) although Theodore signed the Amendment to the Employment Agreement, he lacked the legal authority to bind foreign Defendants Marcafin and Dana Brasil to the contract which serves as the basis for Plaintiff's claims; and (3) pursuant to the express terms of the Asset Purchase Agreement, DPC did not acquire any liability for executive compensation agreements, bonus plans, severance plans, or any other termination-related compensation packages and therefore is not liable under the contract upon which Plaintiff is relying. To further advance these challenges, the Defendants now seek to bifurcate this case in an effort to secure a preliminary trial, pursuant to Section 4 of the Federal Arbitration Act, see 9 U.S.C. § 4, on "the making of the arbitration agreement" underlying this action before filing any motion to compel arbitration in accordance with Section 9 of that agreement.

### DISCUSSION

The Defendants move to bifurcate this case pursuant to the Federal Arbitration Act, 9 U.S.C. § 1, et seq. Rather than immediately expending their efforts on a motion to compel arbitration in accordance with Section 9 of the Employment Agreement, they seek bifurcation in order to secure an initial determination on the issue of whether they incurred

any legal obligations under that agreement. Through bifurcation, the Defendants hope to preserve their purported right ultimately to compel arbitration if a valid arbitration agreement exists while, in effect, first attempting to put "the making of the arbitration agreement" at issue within the meaning of Section 4 of the Federal Arbitration Act, see 9 U.S.C. § 4, so as to warrant a preliminary trial on that issue.

### I. The Arbitration Procedure Under 9 U.S.C. § 4

Ordinarily, one party seeks to compel the arbitration of an action under 9 U.S.C. § 4 while the opposing party strenuously resists such a motion by challenging the existence of the contract containing the relevant arbitration clause. In this case, we are faced with a more unusual set of circumstances. Although the Defendants here contend that the underlying action is subject to binding arbitration pursuant to the arbitration clause in the Employment Agreement, they simultaneously assert three defenses which challenge whether an employment contract existed between themselves and Plaintiff.

*3 Had the Defendants initially sought to compel arbitration in accordance with the employment agreement while at the same time asserting their defenses to that agreement, they would have run afoul of the Third Circuit's analogous yet heretofore unique decision in Sandvik AB v. Advent International Corp. (3d Cir.2000) 220 F.3d 99. In Sandvik AB, the defendant sought to arbitrate the plaintiff's action pursuant to an arbitration clause while at the same time disputing the validity of the agreement which contained that clause. See Sandvik AB, 220 F.3d at 104-105. However, instead of first requesting an initial determination under 9 U.S.C. § 4 as to the validity of the underlying agreement, the defendant moved directly to compel arbitration. In addressing this anomalous situation, the Third Circuit determined that the district court properly denied that motion because the legal status of the agreement containing the arbitration clause was, as yet, unresolved and therefore the defendant's "desire to arbitrate, separate from the contract, appears as a desire, floating in the legal ether untethered by either reciprocal promises or other sufficient consideration." Id. at 109, 112. The Third Circuit explained that it was "not enough to ask that the District Court 'assume' that such an agreement exists; the language of the

Westlaw.

Not Reported in F.Supp.2d                                                                                    Page 3
Not Reported in F.Supp.2d, 2002 WL 1144066 (S.D.N.Y.)
(Cite as: 2002 WL 1144066 (S.D.N.Y.))

F[ederal] A [rbitration] A[ct] affirmatively requires the court to be 'satisfied' that the arbitration agreement's existence is not at issue." *Id.* at 109.

In an apparent effort to comply with the Third Circuit's analysis in *Sandvik AB*, the Defendants do not move to compel arbitration while simultaneously asserting various defenses to the existence of the arbitration agreement. Rather, they move to bifurcate this case under the Federal Arbitration Act in order pursue an initial determination with respect to whether they incurred any legal obligations under the Employment Agreement before litigating the issue of whether they may actually compel Plaintiff to arbitrate this action in accordance with that same agreement.

The Federal Arbitration Act ("FAA"), *9 U.S.C. § 1, et seq.,* embodies a strong federal policy in favor of rigorously enforcing arbitration agreements. *See Doctor's Associates, Inc. v. Hamilton* (2d Cir.1998) 150 F.3d 157, 162, *cert. denied* (1999) 525 U.S. 1103. *See also Thomas James Associates, Inc. v. Jameson* (2d Cir.1996) 102 F.3d 60, 65. Nevertheless, the "liberal federal policy favoring arbitration agreements'... is at bottom a policy guaranteeing the enforcement of private contractual arrangements." *Mitsubishi Motors Corp. v. Soler Chrysler Plymouth, Inc.* (1985) 473 U.S. 614, 625. *See also U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co., Ltd.* (2d Cir.2001) 241 F.3d 135, 146 ("Notwithstanding the strong federal policy favoring arbitration as an alternative means of dispute resolution ... courts must treat agreements to arbitrate like any other contract"). Since arbitration is a matter of contract, " 'a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.' " *AT & T Technologies, Inc. v. Communications Workers of America* (1986) 475 U.S. 643, 648.

*4 Section 4 of the FAA reflects these principles and provides that a district court may order the parties to proceed to arbitration in accordance with the terms of the arbitration agreement "upon being satisfied that the making of the agreement for arbitration ... is not at issue." *9 U.S.C. § 4.* However, "[w]hen parties disagree about whether they entered into an arbitration agreement subject to the FAA, the FAA directs that the 'court shall proceed summarily to ... trial' of the issue." *U.S. Titan, Inc.,* 241 F.3d at 145, *quoting*

*9 U.S.C. § 4.* Hence, "[i]f the making of an arbitration agreement is placed in issue ... the court must set the issue for trial," *Sphere Drake Ins. Ltd. v. Clarendon National Ins. Co.* (2d Cir.2001) 263 F.3d 26, 30, as "before a party can be required to submit to arbitration, it is entitled to a judicial determination of the threshold question of whether it entered into an agreement which obliges it to consent to arbitration," *PMC, Inc. v. Atomergic Chemetals Corp.* (S.D.N.Y.1994) 844 F.Supp. 177, 181.

II. Whether The Defendants Genuinely Put The Arbitration Agreement At Issue

By requesting "bifurcation" under *9 U.S.C. § 4,* the Defendants have, in effect, sought to put the making of the amended Employment Agreement at issue. However, a naked assertion by a party that it did not intend to be bound by the terms of a contract "is insufficient to place in issue 'the making of the arbitration agreement' for the purposes of Section 4 of the Federal Arbitration Act." *Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd.* (3d Cir.1980) 636 F.2d 51, 55. "[T]he party putting the agreement to arbitrate at issue must present 'some evidence' in support of its claims before a trial is warranted." *Sphere Drake Ins. Ltd.,* 263 F.3d at 30, *citing Interocean Shipping Co. v. National Shipping and Trading Corp.* (2d Cir.1972) 462 F.2d 673, 676. *See also Manning v. Energy Conversion Devices, Inc.* (2d Cir.1987) 833 F.2d 1096, 1103 ("A party resisting arbitration on the ground that no agreement to arbitrate exists must submit sufficient evidentiary facts in support of this claim in order to precipitate the trial contemplated by *9 U.S.C. § 4*"); *Almacenes Fernandez, S.A. v. Golodetz* (2d Cir.1945) 148 F.2d 625, 628 (" 'To make a genuine issue entitling the plaintiff to a trial by jury [under Section 4 of the Arbitration Act], an unequivocal denial that the agreement had been made was needed, and some evidence should have been produced to substantiate the denial' ").

At the outset, the Defendants contend that this evidentiary standard should not apply to them. *See, e.g.,* Defs.' Supplemental Brief at 4 ("we can envision no basis upon which *a party who moves to compel arbitration* while reserving its right to a jury trial of defenses not subject to arbitration may be denied its constitutional right to [a] jury trial") (emphasis added). They correctly note that, whereas

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2002 WL 1144066 (S.D.N.Y.)
**(Cite as: 2002 WL 1144066 (S.D.N.Y.))**

cases such as *Sphere Drake Ins. Ltd.* and *Interocean Shipping Co.* address the evidentiary burden imposed on parties resisting arbitration, the Defendants are simultaneously seeking both to challenge the contract containing the arbitration clause and to preserve their right to compel arbitration should their challenge fail. Indeed, outside of *Sandvik AB,* we have found no other published or unpublished opinion which discusses the type of circumstances presented here, and even the Third Circuit in *Sandvik AB* never addressed whether sufficient evidence had been presented to warrant a trial under 9 U.S.C. § 4.

**\*5** While the situation before us is atypical, we hold that the Defendants must bear the burden of establishing that they are entitled to a trial under Section 4 of the FAA. The Second Circuit has explained that "[a] party resisting arbitration 'cannot obtain a jury trial merely by demanding one;' rather, he bears 'the burden of showing that he is entitled to a jury trial under § 4' of the [FAA]." ' *Doctor's Associates, Inc. v. Stuart* (2d Cir.1996) 85 F.3d 975, 983. Although they attempt to characterize themselves as parties which are seeking to compel arbitration, the Defendants are in fact, *in the first instance,* attacking the existence of an arbitration agreement between themselves and Plaintiff. The Defendants clearly view arbitration as a contingency option, to be invoked only *if* those attacks on the underlying contract fail. As such, the Defendants in practical effect stand in the same shoes as a party resisting arbitration and must therefore carry the same evidentiary burden borne by that party.

With respect to the nature of that burden, "[a]n unequivocal denial that the agreement had been made, accompanied by supporting affidavits ... should be sufficient to require a jury determination" under 9 U.S.C. § 4. *Par-Knit Mills, Inc.,* 636 F.2d at 55, *citing Interocean Shipping Co.,* 462 F.2d at 673. *See also Sphere Drake Ins. Ltd.,* 263 F.3d at 32-33 (finding that one affidavit provided "some evidence" so as to warrant a trial under 9 U.S.C. § 4); *Interbras Cayman Co. v. Orient Victory Shipping Co., S.A.* (2d Cir.1981) 663 F.2d 4, 7 (finding that a single telex and supporting affidavits provided the evidence necessary to warrant a trial under 9 U.S.C. § 4); *Ministry of Industry and Trade, The Hashemite Kingdom of Jordan v. S. Kasmas & Bros., Ltd.* (S.D.N.Y.

