# Tab D

Not Reported in F.Supp.2d                                                                                     Page 1
Not Reported in F.Supp.2d, 2004 WL 1660604 (S.D.N.Y.)
**(Cite as: 2004 WL 1660604 (S.D.N.Y.))**

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
DIALOG GROUP, INC., Plaintiff,
v.
Dean Ross EAKER and Bruce A. Biegel, Defendants.
**No. 04 Civ. 3498(RO).**

July 23, 2004.

*MEMORANDUM & ORDER*

OWEN, J.

*\*1* This action arises from the alleged breach of termination payment provisions in employment contracts between Dean Eeaker, Bruce Biegel ("defendants" or "claimants") and Think Direct Marketing, Inc. ("TDMI"), which was subsequently acquired by plaintiff Dialog Group, Inc. ("Dialog"). On April 17, 2003, pursuant to the terms of their employment agreements, Biegel and Eaker commenced an arbitration proceeding before a panel of the American Arbitration Association. The claimants sought relief from Dialog, rather than TDMI on the theory that Dialog was bound by the provisions in the employment agreements. Six months later, on October 24, 2003, Dialog, contending it was not a proper party, moved before the arbitrators to dismiss the claim on the grounds that, as a nonsignatory to the agreements, it was under no obligation to perform. On November 18, 2003, the panel denied the request as "premature" pending discovery, which proceeded. On January 6, 2004, Dialog then filed before the arbitrators a notice of motion to dismiss. In that motion, Dialog did not challenge the authority of the arbitrators to decide the dispute until their reply brief of February 5, 2004, far along into the arbitration. On February 19, 2004, the arbitration panel ruled that the claimants' employment agreements with TDMI empowered them to decide this dispute and directed the parties to present evidence and argument at a hearing on whether Dialog was properly named as the Respondent. Following the argument, the panel issued an extensive

opinion in April of 2004, relying on *Thomson-CSF, S.A. v. Am. Arbitration Ass'n,* 64 F.3d 773, (2d Cir.1995), finding that "Dialog is a proper party to the Arbitration." Accordingly, the panel directed the parties to proceed before them to address the merits of the claims. After all this, Dialog now moves in this Court for an injunction to stay the arbitration proceedings while the Court decides the threshold question of whether Dialog is bound to arbitrate.

It is undisputed that Dialog has continuously and actively participated in the underlying arbitration over the course of the last year. Where a party *at the outset* objects to arbitration, the Court decides the threshold question of arbitrability. *First Options of Chicago, Inc. v. Kaplan, et al.,* 514 U.S. 938, 941 (1955). However, where the parties submit the question of arbitrability to the panel, "the court should give considerable leeway to the arbitrator, setting aside his or her decision only in certain narrow circumstances." *Id.* Here, Dialog continuously contested the issues before the arbitrators, including jurisdiction. The panel ruled against it in a well-reasoned decision under the applicable law. On the record before me, distinguishing *First Options, supra,* I find no likelihood of success on the merits of the plaintiff's claim on jurisdiction. Moreover, the balance of hardships favors the defendants, who have born the expense of a year of contested arbitration. Accordingly, plaintiff's motion for an injunction staying the arbitration is denied, and the parties are to proceed to arbitration on all issues.

*\*2* So ordered.

Not Reported in F.Supp.2d, 2004 WL 1660604 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

• 1:04cv03498 (Docket) (May. 06, 2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Tab E

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1490696 (S.D.N.Y.)
(Cite as: 2001 WL 1490696 (S.D.N.Y.))

Page 1

**H**

**Motions, Pleadings and Filings**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
In re: HBLS, L.P.
Charles C. HICKOX, Appellant,
v.
Dion FRIEDLAND, Appellee.
**No. 01 CIV.2025(JGK).**

Nov. 21, 2001.

OPINION AND ORDER

KOELTL, District J.

*1 On January 16, 2001, United States Bankruptcy Judge Burton R. Lifland, in the matter of HBLS L.P. ("HBLS"), confirmed a mediation award finding Leeward Isles Resorts, Limited ("LIR"), Maundays Bay Management, Limited ("MBM") and HBLS jointly and severally liable for the deficiency on a debt owed to the appellee, Dion Friedland. Based on that ruling, Judge Lifland entered an order reinstating a deficiency judgment in favor of Friedland against LIR, MBM and HBLS, jointly and severally. Charles C. Hickox appeals insofar as the judgment relates to LIR and MBM.

I.

Rule .8013 of the Federal Rules of Bankruptcy Procedure provides that:

On an appeal [from the bankruptcy court,] the district court ... may affirm, modify, or reverse a bankruptcy judge's judgment, order, or decree or remand with instructions for further proceedings.

Fed. R. Bank. P. 8013. The Court reviews a bankruptcy court's factual findings for clear error and its legal conclusions *de novo. See id.; National Union Fire Ins. Co. v. Bonnanzio,* 91 F.3d 296, 300 (2d Cir.1996); *Hickox v. Friedland,* No. 98 Civ. 4988, 1999 WL 970454, at *1 (S.D.N.Y. Oct. 25, 1999). The Court may affirm on any ground that finds support in the record, and need not limit its review to the bases raised or relied upon in the decisions below. *See, e.g., Borrero v. Connecticut Student Loan Found.,* No. 3:97CV1382, at *1 (D.Conn. Oct. 21, 1997); *Levine v. The Resolution Trust Corp.,* No. 94 Civ. 1187, at *3 (S.D.N.Y. July 20, 1995).

II.

The following facts are not in dispute and, unless otherwise indicated, are either matters of public record or were set forth in this Court's earlier opinion, *Hickox, 1999 WL 970454, at *1-5,* and adopted in Judge Lifland's December 22, 2000 decision, *see In re HBLS,* No. 93 B 46399, slip op. at 1, (Bankr.S.D.N.Y. Dec. 22, 2000). Other undisputed facts are taken from the underlying arbitration award, which Judge Lifland confirmed. *See In re HBLS,* No. 93 B. 46399, slip op. at 4-8 (Oct. 13, 2000) (Monheit, Arb.).

LIR is an Anguillan corporation that possesses a ninety-nine-year lease (the "Lease") on a piece of property at Maundays Bay, Anguilla. When the events relevant to this dispute first began, Friedland headed a group (the "Friedland Group") [FN1] that owned LIR. LIR had obtained the Lease in order to secure land for the development of a luxury resort.

> FN1. The Friedland Group refers to Dion Friedland, Caribbean Resorts Corporation, Mmbatho management Company, Peter Venison, NYZ Holdings Ltd and Augusto Marini.

HBLS is a New York limited partnership formed for the purpose of developing the luxury resort on LIR's leased property. Together, HBLS and LIR built the resort, which is commonly known as "Cap Juluca." A third company, MBM, manages Cap Juluca on a day-to-day basis. Although the Friedland Group owned LIR when the events relevant to this case first began, Hickox was the general partner of HBLS and a significant shareholder in MBM.

In October of 1986, the Friedland Group sold the stock of LIR to HBLS pursuant to an agreement (the "Stock Purchase Agreement"), under which HBLS was required to pay a purchase price of $1,400,000 in installments. The parties simultaneously executed another agreement pledging the transferred stock of LIR to the Friedland Group as security for these payments (the "Pledge Agreement"). HBLS made the first payment under the Stock Purchase

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Case 1:05-cv-04286-CM     Document 14-3     Filed 12/27/2005     Page 5 of 22

Not Reported in F.Supp.2d                                                                Page 2
Not Reported in F.Supp.2d, 2001 WL 1490696 (S.D.N.Y.)
(Cite as: 2001 WL 1490696 (S.D.N.Y.))

Agreement, but then defaulted on the others and refused to transfer any stock in LIR back to Friedland. Friedland then brought suit in New York state court to enforce the Pledge Agreement. Friedland prevailed in that suit, and, on June 30, 1993, the court ordered that HBLS transfer its shares of LIR back to Friedland. HBLS moved to substitute monetary compensation for the shares, but the request was denied.

*2 On December 27, 1993, before any shares had been transferred, HBLS filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York (the "Bankruptcy Court"). This filing automatically stayed the state court suit. Friedland then moved for relief from the stay with regard to the shares of LIR owed to the Friedland Group. Because of the close interrelationship between HBLS, LIR, and MBM (collectively, the "Resort Entities"), all of which were managed or owned in part by Hickox, either directly or indirectly, all of these parties had an interest in the issue. *See* Confidential Offering Memorandum, at I-2, I-4, attached as Ex. 15 to Reply Declaration of Donald J. Kravet ("Kravet Decl.") dated December 19, 2000. On August 15, 1995, the Bankruptcy Court referred the entire dispute to a mediator, Barry M. Monheit (the "Mediator"), for a global resolution.