Sept. 7, 2001) 2001 WL 1035133, \*3 (finding that one affidavit provided "some evidence" so as to warrant a trial under 9 U.S.C. § 4). Ultimately, however, we must look to the content of the submissions to determine whether a party resisting arbitration has met its evidentiary burden under 9 U.S.C. § 4. *See General Media, Inc. v. Shooker* (S.D.N.Y. July 16, 1998) 1998 WL 401530, \*7-\*9. With these principles in mind, we examine each of the three defenses at issue respectively to evaluate whether a preliminary trial as to any of them would be justified. [FN1]

> FN1. Plaintiff does not dispute that the Defendants have unequivocally denied that an agreement had been made between themselves and Plaintiff. Accordingly, we do not address whether the Defendants have satisfied that aspect of the standard under 9 U.S.C. § 4.

A. The First Defense

In his Complaint, Plaintiff asserts that Defendant New Dana incurred obligations under the amended Employment Agreement because it became the owner of such Renaissance subsidiaries as foreign Defendants Marcafin and Dana Brasil. *See* Compl. ¶ 22. *See also* Compl. ¶¶ 3-4. As their first challenge to "the making of the arbitration agreement," the Defendants contend that New Dana could not have incurred any obligations under the amended Employment Agreement as, contrary to Plaintiff's allegations, New Dana does not own any capital stock in either Marcafin or Dana Brasil.

**\*6** In support of this defense, they have submitted the affidavit of Alfred R. Cowager, Jr. ("Cowager"), the Vice-President, General Counsel, and Assistant Secretary of, among other companies, Defendant New Dana. *See* Defs.' Supplemental Brief, Ex. B ¶ 1 (hereinafter referred to as the "Cowager Aff."). Cowager describes an intricate web of corporate relationships. According to Cowager, Defendant New Dana does not own any shares in either Marcafin or Dana Brasil. *See* Cowager Aff. ¶¶ 9-10, 17. Rather, Defendant DPC owns a subsidiary, St. Honore Holding, Inc., which owns another subsidiary, Finanz St. Honore, B.V., which in turn directly owns all but one of Defendant Dana Brasil's shares and is Defendant Marcafin's

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

sole shareholder. [FN2] *See* Cowager Aff. ¶¶ 6-7, 12, 14-15. The Defendants corroborate Cowager's statements through a variety of stock ownership documents and the deposition testimony of New Dana's Vice-President of International Sales. *See* Defs.' Supplemental Brief, Ex. C, E.

> FN2. The single remaining Dana Brasil share is directly owned by Financiera de Perfumeria, S.A. *See* Cowager Aff. ¶ 13. However, Finanz St. Honore, B.V., which directly owns the other Dana Brasil shares, now also owns all the shares of Financiera de Perfumeria, S.A. *See* Cowager Aff. ¶¶ 13, 15.

These submissions raise issues of fact with regard to whether Defendant New Dana owns foreign Defendants Marcafin and Dana Brasil (and has thereby undertaken any obligations under the amended Employment Agreement). Plaintiff attempts to undermine this evidence by alleging that the entities identified by Cowager obtained ownership of the foreign Defendants without proof or authorization and by introducing various letters written by Cowager which suggest that Defendant New Dana may have owned the foreign Defendants. *See* Pl.'s. Supplemental Brief, Ex. A-C. However, his efforts merely underscore the existence of a genuine dispute as to the relevant facts underlying this defense.

Accordingly, the Defendants have provided sufficient evidence to satisfy their burden and are entitled to a trial under 9 U.S.C. § 4 with respect to this defense. Under these circumstances, we cannot resolve the foregoing issues of fact on the basis of the parties' affidavits and moving papers. *See A/S Custodia v. Lessin International, Inc.* (2d Cir.1974) 503 F.2d 318, 320 (reversing Judge Ward's decision to deny a trial under 9 U.S.C. § 4 solely on the basis of the affidavits and briefs of the parties since "[t]here would appear to be issues of fact ... These issues should not be determined on affidavits, but rather a full trial should be held"); *El Hoss Engineering & Transport Co., Ltd. v. American Independent Oil Co.* (2d Cir.) 289 F.2d 346, 351, cert. denied (1961) 368 U.S. 837 ("issues [of fact] should not be determined on affidavits, but rather a full trial should be had"); *Herlofson Management A/S/ v. Ministry of Supply* (S.D.N.Y. Sept. 19, 1989) 1989 WL 111083, *3 (finding that questions as to the

making of an agreement under 9 U.S.C. § 4 "cannot not be resolved on the basis of the motions, affidavits and briefs submitted by the parties").

**B. The Second Defense**

In his Complaint, Plaintiff alleges that foreign Defendants Marcafin and Dana Brasil incurred obligations under the terms of the Employment Agreement when they entered into an Amendment to that agreement which made them Plaintiff's employers alongside Renaissance. *See* Compl. ¶¶ 13-15. As their second defense to "the making of the arbitration agreement," the Defendants contend that neither Marcafin nor Dana Brasil could have incurred any obligations by way of that Amendment since it was signed by Theodore (as the Chairman of Renaissance's Board of Directors) and he purportedly lacked the actual or apparent authority to bind the foreign Defendants to the Amendment.

**\*7** "In order to bind a principal to a contract, an agent must have real or apparent authority to do so." *PMC, Inc.,* 844 F.Supp. at 182. Actual authority "to act as an agent can be 'created by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account." ' *In the Matter of the Arbitration Between Herlofson Management A/S and Ministry of Supply, Kingdom of Jordan* (S.D.N.Y.1991) 765 F.Supp. 78, 84. Apparent authority may be created where the "words or conduct of the principal are communicated to a third party and these words or conduct give rise to the reasonable belief that the agent possesses authority to enter into a transaction." *Property Advisory Group, Inc. v. Bevona* (S.D.N.Y.1989) 718 F.Supp. 209, 211. However, "[t]he existence of the apparent authority must be 'traceable' to the principal, and cannot be established by the unauthorized acts, representations, or conduct of the agent." *In the Matter of the Arbitration Between Herlofson Management A/S and Ministry of Supply, Kingdom of Jordan,* 765 F.Supp. at 88.

The Defendants have submitted a number of exhibits in support of their challenge to Plaintiff's allegations of agency. These submissions include Theodore's deposition testimony as well as the deposition testimony of Renaissance's former General Counsel, John R. Jackson

("Jackson"). Although these depositions were not taken over the course of this litigation, they were taken in an action before the United States Bankruptcy Court for the District of Delaware which involved a similar lawsuit by another employee suing Renaissance and its affiliates (including Dana Brasil and Marcafin) for breach of contract after his employment had been terminated.

At his deposition, Theodore indicated that he never considered whether he had the authority to bind either Marcafin or Dana Brasil to the Amendment and that, even to this day, he did not know whether he had the authority to do so. *See* Defs' Supplemental Brief, Ex. G at 21-22, 25. When asked whether he knew if he had the authority to bind the foreign subsidiaries to such agreements, he stated that he "performed no investigation personally and had no basis to assume one way or another." *See* Defs.' Supplemental Brief, Ex. G at 25. Theodore indicated that he had primarily relied on Renaissance's former General Counsel, Jackson, when he signed the agreement on behalf of the foreign Defendants as he believed that Renaissance's internal counsel would not have asked him to execute a document as Chairman of the Board if he did not have authorization to do so. *See* Defs.' Supplemental Brief, Ex. G at 25-26.

However, at his deposition, Jackson similarly indicated that he had never considered whether Renaissance's officers (such as Plaintiff himself) could bind the foreign Defendants to an employment agreement and that he did not remember anyone ever raising that issue in his presence. *See* Defs.' Supplemental Briefs, Ex. I at 25-26. *See also id.* at 36-37 (wherein Jackson testified that he had not raised an issue with anybody regarding whether Renaissance's chief executive officer or directors could designate which subsidiaries a Renaissance employee could work for). Moreover, Jackson also testified that he did not recall being asked to address the issue of such authority when Plaintiff himself signed a similar employment agreement on behalf of both Renaissance and the foreign Defendants and that he did not know whether Plaintiff had the authorization to bind Marcafin and Dana Brasil to such a contract. *See* Defs.' Supplemental Brief, Ex. I at 41, 70-71, 81-82. *See also* Defs. Supplemental Brief, Ex. G at 31-32 (wherein Theodore testified that Plaintiff signed an amendment to

another Renaissance executive's employment agreement which contained the same language as that included in Plaintiff's own Amendment).

*8 Even if we could set aside the questions which arise from Theodore and Jackson's testimony regarding Theodore's actual authority to bind the foreign Defendants to the Amendment, Jackson's testimony would still call into doubt Theodore's apparent authority to do the same. In the absence of further evidence at this preliminary stage in the litigation (where discovery has not yet been conducted), Jackson's testimony raises questions regarding whether Plaintiff had a reasonable basis to believe that a Renaissance officer could bind the foreign Defendants to an employment agreement. *See* Restatement (Second) of Agency § 8 cmt. c (1958) ("Apparent authority exists only to the extent that it is reasonable for the third person dealing with the agent to believe that the agent is authorized [to act on behalf of the principal]"). *See also* PMC, Inc., 844 F.Supp. at 182-183 (ordering the parties to proceed to a trial on the making of the arbitration agreement where the plaintiff had presented evidence which put into question whether the defendant's vice-president could have reasonably believed that the plaintiff's putative agent had the authority to bind the plaintiff to a contract).

In addition to the foregoing deposition transcripts, the Defendants also submitted, *inter alia,* the declaration of a former Marcafin director. In that declaration, Marc Albert ("Albert") explained that "[n]o director, officer or agent of Marcafin executed any contract within the United States." *See* Defs.' Supplemental Brief, Ex. D ¶ 5. *See also* Defs.' Supplemental Brief, Ex. E at 38- 39 (reflecting deposition testimony by Albert wherein he corroborated the statements he had made in his earlier declaration).