With the aid and supervision of the Mediator, the Friedland Group reached a settlement with the Resort Entities (the "Settlement Agreement"), which was conditioned on the Bankruptcy Court's approval. *See* Settlement Agreement dated May 6, 1996, attached as Ex. 3 to Declaration of Richard M. Asche dated December 14, 2000 ("Asche Decl."). This Agreement gave the Mediator the authority to determine the remaining amount due to the Friedland Group under the Pledge Agreement, and the Mediator set this amount at $4,681,986 as of March 31, 1996 (the "Claim"). The Agreement also set a new payment schedule, according to which "[t]he Claim shall be paid as follows":

  (a) $1 million shall be paid to the Friedland Group on or before 12/31/96;

  (b) $1 million shall be paid to the Friedland Group on or before 2/28/97; and

  (c) the balance due to the Friedland Group, including all unpaid interest, shall be paid on or before 6/30/97.

*Id.* ¶ 2. Friedland signed the Settlement Agreement for the Friedland Group, among others, and Hickox signed it for LIR and MBM and "as a partner in HBLS and a shareholder in LIR and MBM." *Id.* at 24-25.

The Agreement states that "HBLS shall make all payments due hereunder to Friedland Group to the Mediator." Settlement Agreement ¶ 16. However, the Agreement also states that "[t]o the extent necessary to pay the Claim, and all other claims and expenses to be paid under HBLS's plan of reorganization ... the *Resort Entities* shall execute" a number of documents to ensure that the Friedland Group would receive the proceeds of certain loans and insurance policies related to the Cap Juluca resort project. *Id.* ¶ 4(a) (emphasis added). The Agreement defined the "Resort Entities" as HBLS, LIR and MBM. *See id.* at 1. Under the Agreement, the Resort Entities were also required to transfer the outstanding shares of LIR and MBM (other than those owned by the Friedland Group) (the "Collateral") to the Mediator, where they would be held in escrow "pending either payment in full of the Claim or default by the Resort Entities after the expiration of any applicable cure periods." *Id.* ¶ 6(a). Finally, the Agreement created a lien (called a "Charge" under Anguillan law) on LIR's leasehold interests in the Cap Juluca property. *Id.* ¶ 6(c). This lien was to last "for the same duration as the Collateral is held by the Mediator" and was to be "released upon payment of the Claim in full." *Id.*

*3 The Agreement contained a number of terms concerning the timing of payments and the consequences and procedures in case of default. Under the Agreement, "[a]ll payments due hereunder [were to] be deemed timely if ... received by the Mediator within three business days of their due date." *Id.* ¶ 16. In the event of a default, the defaulting party was given "a period of five days following the receipt of a written notice of default by the Mediator to cure such default." *Id.* Unless cured, "the unpaid balance of the Claim [was to] be accelerated, and the Mediator [was required to] exercise the Friedland Group's rights as a secured creditor to retain, liquidate or dispose of the Collateral ...." *Id.* ¶ 15(a).

In addition, the Agreement contained a very broad arbitration clause (the "Arbitration Clause"). With one exception that is not relevant to this case, the Clause states

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                        Page 3
Not Reported in F.Supp.2d, 2001 WL 1490696 (S.D.N.Y.)
(Cite as: 2001 WL 1490696 (S.D.N.Y.))

that:

> any disputes or determinations arising under, relating to or in connection with this Settlement Agreement, its interpretation, performance or enforcement shall be determined solely and exclusively by the Mediator, whose decision shall be final and binding and non-appealable.
>
> Id. ¶ 17.

HBLS then applied to the Bankruptcy Court for an order approving the Settlement Agreement. See Application for an Order Approving the Settlement dated June 6, 1996, attached as Ex. 31 to Kravet Decl. In the Application, HBLS, which was managed by Hickox, described the Settlement Agreement as "a global settlement between the Resort Entities and their equity holders on the one hand, and the Friedland Group on the other hand." Id. ¶ 25. The Application also indicated that "MBM and LIR are presently negotiating to obtain a loan in the amount of $10 million," and that if this loan were obtained, "it is anticipated that approximately $2-$3 million will be available to fund the Debtor's plan and pay the Claim." Id. at 11 n. 6.

The Bankruptcy Court approved the Settlement Agreement on June 20, 1996. HBLS then incorporated the Settlement into an Amended Plan of Reorganization. Paragraph 5.05 of that Plan states that:

> [HBLS] and the Resort Entities shall make all payments required under this Plan and the Settlement Agreement either from funds generated through the ordinary course of business of [HBLS] and/or the Resort Entities, or from the sources of funds identified in paragraph 4 of the Settlement Agreement.

The Bankruptcy Court confirmed the Amended Plan on December 12, 1996.

HBLS paid the first installment due under the Settlement Agreement, but then defaulted on the second one, which was due on or before February 28, 1997. On March 6, 1997, the Mediator declared a default and wrote Hickox indicating that "[t]he Resort Entities will have a period of five days from receipt of this written notice to cure this default." Letter of Barry Monheit to Charles Hickox dated March 6, 1997, at 1-2, attached as Ex. 8 to Kravet Decl. The default was left uncured, and the Mediator proceeded to sell the Collateral pursuant to the terms of the Settlement

Agreement. [FN2]

> FN2. Given the nature of the Collateral, the Mediator, with the approval of the Bankruptcy Court, engaged the services of a broker, Eastdil Realty Company, L.L.C. ("Eastdil"), to assist in its sale. See Retention Letter from Eastdil to Monheit dated June 6, 1997 ("Retention Letter"), attached as Ex. 13 to Kravet Decl. In the Retention Letter, addressed to the Mediator, Eastdil recites: "The Mediator has advised Eastdil that the Resort Entities have defaulted in their payment obligations under the Settlement Agreement ...." Id. at 2. The Mediator also wrote to counsel for the Friedland Group on June 13, 1997 that the Claim was to consist of the amounts originally determined by the Mediator ($4,681,985) "reduced by the amount of principal payments made by the Resort Entities ($1,000,000) for a net principal amount of $3,681,985." In the so-called "Confidential Offering Memorandum" prepared by Eastdil, the debts of LIR and MBM were listed, but there was no mention of any debt to the Friedland Group. See Confidential Offering Memorandum, at I-2, attached as Ex. 15 to Kravet Decl. However, the Offering Memorandum also stated: "In February, 1997 the Resort Entities defaulted on their obligations to the Friedland Group." Id. at I-4.
> In the Order approving the Mediator's proposed sale procedures and authorizing his sale of the collateral, the Bankruptcy Court noted that the fees and expenses of the sale would be incurred "in connection with the Resort Entities' default under the Settlement Agreement." See Order Approving Sale Procedures and Authorizing Sale, attached in materials at Ex. 14 of Kravet Decl.

*4 The Friedland Group was the only bidder at the sale of the shares of LIR. The Friedland Group purchased these shares for $500,100 on September 17, 1997. The Bill of Sale, which was signed by the Mediator and sent to Hickox, among others, recited:

> [P]ursuant to the Settlement Agreement, the Resort Entities agreed to pay the Friedland Group approximately

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                                                                Page 4
Not Reported in F.Supp.2d, 2001 WL 1490696 (S.D.N.Y.)
(Cite as: 2001 WL 1490696 (S.D.N.Y.))

$5,000,000 (including interest) in full satisfaction of its claims ... and ... the Resort Entities are currently indebted to the Friedland Group under the Settlement Agreement in an aggregate amount not less than $4,328,766 ... and ... as a result of the Resort Entities default, the Collateral should be liquidated ...."
Bill of Sale at 1, attached in Materials at Ex. 14 to Kravet Decl. None of the parties challenged these statements.

Soon thereafter, a dispute arose between the parties as to who was liable under the Settlement Agreement for the fees and expenses incurred in the sale of the Collateral. On September 23, 1997, Judge Lifland referred this dispute to the Mediator. The Mediator issued a "Final Award" on November 12, 1997 stating, among other things, that "the Resort Entities shall be liable for the fees and expenses of the Friedland Group relating to the payment default under the Settlement Agreement," and directing "the Resort Entities to pay such fees and expenses of the Friedland Group." *Friedland Group v.. Hickox,* No. 93 B 46399, slip op. at 8 (Nov. 12, 1997) (Monheit, Arb.), attached as Ex. 17 to Kravet Decl. The Mediator further determined that "[t]o the extent that the Resort Entities are unable to satisfy these fees and expenses, the fees and expenses shall be added to the Claim"--that is, to the amount due to the Friedland Group under the Settlement Agreement. *Id.*

The Mediator also found that Hickox had violated the "terms, spirit and intent" of the Settlement Agreement by registering certain liens ("charges") against LIR's leasehold interest after executing the Settlement Agreement. *Id.* at 7. These liens were apparently filed by Hickox to secure debts that were owed him by LIR . [FN3]

> FN3. In his previous memorandum of law to this Court, Hickox claimed to be owed "well over $30,000,000" by LIR. *See* Reply Mem. at 5. The Confidential Offering Memorandum prepared in anticipation of LIR's sale on 1997 listed LIR as owing a debt of $17.3 million dollars to Hickox. *See* Offering Memorandum at I-2. The Settlement Agreement makes reference to such debts at several points. *See, e.g.,* Settlement Agreement ¶¶ 6(c), 9(b).