The evidence submitted by the Defendants satisfies the relevant evidentiary standard which was first articulated by the Second Circuit in *Almacenes Fernandez, S.A.* and *Interocean Shipping Co.* and recently reaffirmed by the court in *Sphere Drake Ins. Ltd.* Despite Plaintiff's arguments to the contrary, the Defendants have presented "some evidence" to support their assertion that Theodore lacked the actual or apparent authority to bind the foreign Defendants to the Amendment. [FN3] Given that their evidence

Not Reported in F.Supp.2d                                                          Page 7
Not Reported in F.Supp.2d, 2002 WL 1144066 (S.D.N.Y.)
**(Cite as: 2002 WL 1144066 (S.D.N.Y.))**

conflicts with Plaintiff's contentions, we may not decide these disputed issues on the submissions themselves, but must instead allow a trial to be held on this defense to Plaintiff's allegations of agency pursuant to 9 U.S.C. § 4. *See Interbras,* 663 F.2d at 6-7; *A/S Custodia,* 503 F.2d at 320; *El Hoss Engineering & Transport Co., Ltd.,* 289 F.2d at 351; *Herlofson Management A/S,* 1989 WL 111083 at *3. [FN4]

> FN3. Although the Defendants have demonstrated that disputed issues of fact exist with respect to their first and second defenses, they have done so in the absence of extensive discovery. At this stage in the litigation, the parties have not yet had an opportunity to conduct discovery. Discovery may yet clarify the disputed issues of fact. For example, Plaintiff may obtain evidence through discovery which demonstrates that the foreign Defendants engaged in conduct which gave him a reasonable basis to believe that Theodore had the authority to bind Marcafin and Dana Brasil to the Amendment. Since the Defendants have already produced "some evidence" to warrant a trial under 9 U.S.C. § 4, we will grant their motion to bifurcate. However, before we actually conduct a trial on "the making of the arbitration agreement" pursuant to 9 U.S.C. § 4, we will allow the parties, if they so choose, to pursue discovery limited to the subject matter to be tried. If, through discovery, Plaintiff acquires evidence which would dispositively support the arguments he raised in opposing this motion, he may revive his contentions and seek to preclude the Defendants from ultimately proceeding to a trial on "the making of the arbitration agreement." *See Sagendorf-Teal v. County of Rensselaer* (2d Cir.1996) 100 F.3d 270, 277 (recognizing that a court may reconsider whether triable issues of fact exist on the basis of new evidence). *See also DiFiore v. DiLorenzo* (E.D.N.Y. Sept. 19, 1997) 1997 WL 722697, *3; *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.* (S.D.N.Y.1997) 955 F.Supp. 203, 210.

> FN4. Plaintiff also contends that Renaissance's

Board of Directors ("the Board") approved the Amendment to the Employment Agreement and that this ratification cured any actions Theodore took without actual or apparent authority. "Ratification is the express or implied adoption of the acts of another by one for whom the other assumes to be acting but without authority." *Prisco v. State of New York* (S.D.N.Y.1992) 804 F.Supp. 518, 523. "[U]pon ratification the consequences of the original transaction are the same as if it had been authorized." Restatement (Second) of Agency § 82 cmt. b (1958). *See also Prisco,* 804 F.Supp. at 523 ("a principal may ratify and thereby become liable for the acts of an agent even if those acts were initially unauthorized").

Although Theodore's testimony indicates that the Board approved the Amendment, Plaintiff has failed to address the issue which arises therefrom. "Generally speaking, a parent corporation and its subsidiary are regarded as legally distinct entities and a contract under the corporate name of one is not treated as that of both." *Carte Blanche (Singapore) Pte, Ltd. v. Diner's Club International, Inc.* (2d Cir.1993) 2 F.3d 24, 25. *See also Maltz v. Union Carbide Chemicals & Plastics Co., Inc.* (S.D.N.Y.1998) 992 F.Supp. 286, 300 ("Generally, parent and subsidiary corporations are treated as separate legal entities, and a contract by one does not legally bind the other"). Consequently, although Renaissance was the parent corporation of Marcafin and Dana Brasil, each of the three companies were distinct legal entities. As such, assuming *arguendo* that Theodore lacked the authority to execute a contract on behalf of Marcafin and Dana Brasil, it remains unclear whether any ratification of that contract by the Board would be sufficient to bind the foreign Defendants to the Amendment. Indeed, Theodore himself testified that he could recall no discussion among the Board's members as to whether the Board had the authority to bind its foreign subsidiaries without any action being taken by those subsidiaries themselves. *See* Defs.' Supplemental Brief, Ex. G at 25.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                     Page 8
Not Reported in F.Supp.2d, 2002 WL 1144066 (S.D.N.Y.)
**(Cite as: 2002 WL 1144066 (S.D.N.Y.))**

While Plaintiff contends that the parent corporation's ratification did bind the foreign subsidiaries to the Amendment, he has yet to cite to any legal support for that specific proposition and has not, at this stage, presented evidence which dispositively indicates that the Board had the authority to bind the foreign Defendants to such a contract. Accordingly, it would be inappropriate to preclude the Defendants from pursuing a trial under 9 U.S.C. § 4 on the grounds of the Board's putative ratification at this time. As we indicated in the previous footnote, if Plaintiff acquires dispositive evidence over the course of discovery (and cites to legal authority) which would support this argument, he may renew his contentions and seek to forestall the Defendants from proceeding to a preliminary trial on "the making of the arbitration agreement."

Plaintiff attempts to counter the effect of the submissions by asserting that this agency defense cannot put "the making of the arbitration agreement" at issue because we purportedly ruled against Marcafin and Dana Brasil on this same defense when we denied their prior motion to dismiss in March 2001. *See Becker v. DPC Acquisition Corp.* (S.D.N.Y. Mar. 13, 2001) 2001 WL 246385, * 5-*6. However, the issues we were addressing at that time were raised in a different context then that implicated by the motion at bar.

*9 When the foreign Defendants previously moved to dismiss the claims against them for lack of personal jurisdiction, they argued, *inter alia*, that Theodore's execution of the Amendment did not constitute a transaction on their part within the meaning of New York's long arm statute because Theodore lacked the authority to execute the contract on their behalf. *See Becker*, 2001 WL 246385 at *5. Although we rejected their arguments and found that there was "prima facie proof of a valid agency relationship between Terry Theodore (Renaissance's Chairman) and the foreign defendants," we reached that conclusion by addressing the relationship in accordance with the legal principles applicable under the long-arm statute. For that very reason, we noted that *"[t]o test jurisdiction, courts in this District do not rely on the formalities of agency law"* but rather " 'look to the realities of the relationship' to determine if agency exists." *Id.* (emphasis added). Under those jurisdictional principles, we ultimately determined that we had personal jurisdiction over the foreign Defendants pursuant to N.Y. C .P.L.R. § 302(a).

In sharp contrast, the formalities of agency law now fully apply to the issue at bar as the defense falls outside of the jurisdictional context. Since we must first evaluate whether Theodore had the actual or apparent authority under the formalities of agency law to bind the foreign Defendants to the amended Employment Agreement before we may allow the Defendants to compel arbitration in accordance with Section 9 of that agreement, we are not persuaded that our previous jurisdictional determinations preclude the Defendants from securing a trial with respect to this defense under 9 U.S.C. § 4.

C. The Third Defense

In his Complaint, Plaintiff alleges that Defendant DPC incurred obligations under the amended Employment Agreement when it purchased the assets of Renaissance. *See* Compl. ¶¶ 20-21. As their third defense to "the making of the arbitration agreement," the Defendants contend that DPC never acquired liability for executive compensation agreements, bonus plans, severance plans, or any other termination-related compensation packages under the express terms of the Asset Purchase Agreement and therefore did not incur any obligations under the amended Employment Agreement.

DPC submits the language of the Asset Purchase Agreement itself as the primary item of evidence in support of this defense. *See* Defs.' Supplemental Brief, Ex. K. Section 1(b) of the agreement provides that:

[The] Buyer shall not acquire any interest in any assets of the Sellers that do not constitute Acquired Assets, including the following assets of the Sellers or their bankruptcy estates ... (ii) all assets of the Sellers' executive or incentive compensation plans, bonus plans, deferred compensation agreements, employer pension, profit sharing, saving or retirement plans, employee stock options or stock purchase agreements, arrangements or commitments, including severance, holiday, vacation,

Westlaw.

Christmas, or other bonus plans maintained by Sellers or with respect to which the Sellers make, or have an obligation to make, contributions or under which any present or former officer, director, employee, consultant or agent of the Sellers is entitled to a benefit, and the Sellers' rights with respect thereto.

*10 Defs.' Supplemental Brief, Ex. K at 6.

In addition, Section 1(e) of the Asset Purchase Agreement provides that [e]xcept as expressly provided herein, Buyer is acquiring the Acquired Assets free and clear of any and all Encumbrances and Buyer is not assuming, and shall not be liable for or be bound by any and all claims against Sellers or with respect to the Business or the Acquired Assets, or any obligations, liabilities or indebtedness of Sellers, whether fixed, contingent, disputed, undisputed, liquidated or otherwise. *In particular, Buyer shall have no obligation to employ any employee of Sellers or in any manner be responsible for the payment of any compensation, severance and/or termination pay relating to any employee of Sellers or due to any union or other labor organization associated with Sellers.*

Defs.' Supplemental Brief, Ex. K at 8 (emphasis added). The Defendants argue that their purchase of Renaissance's assets (which included such subsidiaries as Marcafin and Dana Brasil) fell within the scope of foregoing clauses; hence, they assert that Marcafin and Dana Brasil's purported obligations under the amended Employment Agreement could not have been transferred to DPC by way of the Asset Purchase Agreement.

Plaintiff contends that these clauses stand for no more than the proposition that Renaissance's assets were transferred without being subject to liability for the employment agreements of the "Sellers." As Plaintiff correctly notes, the Asset Purchase Agreement specifically delineates which entities fell within the definition of "Sellers;" although Renaissance and a number of its subsidiaries are encompassed within that definition, Defendants Marcafin and Dana Brasil are not. Defs.' Supplemental Brief, Ex. K at 1, 36. Accordingly, Plaintiff asserts that his purported employment agreements with the foreign Defendants themselves (and any liabilities thereunder) fall outside the scope of the foregoing clauses.