In a declaration presented to the Bankruptcy Court dated February 10, 1998, Donald J. Kravet, an attorney for LIR, stated that after obtaining the Collateral "the Friedland Group retained (and continues to retain) a deficiency claim against the Resort Entities, jointly and severally, on the amount owed to it under the Settlement Agreement." *Id.,* attached as Ex. 19 to Kravet Decl. On May 7, 1998, the Bankruptcy Court adopted the Mediator's Final Award, declaring it to have the same force and effect as a final arbitration award under New York law. Hickox raised no objection to the entry of that Order.

By this time, Friedland had obtained all of the Friedland Group's rights under the Settlement Agreement. Having pursued the Settlement Agreement's procedures for liquidating the Collateral but having obtained less than the full amount due on the Claim, Friedland moved in the Bankruptcy Court for a deficiency judgment against HBLS, LIR and MBM, jointly and severally, for the remaining amounts due. [FN4] Hickox opposed Friedland's motion, arguing for the first time that LIR and MBM were not liable for this deficiency. In his reply brief, Friedland argued that the Mediator had already decided the issue of LIR's and MBM's liability in Friedland's favor in its prior proceedings.

> FN4. Friedland claimed that this deficiency amounted to $4,254,554.30, once consideration was made for the amounts already paid under the Settlement Agreement, the amounts obtained through sale of the Collateral, the amounts incurred in fees and expenses during this sale, and any accrued interest.

*5 On June 9, 1998, Judge Lifland held a hearing on the matter. The Mediator appeared through counsel, who informed the Bankruptcy Court that "it's the mediator's understanding, based upon the negotiations and documentation, that it was the intent of the parties that each of the resort entities be liable for the obligations." *In re HBLS L.P.,* 93 B 46399, Hearing of June 9, 1998, Tr. at 9 ("Tr."). According to the Mediator's counsel, the Mediator "made various references to this in the correspondence, including the default notices, and conducted the mediation consistent with that approach ...." *Id.* The Mediator's counsel also represented that the Mediator "had reflected upon" the

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2001 WL 1490696 (S.D.N.Y.)
(Cite as: 2001 WL 1490696 (S.D.N.Y.))

Page 5

issue of joint and several liability "and continues to believe that the intent of the parties was to have each of the resort entities be liable for these obligations." *Id.*

Judge Lifland rejected Hickox's argument and entered a deficiency judgment (the "Deficiency Judgment") declaring HBLS, LIR and MBM jointly and severally liable to Friedland for $4,378,820.53. [FN5] Judge Lifland explained that "[i]t was clearly contemplated that there was a unity among the putative judgment Debtors here today." *Id.* at 24.

> FN5. This amount differed from what Friedland sought because the Bankruptcy Court adjusted the award for interest accrued during the period between Friedland's Motion for a Deficiency Judgment and the Bankruptcy Court's decision.

Hickox appealed to this Court. The Court held that he had standing to bring this appeal, even though he was not personally a party to the Bankruptcy Court proceedings, because LIR owed him a substantial debt and, hence, Hickox might be directly and substantially affected by the Bankruptcy Court's ruling. *See Hickox v. Friedland,* No. 98 Civ. 4988, 1999 WL 970454, at *5 (S.D.N.Y. Oct. 25, 1999). After a close examination of the record, however, the Court determined that it was not clear that the Mediator had ever squarely decided LIR's and MBM's liability for the entire Claim. *Id.* at *6. The record was also unclear as to whether the Bankruptcy Court had entered the Deficiency Judgment because "the Bankruptcy Court determined that the dispute had been presented to the Mediator and decided by him," or, alternatively, because the Bankruptcy Court "determined on the merits that the parties had in fact agreed in the Settlement Agreement that LIR and MBM were liable for the payments to the Friedland Group." *Id.* at *7. The Court thus vacated the Deficiency Judgment against LIR and MBM and remanded to the Bankruptcy Court for a clarification of its decision. The Court also instructed that "[i]f it is unclear whether the specific dispute has been decided by the Mediator, the [Bankruptcy] Court should consider whether the dispute should be submitted to the Mediator in view of the very broad dispute resolution powers of the Mediator and the parties' agreement to refer disputes to the Mediator." *Id.* at *7.

The Court's Order containing these rulings is dated October 21, 1999, and was entered on October 25, 1999. Upon issuance of this opinion, Friedland wrote a letter to the Bankruptcy Court dated October 20, 1999 [FN6] seeking arbitration of LIR's and MBM's liability. *See* Letter from Donald J. Kravet for Friedland to the Bankruptcy Court dated October 20, 1999, attached as Ex. 6 to Asche Decl. Hickox opposed arbitration of the issue by letter to the Bankruptcy dated October 22, 1999. *See* Letter from Richard M. Asche for Hickox to the Bankruptcy Court dated October 22, 1999, attached as Ex. 7 to Asche Decl. Friedland responded on October 25, 1999, attached as Ex. 8 to Asche Decl., and the Bankruptcy Court held a hearing on the issue on December 29, 1999. After hearing arguments on both sides, the Bankruptcy Court submitted the issue of LIR's liability to the Mediator.

> FN6. There appears to be some discrepancy in the dates insofar as this Court's opinion is dated October 21, 1999 and Friedland's letter referencing it is dated October 20, 1999. The record is clear, however, that the latter correspondence closely followed this Court's opinion and that both events occurred on or around October 21, 1999.

*6 On October 13, 2000, the Mediator issued a written decision declaring HBLS, LIR and MBM jointly and severally liable for the Claim under the Settlement Agreement. The Bankruptcy Court confirmed the award and, on January 16, 2001, directed that the Deficiency Judgment be reinstated ("Order of Confirmation and Deficiency Judgment"). *See In re HBLS,* No. 93 B 46399, slip op. (Bankr.S.D.N.Y. Jan 16., 2001). Hickox appealed to this Court.

III.

Hickox argues that the Bankruptcy Court's Order of Confirmation and Deficiency Judgment should be reversed because Friedland waived his right to arbitrate the merits of LIR's liability by moving for a deficiency judgment before the Bankruptcy Court before seeking to arbitrate the issue. As Hickox correctly notes, a party can waive its right to arbitrate an issue by "engag[ing] in protracted litigation that prejudices the opposing party." *PPG Indus., Inc. v. Webster Auto Parts Inc.,* 128 F.3d 103, 107 (2d Cir.1997). The

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                      Page 6
Not Reported in F.Supp.2d, 2001 WL 1490696 (S.D.N.Y.)
**(Cite as: 2001 WL 1490696 (S.D.N.Y.))**

Bankruptcy Court rejected Hickox's argument on the ground that Friedland's initial Motion for a Deficiency Judgment was a ministerial act, and not the kind of substantial litigation that can give rise to waiver. This decision is a legal decision, which is subject to *de novo* review, though any factual determinations that support it are reviewed for clear error. *See Doctor's Assocs., Inc. v. Distajo,* 107 F.3d 126, 130 (2d Cir.1997); *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp.,* 67 F.3d 20, 25 (2d Cir.1995).

Federal policy strongly favors arbitration as an alternative means of dispute resolution. *See Doctor's Assocs.,* 107 F.3d at 130; *Leadertex,* 67 F.3d at 24-25 (citing *Rodriguez de Quijas v. Shearson/American Express, Inc.,* 490 U.S. 477, 480-81 (1989)). This general principle has a corollary with respect to waivers of arbitration: "[A]ny doubts concerning whether there has been a waiver are resolved in favor of arbitration." *Leadertex,* 67 F.3d at 25 (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.,* 460 U.S. 1, 24- 25 (1983)). Hence, "waiver of arbitration is not to be lightly inferred." *Id.* (internal quotation marks omitted).

There is no bright-line rule for determining when a party has waived the right to arbitrate, and the question must be "decided in the context of the case, and with a healthy regard for the policy of promoting arbitration." *Leadertex,* 67 F.3d at 25 (citing *Kramer v. Hammond,* 943 F.2d 176, 179 (2d Cir.1991)). Factors to be considered include:

> (1) the time elapsed from the commencement of litigation to the request for arbitration; (2) the amount of litigation (including exchanges of pleadings, any substantive motions, and discovery); and (3) proof of prejudice, including taking advantage of pre-trial discovery not available in arbitration, delay, and expense.