These very arguments were raised earlier in the litigation, when the Defendants sought to dismiss the action for improper venue. At that time, Defendants New Dana and DPC cited the Asset Purchase Agreement and argued that, under the express language therein, they "clearly did not assume Plaintiff's alleged employment agreement with RCI [i.e. Renaissance]." See Defs.' Reply Brief in supp. of Mot. to Dismiss at 5. The parties also engaged in a heated debate over this issue at the oral arguments on that motion. See January 31, 2001 Tr. Oral Arg. at 6-7, 11-16.

In denying the Defendants' motion to dismiss for improper venue, we agreed with the arguments espoused by Plaintiff and held that "[a]lthough, pending discovery, the precise nature of the inter-party relationships remains uncertain, plaintiff has sufficiently demonstrated that the Asset Purchase Agreement does not unambiguously limit these defendants' liability." *Becker, 2001 WL 246385 at *2.* Plaintiff now relies on that determination and contends that no trial on this third defense is warranted under 9 U.S.C. § 4 since we already decided against the Defendants on this issue when we denied their motion to dismiss.

*11 The Defendants have not explained why a trial would now be justified with respect to the third defense despite our prior decision. In fact, they steadfastly continue to rely on the same express language in the Asset Purchase Agreement to support this particular challenge to "the making of the arbitration agreement." See Defs.' Supplemental Brief at 14 ("The express language of the Asset Purchase Agreement, Section 1, B-C, explicitly excludes the transfer of liabilities arising out of executive compensation plans, bonus plans, compensation agreements, severance plans and all other termination-related compensation packages"). Given our previous determination with respect to the effect of the unambiguous language in the Asset Purchase Agreement, we find that the Defendants are not entitled to a preliminary trial on this issue pursuant to 9 U.S.C. § 4. [FN5]

> FN5. To corroborate their interpretation of the contract, the Defendants for the first time submit deposition testimony (again taken in the course of the aforementioned action before the bankruptcy court in Delaware) wherein the various deponents suggest that the language of the Asset Purchase

Not Reported in F.Supp.2d                                                                   Page 10
Not Reported in F.Supp.2d, 2002 WL 1144066 (S.D.N.Y.)
(Cite as: 2002 WL 1144066 (S.D.N.Y.))

Agreement may preclude the transfer of any employment related liabilities to DPC. *See* Defs.' Supplemental Brief, Ex. M, N. However, we cannot consider such parol evidence. Since we have already determined that the express language in the Asset Purchase Agreement does not "unambiguously limit these defendants' liability," *Becker, 2001 WL 246385 at *2,* we may not reference information beyond the four corners of that agreement to interpret the meaning of the terms therein. *See Wayland Investment Fund LLC v. Millenium Seacarriers, Inc. (S.D.N.Y.2000) 111 F.Supp.2d 450, 454* (" 'It is well settled that 'extrinsic and parol evidence' is not admissible to create an ambiguity' where none exists").

However, the Defendants also indicate that there is another aspect to their third defense under the Asset Purchase Agreement. Because Plaintiff has expressly premised DPC's liability for any breach of the amended Employment Agreement on its purported acquisition of Marcafin and Dana Brasil, the Defendants assert that DPC cannot be held liable under the amended Employment Agreement if we or a jury find, in accordance with their previously discussed second defense, that Theodore lacked the actual or apparent authority to bind either Marcafin or Dana Brasil to the Amendment. *See* Defs.' Supplemental Brief at 14. The merits of this argument are wholly intertwined with the factual disputes and legal issues raised by the evidence which the Defendants presented in support of their second defense. As we have already determined that a trial is warranted on our challenge to Plaintiff's allegations of agency, the Defendants are similarly entitled to a trial on this aspect of the third defense.

III. Waiver Of Arbitration

Plaintiff contends that a trial under 9 U.S.C. § 4 would be unnecessary under these circumstances as the Defendants have supposedly waived their right to arbitration. Where a party challenges the existence of an arbitration agreement while simultaneously asserting a right to compel arbitration under that agreement, a trial on the "making of the arbitration agreement" under 9 U.S.C. § 4 would be justified only if that party had not already waived its right to proceed

to arbitration in accordance with the terms of that agreement. Otherwise, even if the Court conducted a trial and found that an arbitration agreement existed, the judicial resources expended on that initial determination would be wasted since the party seeking arbitration would still have waived its right to proceed to arbitration pursuant to that agreement.

"[A] district court may properly reach the question of waiver whenever a party seeking arbitration has engaged in any prior litigation." *Doctor's Associates, Inc. v. Distajo (2d Cir.1995) 66 F.3d 438, 456 n. 12.* "A party is deemed to have waived its right to arbitration if it 'engages in protracted litigation that results in prejudice to the opposing party.' " *S & R Co. of Kingston v. Latona Trucking, Inc. (2d Cir.1998) 159 F.3d 80, 83,* cert. dismissed (1999) 528 U.S. 1058, quoting *Cotton v. Sloan (2d Cir.1993) 4 F.3d 176, 179.* "There is no bright-line rule ... for determining when a party has waived its right to arbitration." *PPG Industries, Inc. v. Webster Auto Parts Inc. (2d Cir.1997) 128 F.3d 103, 107-108.* "Whether or not there has been a waiver is decided in the context of the case, with a healthy regard for the policy of promoting arbitration." *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp. (2d Cir.1995) 67 F.3d 20, 25.*

*12 In determining whether a party has waived its right to arbitration, "[f]actors to consider include (1) the time elapsed from the commencement of litigation to the request for arbitration; (2) the amount of litigation (including exchanges of pleadings, any substantive motions, and discovery); and (3) proof of prejudice, including taking advantage of pre-trial discovery not available in arbitration, delay, and expense." *S & R Co. of Kingston, 159 F.3d at 83.* " '[A]ny doubts concerning whether there has been a waiver are resolved in favor of arbitration.' " *Leadertex, Inc., 67 F.3d at 25.*

A. Delay

Plaintiff filed his Complaint on February 14, 2000. Thereafter, more than fourteen months passed before the Defendants first asserted their right to arbitrate this action upon filing their Answer on April 27, 2001.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                    Page 11
Not Reported in F.Supp.2d, 2002 WL 1144066 (S.D.N.Y.)
**(Cite as: 2002 WL 1144066 (S.D.N.Y.))**

However, "even a lengthy delay in seeking arbitration will not typically result in waiver unless it prejudices the opposing party." *In re HBLS, L.P.* (S.D.N.Y. Nov. 21, 2001) 2001 WL 1490696, *7. Hence, courts have found that delays in excess of fourteen months did not, without more, constitute a waiver of arbitration. *See id.* at *7-*8 (no waiver of arbitration where seventeen months had passed before the defendant moved to compel arbitration); *Thomas v. A.R. Baron & Co., Inc.* (S.D.N.Y.1997) 967 F.Supp. 785, 789 (no waiver of arbitration where the defendants waited a year and a half after the complaint was filed before seeking arbitration); *Couvaras v. Paine Webber Jackson & Curtis, Inc.* (S.D.N.Y. Feb. 24, 1986) 1986 WL 2713, *2 (no waiver of arbitration where the defendants had delayed twenty-one months before seeking arbitration). Since we may not infer waiver from the fourteenth month delay itself, we must consider the delay in conjunction with the amount of litigation that occurred during that period and any proof that Plaintiff was prejudiced by the Defendants' conduct during that period. *See PPG Industries, Inc.*, 128 F.3d at 108.

B. Prejudice And The Amount Of Litigation

After Plaintiff filed his Complaint in February 2001, Defendants DPC and New Dana aggressively moved to dismiss (or in the alternative, transfer) the action on the grounds of improper venue while Defendants Marcafin and Dana Brasil moved in an equally rigorous fashion to dismiss the action for lack of personal jurisdiction. As the motions were submitted, we granted the parties various extensions of time in which to file their briefs. We denied both motions in March 2001, although we held that Marcafin and Dana Brasil "may revive the jurisdictional question after discovery should newly-acquired evidence contradict plaintiff's preliminary showing [that we had personal jurisdiction over the foreign Defendants]." *Becker*, 2001 WL 246385 at *4, *6. Consequently, the Defendants filed their Answer on April 27, 2001, and shortly thereafter submitted the instant motion to bifurcate in an effort both to attack the underlying amended Employment Agreement while at the same time attempting to preserve their rights, if any, to compel arbitration pursuant to the arbitration clause in that agreement.

**\*13** A party may waive its right to arbitration where it files

substantive motions. *See PPG Industries, Inc.*, 128 F.3d at 107, 109. Plaintiff contends that the Defendants waived their right to compel arbitration by litigating the foregoing motions to dismiss (and by securing the extensions of time which accompanied those motions). However, the Second Circuit has held that a party litigating a motion to dismiss "does not waive the right to arbitrate." *Rush v. Oppenheimer & Co.* (2d Cir.1985) 779 F.2d 885, 888. *See also Sweater Bee by Banff, Ltd. v. Manhattan Industries, Inc.* (2d Cir.) 754 F.2d 457, 463, cert. denied (1985) 474 U.S. 819; *Scott v. Merrill Lynch, Pierce, Fenner & Smith, Inc.* (S.D.N.Y. Sept. 14, 1992) 1992 WL 245506, *3. [FN6] Moreover, the Defendants engaged in such litigation before filing their Answer, and the Second Circuit has specifically held that the earliest point at which a party may ordinarily waive its right to arbitration is when that party files an answer on the merits. *See Chatham Shipping Co. v. Fertex Steamship Corp.* (2d Cir.1965) 352 F.2d 291, 293. *See also Sweater Bee by Banff, Ltd.*, 754 F.2d at 462, 466. Accordingly, the Defendants did not waive their right to arbitration by litigating their motions to dismiss or by requesting extensions of time in which to brief those motions. [FN7]

> FN6. *Cf. American Heart Disease Prevention Foundation, Inc. v. Hughey* (4th Cir.1997) 106 F.3d 389, 1997 WL 42714, * *3 ("Because W & H had the right to seek transfer [of venue] before it pleaded the arbitration defense, doing so was not inconsistent with a desire to arbitrate"); *Kramer v. Hammond* (2d Cir.1991) 943 F .2d 176, 179 (recognizing that "resistance to the assertion of personal jurisdiction" would not "alone have established waiver of arbitration"); *Sedco, Inc. v. Petroleos Mexicanos Mexican National Oil Co.* (5th Cir.1985) 767 F.2d 1140, 1144, 1150-1151 (finding no waiver despite lengthy jurisdictional dispute); *Realco Enterprises, Inc. v. Merrill Lynch, Pierce, Fenner & Smith Inc.* (S.D.Ga.1990) 738 F.Supp. 515, 519 (finding that "merely defending a lawsuit to the point of a motion to dismiss for lack of personal jurisdiction" was not "the type of substantial prejudice necessary to find a waiver, especially in light of the federal policy favoring arbitration"); *Smith v. Pay-Fone Systems, Inc.*

Not Reported in F.Supp.2d                                                                    Page 12
Not Reported in F.Supp.2d, 2002 WL 1144066 (S.D.N.Y.)
(Cite as: 2002 WL 1144066 (S.D.N.Y.))