*S & R Co. v. Latona Trucking, Inc.,* 159 F.3d 80, 83 (2d Cir.1998).

Before turning to these factors, there is a threshold problem with Hickox's argument. A party does not waive arbitration of an issue by failing to compel it when the issue either is not in dispute or has already been arbitrated. All of the evidence in the record suggests that Hickox never seriously disputed LIR's liability until after Friedland filed his first Motion for a Deficiency Judgment. Hickox's silence is especially significant because he was involved in protracted

litigation with the Friedland Group prior to this period, but he never disputed a number of official statements made by the Bankruptcy Court, the Mediator, and Eastdil (the company that brokered the sale of the Collateral) suggesting that the "Resort Entities," and not just HBLS, were liable for the Claim. The Amended Plan of Reorganization similarly stated that "the Resort Entities" were liable for the Claim. Hickox's failure to dispute LIR's and MBM's liability in the face of these events suggests that the issue was not in dispute. These acts and omissions also raise the question whether, through these actions, Hickox waived his right to place the issue into dispute when he did.

*7 Moreover, Friedland moved for a deficiency judgment in the apparent belief that the Mediator had already decided LIR's liability. When Hickox opposed the Deficiency Judgment, Friedland argued that the Mediator had decided this issue, and the Bankrupcty Court granted the initial Deficiency Judgment, although it was unclear whether the Bankruptcy Court decided the issue on the merits or concluded that the Mediator had already decided the merits. The fact that the Mediator may not have squarely addressed this issue did not become clear until this Court rendered its decision on appeal on October 21, 1999. Friedland then immediately indicated to the Bankruptcy Court that it sought to compel arbitration--by one letter on or around that date and by a second letter dated October 25, 1999. Thus, as soon as it became clear that LIR's and MBM's liability were in dispute and had not yet been arbitrated, Friedland sought to compel arbitration. Friedland did not engage in any litigation after this time, and Hickox's waiver argument should be rejected on this ground alone.

In any event, the Bankruptcy Court was correct that the litigation arising out of Friedland's initial Motion for a Deficiency Judgment was not the kind of substantial litigation needed to generate a waiver of arbitration. Hickox complains that seventeen months passed between the time when Friedland first moved for a deficiency judgment and when he moved to compel arbitration. Even if this entire time were to count--as opposed to the very short time between this Court's prior opinion and Friedland's first actions seeking arbitration discussed above--this amount of time would not be dispositive. *See, e.g., Media Edge v. W.B.*

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                           Page 7
Not Reported in F.Supp.2d, 2001 WL 1490696 (S.D.N.Y.)
**(Cite as: 2001 WL 1490696 (S.D.N.Y.))**

*Doner, Inc ., 112 F.Supp.2d 383, 385 (S.D.N.Y.2000)* (allowing ten-month delay); *Thomas v. A.R. Baron & Co, 967 F.Supp. 785, 789 (S.D.N.Y.1997)* (allowing year-and-a-half delay). More than sixteen months of the time in question was due not to any substantial litigation before the Bankruptcy Court, where the parties might have engaged in discovery and made dispositive motions, but to the fact that Hickox was appealing a final adverse judgment. Neither party could have compelled arbitration during that time.

Moreover, even a lengthy delay in seeking arbitration will not typically result in waiver unless it prejudices the opposing party. *See Rush*, 779 F.2d at 887; *Eastern Fish Co. v. South Pac. Shipping Co., 105 F.Supp.2d 234, 240 (S.D.N.Y.2000)*. Hickox claims prejudice in that he was forced to incur costs in opposing Friedland's initial Motion for a Deficiency Judgment and then in appealing the Deficiency Judgment. However, "legal expenses inherent to litigation, 'without more,' do not constitute prejudice requiring a finding of waiver." *Doctor's Assocs., 107 F.3d at 134* (quoting *Leadertex, 67 F.3d at 26*). Prejudice refers instead to "the inherent unfairness--in terms of delay, expense, or damage to a party's legal position--that occurs when the party's opponent forces it to litigate an issue and later seeks to arbitrate that same issue." *Id.* This kind of prejudice can exist when a party obtains information trough discovery procedures not available in arbitration, makes motions going to the merits of a claim and then seeks to relitigate them in arbitration upon losing the motions, or waits until the eve of trial to compel arbitration, when it is clearer which forum will be most profitable to the party. *Id.* at 131. Additionally, prejudice can exist if a party's failure to compel arbitration causes another party "unnecessary delay or expense." *Id.* (internal quotation marks omitted).

**\*8** In this case, the parties have not engaged in any discovery at all on the issue of LIR's liability since the original Motion for a Deficiency Judgment. This Motion was not a motion on the merits, supported by extensive facts developed in pre-trial litigation, but was rather closer to a ministerial act based on the then-undisputed facts and history of the case. Friedland also did not seek to compel arbitration only on the eve of trial, or after losing any

dispositive motions, such that it was apparent that arbitration might provide him a better forum. Finally, to the extent that this litigation caused any delay or expense on Hickox's part, Hickox was equally responsible for these consequences because he never contested LIR's liability in the extensive preceding litigation, thus indicating to Friedland that the issue was undisputed. In these circumstances, there was no waiver. *See, e.g., Eastern Fish, 105 F.Supp.2d at 240-41* (finding no waiver when "[t]he complaint and answer [were] essentially the only pleadings that ha[d] been exchanged," "[l]ittle discovery ha[d] been conducted," and "[w]hile notices of deposition ha[d] been served by both sides, no deposition(s) ha[d] been conducted").

### IV.

Hickox argues that he is not bound by the Mediator's decision because he was not a party to the Settlement Agreement and thus is not personally subject to its arbitration clause. Hickox concedes that HBLS, LIR and MBM are bound by the Settlement Agreement to arbitrate any disputes concerning their liability under the Agreement. Hickox nevertheless argues that he was not bound to arbitrate these issues because he has been opposing LIR's liability in a personal capacity, rather than on behalf of LIR and MBM. He bases his argument in large part on the fact that this Court found he had personal standing to appeal the Bankruptcy Court's first Deficiency Judgment as a creditor of LIR, who was directly and substantially aggrieved by the Bankruptcy Court's decision.

Arbitration is contractual by nature. Hence, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Thomson-CSF, S.A. v. American Arbitration Assoc., 64 F.3d 773, 776 (2d Cir.1995)* (quoting *United Steelworkers v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)*). Hickox signed the Settlement Agreement not only on behalf of LIR and MBM but also as "a shareholder in LIR and MBM" who therefore had an interest in these corporations. Settlement Agreement at 24-25. Hickox signed the Agreement as a private person interested in the financial status of LIR and MBM, and he is thus bound by its terms. The terms of the Arbitration Clause in this case are also very broad and are not limited to

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                    Page 8
Not Reported in F.Supp.2d, 2001 WL 1490696 (S.D.N.Y.)
**(Cite as: 2001 WL 1490696 (S.D.N.Y.))**

disputes between the signatories. The Clause states that:
> *any* disputes or determinations *arising under, relating to or in connection with* this Settlement Agreement, its interpretation, performance or enforcement shall be determined solely and exclusively by the Mediator, whose decision shall be final and binding and non-appealable.

**\*9** Settlement Agreement ¶ 17 (emphases added). Hickox thus agreed to arbitrate issues concerning interpretation of the Settlement Agreement even where nonsignatories were involved.

In any event, the Court of Appeals for the Second Circuit has held that "nonsignatories may be bound by arbitration agreements entered into by others." *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349, 352 (2d Cir.1999). This holding is consistent with the contractual nature of arbitration because whether a nonsignatory is bound is dictated by "ordinary principles of contract and agency." *Thomson-CSF*, 64 F.3d at 776. More specifically, the Court of Appeals has recognized five explicit theories for binding nonsignatories based on these principles: (i) incorporation by reference; (ii) assumption; (iii) agency; (iv) veil-piercing/alter ago; and (v) estoppel. *Id.* Third party beneficiaries of a contract will also be bound by an arbitration clause under ordinary principles of contract. *See, e.g., Spear, Leeds & Kellogg v. Central Life Assurance Co.*, 85 F.3d 21, 27-28 (2d Cir.1996); *Borsack v. Chalk & Vermilion Fine Arts, Ltd.*, 974 F.Supp. 293 302 (S.D.N.Y.1997).