(N.D.Ga.1985) 627 F.Supp. 121, 125 (same); _Nuclear Installation Services Co. v. Nuclear Services Corp_. (E.D.Pa.1979) 468 F.Supp. 1187, 1194 (determining that although the plaintiff had unsuccessfully "challenged the [personal] jurisdiction of the court ... such a challenge does not constitute a knowing waiver [of its right to arbitration]").

FN7. In addition to the previously discussed extensions, we also held a conference on March 30, 2001, wherein we granted the Defendants a single extension of time in which to file their Answer by April 27, 2001. We find that the Defendants did not waive their right to arbitration by requesting this extension because, as we have already noted, the earliest point at which a party may generally waive the right to arbitration is when that party files an answer on the merits. See _Chatham Shipping Co._, 352 F.2d at 293; _Bigge Crane and Rigging Co. v. Docutel Corp._ (E.D.N.Y.1973) 371 F.Supp. 240, 244. Moreover, Plaintiff has failed to establish that he suffered any appreciable prejudice from the four week delay which ensued as a result of this extension.

Plaintiff also contends that the Defendants used the foregoing motions as an opportunity informally to obtain information which they may otherwise have been unable to obtain in advance of arbitration. A party may waive its right to arbitration by engaging in extensive pre-trial discovery. See _PPG Industries, Inc._, 128 F.3d at 107, 109. See also _Cotton_, 4 F.3d at 179 ("Sufficient prejudice to infer waiver has been found when a party seeking to compel arbitration engages in discovery procedures not available in arbitration"). However, Plaintiff has conceded that no formal discovery took place during the time period in question. See Pl.'s Opp'n Brief at 8-9. Even were we to construe any information which the Defendants obtained from Plaintiff's affidavits and oral arguments as a limited form of pre-trial discovery, participation in such limited pre-trial discovery does not constitute a waiver of the right to compel arbitration. See _Scott_, 1992 WL 245506 at *3. See also _McDonnell Douglas Finance Corp. v. Penn. Power &_

_Light Co_. (2d Cir.1988) 858 F.2d 825, 833.

Although Plaintiff cannot rely on the foregoing conduct to establish that he was prejudiced in a way that would compel this Court to conclude that the right to arbitration has been waived, see _Scott_, 1992 WL 245506 at *3, he further attempts to demonstrate waiver by asserting that he has incurred attorneys fees and costs in excess of $45,000 by litigating this action to date. See Pl.'s Opp'n Brief at 9 ("Protracted delays, substantive rulings, and informal discovery aside, Mr. Becker has also suffered prejudice as a result of the attorneys' fees and costs which he incurred during the protracted delays as a result of the Defendants' litigation tactics"). However, "[i]ncurring legal expenses, without more, is insufficient evidence of prejudice to justify a finding of waiver." _Crysen/Montenay Energy Co. v. Shell Oil Co._ (2d Cir.2000) 226 F.3d 160, cert. denied (2001) 532 U.S. 920, quoting _PPG Industries, Inc._, 128 F.3d at 107-108. See also _Leadertex, Inc._, 67 F.3d at 26 ("pretrial expense and delay--unfortunately inherent in litigation--without more, do not constitute sufficient prejudice to support a finding of waiver"). Since the Defendants' conduct between February 2000 and April 2001 does not support an inference of waiver, the legal fees which Plaintiff incurred over those fourteen months in responding to that conduct are insufficient to support a finding of waiver. [FN8]

FN8. Plaintiff also appears to contend that the Defendants waived their right to arbitration when they (1) refused Plaintiff's initial request in September 1999 to arbitrate this matter prior to his commencement of this litigation and (2) refused to waive service of process with respect to the foreign Defendants. See Pl.'s Opp'n Brief at 7-8. However, Plaintiff cites to no legal authorities to support his assertion that parties may waive their right to arbitration under 9 U.S.C. § 4 through such conduct. Since Plaintiff has, as of yet, failed to provide any legal support for these arguments, we reject them without prejudice.

IV. Plaintiff's Bond Application

*14 In his affidavit in opposition to the motion to bifurcate,

Not Reported in F.Supp.2d                                    Page 13
Not Reported in F.Supp.2d, 2002 WL 1144066 (S.D.N.Y.)
(Cite as: 2002 WL 1144066 (S.D.N.Y.))

Plaintiff's counsel requests that we direct the Defendants to post a bond in the amount of $600,000. *See* Babitt Aff. ¶ 56. He asserts that the Defendants "are presently experiencing financial instability" and that a bond may therefore be "necessary and appropriate due to industry information" because their purported financial condition "could place the Defendants' continuing viability in jeopardy." *Id.*

According to Local Civil Rule 54.2 of the Local Rules of the United States District Courts for the Southern and Eastern Districts of New York, "[t]he court, on motion or on its own initiative, may order any party to file an original bond for costs or additional security for costs in such an amount and so conditioned as it may designate." "Under Local Rule 54.2, an individual determination is made by the court on the facts of each case. Factors generally include: the financial condition and ability to pay of the party at issue, whether that party is a non-resident or foreign corporation; the merits of the underlying claims; the extent and scope of discovery; the legal costs expected to be incurred; and compliance with past court orders." *Selletti v. Carey* (S.D.N.Y.1997) 173 F.R.D. 96, 101-101, *rev'd in part on other grounds* (2d Cir.1999) 173 F.3d 104. *See also Building Service 32B-J Pension Fund v. Vanderveer Estates Holdings, LLC* (S.D.N.Y.2000) 115 F.Supp.2d 459, 464.

Even were we to construe the statements in the affidavit as an independent "motion" for a bond under Local Civil Rule 54.2, we would not order the Defendants to file a bond at this time. Plaintiff's counsel has provided no evidence whatsoever to support his contentions with respect to the Defendants' financial condition. Setting aside Plaintiff's unsubstantiated allegations as to the Defendants' financial instability, Plaintiff has not, as of yet, argued or demonstrated why a bond might be necessary under any of the other factors discussed in *Selletti*. Accordingly, we deny Plaintiff's "motion" for such a bond without prejudice.

### CONCLUSION

For the foregoing reasons, we grant the Defendants' motion in part. We hereby bifurcate this case and allow them to proceed to a preliminary trial, pursuant to 9 U.S.C. § 4, on the merits of their first and second defense, as well as that aspect of the third defense discussed above. However, for the aforementioned reasons, we deny the Defendants'

motion to the extent that it seeks a trial on the issue of whether DPC acquired liability for executive compensation agreements, bonus plans, severance plans, or any other termination-related compensation packages under the express terms of the Asset Purchase Agreement (and therefore incurred obligations under the amended Employment Agreement).

In order to allow the parties summarily to proceed to a trial solely on "the making of the arbitration agreement," we hereby stay any further litigation in this action which does not relate to the subject matter to be tried under 9 U.S.C. § 4.

**\*15** The parties are directed to file a joint schedule on or before Tuesday, June 28, 2002, which addresses:

(1) Whether they intend to pursue any discovery with respect to the subject matter to be tried, and if so, the proposed date by which that discovery will be completed;

(2) The proposed date by which they intend to submit a joint pretrial order;

(3) The proposed date by which they will be ready for trial.

SO ORDERED.

Not Reported in F.Supp.2d, 2002 WL 1144066 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:00cv01035 (Docket) (Feb. 14, 2000)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Tab B



**H**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Helen BRILL, Plaintiff,
v.
PRUDENTIAL-BACHE SECURITIES, INC. and Dale
Walden, Defendants.
No. 84 Civ. 0846 (PKL).

June 13, 1986.

Smith, Steibel, Alexander & Saskor, P.C., New York City
(Ludwig A. Saskor, of counsel), for plaintiff.

Hertzog, Calamari & Gleason, New York City (Loretta A.
Preska, of counsel), for defendants.

LEISURE, *District Judge:*

**\*1** This is a securities fraud action in which plaintiff Helen
Brill ("Brill") has alleged that defendants Prudential-Bache
Securities, Inc. ("PBS") and PBS account representative
Dale Walden ("Walden") violated numerous federal statutes,
as well as state statutory and common law. On July 29,
1985, the Court issued an order in this case which, *inter
alia,* granted plaintiff's motion to strike defendants'
affirmative defense of arbitration on the grounds that such a
defense had been waived. Subsequently, in a letter to
counsel dated August 26, 1985, the Court invited
reargument on the issue of arbitration, and specifically
authorized the parties to reargue the issue of waiver.

Under the law of this Circuit, plaintiff's federal claims,
which are based on alleged violations of RICO and the
federal securities laws, are not subject to arbitration. *See
generally McMahon v. Shearson/American Express, Inc.,
788 F.2d 94 (2d Cir.1986).* Plaintiff's state law claims,
however, are not as clearly confined to federal court.
Indeed, when a complaint raises both federal securities
claims and pendent state law claims, the Federal Arbitration
Act requires district courts to grant a defendant's motion to
compel arbitration of the state law claims, even if such
arbitration results in bifurcated proceedings. *See Dean
Witter Reynolds Inc. v. Byrd, 105 S.Ct. 1238, 1241 (1985).*

Relying on *Byrd,* defendants have moved to compel

arbitration of plaintiff's state law claims. Plaintiff opposes
this motion on two grounds: 1) the absence of a binding
agreement to arbitrate; and 2) defendants' waiver of the right
to arbitrate.