The Settlement Agreement resolved a global dispute among HBLS, LIR, MBM and the Friedland Group, and Hickox was a general partner of HBLS and a shareholder in LIR and MBM. For many years prior to the Agreement, Hickox had played a large role in litigating the disputes between the parties, and Hickox was interested in obtaining a settlement in part because of his personal interests in the Resort Entities. The Agreement was meant in part to help all of the parties, including Hickox, resolve their ongoing disputes with one another. Hickox was thus a third party beneficiary of the Settlement Agreement and is bound by its terms.

Moreover, under the doctrine of estoppel, a signatory can also compel a nonsignatory to arbitrate an issue if the nonsignatory has knowingly accepted benefits derived

directly from an agreement containing an applicable arbitration clause. *See Thomson-CSF*, 64 F.3d at 778-79; *Deloitte Noraudit A/S v. Deloitte Haskins & Sells*, 9 F.3d 1060, 1064-65 (2d Cir.1993). Even if Hickox were not technically a third party beneficiary of the Settlement Agreement, he knowingly entered into it on behalf of HBLS and as a shareholder in LIR and MBM, and knowingly obtained the expected benefits that a person interested in the financial status of the Resort Entitites would obtain from a settlement. Hickox is thus estopped from challenging the arbitrability of LIR's and MBM's liability for the Claim.

Finally, the question of LIR's and MBM's liability to Friedland for the Deficiency Judgment was an issue between LIR, MBM and Friedland. Hickox was neither a necessary nor indispensable party to the proceedings before the Bankruptcy Court, and he obtained his standing to intervene in them only either on behalf of LIR or because of his derivative interest in LIR. Hickox has attempted to invalidate the Deficiency Judgment against LIR so that LIR will have additional assets to cover a debt owed to him as a substantial creditor of LIR. Hickox does not dispute that LIR was bound to arbitrate this issue, and Friedland has no claim that is independent of LIR's. In these circumstances, he cannot circumvent the arbitration clause that binds LIR. *Cf. In re Salomon Inc. Shareholders' Derivative Litigation*, No. 91 Civ. 5500, 1994 WL 533595, at *4 (S.D.N.Y. Sept. 30, 1994) (shareholder bound by arbitration clause binding corporation in shareholder derivative action); *Miller v. Schweickart*, 405 F.Supp. 366, 367 (S.D.N.Y.1975) (limited partner bound by partnership arbitration clause in suit on behalf of the partnership).

### V.

**\*10** Hickox argues that even if it was appropriate to arbitrate LIR's and MBM's liability to Friedland for the debt in this action, the Bankruptcy Court's decision should be reversed because the Mediator's award was wrong on the merits. [FN7]

> FN7. There is an initial question as to whether the Mediator's award is even appealable. The question arises because the Settlement Agreement states that the Mediator's decision shall be "final, binding and non-appealable." Settlement Agreement ¶ 17. At

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.2d                                          Page 9
Not Reported in F.Supp.2d, 2001 WL 1490696 (S.D.N.Y.)
(Cite as: 2001 WL 1490696 (S.D.N.Y.))

oral argument, however, the appellee disclaimed any reliance on this provision.

The Federal Arbitration Act (the "FAA") governs review of the Mediator's award because the underlying transactions arise out of activities involving interstate commerce between a New York limited partnership and a number of Anguillan corporations. [FN8] See 9 U .S.C.A. §§ 1, 9-12; PaineWebber Inc. v. Bybyk, 81 F.3d 1193, 1198 (2d Cir.1996); Prima Paint Corp. v. Flood & Conklin Mfg. Co., 360 F.2d 315, 316-17 (2d Cir.1966), aff'd, 388 U.S. 395 (1967). Under the FAA, arbitral awards "are to be reversed only where the arbitrators have exceeded their authority or made a finding in manifest disregard of the law." See Pike v. Freeman, 266 F.3d 78, 86 (2d Cir.2001).

> FN8. Out of an abundance of caution, Judge Lifland reviewed the Mediator's award under both the FAA and the New York C.P.L.R. standards and upheld the award under both.

With regard to LIR's and MBM's liability under the Settlement Agreement, the Bankruptcy Court confirmed the Mediator's decision on the ground that it was not in manifest disregard of the law. The Bankruptcy Court's ruling was itself a legal ruling, which this Court reviews de novo. Cf. Willemijn Houdstermaatschappij, BV v. Standard Microsystems Corp., 103 F.3d 9, 12 (2d Cir.1997). More specifically, the Court must decide de novo whether the Mediator's ruling was in manifest disregard of the law. See Crysen/Monterey Energy Co., 226 F.3d 160, 166-67 (2d Cir.2000).

Review for manifest disregard is, in turn, "severely limited." Dirussa v. Dean Witter Reynolds Inc., 121 F.3d 818, 821 (2d Cir.1997). [FN9] A mere legal error on the part of the arbitrator, or failure to understand or apply the law, does not count. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bobker, 808 F.2d 930, 933 (2d Cir.1986). The Court must find instead both that "(1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether, and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case." Di Russa, 121 F.3d at 821 (internal quotation marks and alterations omitted); see also Folkways Music Pub'rs, Inc. v.

Weiss, 989 F.2d 108, 111-12 (2d Cir.1993).

> FN9. "Arbitration awards are subject to very limited review in order to avoid undermining the twin goals of arbitration, namely, settling disputes efficiently and avoiding long and expensive litigation." Willemijn, 103 F.3d at 12. The party seeking to vacate an arbitration award "bears a heavy burden of proof," Folkways Music Pub'rs, Inc. v. Weiss, 989 F.2d 108, 111 (2d Cir.1993), and the showing required of that party "to avoid summary confirmation of an arbitration award is high," Willemijn, 103 F .3d at 12.

Hickox does not seriously allege manifest disregard of the law under these standards. Because the disputed issue involves interpretation of the Settlement Agreement, Hickox would have to allege that the Mediator knew about and ignored well settled and explicit principles of contractual interpretation that were obviously applicable to this case and clearly settled the issue in his favor in manifest disregard of the law. Hickox does not do this. He simply tries to reargue the question of interpretation on the merits. Such challenges go beyond the limited review permitted under the doctrine of manifest disregard of the law, and Hickox's challenge to the Mediator's interpretation should be denied on this ground alone. See E.I. Dupont De Nemours & Co v. Tankers, B.V., No. 00 Civ. 5644, 2001 WL 435628, at *5 (S.D.N.Y. Apr. 30, 2001).

*11 In any event, the question of LIR's and MBM's liability under the Settlement Agreement is not so clear as a matter of law that a finding of manifest disregard could be appropriate. Hickox correctly argues that the Settlement Agreement provides at one point that "HBLS," rather than the Resort Entities, "shall make all payments due hereunder to the Friedland Group to the Mediator." Settlement Agreement ¶ 16. However, this provision does not create the underlying payment obligations and might reasonably be read as determining only where payments from HBLS were to be made. The provision that sets forth the substantive payment obligations uses the passive voice, rather than referring only to HBLS. See id. at ¶ 2. Moreover, the Agreement explicitly creates a number of other payment and collateral obligations on the part of LIR and MBM, and both

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



of these companies were parties to the Agreement. When coupled with the provision creating the primary payment obligations, the Settlement Agreement might reasonably be interpreted as making LIR and MBM liable for the Claim. Although Hickox correctly argues that the provisions creating the lien on the Collateral state that the lien was to last only "for the same duration as the Collateral is held by the Mediator," *id.* ¶ 6(b), the Mediator correctly noted that that same provision states that the Collateral shall only be "released upon payment of the Claim *in full.*" *Id.* (emphasis added). The Mediator's interpretation of the terms of the Settlement Agreement is not so clearly inconsistent with the Agreement's plain terms that the Mediator could be said to have manifestly disregarded the law by knowingly ignoring the obvious meaning of these terms.

The Settlement Agreement also requires that "[i]n interpreting the Settlement Agreement and resolving any disputes hereunder, the Mediator shall implement the spirit and intent of the parties." *Id.* ¶ 17. The Mediator assisted in formulating the Settlement Agreement, and he was present during its negotiation, where he obtained a first hand understanding of what the parties' purposes were in entering into the Agreement. Based in part on these experiences and on the Agreement's requirement that he use this kind of knowledge to interpret its terms, the Mediator found that:

> it is clear to me as a person present during the creation of the Settlement Agreement that the intent of the Settlement Agreement was to hold LIR and MBM liable along with HBLS for the Friedland Claim. If this were not the case, there would be no reason to have a Settlement Agreement since Friedland already had a judgment against HBLS.

*See Friedland v. Hickox,* No. 93 B 56399, slip op. at 13 (Oct. 13, 2000) (Monheit, Arb.) The Mediator also found that in the period following the execution of the Settlement Agreement and before Hickox opposed Friedland's motion for a deficiency judgment, all of the relevant parties conducted themselves as if the parties' intent in executing the Settlement Agreement was to make LIR and MBM liable for the Claim. *Id.* at 13-15. The Mediator's interpretation of the Settlement Agreement better comports with this spirit and intent.