*A. Existence of Binding Arbitration Agreement*

Plaintiff's insistence that her state law claims are not
governed by a binding arbitration agreement is simply
unconvincing. Defendants have produced at least two
relevant arbitration agreements. In particular, plaintiff has
never denied signing a Client's Agreement, dated January
12, 1983, in which she agreed that "any controversy arising
out of or relating to [her] account" would be settled by
arbitration. *See* Affidavit of Dale Warden, sworn to October
1, 1985, Exhibit A. Moreover, plaintiff's assertion that this
agreement did not apply to her personal PBS account is
belied by the broad language of the January 12, 1983
agreement, which specifically indicates that plaintiff agreed
to arbitration "with respect to all of [her] accounts, in which
[she has] an interest alone or with others, which [she has]
opened or open in the future, with [PBS] for the purchase
and sale of securities and commodities." *Id.*

Accordingly, the Court finds that plaintiff's state law claims
are subject to the terms of a binding arbitration agreement
which requires the arbitration of Brill's state law claims
against either PBS or its representative Walden.

*B. Waiver*

Because of the strong federal policy in favor of arbitration,
"waiver of the right to compel arbitration due to
participation in litigation may be found only when prejudice
to the other party is demonstrated." *Rush v. Oppenheimer &
Co., 779 F.2d 885, 887 (2d Cir.1985).* In *Rush,* the Second
Circuit found that defendants had not waived their right to
arbitration even though defendants did not move to compel
arbitration until eight months of pretrial proceedings had
elapsed and defendants had already moved to dismiss the
complaint. *779 F.2d at 887-88.* In addition, the Court found
no cognizable prejudice to plaintiff in defendants'
participation in discovery or in their failure to raise
arbitration as an affirmative defense in the answer. *Id.* at
888-89.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp., 1986 WL 6787 (S.D.N.Y.)
**(Cite as: 1986 WL 6787 (S.D.N.Y.))**

**\*2** Plaintiff Brill places great emphasis on the fact that the delay of PBS and Walden in formally moving to compel arbitration exceeded the delay of the defendants in *Rush*. Unlike the *Rush* defendants, however, defendants in the instant case raised arbitration as an affirmative defense in their answer, thereby putting Brill on notice that defendants would probably move to compel arbitration, and in fact prompting Brill to move to strike arbitration as an affirmative defense. In this regard, it is worth noting that federal courts have on occasion treated the assertion of arbitration as an affirmative defense in a defendant's answer as an application for a stay pending arbitration. *See Kulukundis Shipping Co. v. Amtorg Trading Corp.*, 126 F.2d 978, 986 n. 29 (2d Cir.1942); *Instituto Cubano de Establizacion del Azucar v. The S/S Rodestar*, 143 F.Supp. 599, 600 (S.D.N.Y.1956).

In any event, it is clear that the arbitrability of plaintiff's claims has been at issue in this case since defendants answered the complaint, a factor which militates against a finding of prejudice to this Court. *Cf. Bengiovi v. Prudential-Bache Securities, Inc.*, Fed.Sec.L.Rep. (CCH) ¶ 92,012 at 91,017-18 (D.D.C. April 25, 1985) (finding of waiver based in part on defendant's failure to plead arbitration as a defense in either its answer or in its amended answer). [FN1]

In *Rush*, the Second Circuit identified two scenarios in which a defendant's delay might be significant enough to justify the conclusion that the right to demand arbitration had been waived. First, a defendant's failure to make a formal motion to compel arbitration until its case had been tried on the merits will almost certainly constitute waiver. *See Rush*, 779 F.2d at 888; *Demsey & Associates, Inc. v. S.S. Sea Star*, 461 F.2d 1009, 1018 (2d Cir.1972). Second, a defendant's failure to move to compel arbitration until four and one-half weeks before trial, after having put plaintiff to the expense of defending a motion for partial summary judgment and after having engaged in pretrial discovery, might constitute waiver. *See Rush*, 779 F.2d at 888 (deriving scenario from *Bengiovi v. Prudential-Bache Securities, Inc.*, Fed.Sec.L.Rep. (CCH) ¶ 92,012 (D.D.C. April 25, 1985)).

The second scenario bears a superficial resemblance to the case at bar. Defendants herein have engaged in some pretrial

discovery, although discovery in this action has been stayed for several months. In addition, defendants did cause plaintiff to defend a two-part motion for summary judgment. Nonetheless, the present motion to compel arbitration was not made on the eve of trial; moreover, a close review of the pleadings and motions filed in this case demonstrates that defendants have never concealed their intent to seek arbitration of plaintiff's claims. [FN2] Under the circumstances, a finding of prejudice to plaintiff is simply not justified.

Although the question of waiver in this case is not free from doubt, any such doubts must be resolved in favor of arbitration. *See Rush*, 779 F.2d at 887. Accordingly, this Court now finds that defendants have not waived their right to demand arbitration of plaintiff's state law claims. [FN3]

*C. Stay of Federal Proceedings*

**\*3** Given the existence of a binding arbitration agreement which defendants have not waived their right to enforce, this Court has no choice but to require the parties to proceed to arbitration on plaintiff's state law claims. *See Byrd*, 105 S.Ct. at 1241.

Defendants have also asked this Court to stay the proceedings in federal court pending arbitration. Where, as here, the facts underlying a plaintiff's federal and state law claims are identical, a stay of federal proceedings pending arbitration of the state law claims is warranted by considerations of judicial economy and convenience. *See Leone v. Advest*, 624 F.Supp. 297, 303 (S.D.N.Y.1985). Defendants' application for a stay of these proceedings pending arbitration of plaintiff's state law claims is therefore granted.

CONCLUSION

Defendants' motion to compel arbitration of plaintiff's state law claims is granted. The adjudication of plaintiff's federal law claims is stayed pending arbitration.

*SO ORDERED.*

FN1. *See also Rush v. Oppenheimer & Co.*, 606 F.Supp. 300, 301 (S.D.N.Y.) (in finding that defendant had waived the right to demand

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



1986 WL 6787                                                              Page 3
Not Reported in F.Supp., 1986 WL 6787 (S.D.N.Y.)
**(Cite as: 1986 WL 6787 (S.D.N.Y.))**

arbitration, district court stressed defendant's failure to raise arbitration as one of the thirteen affirmative defenses defendant had interposed to plaintiff's amended complaint), *rev'd as to finding of waiver,* <u>779 F.2d 885 (2d Cir.1985).</u>

<u>FN2.</u> It is true that, just prior to the Supreme Court's decision in *Byrd,* defendants indicated a willingness to withdraw their arbitration defense. *See* Defendants' Memorandum of Law in Support of Cross Motion for Partial Summary Judgment and in Opposition to Plaintiff's Motion to Strike Certain Affirmative Defenses (filed January 14, 1985) at 3. The defense was never formally withdrawn, however, and defendants subsequently moved to compel arbitration. Although the unequivocal withdrawal of a motion to compel arbitration might, under the circumstances of a particular case, warrant a finding of waiver, *see Gilmore v. Shearson/American Express, Inc.,* 84 Civ. 9011 (PKL) (May 20, 1986) (order adopting in part the report and recommendation of Magistrate Bernikow), PBS and Walden never unequivocally abandoned their right to demand arbitration.

<u>FN3.</u> Plaintiff argues that this Court must adhere to its prior finding of waiver, *see Brill v. Prudential-Bache Securities, Inc.,* 84 Civ. 0846 (July 29, 1985), slip op. at 15, as "the law of the case." That doctrine, however, has no application to a district court's review of its own ruling in a pending action prior to the entry of final judgment. <u>*Hahn v. Breed,* 606 F.Supp. 1557, 1560 (S.D.N.Y.1985)</u> (Weinfeld, J.).

Not Reported in F.Supp., 1986 WL 6787 (S.D.N.Y.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Tab C



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23022033 (S.D.N.Y.)
(Cite as: 2003 WL 23022033 (S.D.N.Y.))

Page 1

C

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Alice CHAMOIS, Plaintiff,
v.
COUNTRYWIDE HOME LOANS, Eric DeClercq, Arthur
Anderson, and Bob Brown,
Defendants.
Rachel DOUGLAS, Plaintiff,
v.
COUNTRYWIDE HOME LOANS, Eric DeClercq, Arthur
Anderson, and Bob Brown,
Defendant.
No. 02Civ. 9550(MBM), 02 Civ. 9553(MBM).

Dec. 29, 2003.

**Background:** Former employees each filed individual suits against their former employer and its employees, alleging gender discrimination in violation of the Equal Pay Act, Title VII, and state laws.

**Holding:** On the employer's motion to compel arbitration, the District Court, J., in a consolidated proceeding, held that the employees were contractually bound to arbitrate their claims.

Motion granted.

West Headnotes

**[1] Arbitration** ☞6.2
33k6.2 Most Cited Cases
Arbitration agreement requiring former employees to arbitrate their employment discrimination claims was enforceable, despite their claim that the agreement denied them their right under Title VII to collect attorney's fees by leaving that issue to the discretion of the arbitrator; district court retained discretion to determine whether attorney's fees should be awarded for a Title VII claim. 9 U.S.C.A. § 3; Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-5(k).

**[2] Arbitration** ☞6.2
33k6.2 Most Cited Cases
Arbitration agreement requiring former employees to arbitrate their employment discrimination claims was enforceable, despite their claim that the costs of arbitration were prohibitive; the employer had offered to pay almost all of the costs of arbitration, and thus, the employees failed to satisfy their burden of showing that prohibitive arbitration fees were likely. 9 U.S.C.A. § 3.

**[3] Arbitration** ☞7.5
33k7.5 Most Cited Cases
Even if alleged wrongs of the individual defendants were unrelated to employer's business, an arbitration agreement binding former employees covered claims arising from those acts, and thus, the former employee's claims against the individual defendants were arbitrable. 9 U.S.C.A. § 3.