*12 Hickox tries to undermine the Mediator's factual

findings concerning the parties' intent by presenting affidavits from four people--himself, one of his prior attorneys, a manager of the Resort Entities, and one from HBLS's attorney--indicating recollections that the parties did not intend to make LIR and MBM liable to the Friedland Group during negotiations of the Settlement Agreement. Hickox also indicates that the Offering Memorandum of the Collateral purported to list LIR's outstanding obligations at the time but did not list any debt to the Friedland Group. The Mediator reviewed these materials and found that they were either inaccurate, inconclusive, or not credible in light of his own recollections of the negotiation and the subsequent course of dealings between the parties. In doing so, the Mediator did not make any factual findings that would justify modification. *See* 9 U.S.C. § 11 (setting forth the limited bases on which a reviewing court may modify or correct an arbitral award on the basis of incorrect factual findings). Therefore, there is no basis to overturn the Mediator's award. *See Siegel v. Titan Indus. Corp.,* 779 F.2d 891, 892-93 (2d Cir.1985) (per curiam); *Amicizia Societa Navegazione v. Chilean Nitrate and Iodine Sales Corp.,* 274 F.2d 805, 808 (2d Cir.1960).

The Mediator's award was not in manifest disregard of the law and indeed finds substantial support in the record. For all of these reasons, the Bankruptcy Court's decision to confirm the Mediator's Award should be affirmed. [FN10]

> FN10. As Judge Lifland noted, the result would be the same if the standard from the New York C.P.L.R. were applied.

VI.

The Court has considered all other arguments raised by Hickox and finds them to be either moot or without merit. The Bankruptcy Court's Order to Confirm the Mediator's Award and to Reinstate the Default Judgment is therefore affirmed.

SO ORDERED.

Not Reported in F.Supp.2d, 2001 WL 1490696 (S.D.N.Y.)

**Motions, Pleadings and Filings (Back to top)**

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.2d                                                                                          Page 11
Not Reported in F.Supp.2d, 2001 WL 1490696 (S.D.N.Y.)
**(Cite as: 2001 WL 1490696 (S.D.N.Y.))**

• <u>1:01cv02025</u> (Docket) (Mar. 09, 2001)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

# Tab F



Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 245506 (S.D.N.Y.)
(Cite as: 1992 WL 245506 (S.D.N.Y.))

H

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Ted SCOTT, Plaintiff,
v.
MERRILL LYNCH, PIERCE, FENNER & SMITH, INC.,
Defendant.
No. 89 Civ. 3749 (MJL).

Sept. 14, 1992.

Kenneth A. Zitter by Kenneth A. Zitter, New York City, for plaintiff.

Orrick, Herrington, and Sutcliffe by Stuart H. Bompey, Ruth D. Raisefield, New York City, for defendant.

OPINION AND ORDER

LOWE, District Judge.

*1 Before this Court is the motion of defendant Merrill Lynch, Pierce, Fenner & Smith Inc. (hereinafter "Merrill Lynch") to stay the above-captioned action and compel arbitration of plaintiff Ted Scott's (hereinafter "Scott") claims of race discrimination, pursuant to the Federal Arbitration Act, 9 U.S.C. § 2 et seq. (hereinafter "FAA"). For the reasons set forth below, the motion to stay this action and compel arbitration is granted.

BACKGROUND

This is an action brought pursuant to both Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII"), 42 U.S.C. § 2000-e et seq., and to 42 U.S.C. § 1981. In addition, plaintiff alleges that he was subjected to discrimination in violation of sections 296 and 297 of the New York Executive Law.

The facts as alleged in Scott's amended complaint are as follows. [FN1] Prior to June 1986, Scott was employed as a member of the risk arbitrage unit in the Equity Trading Department at Chemical Bank. Amended Complaint at ¶ 9. In June of 1986, Scott was hired by Merrill Lynch as an administrative manager in the risk arbitrage unit in the Equity Trading Department. Amended Complaint at ¶ 7. On July 16, 1986, Scott signed a "Uniform Application For Securities Industry Registration Or Transfer" (hereinafter

"Form U-4") to become a Registered Securities Representative with the NYSE. This Form U-4 contains a written agreement to arbitrate all employment related disputes under the rules of the New York Stock Exchange (hereinafter "NYSE").

In January of 1987, Merrill Lynch reorganized and restructured the risk arbitrage unit. Scott was informed that his services would no longer by necessary and contends that he was denied the opportunity to enter into a new contract with Merrill Lynch in the newly restructured department because of his race. Amended Complaint at ¶ 11. Scott, who is an African-American, claims that all of the other members of his unit were white, and that they were all offered new employment with Merrill Lynch. [FN2] Amended Complaint at ¶¶ 8, 12.

On June 2, 1987, Scott filed charges with the Equal Employment Opportunity Commission (hereinafter "EEOC") alleging discriminatory employment practices, as he was required to do in order to pursue his Title VII claim. Amended Complaint at ¶ 16.

Nearly two years after the original filing, the EEOC issued Scott a notice of right to sue, and, on May 30, 1989, he commenced the instant action against Merrill Lynch, alleging discriminatory employment practices, including unlawfully discharging him from employment on the basis of his race and color, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000- e et seq., 42 U.S.C. § 1981, and the New York Executive Law sections 296 and 297. Amended Complaint at ¶¶ 5, 16.

Merrill Lynch subsequently filed the instant motion to stay this action and compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 2 et seq.

DISCUSSION

*2 Merrill Lynch has moved to stay this action and compel arbitration pursuant to the FAA, 9 U.S.C. § 2 et. seq. Section 2 of the FAA provides in relevant part:

A written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction ... shall be valid, irrevocable, and enforceable,

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.                                                                                      Page 2
Not Reported in F.Supp., 1992 WL 245506 (S.D.N.Y.)
**(Cite as: 1992 WL 245506 (S.D.N.Y.))**

save upon such grounds as exists at law or in equity for the revocation of any contract.

9 U.S.C. § 2. In addition, section 3 of the FAA requires the district court to "stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. Furthermore, according to the United States Supreme Court,

the Act leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration on issues as to which an arbitration agreement has been signed.

*Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 218 (1985) (emphasis added).

Scott executed an application for registration for the NYSE as a "general securities representative" of Merrill Lynch (Form U-4). Together with that application he signed an agreement which includes a written agreement at paragraph five to arbitrate any disputes that may arise between him and Merrill Lynch, as required by the NYSE. Specifically, the arbitration clause which Scott entered into provides as follows:

I agree to arbitrate any dispute, claim, or controversy that may arise between me and my firm, or a customer, or any other person, that is required to be arbitrated under the rules, constitutions, or by-laws of the organization with which I register ...

Moreover, Rule 347 of the rules of the New York Stock Exchange, an organization with which Scott registered by signing the Form U-4, provides:

Any controversy between a registered representative and any member or member organization arising out of the employment or termination of employment of such registered representative by and with such member or member organization shall be settled by arbitration, at the instance of any such party, in accordance with the arbitration procedure prescribed elsewhere in these rules.

2 *New York Stock Exchange Guide* (CCH) ¶ 2347 (1988).

Although Scott does not dispute that he executed and signed the Form U-4, he claims that he should not be compelled to arbitrate the instant action for the following reasons: (a) Merrill Lynch has waived its right to compel arbitration; (b) the Form U-4, which Scott says was a condition of his

employment, constitutes a "contract of employment" which is not enforceable under section 1 of the FAA; and (c) race discrimination claims are morally distinguishable from other claims of discrimination and consequently should not be arbitrable. For the reasons that follow, we reject each of plaintiff's arguments.

## A. *WAIVER OF THE RIGHT TO COMPEL ARBITRATION*

**\*3** Scott contends that Merrill Lynch waived its right to arbitration by participating in this litigation and delaying the assertion of its right to compel arbitration until this stage in the litigation. That is, he claims that Merrill Lynch has actively participated in this litigation and waived its right to compel arbitration by doing the following: filing a motion to dismiss the complaint, responding to a document demand, producing documents, responding to interrogatories, serving its own document demand and answering the complaint, all without asserting a right to arbitrate.

Any examination of whether the right to compel arbitration has been waived must be conducted in light of the strong federal policy favoring arbitration for dispute resolution. It is well established that under the FAA, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration, whether the problem at hand is the construction of the contract language itself or an allegation of waiver, delay, or a like defense to arbitrability." *Rush v. Oppenheimer & Co.,* 779 F.2d 885, 887 (2d Cir.1985), quoting, *Moses H. Cone Memorial Hospital v. Mercury Constr. Corp.,* 460 U.S. 1, 24-25 (1983). *see also Coenen v. R.W. Pressprich & Co.,* 453 F.2d 1209, 1212 (2d Cir.1972), *cert. denied,* 406 U.S. 949 (1972). Clearly, the policies underlying the FAA favor enforcement of agreements to arbitrate disputes.