**[4] Arbitration** ☞2.2
33k2.2 Most Cited Cases

**[4] Federal Courts** ☞403
170Bk403 Most Cited Cases
Federal law determined whether former employees waived the right to arbitrate their claims against employer where the parties agreed in the arbitration agreement that the Federal Arbitration Act (FAA) governed "the interpretation, enforcement, and all proceedings pursuant to this Agreement"; the FAA created a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act, and state law had to be applied to an issue of arbitrability only when that was clearly the parties' intent. 9 U.S.C.A. § 3.

**[5] Arbitration** ☞23.3(2)
33k23.3(2) Most Cited Cases
A plaintiff does not waive her right to arbitrate merely by filing an action in district court, but rather, the earliest point at which such preclusion may be found is when the other party files an answer on the merits. 9 U.S.C.A. § 3.
Joseph J. Ranni, Goshen, NY, for Plaintiffs.

Jennifer F. Dimarco, Scott J. Wenner, Little Mendelson, New York, NY, for Defendants.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



OPINION AND ORDER

MUKASEY, J.

*1 Plaintiffs Alice Chamois and Rachel Douglas have each filed actions against their former employer, Countrywide Home Loans ("Countrywide"), and Countrywide employees Eric DeClercq, Arthur Anderson, and Bob Brown, alleging gender discrimination in violation of the Equal Pay Act, 29 U.S.C. § 206 (2000); Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) et seq.; and the New York State Human Rights Law, N.Y. Exec. Law § 296 et seq. Plaintiffs also assert New York common law claims of intentional infliction of emotional distress and breach of contract. Defendants move to stay the proceedings in this court and compel arbitration, in accordance with the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq. In the alternative, defendants move pursuant to Fed.R.Civ.P. 12(b)(1) and 12(b)(6) to dismiss the actions with prejudice on the ground that plaintiffs have waived their right to arbitrate their claims. By agreement of the parties, plaintiffs' cases have been consolidated for the purposes of briefing and deciding these motions. For the reasons stated below, defendants' motion to compel arbitration is granted as to both cases, and the proceedings are stayed pending the completion of arbitration.

I.

Before she was hired as Branch Manager for Countrywide on November 10, 1997, (Chamois Compl. ¶ 11) Alice Chamois signed an arbitration agreement ("Arbitration Agreement") with Countrywide entitled "Mutual Agreement to Arbitrate Claims" on September 2, 1997. [FN1] (DiMarco Letter of 9/10/03, Ex. B ("Arbitration Agreement")) Rachel Douglas signed an identical document on November 28, 1997, [FN2] (id.) and Countrywide subsequently hired her as Assistant Branch Manager on December 29, 1997. (Douglas Compl. ¶ 12)

FN1. In her affidavit, Karen J. McPhee states that Chamois signed the agreement "[o]n or about January 15, 1998." (DiMarco Aff., Chamois Case, Ex. D, ¶ 3) However, it is clear from the attached copy of the Arbitration Agreement that Chamois in fact signed the agreement on September 2, 1997. (DiMarco Aff., Chamois Case, Ex. D, at Ex. 1)

FN2. Again, McPhee states in an affidavit that Douglas signed the agreement "[o]n or about December 4, 1997," (DiMarco Aff., Douglas Case, Ex. D, ¶ 3) but the attached copy of the agreement shows that Douglas signed it on November 28, 1997. (DiMarco Aff., Douglas Case, Ex. D, at Ex. 1)

The Arbitration Agreement states, in relevant part:
[T]he Company and the Employee hereby consent to the resolution by arbitration of all claims or controversies for which a federal or state court or other dispute resolution body otherwise would be authorized to grant relief, whether or not arising out of, relating to or associated with the Employee's employment with the Company, or its termination.... The Claims covered by this Agreement include, but are not limited to, claims for wages or other compensation due; claims for breach of any contract or covenant, express or implied; tort claims; claims for discrimination or harassment on bases which include ... sex ...; and claims for violation of any federal, state, or other governmental constitution, statute, ordinance, regulation, or public policy. The purpose and effect of this Agreement is to substitute arbitration as the forum for resolution of the Claims; all responsibilities of the parties under the statues applicable to the Claims shall be enforced.

(Arbitration Agreement ¶ 1) The Arbitration Agreement specifies that "all references to the 'Company' in this Agreement shall include Countrywide Credit Industries, Inc. and all of its subsidiary and affiliated entities, including all former, current and future officers, directors, and employees of all such entities, in their capacity as such and otherwise...." (Id.) The Arbitration Agreement also states that the FAA governs "the interpretation, enforcement and all proceedings pursuant to this Agreement," except as otherwise provided. (Id. ¶ 2)

*2 On October 17, 2000, Countrywide distributed an e-mail to all employees informing them of the implementation of a change to the Arbitration Agreement. (DiMarco Reply Aff., Ex. A ¶ 3) Before that date, the Arbitration Agreement provided that Countrywide would pay for the first day of any arbitration proceeding, but that all other arbitration

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23022033 (S.D.N.Y.)
**(Cite as: 2003 WL 23022033 (S.D.N.Y.))**

costs would be shared equally between the company and the employee. (Arbitration Agreement ¶ 8) The revision provides that Countrywide will pay for all arbitration hearing fees, except that an employee requesting arbitration will be required to pay a filing fee up to a maximum of $125. (DiMarco Reply Aff., Ex. A, at Ex. 1) Accordingly, this unilateral change imposes additional burdens only on Countrywide and relieves Countrywide employees like plaintiffs from most of their obligations to pay arbitration costs.

In mid-October 2001, plaintiffs' attorney informed Countrywide that plaintiffs were considering initiating legal action against Countrywide. (DiMarco Aff., Chamois Case, Ex. C, at Ex. 1; DiMarco Aff., Douglas Case, Ex. C, at Ex. 1) Douglas and Chamois subsequently left their positions at Countrywide on October 18 and October 25, 2001, respectively. (Douglas Compl. ¶ 24; Chamois Compl. ¶ 25) On October 26, 2001, Countrywide informed plaintiffs' counsel in writing that Douglas and Chamois had each entered into the Arbitration Agreement, and Countrywide's legal counsel provided plaintiffs' counsel with a copy of the agreement. (DiMarco Aff., Douglas Case, Ex. C, ¶ 3; DiMarco Aff., Chamois Case, Ex. C, ¶ 3) Notwithstanding the Arbitration Agreements, plaintiffs filed the instant actions in November 2002.

II.

Under § 3 of the FAA, a district court "must stay proceedings if satisfied that the parties have agreed in writing to arbitrate an issue or issues underlying the district court proceeding." *WorldCrisa Corp. v. Armstrong,* 129 F.3d 71, 74 (2d Cir.1997) (internal quotation marks omitted). In that event, the court must direct the parties to proceed to arbitration on issues covered in that agreement. *See id.*

In deciding whether to stay the proceedings and compel arbitration, this court must determine: (1) whether the parties agreed to arbitrate; (2) the scope of the parties' arbitration agreement; and (3) whether Congress intended any federal statutory claims to be nonarbitrable. [FN3] *Genesco, Inc. v. T. Kakiuchi & Co. ., Ltd.,* 815 F.2d 840, 844 (2d Cir.1987).

FN3. In the event that only some claims are arbitrable, *Genesco* requires the court to determine whether to stay the balance of proceedings pending arbitration. 815 F.2d 840, 844 (2d Cir.1987). However, I need not consider this fourth prong of the *Genesco* test because all of plaintiffs' claims are subject to arbitration. *See Arakawa v. Japan Network Group,* 56 F.Supp.2d 349, 353 n. 2 (S.D.N.Y.1999).

First, it is apparent that Chamois and Douglas each entered into an arbitration agreement with Countrywide. Each plaintiff signed the "Mutual Agreement to Arbitrate Claims," which provides for "arbitration of all claims or controversies for which a federal or state court or other dispute resolution body otherwise would be authorized to grant relief." (Arbitration Agreement ¶ 1) Under general contract principles, parties are bound by the provisions of contracts that they have signed, unless they can show special circumstances that would relieve them of their contractual obligations. *Genesco,* 815 F.2d at 845. Plaintiffs argued initially that the Arbitration Agreements in this case were unenforceable because of illegibility (Plaintiffs' Brief in Opposition at 4-7), but they have since conceded that the agreements are legible. (Court Order of 8/12/03) Plaintiffs do not deny that they signed the agreements, do not argue that their consent was improperly obtained, and do not otherwise show special circumstances that would relieve them of their obligations under the Arbitration Agreement. Accordingly, Chamois and Douglas are bound by the provisions of the Arbitration Agreements and have agreed to arbitrate their claims against Countrywide to the extent of those agreements.

**\*3** The next question is whether plaintiffs' claims fall within the scope of the Arbitration Agreement. Because federal policy favors arbitration as an alternative to litigation, this court is required to construe arbitration agreements "as broadly as possible" and to resolve "any doubts concerning the scope of arbitrable issues ... in favor of arbitration." *Oldroyd v. Elmira Sav. Bank, FSB,* 134 F.3d 72, 76 (2d Cir.1998) (internal quotation marks omitted). In this case, the Arbitration Agreement states specifically that it applies to breach of contract claims, tort claims, and sex

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



discrimination claims (Arbitration Agreement ¶ 1), which covers all of the claims that plaintiffs' have brought in these actions.

Plaintiffs have also failed to demonstrate that arbitration is inappropriate under the third *Genesco* inquiry, which examines whether Congress intended any of their federal statutory claims to be nonarbitrable. *See Genesco, 815 F.2d at 844*. Because plaintiffs are opposing arbitration, they bear the burden of showing that Congress intended to preclude arbitration of their federal statutory claims. *See Bird v. Shearson Lehman / Am. Express, Inc., 926 F.2d 116, 119 (2d Cir.1991)*. Plaintiffs do not even argue that Congress intended to preclude arbitration for any of their claims, let alone offer evidence or authority to that effect. Therefore, the three relevant *Genesco* inquiries show that all of plaintiffs' claims are arbitrable.