In *Rush* the Second Circuit set forth what has become the standard for waiver:

Waiver of the right to compel arbitration due to participation in litigation may be found only when prejudice to the other party is demonstrated ... 'waiver ... is not to be lightly inferred, and mere delay in seeking a stay of the proceedings without some resultant prejudice to a party ... cannot carry the day.'

*Rush,* 779 F.2d at 887 (citations omitted).

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Westlaw.

Not Reported in F.Supp.
Not Reported in F.Supp., 1992 WL 245506 (S.D.N.Y.)
(Cite as: 1992 WL 245506 (S.D.N.Y.))

Page 3

Nevertheless, the Second Circuit recently reaffirmed "that the litigation of substantial issues going to the merits may constitute a waiver of arbitration", _Sweater Bee By Banff, Ltd. v. Manhattan Industries, Inc._, 754 F.2d 457, 461 (2d Cir.1985), _cert. denied_, 474 U.S. 819 (1985).

Applying the test set forth in _Rush_ to the facts of the instant case, neither Merrill Lynch's failure to include the right to arbitrate in its initial answer nor its participation in limited pretrial discovery prejudices plaintiff in a way that would constitute a waiver of the right to compel arbitration. _Russo v. Simmons_, 723 F.Supp. 220, 223 (S.D.N.Y.1989). _see also McDonnell Douglas Finance Corp. v. Pennsylvania Power & Light Co._, 858 F.2d 825, 833 (2d Cir.1988). Likewise, Merrill Lynch's motion to dismiss the complaint does not waive their right to arbitration. _Rush_, 779 F.2d at 888, _quoting Sweater Bee_, 754 F.2d at 463. [FN3] Hence, Scott has not demonstrated that he was prejudiced in a way that would compel this Court to conclude that the right to arbitration has been waived.

*4 Similarly, Merrill Lynch's response to a demand for documents, their production of documents, and their response to interrogatories have not prejudiced Scott. If anything, he has benefited by Merrill Lynch's response to his discovery requests, which could certainly aid him in any future arbitration. Moreover, Scott has not responded to any of Merrill Lynch's requests for discovery, while Merrill Lynch has produced documents and information in response to Scott's discovery requests. _See_ Affidavit of Ruth D. Raisfeld at ¶¶ 5, 6. Therefore, plaintiff can not claim he has suffered any prejudice. _See Interstate Secur. Corp. v. Siegel_, 676 F.Supp. 54, 57 (S.D.N.Y.1988) ("mere expense and delay, participation in discovery, service of a motion to dismiss, and service of an answer containing affirmative defenses, none of which raise the agreement to arbitrate, are insufficient to compel a waiver of arbitration"). [FN4]

This is not the type of pretrial litigation which results in the waiver of arbitration. In the rare cases in which the Second Circuit will find a party to have waived arbitration by participating in litigation, it will do so only where the moving party has subjected the opposing party to "the litigation of substantial issues going to the merits." _Com-Tech Assoc. v. Computer Assoc. Int'l., Inc._, 938 F.2d

1574, 1576 (2d Cir.1991), _quoting, Sweater Bee_. There has been no such "merits" litigation here.

Furthermore, Merrill Lynch's delay in moving for arbitration was partially attributable to its reasonable perception that the plaintiff's claims were nonarbitrable under the law at the time it participated in the pre-trial litigation, prior to the Supreme Court's decision in _Gilmer v. Interstate/Johnson Lane Corp._, 500 U.S. 20, 111 S.Ct. 1647, 114 L.Ed.2d 26 (1991), as will be discussed _infra_. [FN5] Consequently, in light of the recent United States Supreme Court decision in _Gilmer_, there is no question that Scott's agreement to arbitrate includes the race discrimination claims he asserts in the instant action. _see Lester v. Basner_, 676 F.Supp. 481, 485 (S.D.N.Y.1987) (defendant did not waive arbitration because he cannot be expected to have read "the Supreme Court's crystal ball.") Merrill Lynch promptly asserted its right to compel arbitration in its amended answer only three days after the Supreme Court announced its decision in _Gilmer_. [FN6]

Therefore, Merrill Lynch has not waived its right to compel arbitration because Scott has not demonstrated the requisite prejudice.

B. _EXEMPTION FROM ARBITRATION UNDER SECTION 1 OF THE FAA_

Second, Scott contends that the Form U-4, which he says was a condition of his employment, constitutes a "contract of employment" with Merrill Lynch and, therefore, is not enforceable under section 1 of the FAA.

Section 1 of the FAA provides a specific exemption from arbitration. That section states:
  [N]othing herein contained shall apply to contracts of employment of seamen, railroad employees, or any other class of workers engaged in foreign or interstate commerce.
*5 9 U.S.C. § 1. Thus, if an agreement to arbitrate were part of the contract of employment of a worker involved in interstate commerce, section 1 of the FAA exempts from arbitration any claims in connection with said employment.

However, in _Gilmer_, the Supreme Court expressly

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                                           Page 4
Not Reported in F.Supp., 1992 WL 245506 (S.D.N.Y.)
**(Cite as: 1992 WL 245506 (S.D.N.Y.))**

addressed and rejected plaintiff's argument and held that the Form U-4 is not a "contract of employment." In *Gilmer,* the Supreme Court determined that a registered securities representative who was required as a condition of his employment to sign a Form U-4 could be compelled to arbitrate his age discrimination claim. The Court held as follows:

> Several *amici curiae* in support of Gilmer argue that [section 1] excludes from the coverage of the FAA all 'contracts of employment' ... [It] would be inappropriate to address the scope of the § 1 exclusion because the arbitration clause being enforced here is not contained in a contract of employment ... Rather, the arbitration clause at issue is in Gilmer's securities registration application, which is a contract with the securities exchanges, not with Interstate. The lower courts addressing the issue uniformly have concluded that the exclusionary clause in § 1 of the FAA is inapplicable to arbitration clauses contained in such registration applications ... We implicitly assumed as much in *Perry v. Thomas,* 482 U.S. 483 (1987), where we held that the FAA required a former employee of a securities firm to arbitrate his statutory wage claim against his former employer, pursuant to an arbitration clause in his registration application. Unlike the dissent ... we choose to follow the plain language of the FAA and the weight of authority, and we therefore hold that § 1's exclusionary clause does not apply to Gilmer's arbitration agreement.

500 U.S. at ----, 111 S.Ct. at 1652 n. 2, 114 L.Ed.2d 26 (citations omitted).

Contrary to Scott's characterization of footnote 2 as "dictum," the Supreme Court holding has been followed, and found to be controlling, in subsequent decisions in which discrimination claims have been held arbitrable under a Form U-4 agreement. *See Willis v. Dean Witter Reynolds, Inc.,* 948 F.2d 305, 312 (6th Cir.1991), (Sixth Circuit stated that the Supreme Court in *Gilmer* "squarely held that the arbitration clauses contained in a securities registration application such as the one at issue in this case, do not constitute a contract for employment."); *see also Alford v. Dean Witter Reynolds, Inc.,* 939 F.2d 229, 230 n. 1 (5th Cir.1991), (on remand from the Supreme Court in light of *Gilmer,* 111 S.Ct. 2050 (1991), the Fifth Circuit concluded

that the Form U-4 arbitration clause "was contained in the employee's contract with a securities exchange, not with the employer.").