[1] Plaintiffs contend that the Arbitration Agreement should not be enforced in this case for three reasons. First, plaintiffs claim that the agreement denies them their right under Title VII to collect attorney's fees because it leaves this issue to the discretion of the arbitrator. (Pl. Br. in Opp'n at 7-8) Second, plaintiffs assert that the costs of arbitration are prohibitive and will effectively prevent them from pursuing their claims through arbitration. (Pl. Br. in Opp'n at 9-10) Finally, plaintiffs argue in the alternative that their claims against individual defendants DeClercq, Anderson, and Brown are not arbitrable and should be severed because these claims do not involve "significant aspects of employment." (Ranni Letter of 9/15/03, at 1) For the reasons discussed below, these arguments are unpersuasive.

Plaintiffs first contend that the Arbitration Agreement impairs their ability to collect the attorney's fees to which they claim they are entitled under the law. (Pl. Br. in Opp'n at 7-8) The relevant portion of the agreement states that "the arbitrator may, in his or her discretion, permit the prevailing party to recover fees and costs only to the extent permitted by applicable law." (Arbitration Agreement ¶ 8) Plaintiffs apparently object to this provision because it invokes the discretion of the arbitrator, when in fact the prevailing plaintiff a Title VII claim is entitled to attorney's fees in the absence of special circumstances. *See Lyte v. Sara Lee Corp., 950 F.2d 101, 103 (2d Cir.1991)*. However, a district court retains discretion to determine whether attorney's fees should be awarded for a Title VII claim, *42 U.S.C. § 2000e-5(k)*, and Supreme Court precedent establishes a two-step inquiry that guides that discretion. *See Pino v. Locascio, 101 F.3d 235, 237 (2d Cir.1996)*. An arbitrator in this case likewise must exercise his discretion in accordance with the same legal guidelines, as the Arbitration Agreement provides that "all arbitrations covered by this Agreement shall be adjudicated in accordance with the state or federal law which would be applied by a United States District Court sitting at the place of the hearing...." (Arbitration Agreement ¶ 2) Accordingly, because attorney's fees are awarded in Title VII claims only at the discretion of the decision-maker and because an arbitrator would be subject to the same legal constraints as this district court, the Mutual Agreement to Arbitrate does not limit plaintiffs' possible remedies in any meaningful way.

*4 [2] Plaintiffs argue also that the Arbitration Agreement is unenforceable because it obligates them to pay prohibitive fees for the arbitration process. Although *Green Tree Financial Corp.-Alabama v. Randolph, 531 U.S. 79, 121 S.Ct. 513, 148 L.Ed.2d 373 (2000)*, does suggest that large arbitration costs may invalidate an arbitration agreement, *see id. at 90*, that decision states that a party who "seeks to invalidate an arbitration agreement on the ground that arbitration would be prohibitively expensive ... bears the burden of showing the likelihood of incurring such costs." *Id. at 91*. In an attempt to satisfy this burden, plaintiffs have provided the court with a fee schedule from the National Arbitration Forum, which allegedly demonstrates that the fees for arbitrating these actions will exceed $15,000. (Pl. Br. in Opp'n at 9; Ranni Aff. Ex. 4) However, Countrywide announced in October 2000 via e-mail that it would pay all arbitration costs that exceeded the $125 filing fee (DiMarco Reply Aff., Ex. A, at Ex. 1), and plaintiffs have presented no evidence to show that they will incur any arbitration costs above that $125 fee. Plaintiffs attempt to argue that the parol evidence rule prevents the October 2000 e-mail from altering the terms of the Arbitration Agreement (Pl. Br. in Opp'n at 7-8), despite the fact that the intended effect of the unilateral revision is to benefit plaintiffs and other employees like them. Even if plaintiffs' argument about the parol evidence rule is correct, the October 2000 e-mail

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                    Page 5
Not Reported in F.Supp.2d, 2003 WL 23022033 (S.D.N.Y.)
**(Cite as: 2003 WL 23022033 (S.D.N.Y.))**

nonetheless shows that Countrywide intends to pay almost all arbitration costs, which in turn shows that plaintiffs are not likely to incur any great expense from arbitration. Because Countrywide has offered to pay almost all of the costs of arbitration, plaintiffs have failed to satisfy their burden of showing that prohibitive arbitration fees are likely. *Cf. In re Currency Conversion Fee Antitrust Litigation,* 265 F.Supp.2d 385, 411-12 (S.D.N.Y.2003) (citing cases for proposition that plaintiffs cannot show prohibitive arbitration costs when defendants have offered to pay all arbitration fees and to forgo any right to seek prevailing party attorney's fees).

[3] Finally, plaintiffs argue in the alternative that their claims against DeClercq, Anderson, and Brown are not arbitrable and should be severed because these claims are based on "intentional acts" by the individual defendants that were "unrelated to the [corporate] Defendant's business purpose." (Ranni Letter of 9/15/03, at 1) In support of this contention, plaintiffs cite *Singer v. Jeffries & Co., Inc.,* 78 N.Y.2d 76, 571 N.Y.S.2d 680, 575 N.E.2d 98 (1991), for the proposition that claims arising from employment are arbitrable only when they involve "significant aspects of employment." [FN4] (Ranni Letter of 9/15/03, at 1) This reading of *Singer* is too broad. That case was interpreting an agreement which provided for arbitration of "any dispute arising out of the employer's business," and the court simply explained that a claim arose out of the employer's business, and thus was subject to arbitration under that particular agreement, when it involved "significant aspects of employment." *See* 78 N.Y.2d at 82-83, 571 N.Y.S.2d at 683-84, 575 N.E.2d 98. By contrast, the Arbitration Agreement is broader and applies to claims "whether or not arising out of, relating to or associated with the Employee's employment with the Company." (Arbitration Agreement ¶ 1) The Arbitration Agreement further explains that references to the "Company" include "all former, current and future officers, directors and employees of all [Countrywide] entities, in their capacity as such or otherwise." (*Id.*) Although plaintiffs contend that the phrase "or otherwise" is unenforceably vague, this language plainly signifies that the Arbitration Agreement applies to cases against Countrywide employees both in their capacity as employees and "otherwise," to wit, outside their capacity.

Accordingly, even if the alleged wrongs of the individual defendants were unrelated to Countrywide's business, [FN5] the Arbitration Agreement covers claims arising from these acts, and plaintiffs' claims against DeClercq, Anderson, and Brown are arbitrable.

> FN4. Plaintiffs also cite *Berger v. Cantor Fitzgerald, Inc.,* 240 A.D.2d 222, 658 N.Y.S.2d 591 (1st Dep't 1997), which found that a slander claim "was not arbitrable under the parties' arbitration agreement" because it did not involve significant aspects of employment. 240 A.D.2d at 223, 658 N.Y.S.2d at 592. However, *Berger* never described the arbitration agreement at issue there, and there is no indication that the terms of that agreement are similar to the Arbitration Agreement.

> FN5. Plaintiffs allege that DeClercq, Anderson, and Brown acted unlawfully by hiring and compensating employees in a discriminatory manner, submitting inaccurate job evaluations, and attempting to eliminate any need for plaintiffs' services. (Chamois Compl. ¶¶ 14, 18, 22, 23; Douglas Compl. ¶¶ 15, 18, 22) It is by no means clear that these acts do not involve significant aspects of employment.

**\*5** As discussed above, all of plaintiffs' claims are arbitrable, and the parties should proceed to arbitration. Because the FAA permits this court to stay plaintiffs' actions pending the conclusion of arbitration, *see* 9 U.S.C. § 3, these actions are stayed until the parties have completed arbitration. *See Salim Oleochemicals v. M/V Shropshire,* 278 F.3d 90, 93 (2d Cir.2002) (implying that granting a stay, which is an unappealable interlocutory order, is preferable to dismissing an action because "[u]nnecessary delay of the arbitral process through appellate review is disfavored.").

IV.

[4] Defendants argue that plaintiffs' claims should be dismissed with prejudice because, by filing these civil actions, Chamois and Douglas have waived any right to arbitrate their claims. Defendants contend that New York

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 23022033 (S.D.N.Y.)
**(Cite as: 2003 WL 23022033 (S.D.N.Y.))**

contract law should govern the question of waiver. (Defendants' Memorandum of Law, Chamois Case, at 11; Defendants' Memorandum of Law, Douglas Case, at 11) As discussed above, the parties agreed in the Arbitration Agreement that the FAA governs "the interpretation, enforcement, and all proceedings pursuant to this Agreement," (Arbitration Agreement ¶ 2) and defendants identify no provision that shows the parties intended state law to govern the issue of waiver. Accordingly, federal law determines whether plaintiffs have waived the right to arbitrate because "the FAA creates a body of federal substantive law of arbitrability, applicable to any arbitration agreement within the coverage of the Act," as state law must be applied to an issue of arbitrability only when that was clearly the parties' intent. *Doctor's Assocs., Inc. v. Distajo,* 107 F.3d 126, 130-31 (2d Cir.1997) (internal quotation marks omitted). *See also Allied Sanitation, Inc. v. Waste Management Holdings, Inc.,* 97 F.Supp.2d 320, 334 n. 12 (E.D.N.Y.2000).

[5] "There is a strong presumption in favor of arbitration, and waiver of the right to arbitration is not to be lightly inferred." *Thyssen, Inc. v. Calypso Shipping Corp., S.A.,* 310 F.3d 102, 104-05 (2d Cir.2002) (internal quotation marks and brackets omitted). A plaintiff does not waive her right to arbitrate merely by filing an action in district court; "the earliest point at which such preclusion may be found is when the other party files an answer on the merits." *Chatham Shipping Co. v. Fertex S.S. Corp.,* 352 F.2d 291, 293 (2d Cir.1965). *See also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Lecopulos,* 553 F.2d 842, 845 (2d Cir.1977) (citing *Chatham* ). In this case, defendants have not filed an answer to plaintiffs' claims on the merits; they have responded to plaintiffs' complaints only by filing the instant motions to enforce the Arbitration Agreement. Accordingly, plaintiffs have not waived the right to arbitrate by filing the instant lawsuits, and plaintiffs' actions are stayed, not dismissed with prejudice.

\* \* \*

For the reasons stated above, the parties should proceed to arbitration, and plaintiffs' actions are stayed pending the completion of arbitration.

**Motions, Pleadings and Filings (Back to top)**

- 7:02cv09553 (Docket) (Nov. 27, 2002)
- 7:02cv09550 (Docket) (Nov. 27, 2002)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.