Although not a discrimination case, in *Haviland v. Goldman, Sachs & Co.,* 947 F.2d 601, 607 (2d Cir.1991), citing the *Gilmer* footnote, the Second Circuit stated that registered employees of a brokerage firm "contract to arbitrate directly with the exchange in signing a U-4 registration statement ... and in doing so undertake an open-ended commitment to be bound by the exchange's rules, constitution and by-laws [including NYSE Rule 347 requiring arbitration of employment-related disputes]." These federal court decisions undermine Scott's argument that footnote 2 of the *Gilmer* decision is merely dictum. [FN7]

**\*6** Hence, the arbitration clause at issue is not part of Scott's "contract of employment" with Merrill Lynch, and therefore does not fall within the exemption from arbitration contained in section 1. [FN8]

### C. *RACE DISCRIMINATION CLAIMS*

Finally, Scott argues that his race discrimination claims should not be compelled to arbitration despite the holding of *Gilmer,* because race discrimination is morally distinguishable from other forms of discrimination and is a more serious offense. Scott maintains that Congress could not possibly have intended race discrimination claims to be subject to arbitration agreements such as the Form U-4. However, this argument lacks both judicial and legislative support. [FN9]

The Supreme Court has stressed the public policy favoring arbitration in a series of decisions beginning with *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614 (1985). Moreover, *Gilmer,* and the subsequent decisions of the Fifth Circuit in *Alford* and the Sixth Circuit in *Willis,* which held Title VII sex discrimination claims arbitrable under Form U-4 agreements, have rejected the argument that Congress did not intend discrimination claims to be addressed in a non-judicial forum. In *Alford,* the Fifth Circuit stated:

> Because both the ADEA and Title VII are similar civil

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Not Reported in F.Supp.                                                                    Page 5
Not Reported in F.Supp., 1992 WL 245506 (S.D.N.Y.)
(Cite as: 1992 WL 245506 (S.D.N.Y.))

rights statutes, and both are enforced by the EEOC ..., we have little trouble concluding that Title VII claims can be subjected to compulsory arbitration. Any broad public policy arguments against such a conclusion were necessarily rejected by *Gilmer.* *Alford,* 939 F.2d at 230. Similarly, in *Willis,* the Sixth Circuit stated: "The plaintiff's arguments which suggest that something inherent in Title VII precludes the enforcement of valid arbitration agreements in circumstances where the FAA is otherwise applicable was rejected in *Gilmer.*" *Willis,* 948 F.2d at 312.

Likewise, plaintiff's reluctance to participate in the arbitral process is at odds with the prevailing presumption in favor of arbitration. The Supreme Court has stated: "we decline to indulge the presumption that the parties and arbitral body conducting a proceeding will be unable or unwilling to retain competent, conscientious and impartial arbitrators." *Gilmer,* 111 S.Ct. at 1654, quoting *Mitsubishi Motors Corp.,* 473 U.S. at 634. Similarly, both the NYSE rules and the FAA protect against biased panels. *See* NYSE Rules 607-611.

Furthermore, plaintiff's argument that race discrimination claims are different than age or sex discrimination claims with respect to their arbitrability is contrary to recent legislative enactments. In recent amendments to Title VII, Congress expressly endorsed arbitration as an alternative dispute resolution mechanism for all discrimination claims. Section 118 of the new Civil Rights Act of 1991 states: "Where appropriate and to the extent authorized by law, the use of alternative means of dispute resolution, including ... arbitration, is encouraged to resolve disputes arising under the Acts or provisions of Federal law amended by this title." P.L. No. 102-166, 105 Stat. 1071 (1991). Similarly, the New York Executive Law, under which plaintiff asserts a claim of race discrimination, has also recently been amended to authorize the State Division of Human Rights to adapt arbitration procedures for the resolution of discrimination claims filed under that statute. (New York Exec.Law Sec. 297(4)(a)(ii), as amended Ch. 568, L.1989). Therefore, there is no judicial or legislative basis for Scott's argument that Congress could not have intended arbitration to be a forum for race discrimination claims.

*7 Significantly, in *Roe,* discussed *supra,* the court compelled arbitration, under a Form U-4, of a registered representative's Title VII and Section 1981 *race* discrimination claims arising out of his discharge, finding nothing in Title VII or Section 1981 that would preclude application of the presumption favoring arbitration.

Thus, Scott has failed to meet his burden to show that Congress intended to preclude arbitration of claims of race discrimination. Consequently, this Court must compel arbitration of plaintiff's claims. [FN10]

In sum, defendant's motion to compel arbitration must be granted because of the following: (a) Merrill Lynch has not waived its right to compel arbitration; (b) the arbitration clause at issue is not part of Scott's "contract of employment" with Merrill Lynch, and therefore does not fall within the exemption from arbitration contained in section 1 of the FAA; and (c) Scott has failed to meet his burden to show that Congress intended to preclude arbitration of claims of race discrimination.

CONCLUSION

For the reasons stated above, defendant's motion to stay this action and compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. § 2 et. seq., is granted. Defendant's request for the costs, expenses and attorney's fees incurred in connection with the defense of this action is denied.

It Is So Ordered.

> FN1. For the purposes only of this motion to stay and to compel arbitration, the facts alleged in the amended complaint will be deemed admitted. Merrill Lynch, however, does not necessarily agree with, or concede any, of the facts alleged in the amended complaint.

> FN2. Merrill Lynch objects strenuously to Scott's claim that racial discrimination was involved in its employment practices, and contends that Scott was terminated because his services were no longer required due to the restructuring of the risk arbitrage unit at Merrill Lynch and due to job abandonment. Amended Answer to Amended



Complaint at ¶¶ 20, 21. Defendant also disputes the allegation that a new employment opportunity was available from which Scott was excluded. *Id.* at ¶ 10.

FN3. In *Rush* both the plaintiff and the defendants engaged in considerable pretrial litigation, including motions to dismiss, the filing of amended pleadings, and the participation in discovery. The defendants eventually moved to compel arbitration and the plaintiff opposed claiming that their involvement in the district court proceedings constituted a waiver. The Second Circuit found that the plaintiff was not prejudiced "in terms of either expense or delay" by defendant's pretrial actions that had transpired prior to the defendant's motion to compel arbitration.

FN4. The Court notes that in the cases plaintiff has cited, in support of its proposition that defendant has waived its right to compel arbitration, the person asserting the right to arbitration has either moved for partial summary judgment, summary judgment, or had a full trial on the merits. All these cases had progressed to a much further extent than the instant case.

FN5. Until the Supreme Court's decision in *Gilmer* on May 13, 1991, the right to compel arbitration of discrimination claims was not clearly established. There was very little law on the issue of arbitrability of employment discrimination claims in the Second Circuit. Moreover, where there was law there was no agreement. In two unreported decisions, Judge Haight granted a motion to compel arbitration of race discrimination claims, *Roe v. Kidder Peabody & Co.,* 52 FEP Cases (BNA) 1865 (S.D.N.Y.1990), and Judge Griesa denied a motion to compel arbitration of an ADEA claim. *Walsh v. Goldman, Sachs & Co.,* 54 FEP Cases (BNA) 920 (S.D.N.Y.1990), vacated and remanded, 940 F.2d 649 (2d Cir. June 24, 1991). Similarly, prior to *Gilmer,* there had been a split in other federal courts on the right to compel arbitration of federal discrimination claims.

FN6. The Court is not applying *Gilmer* retroactively. Rather, *Gilmer* represents a clarification of the scope of Scott's U-4 agreement, under existing law.

FN7. Even if Scott were correct that footnote 2 is dictum, which is highly unlikely, "judicial dictum" concerning the construction of a federal statute "must be given considerable weight and can not be ignored in the resolution of [a] close question." *United States v. Bell,* 524 F.2d 202, 206 (2d Cir.1975).

FN8. Nevertheless, plaintiff relies on a lone decision to the contrary by New York Supreme Court Justice Karla Moskowitz in *Sokalski v. Societe Generale Securities Corp.,* N.Y.L.J., Nov. 14, 1991, at 25, col. 2. In *Sokalski,* Justice Moskowitz decided that the Form U-4 was a "contract of employment," stating that the Supreme Court in *Gilmer* "specifically refused to reach the question." However, the only issue the Supreme Court did not address in *Gilmer* is which type of "contracts of employment" are covered by section 1 of the FAA. Since the Supreme Court decided that the Form U-4 is not a "contract of employment," it did not need to address the scope of section 1. Moreover, a lower state court's interpretation of federal law is not binding on a federal district court. *See Angel v. Bullington,* 330 U.S. 183, 188-189 (1947); *Sola Electric Co. v. Jefferson Electric Co.,* 317 U.S. 173 (1942). In addition the *Sokalski* decision is of even less weight in view of a contrary decision by another New York Supreme Court in *Nelsen v. Colleary,* 152 Misc.2d 81, 574 N.Y.S.2d 912 (N.Y.1991), which, citing *Gilmer,* compelled arbitration of sex and religious discrimination claims under a Form U-4.

FN9. The Court notes that the burden is on Plaintiff to demonstrate that Congress intended to preclude a waiver of judicial remedies for employment discrimination claims based on race. *See Shearson/American Express Inc. v. McMahon,* 482



Not Reported in F.Supp.                                                                                      Page 7
Not Reported in F.Supp., 1992 WL 245506 (S.D.N.Y.)
**(Cite as: 1992 WL 245506 (S.D.N.Y.))**

U.S. 220, 227 (1987), *reh. den.,* 483 U.S. 1056.

FN10. This Court recognizes the importance of combatting racial discrimination. However, we note that by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than a judicial, forum. *See Mitsubishi* at 628.

Not Reported in F.Supp., 1992 WL 245506 (S.D.N.Y.)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.